David R. Hurst
Daniel F. X. Geoghan
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:    (212) 332-8840
Facsimile:    (212) 332-8855
*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FLETCHER INTERNATIONAL, LTD.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-12796-REG |
| FLETCHER INTERNATIONAL, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>FLETCHER INCOME ARBITRAGE FUND IN VOLUNTARY LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey, FIA LEVERAGED FUND-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey, and FLETCHER FIXED INCOME ALPHA FUND, LTD-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Tammy Fu and Jenna Wise,<br><br>Defendants. | Adversary Proceeding No. 12-____ |

## <u>COMPLAINT OF DEBTOR</u>

Plaintiff Fletcher International, Ltd., debtor and debtor in possession in the above-captioned bankruptcy case, for its complaint against the above-captioned defendants seeking temporary, preliminary and permanent injunctive relief, along with the Affidavit of Floyd

Saunders in Support of the Complaint and Motion filed contemporaneously herewith and incorporate fully herein by reference, hereby states as follows:

### PRELIMINARY STATEMENT

On June 29, 2012 (the "Petition Date"), the Debtor filed a voluntary petition in this Court (the "Chapter 11 Case") for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to operate and manage its businesses as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code. The relief requested in this action is necessary to minimize disruption to the Debtor's business operations so as to permit an effective transition into chapter 11, preserve and maximize the value of the Debtor's estate and, ultimately, achieve a successful reorganization.

### PARTIES

1.      Plaintiff Fletcher International, Ltd. ("Fletcher International" or the "Debtor") is a Bermudan company incorporated on December 14, 2000, as an exempted company under the Companies Act 1981 with limited liability and a debtor and debtor in possession in the above captioned chapter 11 case.

2.      Defendant Fletcher Income Arbitrage Fund In Voluntary Liquidation ("Arbitrage"), a Cayman Islands corporation, owns 83% of the common shares and is a majority shareholder of the Debtor.

3.      Defendant FIA Leveraged Fund-In Official Liquidation ("FIAL") is a Cayman Islands corporation.

4.      Defendant Fletcher Fixed Income Alpha Fund Ltd.-In Official Liquidation ("Alpha") is a Cayman Islands corporation.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       This proceeding is a core proceeding under 28 U.S.C. § 157(b), arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").

## FACTUAL BACKGROUND

## CORPORATE OVERVIEW

**A.      The Fletcher Asset Management Family of Funds**

1.       Fletcher Asset Management ("**FAM**") was founded in 1991.  During its initial four years, FAM operated as a broker dealer trading various debt and equity securities and making long-term equity investments.  Then, in 1995, FAM began creating and managing a family of private investment funds (the "**Fletcher Funds**").

2.       The Fletcher Funds are arranged in a "master-feeder fund" structure. Historically, third-party investors made investments in feeder funds ("**Feeder Funds**") by purchasing shares in a particular series of stock designed to correspond to underlying investments made by master funds ("**Master Funds**").  After receiving funds from investors, the Feeder Funds then invest their capital in the common equity, preferred equity or debt instruments of one or more of the Master Funds.  The Master Funds in turn invest their capital in specific investments, as described in more detail below.  The structure allows each Feeder Fund to gain access to investment strategies and risk and return levels that, for a variety of reasons, may be best pursued by a particular Master Fund.

3.       FAM believes that investors can obtain above average returns by entering

into transactions in which instruments are traded which are immediately quantifiably worth more

to the buyer than the seller.  Buyers and sellers may place different values on the same asset

because of liquidity, transaction cost, tax, carrying cost, risk, accounting, regulatory,

administrative or strategic considerations.  FAM attempts to achieve the investment objectives of

the Fletcher Funds by utilizing a number of strategies in arbitraging different valuations placed

on income streams of a variety of investments.

**B.**       **The Debtor**

4.       The Debtor is a "Master Fund" in the Fletcher Fund structure.  As a master

fund, the Debtor engages in proprietary trading of various financial instruments.  In keeping with

the FAM investment philosophy, many of the financial instruments owned by the Debtor are

complex, long-term, illiquid investments.

5.       The Debtor is directly owned by Fletcher Income Arbitrage Fund

("**Arbitrage**"), a Cayman Islands company, and Fletcher International Inc. ("**FII**"), a Delaware

corporation, which own approximately 83% and 17% of the Debtor's common shares,

respectively.  Arbitrage's direct parent entities are Fletcher Fixed Income Alpha Fund Ltd.

("**Alpha**") and FIA Leveraged Fund ("**FIAL**"), both of which are incorporated in the Cayman

Islands and are subject to liquidation proceedings in that jurisdiction, and which own

approximately 76% and 22% of Arbitrage's common stock, respectively.[1]  The Debtor currently

has a single subsidiary, The Aesop Fund Ltd. ("**Aesop**").  An organizational chart summarizing

this ownership structure is attached hereto as Exhibit A.

---

[1]       The remaining approximately 2% of Arbitrage's common stock is owned by third-party investors.  These
percentages are based on a number of assumptions, and are subject to change.

6.      The Debtor's board of directors has three members.  In addition to Floyd Saunders, the board includes Teddy Stewart, who also serves as the Debtor's vice president; and Stewart Turner, who also serves as the Debtor's treasurer.

7.      The Debtor has no employees, but employs several consultants.  Among other things, these consultants provide accounting, valuation, trading-related and investor-related services to the Debtor.

8.      In addition, the Debtor receives services pursuant to an investment management agreement with FAM (the "**Management Agreement"**), and an administrative services agreement with SS&C Technologies Inc. ("**SS&C**") (the "**Administrative Services Agreement**").  Pursuant to the Management Agreement, FAM (i) acts as the investment manager for the Debtor with respect to investing the Debtor's assets and supervising and arranging the purchase and sale of investments; and (ii) supervises and arranges for any borrowings or other investment-related transactions on behalf of the Debtor.  Pursuant to the Administrative Services Agreement, SS&C provides hedge fund-related administrative services including accounting, redemptions and reporting, and the calculation of net asset value of securities.

9.      The majority of the Debtor's assets are complex, long-term investments which may under certain circumstances remain illiquid for a substantial period, or litigation actions which have arisen from such positions, which require specialized technical knowledge and experience—or historical knowledge—in order to maximize value.  The continued management of these assets by the Debtor's board of directors and consultants, as well as FAM, is necessary—and indeed critical—to maximize recoveries for stakeholders.  Indeed, if the Debtor were to lose the knowledge and experience of the management team, there would be a significant loss of value, to the detriment of the Debtor's creditors and shareholders alike.

C.      **Prepetition Indebtedness**

10.     In July 2006, the Debtor and Credit Suisse Securities (USA) LLC ("**CSSU**") and its affiliated entity Credit Suisse Securities (Europe) Limited ("**CSSE**" and, together with CSSU and their affiliates, "**Credit Suisse**") entered into a relationship whereby Credit Suisse agreed to serve as the prime broker and to serve as a counterparty with respect to certain investment activities to be undertaken by the Debtor.  Specifically, the Debtor and Credit Suisse entered into the following agreements:

- that certain Customer Agreement and Prime Broker Annex to Customer Agreement between the Debtor and CSSU, dated as of July 7, 2006 (together with all other annexes, amendments and supplements thereto, the "**Customer Agreement**"), which outlined the terms and conditions on which CSSU would serve as prime broker to the Debtor;

- that certain Arranging Loan Agreement between the Debtor and CSSE, dated as of July 7, 2006 (the "**ALA**");

- that certain Overseas Securities Lenders Agreement by and between the Debtor and CSSE, dated as of July 7, 2006 (the "**OSLA**");

- those certain ISDA Master Agreement, Schedule and Credit Support Annex by and between the Debtor and CSSE, each dated as of July 7, 2006; and the Portfolio Swaps (Standard Terms Annex thereto (the "**PSA**"), dated as of December 26, 2006 (collectively, the "**ISDA**"),[2] which outlined the terms and conditions upon which CSSE and the Debtor would engage in "swap" transactions.

11.     The CS Agreements provided that CSSU would serve as the Debtor's prime broker, which would allow the Debtor to benefit from using one bank to implement its trading strategy, including trading on margin.  The CS Agreements also purported to grant the Credit Suisse entities security interests and rights of setoff with respect to obligations the Debtor owed to the Credit Suisse entities against assets of the Debtor held in accounts with CSSU.

---

[2]     The Customer Agreement, ALA, OSLA and ISDA are collectively referred to as the "**CS Agreements**."

12.     In early June 2012, the Debtor held 22,000 shares of Series D-1 Cumulative Convertible Preferred Stock of ION Geophysical Corporation, 5,000 shares of Series D-2 Cumulative Convertible Preferred Stock of ION Geophysical Corporation, and 1,000 Series A-1 Cumulative Convertible Preferred Shares of Helix Energy Solutions Group, Inc. in its accounts with CSSU.  The Debtor was also a party to a certain swap transaction with CSSE.  As discussed further below, Credit Suisse terminated its relationship with the Debtor and the CS Agreements and liquidated the Debtor's positions under the ISDA in June 2012.

13.     On June 15, 2012, Credit Suisse sold the Debtor's position in ION Geophysical Corporation and terminated the Debtor's related swap positions; Credit Suisse did not liquidate any of the shares in Helix Energy Solutions Group.  Credit Suisse applied a large portion of those proceeds to satisfy the Debtor's existing margin debt under the CS Agreements. From June 20, 2012 to June 27, 2012, Credit Suisse liquidated the Debtor's remaining swap positions to satisfy the Debtor's obligations under the ISDA, and as set forth in its letter dated June 27, 2012, Credit Suisse advised the Debtor that all swap contracts with Credit Suisse had been closed out.  The Debtor does not believe that any significant indebtedness to Credit Suisse exists as of the Petition Date, and believes that CSSU is holding approximately $1.66 million of funds belonging to the Debtor.

## EVENTS LEADING TO CHAPTER 11

**A.      The Louisiana Pension Funds**

14.     In early 2008, the Firefighters' Retirement System (the "**FRS**"), the New Orleans Fire Fighters' Pension & Relief Fund (the "**NOFF**") and the Municipal Employees' Retirement System of Louisiana (the "**MERS**" and, together with FRS and NOFF, the "**Louisiana Pension Funds**") approached FAM about investing in the Fletcher Funds.  On

April 1, 2008, the Louisiana Pension Funds purchased $100 million of "Series N" shares issued by FIAL.

15.    In March 2011, two of the Louisiana Pension Funds, MERS and FRS, made partial redemption requests to FIAL.  In its initial confirmation of the redemption request in an April 14, 2011 letter, FIAL confirmed for MERS and FRS that in accordance with its governing documents, FIAL would satisfy the redemptions "in cash or in kind" and had the right to satisfy a minimum of 90% of the redeemed amounts within fifteen days of the redemption date, with the remaining 10% being payable no later than thirty days after the completion of FIAL's audit for that year.  FIAL thus distributed to each of the redeeming Louisiana Pension Funds, on June 15, 2011, a transfer of a promissory note issued in favor of FIAL by Arbitrage.  Tender of the promissory notes ultimately was rejected by the Louisiana Pension funds.

16.    Following the issuance of the promissory notes, MERS and FRS demanded to be redeemed for the remainder of their respective investments.  Shortly thereafter the third Louisiana Pension Fund demanded to be fully redeemed.  Knowing that the other Louisiana Pension Funds had rejected the promissory notes, in late July 2011 FIAL began discussions with all three funds regarding a commercially reasonable resolution to their request to be redeemed outside their rights under the governing documents.

17.    In an effort to give comfort to the pension funds, in late July 2011, FIAL allowed them to examine its books and records to verify FIAL's asset base and its representations regarding the value of the investments.  The pension funds hired Ernst & Young to represent their interests in examining FIAL's books and records.  Ernst & Young sent a team

of accountants to FAM's office where they spent more than two weeks reviewing the information.

18.     On July 11, 2011, the pension funds issued a joint statement claiming that "[t]he FIA fund manager (Fletcher) first responded by indicating that the retirement systems' request had been received and would be accommodated at the end of the 60 day notice period as provided for in the contractual agreements.  Just prior to the expiration of the time period allowed under the terms of the agreements, Fletcher informed FRS and MERS that they would receive the requested distribution, but the cash distribution would first require an orderly liquidation of assets held by FIA. … The distribution of a promissory note in lieu of immediate cash has raised concerns with each of the systems' respective boards.  To be practical, it gives rise to questions regarding the liquidity of the FIA fund and the accuracy of the financial statements issued by the two renowned independent auditors.  For that reason, the systems have already provided notice to Fletcher that a team of system experts, including board members, systems' accountants, and investment consultant is being assembled to appear and closely examine Fletcher's books and financial statements."

19.     On July 28, 2011 the pension funds issued a joint statement noting that FIAL was being "completely open and forthcoming" and that the books and records that had been subject to examination on their behalf showed that FIAL "has assets exceeding the value of the [Louisiana Pension Funds] investments and earnings showing more than $40 million in profit on the [pension funds] original investment."

20.     On September 9, 2011 the pension funds issued a joint memorandum to their beneficiaries noting that "[t]o this point the management and staff of FAM have been open and forthcoming with the documents requested by the team.  FAM representatives freely

discussed any subject raised by the team.  The firm that provides a valuation of investments managed by FAM  is comprised of a well respected, independent team of academics. Independent valuations have been used to value the assets in preparing prior audits of the funds in accordance with generally accepted accounting principles."

21.     On September 9, 2011 the pension funds issued a joint statement noting that the review had been conducted by "a principal in the investigation and dispute services unit of Ernst & Young accounting firm."  That statement declared that "[t]he assets and their valuations have now been corroborated."

22.     The parties sought to work out a resolution over the next several months.  Unable to resolve their dispute, in late January 2012, the pension funds suddenly demanded their full redemption in kind.  Within two weeks, on or about February 13, 2012, the Debtor transferred assets valued at $136,135,806 to its newly-formed and wholly-owned subsidiary FILB Co-Investments LLC ("**FILBCI**"), a Delaware limited liability company.  The Debtor distributed those shares to its shareholder as a redemption in kind as did that shareholder and its shareholder until the shares were distributed to and registered in the name of the three Louisiana Pension Funds.  The transferred asset held by FILBCI was an option to purchase shares that will expire on July 3, 2012.

**B.     The FIAL Winding-Up Proceeding**

23.     On January 31, 2012, the Louisiana Pension Funds filed a winding up petition against FIAL in the Grand Court of the Cayman Islands (the "**FIAL Petition**"), thereby seeking to wind up FIAL.  Although FIAL vigorously opposed the FIAL Petition, by order dated April 18, 2012, the Cayman Court wound up FIAL and appointed Robin McMahon and Roy Bailey, both of Ernst & Young, as its official liquidators (the "**Liquidators**").

24.     The directors of FIAL have appealed the decision to windup FIAL (the "**FIAL Appeal**") on numerous grounds, including that the debt claimed by the Louisiana Pension Funds was genuinely disputed on substantial grounds and that "loss of substratum" is a ground which is only open to contributories of a company and not a creditor.

25.     The Debtor has been advised that the FIAL Appeal will be heard on either July 31, 2012 or August 1, 2012.  Any actions taken by the Liquidators pending the resolution of the FIAL Appeal are subject to a determination that the liquidation of FIAL was ordered in error and that the Liquidators lack any authority to act on FIAL's behalf—yet the Liquidator's actions to date have done irreparable harm and unfortunately cannot be undone.

**C.      The Alpha Winding-Up Proceeding**

26.     On or about May 9, 2012, the successor to the Massachusetts Bay Transportation Authority Retirement Fund (the "**MBTARF**"), Gregoreuo Ltd., in its capacity as the sole shareholder of Alpha, caused Alpha to enter into voluntary liquidation, and professionals from Zolfo Cooper were appointed as joint voluntary liquidators (the "**Alpha Liquidators**").

D.   **The Intercompany Note**

27.     The Debtor issued a note, dated January 1, 2011, in favor of FIAL in the

amount of €20,448,765.14 (the "**Intercompany Note**").[3]  The Intercompany Note related to a

class of securities issued by FIAL called "Class 6 Shares."   The capital, cash and securities

contributed by Class 6 shareholders to FIAL in exchange for the Class 6 Shares were allocated to

the Debtor, and the amount of this investment was memorialized by the Intercompany Note.

28.     The Intercompany Note and the issuance of the Class 6 Shares were part

of the same transaction.  At issuance, the face amount of the Intercompany Note and the Class 6

Shares were identical.  Historically, as Class 6 shareholders redeemed their Class 6 Shares, the

amount of the Intercompany Note was adjusted downward, and a payment obligation running

from the Debtor to FIAL was created.  As Class 6 Shares have been redeemed in the past, the

Debtor has fulfilled its payment obligations in cash or in kind.

E.   **The New York Action**

29.     On or about May 1, 2012, the Liquidators sent a letter to the Debtor

demanding payment on the Intercompany Note.  The Debtor replied to this correspondence by

letter on May 9, 2012, thereby disputing that payment was due, and clarifying that the amount

outstanding on the Intercompany Note at the time of demand was only $5.1 million.  On May 14,

2012, the Liquidators sent additional correspondence to the Debtor requesting immediate

payment on the Intercompany Note.

30.     To clarify the Debtor's obligations under the note and thereby avoid

precipitous harmful action by the Liquidators, the Debtor filed a complaint (the "**New York**

**Complaint**") in the Supreme Court of the State of New York on May 24, 2012 (the "**New York**

---

[3]     Although the Intercompany Note is dated January 1, 2011, it was in fact executed by the parties on or about
May 19, 2011.

**Matter")**.[4]  In the Intercompany Note the parties expressly agreed that New York law would govern and consented to the non-exclusive jurisdiction of the New York courts.  The New York Complaint seeks a declaratory judgment[5]: (i) declaring that the amount of the Intercompany Note is not fixed at its face amount, but rather may vary depending on Class 6 shareholder subscriptions and redemptions; (ii) declaring the amount of the Debtor's payment obligation under the Intercompany Note as of January 31, 2012; and (iii) declaring that the Debtor's payment obligation under the Intercompany Note may be paid in cash or in kind.  The Debtor provided a copy of the New York Complaint to the Liquidators.

31.     The New York Supreme Court has scheduled a status conference in the New York Matter for July 12, 2012.  The Liquidators have not yet filed an answer or other responsive pleading in the litigation.

**F.      The Bermuda Winding Up Petition**

32.     On May 30, 2012, the Liquidators filed a winding up petition in Bermuda against the Debtor (the "**Bermuda Petition**"), thereby seeking to make an end run around the New York court and to litigate the issues raised in the New York Matter in Bermuda.  Although the primary basis for the Bermuda Petition was the nonpayment of the Intercompany Note, the Liquidators failed to inform the Bermudian Court that there was an earlier-filed on-going litigation on the very same subject in New York.

---

[4]     Approximately one week earlier, on May 18, 2012, the Debtor filed a substantially similar complaint against the Liquidators and FIAL seeking a declaratory judgment in the United States District Court for the Southern District of New York, and a copy of this complaint was transmitted to the Liquidator's attorneys in Bermuda.  This complaint was withdrawn after the New York Complaint was filed.

[5]     The Intercompany Note provides that it is governed by and construed in accordance with New York law and that FIAL submits to the non-exclusive jurisdiction of the New York courts.

33.     At the initial hearing on the Bermuda Petition held on June 22, 2012, the

Bermudian court established a briefing schedule, and adjourned the hearing until August 31,

2012.

**G.     The Liquidation of Assets by Credit Suisse**

34.     In July 2011, Credit Suisse advised the Debtor that it was unilaterally

terminating the CS Agreements, effective as of August 8, 2011.  The Debtor and Credit Suisse

engaged in discussions over a series of months to continue to extend the termination dates of the

CS Agreements and transfer the positions to another securities firm.  In the course of those

discussions, the Debtor repeatedly advised Credit Suisse that the assets held in the Credit Suisse

accounts—the convertible preferred shares in ION Geophysical Corporation and Helix Energy

Solutions Group, Inc.—had a substantial time-value premium and that such premium would be

lost if the shares were converted or sold prematurely to opportunistic or uninformed

counterparties.

35.     The Debtor was able to negotiate a series of extensions of the termination

dates under the CS Agreements with Credit Suisse.  Most recently, on January 31, 2012, Credit

Suisse agreed to an open-ended extension of the termination dates, subject to certain terms and

conditions.  The purpose of these extensions was to ensure that there would be no premature

conversion of the convertible preferred shares, which would have resulted in the forfeiture of

substantial value to the Debtor and its stakeholders.

36.     Nonetheless, on May 23, 2012, Credit Suisse provided notice to the

Debtor that it was revoking its consent to extend the termination date of the CS Agreements

effective as of June 7, 2012.   Credit Suisse cited the Debtor's failure to deliver audited financial

statements for 2010 and 2011 and the grant of the Cayman Petition against FIAL, an indirect

shareholder of the Debtor, as reasons supporting its revocation. By letter dated May 31, 2012, the Debtor requested that Credit Suisse reconsider its proposed revocation and reiterated that the Debtor and its stakeholders would be irreparably harmed if the conversion rights under the preferred shares were sold prematurely. By letter dated June 4, 2012, Credit Suisse advised the Debtor that its revocation remained in full force, and by letter dated June 7, 2012, Credit Suisse provided the Debtor with confirmation of the termination of the CS Agreement.

37.     Thereafter, on June 15, 2012, Credit Suisse proceeded to sell the 27,000 shares of Series D-1 and D-2 Convertible Preferred Stock of ION Geophysical Corporation. The price received for the Convertible Preferred Stock of ION Geophysical Corporation was that of the underlying common stock into which the preferred stock was convertible, well below the value of such preferred stock and resulted in a significant loss of value to the Debtor and its stakeholders. As discussed above, Credit Suisse used the proceeds from the sale of those shares to satisfy the Debtor's margin obligations and to close out and satisfy the Debtor's obligations under its swap contracts with CSSE.

38.     The Debtor believes that Credit Suisse currently is holding not less than $1.66 million of the Debtor's cash, in addition to various of the Debtor's securities, and has requested the immediate turnover of such property. To date, Credit Suisse has refused to return the Debtor's property, citing unspecified indebtedness that may be owed to Credit Suisse and the unsubstantiated allegation that third parties may have rights in the Debtor's assets. In the very early stages of this case the Debtor intends to commence an adversary proceeding against Credit Suisse seeking, among other things, a determination that the cash and other assets in the Debtor's accounts with Credit Suisse are property of the Debtor's bankruptcy estate and directing Credit Suisse to turn over all property of the Debtor's estate in its possession.

**H.** **The Arbitrage Shareholder Meeting**

39.    On or about June 13, 2012, Alpha and FIAL (the two shareholders of Arbitrage) called a meeting of the shareholders of Arbitrage to consider: (i) placing Arbitrage into voluntary liquidation and appointing the Liquidators (or some other qualified insolvency practitioners) as joint voluntary liquidators for the entity; or (ii) in the alternative, replacing the board of Arbitrage with the Liquidators (or other persons resident in the Cayman Islands).  The meeting ultimately was held on June 29, 2012, and the shareholders of Arbitrage elected to put Arbitrage into voluntary liquidation.  The liquidation will be conducted by the very same Liquidators that already are conducting the liquidation of FIAL.

40.    With their appointment as joint voluntary liquidators for Arbitrage, the Debtor's majority shareholder, the Liquidators now likely will seek to call a meeting of the Debtor's shareholders in an effort to cause themselves to be installed as joint voluntary liquidators of the Debtor.

**I.** **The Debtor's Decision to File for Chapter 11 Bankruptcy Protection**

41.    Despite the fact that the FIAL Appeal is pending, and that the Liquidators ultimately may be found to have no authority to act on FIAL's behalf, the Liquidators continue to use their current appointment—which may well have been ordered in error—to attempt to systematically dismember the Fletcher Funds.

42.    The next Fletcher Fund in the Liquidator's sights clearly is the Debtor, and the Liquidators already have begun their attempt to liquidate the Debtor through the inappropriate filing and prosecution of the Bermuda Petition.  With their appointment as the joint voluntary liquidators of Arbitrage (which was only possible because of their role as joint provisional liquidators of FIAL), the Liquidators now have another weapon in their arsenal: the

01:12255275.1

16

power to call a shareholders meeting at the Debtor and thereby push the Debtor into voluntary liquidation.

43.    As noted above, many of the financial instruments owned by the Debtor are long-term investments which may under certain circumstances remain illiquid for a substantial period, or litigation actions which arise from such positions, which require specialized technical knowledge and experience—or historical knowledge—in order to maximize value.  Thus, it will take time, along with very specific knowledge and experience, to ensure that the Debtor's assets are liquidated in a manner that provides the maximum benefit to the Debtor's creditors and shareholders.

44.    The Liquidators have neither the time, nor the specific knowledge of the Debtor's assets, nor the specialized technical knowledge and experience necessary to liquidate the Debtor's assets in a manner that will maximize value.  Indeed, the Debtor's current management team, along with its financial advisor FAM, are uniquely suited as a result of their specialized technical knowledge and experience, to carry out this process.

45.    The Debtor, faced squarely with the reality that the Liquidators might soon be able to wind down the Debtor's operations, determined that chapter 11 was the only option to prevent the destruction in value of its assets, to the detriment of all stakeholders.  Moreover, with no access to its cash—which was precipitated at least in part by the Liquidator's actions—the Debtor had run out of resources to defend itself on the multiple fronts on which it was being attacked.  Accordingly, the Debtor's board of directors determined that chapter 11 was its last option to protect the corporate enterprise and maximize recoveries for its creditors and shareholders alike.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment – 11 U.S.C. § 362(a)(3))

46.     The Debtor incorporates by reference each and every allegation in the preceding paragraphs of this Complaint.

47.     Section 362(a)(3) of the Bankruptcy Code stays any acts "to exercise control over property of the estate."

48.     Upon information and belief, the Defendants have and continue to utilize corporate governance actions to in furtherance of a scheme to institute liquidation of the Debtor in Bermuda to the detriment of the Debtor's estate, and its creditors, and to disrupt and interfere with the Debtor's Chapter 11 case, its business operations and its efforts to reorganize.

49.     Through these actions, Defendants are seeking improperly to exercise control over property of the Debtor's estate, including control over all of the Debtor's assets for purposes of complete liquidation, in violation of  the automatic stay provision of section 362(a)(3).

50.     A justiciable controversy exists between the Debtor on the one hand and Defendants on the other hand, which may be heard and determined by this Court pursuant to 28 U.S.C. § 2201.

51.     As a result of the foregoing, pursuant to section 362(a)(3) of the Bankruptcy Code, the Debtor is entitled to entry of a judgment declaring that the automatic stay imposed by Section 362(a)(3) of the Bankruptcy Code operates to stay and prohibit the Defendants, their respective officers, attorneys, agents, servants, and employees, including directors, representatives and other professionals, and all other persons who are in active concert

or participation with, or acting in the interest or at the direction of them, from undertaking the aforementioned actions.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment – Interference with Debtor's Fiduciary Duties)

52.     The Debtor incorporates by reference each and every allegation in the preceding paragraphs of this Complaint.

53.     Pursuant to 11 U.S.C. § 1107, the Debtor has a fiduciary duty to preserve the value of its estate for all creditors.

54.     Upon information and belief, the Defendants are improperly seeking to change the composition of the Debtor's Board of Directors, officers or management in order to force a shareholder vote for the Debtor to proceed with winding up, dissolution and the liquidation of the Debtor's assets to the detriment of the Debtor's estate and its creditors, and to disrupt and interfere with the Debtor's Chapter 11 case, its business operations and its efforts to reorganize.

55.     As a direct and proximate result of Defendants' improper actions, the Debtor will be irreparably harmed and forced to breach its fiduciary duties owed to its estate and creditors by taking actions that will result in the complete liquidation of its assets, and that would impair and not maximize value of the Debtor's estate for the benefit of its creditors and other parties in interest.

56.     A justiciable controversy exists between the Debtor on the one hand and Defendants on the other hand, which may be heard and determined by this Court pursuant to 28 U.S.C. § 2201.

01:12255275.1

19

57.     As a result of the foregoing, the Debtor is entitled to entry of a judgment declaring that the Defendants' conduct as alleged would interfere with and impair Debtor's fiduciary duties owed to its estate, its creditors and parties in interest and its ability to effectuate those duties.

### THIRD CLAIM FOR RELIEF

### (Injunctive Relief – 11 U.S.C. § § 105(a))

58.     The Debtor incorporates by reference each and every allegation in the preceding paragraphs of this Complaint.

59.     Section 105 of the Bankruptcy Code empowers the Bankruptcy Court, in the exercise of its equitable powers, to fashion relief that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

60.     In furtherance of the broad grant of power under section 105 of the Bankruptcy Code, a bankruptcy court may grant injunctive relief to prevent harm to the Debtor, its estate, and its creditors, and to preserve the integrity of the reorganization process.

61.     Pursuant to section 105(a) of the Bankruptcy Code, the Debtor seeks to temporarily, preliminarily and permanently enjoin Defendants from: (i) removing, displacing or changing the Debtor's Board of Directors, officers or management throughout the Debtor's Chapter 11 Case; (ii) commencing or proceeding with the winding up and dissolution of Debtor or the liquidation of Debtor's assets; (iii) transferring, liquidating, selling and disposing of any of the Debtor's assets below fair market value or in a manner that will impair, is against the interests of, or does not maximize value for the Debtor's estate,  including its creditors and  its minority shareholders; and (iv) thwarting, disrupting or in any manner  interfering with the Debtor's obligations and duties owed to its estate, its creditors and parties in interest and its ability to effectuate those duties , the Debtor's Chapter 11 Case, its efforts to reorganize, or

otherwise interfering with, impairing, or attempting to defeat in whole or in part the jurisdiction of the Bankruptcy Court.

62.     Absent injunctive relief enjoining Defendants' conduct, the Debtor will suffer immediate and irreparable harm to its estate, and its creditors' and shareholders' value, and the purposes and policies of the Bankruptcy Code will be frustrated because, among other reasons, the Defendants' conduct will necessarily: (i) cause the Debtor to cease to exist as a going concern by the winding up and dissolution of the Debtor; (ii) result in the complete liquidation of Debtor's assets; (iii) impair and not maximize value of the Debtor's estate for the benefit of its creditors and other parties in interest; and (iv) disrupt and interfere with the Debtor's obligations and duties owed to its estate, its creditors and parties in interest and its ability to effectuate those duties, the Debtor's Chapter 11 Case, its business operations and its efforts to reorganize.

63.     The Debtor has no adequate remedy at law.

64.     Based on the foregoing, pursuant to section 105(a) of the Bankruptcy Code, the Debtor respectfully requests an order temporarily, preliminarily and permanently enjoining Defendants from the above stated conduct.

**FOURTH CLAIM FOR RELIEF**

**(Injunctive Relief – Rule 7065 of the Federal Rules of Bankruptcy Procedure)**

65.     The Debtor incorporates by reference each and every allegation in the preceding paragraphs of this Complaint.

66.     Pursuant to Federal Rule of Bankruptcy Procedure 7065, the Bankruptcy Court may issue injunctive relief on application of a debtor, trustee, or debtor in possession.

67.     The Debtor seeks to temporarily, preliminarily and permanently enjoin Defendants from: (i) taking any action in furtherance of securing appointment of a liquidator,

01:12255275.1

including a Joint Provisional Liquidator by *ex parte* motion; (ii) removing, displacing or

changing the Debtor's Board of Directors, officers or management; (iii) commencing or

proceeding with the winding up and dissolution of Debtor or the liquidation of Debtor's assets;

(iv) transferring, liquidating, selling and disposing of any of the Debtor's assets below fair

market value or in a manner that will impair, is against the interests of, or does not maximize

value for the Debtor's estate, including its creditors and parties in interest; and (v) thwarting,

disrupting or in any manner interfering with the Debtor's obligations and duties owed to its

estate, its creditors and parties in interest and its ability to effectuate those duties, the Debtor's

Chapter 11 Case, its efforts to reorganize, or otherwise interfering with, impairing, or attempting

to defeat in whole or in part the jurisdiction of the Bankruptcy Court.

   68.  Absent injunctive relief enjoining Defendants' conduct, the Debtor will

suffer immediate and irreparable harm to its estate, and its creditors' and shareholders' value,

and the purposes and policies of the Bankruptcy Code will be frustrated because, among other

reasons, the Defendants' conduct will necessarily: (i) cause the Debtor to cease to exist as a

going concern by the winding up and dissolution of the Debtor; (ii) result in the complete

liquidation of Debtor's assets; (iii) impair and not maximize value of the Debtor's estate for the

benefit of its creditors and other parties in interest; and (iv) disrupt and interfere with the

Debtor's obligations and duties owed to its estate, its creditors and parties in interest and its

ability to effectuate those duties, the Debtor's Chapter 11 Case, its business operations and its

efforts to reorganize.

   69.  The Debtor has no adequate remedy at law.

70.     Based on the foregoing, pursuant to Fed. R. Bankr. P. 7065, the Debtor respectfully requests an order temporarily, preliminarily and permanently enjoining Defendants from the above stated conduct.

### REQUEST FOR WAIVER OF SECURITY

71.     Pursuant to Fed. R. Bankr. P. 7065, The Debtor requests that the Court waive the security requirements of Federal Rule of Civil Procedure 65(c) with respect to the injunctive relief sought hereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Debtor prays for judgment and an order:

A.     Temporarily, preliminarily and permanently enjoining the Defendants, their respective officers, attorneys, agents, servants, and employees, including directors, representatives and other professionals, and all other persons who are in active concert or participation with, or acting in the interest or at the direction of them, and each of them from: (i) taking any action in furtherance of securing appointment of a liquidator, including a Joint Provisional Liquidator by *ex parte* motion; and (ii) thwarting, disrupting or in any manner interfering with the Debtor's fiduciary duties owed to its estate, its creditors and parties in interest and its ability to effectuate those duties, Debtor's Chapter 11 Case, its efforts to reorganize, or otherwise interfering with, impairing, or attempting to defeat in whole or in part the jurisdiction of the Bankruptcy Court; and

B.     Declaring that the automatic stay imposed by Section 362(a) of the Bankruptcy Code operates to stay and prohibit the Defendants, their respective officers, attorneys, agents, servants, and employees, including directors, representatives and other professionals, and all other persons who are in active concert or participation with, or acting in the interest or at the direction of them, from undertaking the aforementioned actions; and

C.    Granting the Debtor such other and further relief the Court deems just and proper.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Daniel F.X. Geoghan*

David R. Hurst (DH-9173)
Daniel F.X. Geoghan (DG-3132)
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Email: dhurst@ycst.com
Email: dgeoghan@ycst.com

Melanie K. Sharp
Monté T. Squire
Robert M. Vrana
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Dated: New York, New York
July 2, 2012

*Proposed Counsel to the Debtor and Debtor in Possession*