David R. Hurst
Daniel F. X. Geoghan
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:    (212) 332-8840
Facsimile :    (212) 332-8855

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FLETCHER INTERNATIONAL, LTD., | Case No. 12-12796  (REG) |
| Debtor. | |
| FLETCHER INTERNATIONAL, LTD., | |
| Plaintiff, | |
| v. | |
| FLETCHER INCOME ARBITRAGE FUND-IN VOLUNTARY LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey; FIA LEVERAGED FUND-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey; and FLETCHER FIXED INCOME ALPHA FUND, LTD-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Tammy Fu and Jenna Wise, | Adv. Proc. No. 12-01740 (REG) |
| Defendants. | |

**DEBTOR'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION, AS SUBSEQUENTLY MODIFIED TO**
**WITHDRAW THE REQUEST FOR A *MANVILLE* INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.    THE AUTOMATIC STAY PLAINLY PROHIBITS THE DEFENDANTS
      FROM TAKING ANY FURTHER ACTION WITH RESPECT TO THE
      INVOLUNTARY PETITION AGAINST THE DEBTOR ................................................. 6

   A.    § 362(a)(1) and (6): The Bermuda Proceeding is a Judicial Action
         Against the Debtor to Recover a Prepetition Claim .................................... 9

   B.    § 362(a)(3): Seeking Appointment of a Liquidator Would be an
         Attempt to Obtain Property From the Estate and to Exercise
         Control Over Property of the Estate ........................................................... 9

   C.    The Automatic Stay Applies Extraterritorially and is Binding
         Upon the Defendants .................................................................................. 10

II.   EVEN IF THE STAY DID NOT APPLY, EXTENSION OF THE
      362 INJUNCTION WOULD BE APPROPRIATE UNDER § 105(a)
      OF THE BANKRUPTCY CODE ................................................................................. 11

   A.    There is a Reasonable Likelihood of a Successful Reorganization ........................... 12

   B.    To the Extent Legally Relevant, There is a Danger of Irreparable
         Harm if the 362 Injunction is Not Extended ............................................. 15

      1.    Appointment of Liquidators for the Debtor Would be Difficult to
            "Unscramble" in the Event the Winding Up Petition for Leveraged
            is Overturned on Appeal ........................................................................ 16

      2.    Defense of the Involuntary Petition Would Greatly Distract the Debtor's
            Management Team ................................................................................. 16

      3.    Involuntary Liquidation of the Debtor Would Result in Irreparable Harm .......... 17

   C.    Entry of a 362 Injunction Would Not Harm the Defendants ................................. 18

   D.    The Public's Interest Favors Reorganization, and Thus Supports
         Continuation of the 362 Injunction .......................................................... 20

**III.  EXTENSION OF THE 362 INJUNCTION WOULD NOT OFFEND
(OR EVEN IMPLICATE) PRINCIPLES OF INTERNATIONAL COMITY ............. 21**

**A.    There is No Comity Exception to the Automatic Stay ................................................. 23**

**B.    There is No Foreign Judgment to Which this Court Must Grant
Comity or Give Deference ............................................................................................. 26**

**C.    For Both Legal and Practical Reasons, Including That the Debtor's
Center of Main Interests is Located in the United States
(and Not in Bermuda), it Makes Logical Sense for this Chapter 11 Case to
Proceed First ................................................................................................................. 27**

**CONCLUSION ..................................................................................................................... 29**

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adelphia Communs. Corp. v. The America Channel, LLC (In re Adelphia Communs. Corp.)*,
345 B.R. 69 (Bankr. S.D.N.Y. 2006) …………………………………………………15

*In re A.H. Robins Co.*,
788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) ……………………………..7

*Allstate Life Ins. Co. v. Linter Group, Ltd.*,
994 F.2d 996 (2d Cir. 1993) …………………………………………………………22

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*
*(In Provisional Liquidation)*, 374 B.R. 122 (Bankr. S.D.N.Y. 2008),
*aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) …………………………………………………..5, 27-28

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2001) ………………………………..21, 26

*Cambridge Gas Transp. Corp. v. Official Comm. of Unsecured Creditors*
*of Navigator Holdings plc*, [2006] UKPC 26,
[2007] 1 A.C. 508 (P.C.) (appeal taken from Mann) …………………………5, 20, 25, 26

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) ……………………………………..8

*In re Continental Airlines*, 177 B.R. 475 (D. Del. 1993) …………………………………..6-7

*Cunard S.S. Co. v. Salen Reefer Serv. AB*, 773 F.2d 452 (2d Cir. 1985) ……………………22

*Re Dickson Group Holdings Ltd*, [2008] Bda L.R. 34 (Berm.) …………………………5, 18

*In re Hamilton*, 240 F.3d 148 (2d Cir. 2001) …………………………………………………21

*Hilton v. Guyot*, 159 U.S. 113 (1895)…………………………………………………..21, 26

*Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638 (D. Md. 1998) …………………...22

*Hong Kong and Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*,
153 F.3d 991 (9th Cir. 1998) …………………………………………………………26

*Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194 (6th Cir. 1983) ……………………..6

*Lyondell Chem. Co. v. Centerpoint Energy Gas Servs., Inc. (In re Lyondell Chem. Co.)*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) …………………………………11-20, 28

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*,
801 F.2d 60 (2d Cir. 1986) ………………………………………………………....14

*Midlantic Nat'l Bank v. New Jersey Dep't. of Envt'l Protection*,
474 U.S. 494 (1986) …………………………………………………………..6

*In re Miller*, Case No. 11-CV-130-GKP-PHM,
2012 U.S. Dist. LEXIS 40921 (N.D. Okla. Mar. 26, 2012) …………………………..4

*Nakash v. Zur (In re Nakash)*,
190 B.R. 763 (Bankr. S.D.N.Y. 1996) …………………………………10, 23, 25

*Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
365 B.R. 401 (S.D.N.Y. 2007)…………………………………………………...20

*In re Pan Am. Corp.*, 950 F.2d 839 (2d Cir. 1991) ……………………………………25

*Picard v. Maxam Absolute Return Fund (In re Sec. Investor Prot. Corp. v.*
*Bernard L. Madoff Inv. Secs., LLC)*, 460 B.R. 106 (Bankr. S.D.N.Y. 2011),
*aff'd*, 11 Civ. No. 8629 (JPO),
2012 U.S. Dist. LEXIS 63508 (S.D.N.Y. May 4, 2012) …………….10, 11, 15, 23-25

*Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir. 1997)………………21

*In re Pro-Fit Holdings Ltd.*, 391 B.R. 850 (Bankr. C.D. Cal. 2008)……………………………10

*Red Rock Rig 101, Ltd. v. Unibridge Sys. (In re Red Rock Rig 101, Ltd.)*,
BAP No. WO-07-073, 2008 Bankr. LEXIS 1423 (unpublished)
(B.A.P. 10th Cir. May 15, 2008) …………………………………………………..4

*Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp.*,
140 B.R. 814 (Bankr. M.D. Fla. 1992) …………………………………………14

*Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443 (2007) ……………………………23

*Underwood v. Hilliard (In re Rimsat, Ltd.)*,
98 F.3d 956 (7th Cir. 1996) ……………………………………………..9, 15, 25

## STATUTES

11 U.S.C. § 101(15) …………………………………………………………………10

11 U.S.C. § 105(a) …………………………………………………6, 8, 11, 15, 16

11 U.S.C. § 301(b) …………………………………………………………………27

11 U.S.C. § 303(a) …………………………………………………………..3-4

11 U.S.C. § 303(f) …………………………………………………………………..4

11 U.S.C. § 362(a) …………………………………………………………..8, 10, 23

11 U.S.C. § 362(a)(1) ……………………………………………………………..3, 9

11 U.S.C. § 362(a)(3) …………………………………………………………..3

11 U.S.C. § 362(a)(6)…………………………………………………………...3, 9

11 U.S.C. § 362(b)…………………………………………………………….....8

11 U.S.C. § 502(b)………………………………………………………………23

11 U.S.C. § 541(a)………………………………………………………………11

11 U.S.C. §§ 559-561 …………………………………………………………23

11 U.S.C. § 706(a)    …………………………………………………………..4

11 U.S.C. § 1101(1)    …………………………………………………………..4

11 U.S.C. § 1104    …………………………………………………………..4

11 U.S.C. § 1129(a)(7)    …………………………………………………………14

11 U.S.C. §§ 1501-1532    …………………………………………………………23

28 U.S.C. § 1334(c)(1)    …………………………………………………………25

28 U.S.C. § 1334(e)(1)    …………………………………………………………11

## **SECONDARY SOURCES**

Ian R.C. Kawaley, *Chapter 17: Bermuda, in Cross-Border Judicial Cooperation
    in Offshore Litigation (The British Offshore World)*
    (Ian R.C. Kawaley, *et al.*, eds. 2009)…………………………………...5-6, 19-20, 26, 28

Plaintiff Fletcher International, Ltd., the debtor and debtor in possession (the "**Debtor**"), submits this reply memorandum of law (the "**Reply Brief**") in further support of its motion for preliminary injunctive relief [Adv. Dkt. No. 3] (as subsequently modified by July 18, 2012, letter to the Court, the "**Motion**").  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Debtor's opening memorandum of law in support of the Motion [Adv. Dkt. No. 4] (the "**Opening Brief**").

## PRELIMINARY STATEMENT

The temporary restraining order entered by this Court on July 5, 2012 [Adv. Dkt. No. 7] (as subsequently extended [Adv. Dkt. No. 20], the "**TRO**") contained *two discrete injunctions*, aimed at conduct of different defendants acting in different capacities.

The first injunction (the "**362 Injunction**") precluded the Defendants from taking any action in furtherance of securing the appointment of a liquidator in connection with the involuntary winding-up petition filed by defendant FIA Leveraged Fund ("**Leveraged**"), and later joined by defendant Fletcher Fixed Income Alpha Fund, Ltd ("**Alpha**"), against the Debtor in Bermuda (the "**Involuntary Petition**").  This injunction was directed primarily at the Defendants in their capacity as *creditors* of the Debtor.

The second injunction (the "***Manville* Injunction**") precluded the Defendants from holding any shareholder meeting or shareholder vote to change the Debtor's board of directors.  This injunction was directed primarily at defendant Fletcher Income Arbitrage Fund ("**Arbitrage**" and, together with Leveraged, the "**E&Y Defendants**") in its capacity as an *equity holder* of the Debtor.  At the outset of this case, the Debtor and its professionals in good faith believed that the Debtor's stock was owned 83% by Arbitrage and 17% by non-party Fletcher International Inc. ("**Fletcher Delaware**").  This belief was reasonable under the circumstances,

and was based on the Debtor's books and records, which appeared (and still appear) to show that on or about April 22, 2012, Fletcher Delaware transferred most of its stock in the Debtor to Arbitrage, resulting in the 83/17 ownership split. Based upon its belief that Arbitrage was its majority stockholder, and the fact that Arbitrage is controlled by joint official liquidators (the "**E&Y Liquidators**") whose apparent goal is to take over and liquidate the Debtor, the Debtor sought the *Manville* Injunction to preserve its ability to voluntarily reorganize in chapter 11 for the benefit of all stakeholders.

After the TRO was entered, further diligence revealed that the April 22 stock transfer between Fletcher Delaware and Arbitrage was never recorded on the official Register of Members maintained by the Debtor's corporate secretary in Bermuda. The Debtor is advised that, as a matter of Bermuda law, this means the stock transfer has not yet taken place and that Fletcher Delaware still owns all the stock of the Debtor.[1] It appears the E&Y Liquidators may already have been aware of this issue.[2] But it was news to the Debtor and its professionals. And in light of this development, the Debtor promptly notified the Defendants (on July 17, 2012) that it did not intend to go forward with its request for a *Manville* Injunction, which the Debtor followed by (i) a formal withdrawal of the request and related discovery requests by letter to the Court, copying the Defendants, and (ii) a supplemental declaration of Floyd Saunders [Bk. Dkt. No. 18] correcting his prior testimony regarding the ownership of the Debtor's equity.[3] As a

---

[1] To be clear, the legal significance of the Register of Members is not before the Court at this time, and the Debtor is not asking the Court to endorse the Debtor's view of Bermuda law on this point.

[2] (*See* Hr'g Tr. 7/23/12 at 8:13-9:1 (Mr. Lurie) ("[T]he state of affairs in which the Delaware company owns a hundred percent of the debtor, is what was represented in various SEC filings as of several years ago. . . . [W]e did note that it was possible that we might, at some point . . . be presented with an argument that, no, we're wrong; in fact, this Delaware company owns [the stock].").) A true and accurate copy of the July 23, 2012, hearing transcript is attached hereto as Exhibit A.

[3] True and accurate copies of the letter and the supplemental Saunders declaration are attached hereto as Exhibits B and C, respectively. At the July 23, 2012, hearing, counsel for Arbitrage suggested that the letter to the

result, all that remains of the Motion is the request for extension of the 362 Injunction, which, as noted above, is aimed primarily at the Defendants in their capacity as *creditors*.

The *Manville* Injunction admittedly presented close questions of law and fact. But the 362 Injunction did not. It merely enjoined further proceedings with respect to the Involuntary Petition filed against the Debtor in Bermuda, which proceedings were already automatically stayed by § 362(a)(1), (3), and (6) of the Bankruptcy Code upon the Debtor's bankruptcy filing. Under the circumstances, then, withdrawal of the Debtor's request for a *Manville* Injunction should have obviated a preliminary injunction hearing. But it did not. Despite repeated requests by the Debtor, the E&Y Defendants would not agree to an extension of the 362 Injunction,[4] leading the Debtor to believe that they intended to violate the automatic stay by pressing ahead with the Involuntary Petition absent a specific order from this Court prohibiting them from doing so.

## **ARGUMENT**

As counsel for the E&Y Defendants candidly acknowledged at the July 3, 2012, hearing on the TRO (the "**TRO Hearing**"), this case is about control.[5] But as between the Debtor and the E&Y Defendants, the Bankruptcy Code is clear who Congress thought should be in control. For example, Congress did not believe it appropriate for an involuntary bankruptcy petition to be filed by a creditor whose claim was the subject of a *bona fide* dispute. *See* 11

---

Court was the first notice the Defendants had of the modification of the Motion. (Hr'g Tr. 7/23/12 at 13:6-12.) This is simply not true.

[4] Importantly, Alpha has agreed to at least a 60-day extension of the 362 Injunction, as set forth in its papers filed on July 23, 2012 [Adv. Dkt. No. 31] (hereinafter cited as "Alpha Br. at __").

[5] (Hr'g Tr. 7/3/12 at 76:24-77:4 (Mr. Read) ("This is an issue of control. . . . [T]he question is, who's going to control this proceeding[?]").) A true and accurate copy of the transcript of the TRO Hearing is attached hereto as Exhibit D.

U.S.C. § 303(a).[6]  Yet Leveraged filed the Involuntary Petition in Bermuda on the basis of a

payment demand that was the subject of a complaint filed by the Debtor in the agreed-upon

venue for resolving disputes under the Intercompany Note.  Congress did not believe it

appropriate to grant involuntary bankruptcy relief against a debtor prior to a hearing on the

merits.  *See* 11 U.S.C. § 303(f) (pending entry of an order for relief, debtor generally permitted to

continue to operate its business and enter into transactions "as if an involuntary case . . . had not

been commenced") and (h) (order for relief on disputed involuntary petition only granted after a

trial, after notice and a hearing).  But if the Court were to deny the Debtor the protections to

which its voluntary chapter 11 petition entitles it out of "deference" to the Involuntary Petition,

which has not been adjudicated, the effect would be the same.  Congress also believed that

debtors should have a choice between restructuring and liquidation, with a preference for the

former.  *See* 11 U.S.C. § 706(a) (providing debtor an absolute right to convert to chapter 11,

irrespective of whether the case itself was voluntary or involuntary).  But the E&Y Defendants

want to take this choice away from the Debtor by forcing it into liquidation in Bermuda.  Finally,

and most importantly, Congress believed that, absent a showing of cause after notice and a

hearing, a chapter 11 debtor should remain in possession of its assets and in control of its

operations.  *See* 11 U.S.C. § 1101(1) (debtor remains in possession unless and until a trustee is

appointed in the case) and § 1104 (requiring application by a party in interest, notice, and a

hearing in order to appoint a trustee).  Yet if the Involuntary Petition were to go forward in

Bermuda, outside liquidators would automatically be appointed to take control of the Debtor's

assets and operations.

---

[6]  Notably, for purposes of § 303(a), "the pendency of litigation suggests that a bona fide dispute exists."  *In re Miller*, Case No. 11-CV-130-GKP-PHM, 2012 U.S. Dist. LEXIS 40921, *8 (N.D. Okla. Mar. 26, 2012) (*quoting Red Rock Rig 101, Ltd. v. Unibridge Sys. (In re Red Rock Rig 101, Ltd.)*, BAP No. WO-07-073, 2008 Bankr. LEXIS 1423, *7 (unpublished) (B.A.P. 10th Cir. May 15, 2008)).

Ironically, even if the Involuntary Petition were to go forward in Bermuda, and the E&Y Liquidators were to be appointed joint official liquidators of the Debtor, this matter would necessarily land back in this Court before too long because all of the Debtor's assets and most of its creditors are in the United States.  *See Cambridge Gas Transp. Corp. v. Official Comm. of Unsecured Creditors of Navigator Holdings plc*, [2006] UKPC 26, [2007] 1 A.C. 508 (P.C.) [10] (appeal taken from Mann) ("According to general principles of private international law, judgments in rem can affect only property within the court's territorial jurisdiction."); *Re Dickson Group Holdings Ltd*, [2008] Bda L.R. 34 (Berm.) [9] (recognizing *Cambridge Gas* as authoritative) and [27] ("[T]he reasonable expectations of the creditors as to what law would apply will be potentially relevant to this Court's decision as to whether to recognize a foreign winding-up proceeding as the sole or primary winding-up in relation to a Bermudian company . . . .").[7]  And what's more, the case would have to be filed as a chapter 11, because the Debtor has neither the "center of its main interests" nor any "establishment" in Bermuda so as to permit recognition of a Bermuda insolvency proceeding under chapter 15 of the Bankruptcy Code.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (In Provisional Liquidation)*, 374 B.R. 122, 132 (Bankr. S.D.N.Y. 2008) (Lifland, J.) (denying recognition of Cayman Islands insolvency proceedings as either "foreign main proceedings" or "foreign nonmain proceedings" under §§ 1517 or 1502(5), respectively, where debtor's sole connection with the Cayman Islands was its incorporation there; concluding that chapter 11 would be the only avenue for the liquidators to obtain relief from United States courts), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).[8]

---

[7]  True and accurate copies of the *Cambridge Gas* and *Dickson Group* cases are attached hereto as Exhibits E and F, respectively.

[8]  *See also* Ian R.C. Kawaley, *Chapter 17: Bermuda*, *in Cross-Border Judicial Cooperation in Offshore Litigation (The British Offshore World)*, 229 (Ian R.C. Kawaley, *et al.*, eds. 2009) (noting that under Bermuda

*Thus, all roads lead to a chapter 11 proceeding before this Court.* Which underscores that this case really is *not* about whether the Debtor's insolvency proceedings should proceed here or in Bermuda. It is solely about who should control proceedings that are certain to occur here. And under both the letter and the spirit of the Bankruptcy Code, this should be the Debtor. Having properly availed itself of this Court's jurisdiction, the Debtor is entitled to the protection of the automatic stay, which plainly prohibits the Defendants from taking any further action with respect to the Bermuda Petition. Even if the automatic stay did not apply, continuing the 362 Injunction under § 105(a) of the Bankruptcy Code would be appropriate. And considerations of international comity – to the extent they apply at all to the automatic stay or in the absence of an actual judgment of the Bermuda Court, which is doubtful – do not mandate a different result. *A fortiori*, the Court should continue the 362 Injunction.

## I.   THE AUTOMATIC STAY PLAINLY PROHIBITS THE DEFENDANTS FROM TAKING ANY FURTHER ACTION WITH RESPECT TO THE INVOLUNTARY PETITION AGAINST THE DEBTOR

The automatic stay is "one of the fundamental debtor protections provided by the Bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't. of Envt'l Protection*, 474 U.S. 494, 503 (1986) (internal quotations, citation omitted). The stay gives the debtor "a breathing spell from [its] creditors" and permits it "to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove [it] into bankruptcy." *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1197 (6th Cir. 1983) (internal quotations, citation omitted). The purposes of § 362 of the Bankruptcy Code are well established, namely:

---

conflict of law rules, the law governing the validity and enforceability of creditors' claims in a liquidation proceeding where the majority of the creditors' rights to payment arise under instruments governed by New York law, would be the law of New York, and "it is not incongruous for the US Bankruptcy Court to play a leading role in adjusting the creditors' rights" in such a proceeding). Justice Kawaley is the current Chief Justice of Bermuda and was Judge Drain's counterpart in the cross-border chapter 11 case *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y. 2005). A true and accurate copy of the cited chapter is attached as <u>Exhibit G</u> hereto.

> to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor.

*In re Continental Airlines*, 177 B.R. 475, 479 (D. Del. 1993) (*quoting In re A.H. Robins Co.*, 788 F.2d 994, 998 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986)).

At the time the Debtor filed for chapter 11 protection, an uncontrollable scramble for its assets was well underway in uncoordinated liquidation proceedings in the Cayman Islands and Bermuda.  As set forth in the Complaint and Opening Brief, the Louisiana Pension Funds, in their capacity as creditors of Leveraged, commenced involuntary liquidation proceedings against Leveraged in the Cayman Islands.  The Cayman Court wound up Leveraged, over its objection, and appointed the E&Y Liquidators as its official liquidators.  The E&Y Liquidators, who may or may not have had valid authority to act on behalf of Leveraged (to be determined in an appeal currently pending in the Cayman Islands), caused Leveraged to demand payment in full of the Intercompany Note from the Debtor.  The Debtor promptly challenged this payment demand by means of a declaratory judgment action in New York,[9] whose law governs the Intercompany Note and whose courts are the agreed venue for resolution of disputes thereunder.  On the basis of this disputed payment demand, the E&Y Liquidators, on behalf of Leveraged, filed an involuntary winding-up petition against the Debtor in Bermuda (which, as noted above, could not have been filed in the United States by reason of the dispute regarding the debt).  Faced with the potential loss of control over the management of its complex asset holdings, and the concomitant loss of value to the Debtor's stakeholders if its assets were to be hastily liquidated

---

[9] For the avoidance of doubt, the Debtor reserves the right to remove this litigation to federal court in accordance with 28 U.S.C. § 1452(a).

by outside professionals having no institutional knowledge of the Debtor's complex investment

strategies, the Debtor availed itself of its statutory right to *voluntary* bankruptcy relief in the

jurisdiction where all of its operations, assets, and non-insider creditors are located.

      While the particular circumstances of this case are unusual, the basic story is not:

creditor seeking payment invokes a remedy designed to collect the debt as quickly as possible;

debtor foreseeing a loss of value invokes a remedy designed to maximize value for the benefit of

all stakeholders (including, but not limited to, the creditor).  This is precisely what Congress had

in mind in enacting § 362 of the Bankruptcy Code.

      As discussed below, the conduct enjoined by the 362 Injunction implicates no

fewer than three discrete sub-paragraphs of § 362(a), and it does not fall within any of the

enumerated exceptions to the stay in § 362(b).  Thus, the conduct is prohibited by operation of

law irrespective of the 362 Injunction.  Nevertheless, it is well settled that the Court may issue an

independent injunction against conduct already subject to the automatic stay, under its broad

statutory authority to "issue any order, process, or judgment that is necessary *or appropriate* to

carry out the provisions of [the Bankruptcy Code]," 11 U.S.C. § 105(a) (emphasis added).  *See In*

*re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992) (affirming bankruptcy court order

under § 105(a) enjoining violations of the automatic stay, even though such order "was in a sense

superfluous, prompted only by the [defendant]'s indication that a specific injunctive order would

be required to induce its compliance with the statutory stay").  Under the circumstances, and

given the E&Y Defendants' unjustified refusal to agree not to take the actions prohibited by the

362 Injunction, the Debtor respectfully submits that continuation of the 362 Injunction is

appropriate under the Court's § 105(a) power to effectuate the automatic stay and afford the

Debtor the breathing spell to which it is entitled, but which it has not yet enjoyed.

**A.      § 362(a)(1) and (6): The Bermuda Proceeding is a Judicial Action
Against the Debtor to Recover a Prepetition Claim**

Section 362(a)(1) of the Bankruptcy Code stays "the commencement or

continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that

was or could have been commenced [prepetition], or to recover a claim against the debtor that

arose [prepetition]."  11 U.S.C. § 362(a)(1).  Similarly, § 362(a)(6) of the Bankruptcy Code stays

"any act to collect, assess, or recover a claim against the debtor that arose [prepetition]."  11

U.S.C. § 362(a)(6).  The Bermuda Proceeding is a judicial action commenced by a putative

creditor[10] prepetition to collect on a prepetition claim.  Thus, it falls squarely within §§ 362(a)(1)

and (6).  *See Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956, 961 (7th Cir. 1996)

(Posner, C.J.) (noting § 362(a)(1) implicated when receiver appointed by Nevis court prepetition

in action against the debtor sought additional relief from the Nevis court post-petition).

**B.      § 362(a)(3): Seeking Appointment of a Liquidator Would be an
Attempt to Obtain Property From the Estate and to Exercise Control
Over Property of the Estate**

Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of

property of the estate or of property from the estate or to exercise control over property of the

estate."  11 U.S.C. § 362(a)(3).  Appointment of a liquidator in the Bermuda Proceedings to

displace the Debtor's management and to take control of the Debtor's assets and operations

would clearly implicate § 362(a)(3).  *See Rimsat*, 98 F.3d at 961-62 (noting § 362(a)(3)

implicated by individual's attempt to obtain appointment by Nevis court as equity receiver for

the debtor).

---

[10]  The Debtor believes the intercompany debt to Leveraged is more properly characterized as an equity
contribution, and reserves all rights with respect to recharacterization.  Reference to the intercompany "debt," or to
Leveraged's status as a "creditor," is not intended, nor should it be construed, as an admission or acknowledgement
regarding the proper legal characterization of the transaction between the Debtor and Leveraged.

C.    **The Automatic Stay Applies Extraterritorially and is Binding Upon the Defendants**

By its terms, the automatic stay applies to "all entities," 11 U.S.C. § 362(a), which encompasses any "person, estate, trust, [or] governmental unit," 11 U.S.C. § 101(15).  It is well settled that the stay applies extraterritorially, as demonstrated recently by *Picard v. Maxam Absolute Return Fund (In re Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs., LLC)*, 460 B.R. 106 (Bankr. S.D.N.Y. 2011), *aff'd*, 11 Civ. No. 8629 (JPO), 2012 U.S. Dist. LEXIS 63508 (S.D.N.Y. May 4, 2012).

In *Madoff*, Judge Lifland found that a declaratory judgment action commenced in the Cayman Islands by an adversary defendant against the trustee in the Madoff Securities Investor Protection Act ("SIPA") liquidation proceeding violated § 362(a)(3) of the Bankruptcy Code.[11]  460 B.R. at 114-15 (*citing*, *inter alia*, *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 863 (Bankr. C.D. Cal. 2008) ("The United States automatic stay applies worldwide, whether or not this is consistent with domestic law in the relevant foreign country.")); *accord Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (Lifland, J.) (finding filing of involuntary insolvency petition against the debtor in Israel violated the automatic stay)).  To redress the stay violation, Judge Lifland entered an order directing the defendant to dismiss the Cayman Islands proceeding and prohibiting the defendant from taking any other actions with respect to it. *Madoff*, 460 B.R. at 123.  The defendants appealed, asserting that the automatic stay lacked extraterritorial effect.  After substantial discussion, the District Court affirmed, following the weight of authority concluding that the automatic stay "protects a bankruptcy court's *in rem* jurisdiction extraterritorially by way of *in personam* jurisdiction over those who would take

---

[11]   The automatic stay applies in SIPA proceedings.  11 U.S.C. § 362(a).

actions prohibited by the stay." *Madoff*, 2012 U.S. Dist. LEXIS 63508 at *17.[12]  Because the

bankruptcy court had *in personam* jurisdiction over the defendant and the defendant's

commencement of an action against the SIPA trustee in the Cayman Islands violated the stay, the

bankruptcy court's order redressing the stay violation was proper.  *Id.* at *27.  So too here,

because the Court has personal jurisdiction over the Defendants, extension of the 362 Injunction

to enjoin the Defendants' continuation of the Bermuda proceedings in violation of the automatic

stay would be proper.

II.     **EVEN IF THE STAY DID NOT APPLY, EXTENSION OF THE 362
        INJUNCTION WOULD BE APPROPRIATE UNDER § 105(a) OF THE
        BANKRUPTCY CODE**

        Even if the automatic stay did not apply, § 105(a) of the Bankruptcy Code would

provide an independent basis for continuation of the 362 Injunction.  As this Court has

recognized (consistent with the weight of authority in the Second Circuit), the broad equitable

powers under § 105(a) includes the power to enjoin acts that, while not proscribed by the

automatic stay, nonetheless impair a debtor's ability to reorganize in a chapter 11 case.  *Lyondell*

*Chem. Co. v. Centerpoint Energy Gas Servs., Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 587

(Bankr. S.D.N.Y. 2009) (Gerber, J.).  In determining whether to issue a § 105(a) injunction, this

Court considers the following factors:

        (i)     whether there is a reasonable likelihood of a successful reorganization,

        (ii)    whether there is an imminent threat of irreparable harm to the estate in the
                absence of an injunction,

        (iii)   whether the balance of the harms favors the movant, and

---

[12]   *Accord* 28 U.S.C. § 1334(e)(1) (federal bankruptcy jurisdiction includes "exclusive jurisdiction . . . of all of the property, *wherever located*, of the debtor as of the commencement of [the bankruptcy case], and of property of the estate" (emphasis added)); 11 U.S.C. § 541(a) (bankruptcy estate "is comprised of the [enumerated types of] property, *wherever located and by whomever held*" (emphasis added)).

(iv)     whether the public interest weighs in favor of an injunction.

*Id.* at 588-94.  Applying these factors in the *Lyondell* case, this Court issued a temporary

injunction prohibiting creditors of the debtor's non-debtor parent, a Luxembourg corporation,

from pursuing remedies against the parent, including the commencement of involuntary

insolvency proceedings outside the United States.  *Id.* at 595.

This case is similar to *Lyondell* in many respects, as discussed further below.

Indeed, there are but three key differences, each of which cuts in favor of extending the 362

Injunction here.

(i)     *First,* the actions enjoined in *Lyondell* were against a *non-debtor parent*, and thus
the potential harm to the estate and to the bankruptcy proceeding from the
conduct to be enjoined was indirect, 402 B.R. at 581-82; here, the action to be
enjoined is against *the debtor itself*, and the harm to the estate and to the chapter
11 proceeding would be direct.

(ii)    *Second*, the injunction in *Lyondell* frustrated the reasonable commercial
expectations of holders of guaranties from the non-debtor, which are ordinarily
enforceable notwithstanding the insolvency of the primary obligor, 402 B.R. at
593-94; here, the E&Y Defendants' claims are against the Debtor, and were
always subject to the risk that the Debtor might avail itself of chapter 11 relief and
thereby stop collection efforts.

(iii)   *Third*, the injunction in *Lyondell* risked unequal treatment of similarly situated
creditors because parties who were not subject to the injunction would be free to
pursue their remedies against the non-debtor, 402 B.R. at 594; here, there is no
such danger because the automatic stay prevents creditors other than the E&Y
Defendants from exercising remedies against the Debtor.

In sum, the injunction in *Lyondell* was extraordinary, but appropriate; extension of the 362

Injunction here would be less extraordinary, but no less appropriate.

## A.     There is a Reasonable Likelihood of a Successful Reorganization

In *Lyondell*, this Court found that the debtors were reasonably likely to

successfully reorganize because the debtors were proceeding "on track" and "there [wa]s no

reason to believe or suspect that their reorganization w[ould] fail—unless, of course, the acts

sought to be enjoined *cause[d]* it to fail." 402 B.R. at 590 (emphasis in original).  So too here,

the Debtor is "on track" and has done everything it has needed to do in its chapter 11 case to

date, including

> (i) filing the Rule 1007-2 declaration with disclosures [Bk. Dkt. No. 2], and updating the same in light of newly discovered information [Bk. Dkt. No. 18];
>
> (ii) obtaining and extending the TRO [Adv. Dkt. Nos. 3 & 20];
>
> (iii) opening new bank accounts and custodial accounts, and negotiating with the Debtor's prepetition banks and prime broker account holder regarding the transfer of the assets in the prepetition accounts to the new debtor-in-possession accounts;
>
> (iv) obtaining an order [Bk. Dkt. No. 14] extending the time within which to file the Schedules of Assets and Liabilities and Statement of Financial Affairs, which are in process;
>
> (v) seeking authority to retain bankruptcy counsel [Bk. Dkt. No. 8] and hire a chief restructuring officer [Bk. Dkt. No. TBD] (application to be filed shortly after this Reply Brief);
>
> (vi) entering into a standstill and consultation agreement with Fletcher Delaware [Bk. Dkt. No. 20];
>
> (vii) investigating the desirability of continuing the New York Matter and/or removing it to federal court; and investigating the Intercompany Note transaction and the possibility that the Intercompany Note is properly characterized as an equity contribution;
>
> (viii) negotiating the turnover from Credit Suisse of approximately $1.6 million belonging to the estate, subject to the terms of a consensual cash collateral order the Debtor anticipates presenting to the Court by motion in the near future; and
>
> (ix) throughout, engaging the Liquidators and the Alpha Liquidators regarding the possibility of a negotiated resolution of this litigation and other open issues.

At this early stage in the chapter 11 case, which is still well within the Debtor's exclusive periods

for filing and soliciting a chapter 11 plan, there is simply no reason to believe or suspect that the

Debtor's reorganization efforts will fail.

The E&Y Defendants baldly assert that the Debtor is "hopelessly insolvent" and that reorganization is not possible. (*E.g.*, Hr'g Tr. 7/3/12 at 71:13-17.)[13]  As a threshold matter, insolvency and reorganization are not mutually exclusive—as this Court held in *Lyondell*, a debtor need not establish that it can confirm a 100% payout plan in order to establish a "reasonable likelihood of a successful reorganization."  402 B.R. at 589-90.  Indeed, chapter 11 reorganizations often result in less than full payout to creditors; but they are still considered "successful" if they manage to preserve some value that would have been lost in a liquidation.  *See* 11 U.S.C. § 1129(a)(7) (requiring chapter 11 plan to provide dissenting creditors at least what they would have received in a chapter 7 liquidation).  And it makes little sense to speculate now about what the Debtor's future chapter 11 plan will provide; it suffices at this early stage of the case that a plan is possible.  *See Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp.*, 140 B.R. 814, 816-17 (Bankr. M.D. Fla. 1992) (Paskay, J.) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization. . . .  In this connection, it should be noted that there is nothing in the record to indicate that the Debtor will not be able to successfully reorganize.").  But even if the Debtor's solvency were pertinent to its likelihood of a successful reorganization, there is no basis on the record presently before the Court to conclude that the Debtor is insolvent.[14]

---

[13]  The Debtor notes that this position is completely inconsistent with Arbitrage's vigorous opposition to the *Manville* Injunction on account of its purported corporate governance rights. *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 65 n.6 (2d Cir. 1986) ("We note that if Manville were determined to be insolvent, so that the shareholders lacked equity in the corporation, denial of the right to call a [shareholder] meeting would likely be proper, because the shareholders would no longer be real parties in interest.").

[14]  Under paragraphs 5-6 of this Court's Case Management Order dated July 3, 2012 [Bk. Dkt. No. 4], the E&Y Defendants were required to submit affidavits setting forth the direct testimony of any witnesses they intended to call at the hearing on the Motion.  They did not file any affidavits, so it does not appear they intend to substantiate their prior assertions that the Debtor is insolvent and has no hope of rehabilitation.

**B.    To the Extent Legally Relevant, There is a Danger of Irreparable Harm if the 362 Injunction is Not Extended**

This Court and others within the Second Circuit have repeatedly held that irreparable harm need not be shown in a proceeding for an injunction under § 105(a). *Lyondell*, 402 B.R. at 588 n.37, 590-91 (citing cases); *Adelphia Communs. Corp. v. The America Channel, LLC (In re Adelphia Communs. Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) (Gerber, J.) (citing cases). Thus, strictly speaking, a showing of irreparable harm is not necessary to continuation of the 362 Injunction.

Even if a showing of irreparable harm were required to obtain a preliminary injunction under § 105(a), courts in the Second Circuit have recognized a limited exception to this requirement where the action to be enjoined "threatens the reorganization process" or "would impair the court's jurisdiction with respect to the case before it." *Lyondell*, 402 B.R. at 590 (citing cases). This exception is satisfied here because, as noted by the Court at the TRO Hearing, appointment of a liquidator for the Debtor in Bermuda would at least risk (if not guarantee) "d[uel]ing jurisdiction" between this Court and the Bermuda Court over the Debtor and its assets. (Hr'g Tr. 7/3/12 at 83:23-25.)[15] *Cf. Rimsat*, 98 F.3d at ("The efficacy of the bankruptcy proceeding depends on the court's ability to control and marshal the assets of the debtor, which in this case required that [the receiver appointed by the Nevis court] be prevented from exercising control over the debtor."); *Madoff*, 460 B.R. at 120 (finding parallel proceeding in Cayman Islands would "hijack" the bankruptcy court's exclusive jurisdiction over property of the SIPA estate). But in any event, there is a real threat of irreparable harm if the 362 Injunction is not extended.

---

[15] The official transcript erroneously reads "doing jurisdiction."

15

1.   ***Appointment of Liquidators for the Debtor Would be Difficult to "Unscramble" in the Event the Winding Up Petition for Leveraged is Overturned on Appeal***

As noted above, the grant of the involuntary winding-up petition against Leveraged in the Cayman Islands was the first step in a process that resulted in the filing of the Involuntary Petition against the Debtor in Bermuda.  But the order winding up Leveraged and appointing the Liquidators is on appeal.  And a possible outcome of this appeal is reversal of the winding-up order.  If the order is reversed, but the Liquidators wrongfully appointed to act on behalf of Leveraged have already obtained appointment of liquidators for the Debtor, then the harm to the Debtor will be irreparable.  The Court concluded as much at the TRO Hearing, finding that a change in the Debtor's management board as a result of the Bermuda Petition going forward would raise "material risks, if not a certainty of an inability to unscramble the omelet." (Hr'g Tr. 7/3/12 at 83:21-22.)  Nothing has changed between the TRO Hearing and now that should disturb the Court's finding on this point.

2.   ***Defense of the Involuntary Petition Would Greatly Distract the Debtor's Management Team***

At the TRO Hearing, the Court found that the 362 Injunction was independently justified under § 105(a), at least temporarily, "[b]ecause certainly having to do what is necessary in this case at the same time as liquidating in Bermuda would, by reason of the latter, give rise to a distraction" of the Debtor's management.  (Hr'g Tr. 7/3/12 at 87:20-88:2.)  *Accord Lyondell*, 402 B.R. at 582 n.14 (considering management distraction "as something worthy of consideration" in entering a § 105(a) injunction, and finding that "an involuntary filing . . . placing control of the Debtors' European affiliates in the hands of a foreign trustee" would lead to management distraction that "would greatly exceed any distraction that I had ever considered in any other case on my watch before").  Nothing has changed between the TRO Hearing and

16

now that should disturb the Court's finding on this point.  Indeed, as set forth in the declaration

of the Debtor's proposed Chief Restructuring Officer, Donald S. MacKenzie, in support of this

Reply Brief [Adv. Dkt. No. 34],[16] the two non-employee consultants who currently comprise the

Debtor's core work force have a tremendous amount of work to do in this chapter 11 case for at

least the first ninety days of the case, and likely more.  But given their institutional knowledge of

the Debtor and its operations, they would have to be involved in any defense of the Involuntary

Petition if it were permitted to go forward, which would hamper their ability to focus on their

restructuring-related tasks to the detriment of the Debtor's estate and creditors.  Under these

circumstances, continuation of the 362 Injunction would be justified *at least* for the next few

months to afford the Debtor's management team a reasonable opportunity to stabilize the

Debtor's operations and this chapter 11 case.

3.      *Involuntary Liquidation of the Debtor Would
Result in Irreparable Harm*

In *Lyondell*, this Court found that, absent an injunction protecting the debtors'

non-debtor parent, creditors of the parent could commence involuntary insolvency proceedings

against it outside of the United States, in which case (i) the parent's management would be

displaced and control of the parent's assets and operations would be placed in the hands of an

outside liquidator, and (ii) the parent's assets could be quickly liquidated, there being no process

of reorganization or restructuring available under the foreign jurisdictions' laws.  402 B.R. at

580-81.  The Court further found that the debtors' and its parent's operations – and restructuring

efforts – benefited substantially from maintaining coordinated control and management over all

operations.  *Id.* at 582.  Under the circumstances, the Court concluded that an involuntary

---

[16]  A true and accurate copy of the MacKenzie declaration is attached hereto as <u>Exhibit H</u>.

01: 12301714.2

17

liquidation proceeding against the parent "would be a disaster, and the resulting injury would indeed be irreparable" because "the recoveries of the creditors in the chapter 11 cases . . . depend upon maximizing the value of the Debtors." *Id.* The Court contrasted this with a "*voluntary*, properly planned and organized, *restructuring* of the affairs of [the parent]," which it concluded would *not* result in irreparable injury. *Id.* (emphasis in original).

As noted above, the harm to the Debtor here is even more direct than the harm to the debtors in *Lyondell*, because in the absence of injunctive relief here *the Debtor itself* could be subjected to an involuntary, foreign liquidation proceeding. *The Debtor itself* could have control of its assets and operations wrested from current management and placed in the hands of an outside liquidator lacking the institutional knowledge of the Debtor's complex assets and investment strategies necessary to maximize value for the Debtor's estate and creditors. And while it is admittedly speculative to say that an outside liquidator, who is yet to be appointed, would necessarily depress creditor recoveries, there is at the very least "a risk" of this outcome. (Hr'g Tr. 7/3/12 at 84:10-18 (acknowledging risk, though declining to speculate as to the skill and patience by which liquidators might approach the asset liquidation).) This, coupled with the fact that Bermuda law, like the laws of the foreign jurisdictions in *Lyondell*, does not have a process comparable to chapter 11,[17] establishes a risk of irreparable harm justifying extension of the 362 Injunction.

### C.    Entry of a 362 Injunction Would Not Harm the Defendants

In considering the balance of harms in *Lyondell*, this Court hypothesized whether the defendants would stand to gain anything of practical, economic value if they were permitted to go forward with involuntary liquidation proceedings against the debtors' non-debtor parent.

___

[17]   *See Dickson Group*, [2008] Bda L.R. 34 [25] (noting that Bermuda law "lack[s] statutory corporate rescue rules").

402 B.R. at 584-85.  Because the parent's principal assets were encumbered by the liens of

senior creditors, the Court concluded that allowing the debtors' creditors to proceed against the

non-debtor parent would "get them very little, other than an opportunity to complicate the

Debtors' affairs (and thus to exercise leverage)," and would not "in any reasonably foreseeable

way, afford [them] any meaningful recovery."  *Id.*  So too here, proceeding in Bermuda would

not afford the E&Y Defendants, to the extent they are creditors of the Debtor, any meaningful

recovery above and beyond what they would receive in this chapter 11 case.

It is axiomatic that creditors' rights are respected in chapter 11 and are protected

by various provisions of the Bankruptcy Code, including the automatic stay, the distribution and

priority scheme, and the provisions governing the plan solicitation and confirmation process.

There is no reason to believe that the E&Y Defendants would be treated worse, or protected less,

here than in Bermuda.  Indeed, the only advantage to proceeding in Bermuda cited by the E&Y

Defendants is obtaining control of the proceedings.  But against the backdrop of a statutory

scheme that intentionally places chapter 11 debtors at the helm of their own reorganization

proceedings, the E&Y Defendants' stated objective of "becoming . . . the debtor in possession"[18]

is not entitled to protection in the balance-of-harms analysis.  *See Lyondell*, 402 B.R. at 585 n.26

(finding that creditors' inability to accelerate indebtedness and collect on valuable credit default

swaps as a result of § 105(a) injunction was not "legally cognizable prejudice" for purposes of

the balance-of-harms analysis).

Perhaps more importantly, as noted by Alpha in its brief, proceeding in chapter 11

before this Court will decrease the potential for duplicative or conflicting efforts by multiple sets

of professionals.  (Alpha Br. at 8.)  *See* Kawaley, *supra*, at 227-32 (discussing trend toward

---

[18]  (Hr'g Tr. 7/23/12 at 10:16-18.)

conferring "primary proceeding" status on United States bankruptcy proceedings, "even as regards a Bermuda incorporated company," for the sake of efficient administration).  As noted above, and also acknowledged by Alpha, given that the Debtor's assets, operations, and creditors are all in the United States, proceeding here in the first instance eliminates the unnecessary step of obtaining relief in the Bermuda Court "only to face the unavoidable necessity of returning to New York to seek enforcement of [such] orders" (Alpha Br. at 9).  *See Cambridge Gas,* [2006] UKPC 26 [10] (noting insolvency courts' *in rem* jurisdiction does not extend to property outside their territorial jurisdiction).  Thus, the balance of harms strongly favors extension of the 362 Injunction.

> **D.      The Public's Interest Favors Reorganization, and Thus Supports Continuation of the 362 Injunction**

Evaluation of the public interest factor of the § 105(a) injunction analysis "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests."  *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 413 (S.D.N.Y. 2007).  In *Lyondell*, this Court found that societal interests in respecting the sanctity of guaranties, ensuring the equal treatment of creditors, and allowing creditors to resort to court-supervised insolvency processes, even cumulatively, did not outweigh the public's interest in the successful reorganization of the debtors so as to warrant denial of the requested injunctive relief.  *See* 402 B.R. at 594.  None of these particular concerns are present here, as this chapter 11 case is a court-supervised process wherein creditors will be treated equally with respect to their legitimate claims.  And the only public interest concern raised by the E&Y Defendants is that the Debtor's commencement of this case effected an "end run" around the supposedly "first filed" proceedings in Bermuda.  (Hr'g Tr. 7/3/12 at 76:13-20; Hr'g Tr. 7/23/12 at 7:12.)  But this argument proves too much, because if the "first filed" proceeding is entitled to

deference, then by the same reasoning, the complaint filed by the Debtor in the New York state

court should be accorded deference, and the Bermuda Petition should be viewed as an "end run"

around the jurisdiction of the New York state court.  Finger-pointing aside, the fact remains that

the Debtor's bankruptcy filing was consistent with the letter and spirit of the Bankruptcy Code,

which favors voluntary reorganization over involuntary liquidation.  Thus, the public's interest in

the successful reorganization of the Debtor cuts in favor of extending the 362 Injunction.

## III.    EXTENSION OF THE 362 INJUNCTION WOULD NOT OFFEND (OR EVEN IMPLICATE) PRINCIPLES OF INTERNATIONAL COMITY

At the TRO Hearing, the Court requested briefing regarding whether principles of

international comity should affect the outcome of the Motion.  For the reasons set forth below,

they should not.

International comity is "the recognition which one nation allows within its

territory to the legislative, executive or judicial acts of another nation."  *Bigio v. Coca-Cola Co.*,

239 F.3d 440, 454 (2d Cir. 2001) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).

"Although courts in this country have long recognized the principles of international comity and

have advocated them in order to promote cooperation and reciprocity with foreign lands, comity

remains a rule of 'practice, convenience, and expediency' rather than law."  *Pravin Banker*

*Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997) (citations omitted).

"[C]ourts will not extend comity to foreign proceedings when doing so would be contrary to the

policies or prejudicial to the interests of the United States."  *Id.* at 854 (citation omitted).  Indeed,

the "principle of comity has never meant a categorical deference to foreign proceedings."  *In re*

*Hamilton*, 240 F.3d 148, 157 (2d Cir. 2001) (reversing order turning funds over to foreign

liquidators).  Rather, "[i]t is implicit in the concept [of comity] that deference should be withheld

where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of

the United States." *Id.* at 157 (*citing Pravin Banker*, 109 F.3d at 854); *see Allstate Life Ins. Co. v. Linter Group, Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) ("[C]omity may be granted where 'it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated.'" (*quoting Cunard S.S. Co. v. Salen Reefer Serv. AB*, 773 F.2d 452, 457 (2d Cir. 1985)).[19]

A decision that comity does not require "yielding to the foreign proceeding" is within the discretion of the bankruptcy court. *Hobson v. Travelstead* (*In re Travelstead*), 227 B.R. 638, 656 (D. Md. 1998); *see Bigio*, 239 F.3d at 454 ("The decision whether to dismiss a case on international comity grounds ordinarily lies within the discretion of the court."). Moreover, the "party seeking to have a U.S. court extend comity bears the burden of proving the comity is appropriate." *In re Travelstead*, 227 B.R. at 656 (*citing*, *inter alia*, *Linter Group*, 994 F.2d at 999).

The E&Y Defendants cannot carry this burden. As a threshold matter, the Debtor is unaware of any precedent recognizing a federal common-law "comity" exception to the automatic stay, which by its express terms (and by Congressional design) applies extraterritorially. Beyond this, the Debtor is unaware of any precedent wherein comity was granted to a foreign proceeding in the absence of a conflicting judgment or order of the foreign court. Even if comity could serve as an extra-statutory exception to the automatic stay, and could apply to an involuntary petition that has not yet been adjudicated by the foreign court, sound legal and practical reasons militate against granting comity here, where the Debtor's

---

[19]  In *Linter Group*, the Second Circuit affirmed the district court's application of the international comity doctrine to abstain from exercising jurisdiction over securities actions against an Australian corporation that was the subject of ongoing insolvency proceedings in Australia, where comity "did not violate any laws or public policies of the United States." 994 F.2d at 1000. As discussed below, by way of contrast, granting comity to the Involuntary Petition here would violate United States law and the rights of the Debtor's domestic creditors by permitting foreign creditors to go forward with an action against the Debtor in violation of the automatic stay.

center of main interests – including its headquarters, property, books and records, business
operations, and the majority of its creditors – are all located in the United States, and the Debtor
has virtually no operations in Bermuda.

### A.    There is No Comity Exception to the Automatic Stay

As discussed above, the automatic stay applies extraterritorially and is
enforceable by its terms against all parties over which the Court has personal jurisdiction
(including the E&Y Defendants). There are twenty-eight exceptions to the automatic stay set
forth in § 362(b) of the Bankruptcy Code, and three more set forth in the §§ 559-561 safe harbors
applicable to repo, swap, and master netting agreements. Not one of these is for "international
comity." And it is not as though Congress was unaware of the possibility of foreign insolvency
proceedings involving a chapter 11 debtor. To the contrary, there is an entire chapter of the
Bankruptcy Code devoted to cross-border insolvencies. *See generally* 11 U.S.C. § 1501-1532.
Surely if Congress had intended for there to be an "international comity" exception to the
automatic stay, it would have said so. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S.
443, 449-50 (2007) (unanimously reversing disallowance of proof of claim based on a judge-
made doctrine that was not tethered to any statutory exception to allowance set forth in
§ 502(b)(1)-(9)). *Compare* 11 U.S.C. § 502(b) (requiring allowance of a claim "except to the
extent that" any of the exceptions in subparagraphs (1)-(9) are satisfied) *with* § 362(a)
(bankruptcy petition operates as a stay, "applicable to all entities," "[e]xcept as provided in
subsection (b)"). *Nakash* and *Madoff*, both of which involved extraterritorial proceedings that
violated the automatic stay, support the proposition that the doctrine of international comity does
not override the automatic stay.

In *Nakash*, the Official Receiver for the State of Israel, acting in its capacity as receiver for a failed Israeli bank, obtained a judgment against the bank's directors, which was then used as the basis of an initial involuntary bankruptcy petition against one of the directors in Israel. The petition was dismissed, and the receiver appealed. While the appeal was pending, the debtor filed a voluntary petition for chapter 11 relief in the United States. *Id.* at 767. While the chapter 11 case was pending, the receiver requested and obtained an order from an Israeli court authorizing and directing him to file a second involuntary bankruptcy petition against the debtor in Israel. The receiver filed the petition, and the debtor commenced an adversary proceeding in his chapter 11 case against the receiver seeking (i) a declaration that the second involuntary petition violated the automatic stay and (ii) an injunction against further stay violations. Prior to trial in the adversary proceeding, the Supreme Court of Israel reversed the dismissal of the first involuntary bankruptcy petition and remanded for further proceedings. The receiver argued that the doctrine of international comity required the court to respect and defer to the Israeli court's determination approving the receiver's filing of the second involuntary bankruptcy petition. Judge Lifland disagreed, distinguishing between the Israeli court's determination and the receiver's actions:

> I do not find that comity is an issue to be considered at this point in time. The receiver, a party in interest in this case who has appeared before the court and has sought various relief from the court as a judgment creditor, unilaterally pursued *ex parte* acts against the Debtor and the estate without advising or obtaining approval from this court. As such, the Receiver has violated the automatic stay. Comity does not require me to respect or defer to the acts of a judgment creditor. This finding does not implicate the determinations made by the Israeli courts.

*Nakash*, 190 B.R. at 770.

In *Madoff*, the SIPA trustee sued certain Cayman Islands entities in the bankruptcy court for avoidance and recovery of preferential transfers. In response to the

trustee's action, the defendants commenced an action against the trustee in the Cayman Islands

seeking a declaration of non-liability.  The trustee moved the bankruptcy court for a

determination that the Cayman Islands proceeding violated the automatic stay and an injunction

enforcing the stay.  The defendants argued that an injunction against a foreign judicial

proceeding violated the doctrine of international comity.  Judge Lifland disagreed, finding the

doctrine of international comity inapplicable where the foreign proceeding violated United States

law or interfered with the exclusive jurisdiction of a United States court.  *Madoff*, 460 B.R. at

122 (*citing Rimsat*, 98 F.3d at 963 ("Comity is a doctrine of adjustment, not a mandate for

inaction.")); *cf. In re Pan Am. Corp.*, 950 F.2d 839, 847 (2d Cir. 1991) (concluding that comity

vis-à-vis state law under 28 U.S.C. § 1334(c)(1) "is not strained when a federal court cuts off

state proceedings that entrench upon the federal domain" (quotations, citation omitted)).

Judge Lifland's reasoning in *Nakash* and *Madoff* applies perforce here.  Even

assuming *arguendo* that extension of the 362 Injunction would conflict with a determination of

the Bermuda Court (which, as discussed below, it would not), the focus of the 362 Injunction is

the *conduct of the Defendants*, who are parties before this Court and subject to personal

jurisdiction here, as distinct from any *determination of the Bermuda Court*.  Additionally, the

acts prohibited by the 362 Injunction would affirmatively violate United States bankruptcy law

and conflict with federal bankruptcy policy.  Thus, any determination of a foreign court

purporting to authorize such actions is entitled to no deference from this Court.

That this Court, by virtue of its having *in personam* jurisdiction over the

Defendants, may exercise that jurisdiction extraterritorially in the context of a chapter 11 case

also comports with Bermuda law.  *See Cambridge Gas*, [2006] UKPC 26 [12] (discussing *in

personam* jurisdiction in the context of enforcement abroad of an order from a chapter 11 case in

New York and that the order would be "binding upon persons over whom the New York court

had jurisdiction"); *see generally* Kawaley, *supra*, at 221 (discussing *Cambridge Gas*) and 226-28

(discussing cooperation between the Bermuda Supreme Court and United States Bankruptcy

Courts).

**B.      There is No Foreign Judgment to Which this Court Must Grant
          Comity or Give Deference**

It is well-established that comity may be granted to a decision or judgment of a

foreign court if it is shown that the foreign court is a court of competent jurisdiction and that the

laws and public policy of the United States and the rights of its citizens will not be violated.

*Hilton*, 159 U.S. at 202-03.  As is often the case, a party invoking the doctrine of international

comity is seeking the "recognition" and enforcement of a foreign judgment.  *Bigio*, 239 F.3d at

454; *see also Hilton*, 159 U.S. at 166 (noting that the "effect to be given to foreign judgments is

altogether a matter of comity").

In this case, the principles of international comity would not be offended by

extension of the 362 Injunction because *there is no foreign judgment* that the Defendants are

seeking to have recognized or enforced by this Court.  As this Court correctly noted (and the

E&Y Defendants' counsel conceded) at the TRO Hearing, "at this point . . . nobody's asking

[Your Honor] to disregard the order of a Bermuda judge."  (Hr'g Tr. 7/3/12 at 74:24-75:2).

There is simply no foreign judgment or decision for this Court to grant comity to or that would

require this Court to abstain from exercising its jurisdiction over the E&Y Defendants, the

Debtor's chapter 11 case, and property of the estate.  *Cf. Hong Kong and Shanghai Banking

Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 999 (9th Cir. 1998) (noting that in the context

of international comity, a bankruptcy court "may choose to exercise its power to the full extent

of its jurisdiction in an appropriate case").

The Bermuda proceeding has not progressed much at all since the initial hearing more than a month ago.  The Bermuda Court has not yet entered any judgments or decisions that raise any concerns about international comity for this case.[20]  In fact, the Bermuda proceedings have been adjourned until August 31, 2012.

By way of contrast, substantial relief has already been granted in the chapter 11 case.  Most fundamentally, the Debtor's bankruptcy filing constituted an order for bankruptcy relief as a matter of law.  11 U.S.C. § 301(b) (commencement of a voluntary case constitutes an order for bankruptcy relief).  Thus, if anything, these proceedings should be entitled to deference from the Bermuda Court; and it is the Bermuda Court that should abstain on international comity grounds in favor of this chapter 11 proceeding.

**C.      For Both Legal and Practical Reasons, Including That the Debtor's Center of Main Interests is Located in the United States (and Not in Bermuda), it Makes Logical Sense for this Chapter 11 Case to Proceed First**

For both legal and practical reasons, it makes logical sense for this chapter 11 case to proceed in lieu of the Involuntary Petition in Bermuda.  First of all, as noted above, the Debtor's center of main interests is located here in the United States.  In determining where the debtor's "center of main interests" was located in *Bear Stearns*, Judge Lifland concluded that

> [v]arious factors could be relevant to such a determination, including: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

---

[20] It should be noted that the Bermuda Court entered an order on June 22, 2012, a true and accurate copy of which is attached hereto as Exhibit I, adjourning the Bermuda proceedings until August 31, 2012 and setting forth the timing for the parties in that proceeding to submit papers.  That order, of course, is not by any means a final judgment or decision on the merits by the Bermuda Court that would warrant dismissal of this action or abstention by this Court on international comity grounds, and the E&Y Defendants have not argued as much.  In addition, the schedule set forth in this order was subsequently vacated by agreement of the parties.

2007 Bankr. LEXIS 4762 at *15.  Considering these factors here, it is clear that the Debtor's

center of main interests is located here in the United States, because

> (i)     the Debtor's headquarters are located in the United States;
>
> (ii)    the investment manager and consultants that provide the day-to-day
>         administrative and clerical services for the Debtor are located in the United States;
>
> (iii)   the Debtor's primary assets and property of the estate are located in the United
>         States;
>
> (iv)    all of the Debtor's non-insider creditors are located in the United States; and
>
> (v)     United States law (including New York state law) would apply to most of the
>         parties' disputes in this chapter 11 case.

Given that the Debtor's center of main interest is located in the United States, it makes legal and

practical sense for this chapter 11 case to proceed first.  Consideration of these same factors and

the conclusion that this Court should lead in these circumstances are also supported under

Bermuda law.  *See* Kawaley, *supra*, at 235 (noting that the "leading role typically being

determined by the *commercial centre of gravity* rather than the jurisdictional centre of gravity"

(emphasis added)).

Another reason for this case to proceed in lieu of the Involuntary Petition in

Bermuda is that this Court is best-equipped to protect and preserve the estate for the benefit of

*all* creditors, and not just the Defendants.  There is no comparable chapter 11 proceeding under

Bermuda law.  As this Court noted in *Lyondell*, "it's [the Court's] job" to protect the estate from

the kind of irreparable harm that would result from the defendants being permitted to proceed

with liquidation of the Debtor and property of the estate in Bermuda.  *See* 402 B.R. at 591.  Here,

the need for the Court to exercise its jurisdiction over the defendants is even more pressing than

in *Lyondell*, because the defendants in this case have already commenced involuntary liquidation

28

proceedings against the Debtor in Bermuda.  They have also made clear that their intention

through the Bermuda proceeding is to liquidate the Debtor, rather than reorganize.

## CONCLUSION

For the foregoing reasons, and for the reasons to be set forth at or prior to the

hearing on the Motion,[21] the Debtor respectfully requests that this Court grant the Motion, as

subsequently modified, and extend the 362 Injunction as a preliminary injunction.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ David R. Hurst*
_____
David R. Hurst (DH-9173)
Daniel F.X. Geoghan (DG-3132)
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Email: dhurst@ycst.com
Email: dgeoghan@ycst.com

Melanie K. Sharp (admitted *pro hac vice*)
Monté T. Squire (admitted *pro hac vice*)
Patrick A. Jackson (*pro hac vice* pending)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Dated: New York, New York
      July 26, 2012       *Proposed Counsel to the Debtor and*
*Debtor-in-Possession*

---

[21]  Given that the deadline for filing this Reply Brief was only few hours after the E&Y Defendants'
papers were filed, the Debtor has not had an opportunity to review or meaningfully reply to arguments
raised by the E&Y Defendants.  Accordingly, the Debtor reserves the right to supplement this Reply
Brief, or request leave to supplement, prior to or at the hearing on the Motion.

01: 12301714.2

## **EXHIBIT A**

**Transcript of July 23, 2012, Hearing**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg

- - - - - - - - - - - - - - - - - - - -x

In the Matters of:

FLETCHER INTERNATIONAL, LTD.,

               Debtor.

- - - - - - - - - - - - - - - - - - - -x

FLETCHER INTERNATIONAL, LTD.,

               Plaintiff,

   v.

FLETCHER INCOME ARBITRAGE FUND-IN VOLUNTARY

LIQUIDATION, et al.,

               Defendants.

- - - - - - - - - - - - - - - - - - - -x

               United States Bankruptcy Court

               One Bowling Green

               New York, New York

               July 23, 2012

               2:18 PM

B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

2

Telephone Conference re:   TRO

Transcribed by:   Clara Rubin

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

3

A P P E A R A N C E S (TELEPHONICALLY):

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     Counsel for the Debtor

     1270 Avenue of the Americas

     Suite 2210

     New York, NY 10020

BY:   DANIEL F.X. GEOGHAN, ESQ.

     DAVID R. HURST, ESQ.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     Counsel for the Debtor

     Rodney Square

     1000 North King Street

     Wilmington, DE 19801

BY:   MELANIE K. SHARP, ESQ.

4

SATTERLEE STEPHENS BURKE & BURKE LLP

        Counsel for Fletcher Income Arbitrage Fund

           and FIA Leveraged Fund

        230 Park Avenue

        New York, NY 10169


BY:    TIMOTHY T. BROCK, ESQ.

        DAVID R. LURIE, ESQ.

        JUSTIN E. KLEIN, ESQ.

        MARIO AIETA, ESQ.



HOLLAND & KNIGHT LLP

        Counsel for Fletcher Fixed Income Alpha Fund, Ltd.

        10 Saint James Avenue

        11th Floor

        Boston, MA 02116


BY:    JOHN J. MONAGHAN, ESQ.

FLETCHER INTERNATIONAL, LTD.                                    5

1                           P R O C E E D I N G S

2              THE COURT:  Hello.  This is Robert Gerber.  May I find

3     out who's on the phone, please?

4              MR. LURIE:  Judge, David Lurie, Timothy Brock and

5     Justin Klein of Satterlee Stephens, for the defendants

6     leveraged in Arbitrage.

7              MR. AIETA:  Mario Aieta from Satterlee Stephens, also

8     for those defendants.

9              THE COURT:  I couldn't hear you.  Could you repeat

10    yourself, please?

11             MR. AIETA:  Mario Aieta from Satterlee Stephens, also

12    for those defendants.

13             THE COURT:  All right.

14             MR. HURST:  Judge, this is David Hurst and Daniel

15    Geoghan from Young Conaway, representing the debtor.

16             THE COURT:  All right.

17             MR. MONAGHAN:  And, good afternoon, Your Honor.  John

18    Monaghan from Holland & Knight, counsel to the Alpha Funds

19    defendant.

20             THE COURT:  All right.  Gentlemen, the original

21    purpose of my call was -- and I hear a lot of noise on the

22    other side of the phone.  You're going to have to be quiet or

23    I'm going to require you to take yourselves off speakerphone or

24    to limit the number of participants on the call.

25             I had initially contemplated this call for you guys to

**FLETCHER INTERNATIONAL, LTD.**                                    6

1  explain to me why you were arguing over a four-day difference

2  in the expiration of the TRO insofar as it had previously

3  blocked the shareholder vote.  And I still want to know why I

4  saw so much letter-writing and so much controversy over that.

5          Since then, I've seen Mr. Lurie's most recent e-mail

6  to my chambers and have seen a supplemental declaration which

7  seems to say, or at least suggest, that facts were

8  misrepresented to me repeatedly earlier in this case.  And I

9  need to know what is going on in this case and what the

10  implications of that are true if, as it appears, the debtor is

11  now saying never mind with respect to everything that I was

12  told in the outset of this case.

13          I don't know at this juncture what the implications of

14  that are vis-a-vis a shareholder vote or anything else; I guess

15  it depends in part on whether I was told the truth the first

16  time or now and whether a judicial estoppel results from

17  anything that I was told at one time.  But I need to know what

18  is going on this case, and I need to know why I should not just

19  end the TRO on the shareholder vote immediately and have a

20  broader preliminary injunction hearing on the status of my

21  injunction against proceedings elsewhere, given the new

22  disclosures.

23          Mr. Lurie, let me hear from you first, including, of

24  course, why there's such a big fight over four days.

25          MR. LURIE:  Certainly, Your Honor.  And I would submit

FLETCHER INTERNATIONAL, LTD.                    7

1  just at the outset that a great deal of the answer to that

2  important question, that is, the timing, is set forth in the

3  materials that I submitted to you a few minutes ago, and I

4  apologize for the lateness of submitting those to you.

5          Your Honor, when we -- I was not there because we

6  didn't represent the defendants at that point, but when the

7  debtor first appeared before this Court, it represented in

8  multiple pleadings that one of our clients, Arbitrage, owned

9  the super-majority interest in the debtor, and in fact they had

10 represented as much to us.  And we were proceeding, as the

11 debtor represented, to exercise our equityholder rights in this

12 first filed insolvency proceeding in Bermuda when this action

13 was filed, filed for the express purpose of blocking that

14 action.

15         Your Honor, as we began to investigate -- and it's

16 been very, very difficult for our clients, although they're

17 experienced, in some cases, forensic accountants, to get to the

18 bottom of a series of incredibly and quite deliberately obscure

19 corporate ownership structure here.  But they began to

20 investigate further.  They found evidence, including an

21 unsigned minutes of one of the corporations at issue here, that

22 at one time very recently, ownership had in fact transferred --

23 ownership of the debtor had transferred to our client,

24 Arbitrage.  And again, that's what was represented to the Court

25 by the debtor, and that was how we were proceeding, including

**FLETCHER INTERNATIONAL, LTD.**                                           8

1  in Bermuda, when this action was filed, when the blocking

2  lawsuit was filed here.

3      Apparently, although the debtor -- and the debtor can

4  speak for itself on this -- acknowledges that that transaction

5  may have occurred, that is, yes, it's possible, we're not

6  really sure that Arbitrage, one of the defendants here, owns

7  eighty-seven percent -- I think eighty-three percent of the

8  debtor, it's also possible that an entirely different state of

9  corporate reality is in place and that the Delaware company,

10  that was previously represented to be the minority shareholders

11  owning only a small percentage of the shares, now owns a

12  hundred percent of the debtor.

13      Incidentally, Your Honor, that state of affairs, the

14  state of affairs in which the Delaware company owns a hundred

15  percent of the debtor, is what was represented in various SEC

16  filings as of several years ago.  Be that as it may, we were

17  presented with these two entirely inconsistent accounts of one

18  of the central facts in the case:  just who owns the debtor-in-

19  possession in this case.

20      Now, Your Honor, although we have been blocked in our

21  access to a lot of critical information here, we did note that

22  it was possible that we might, at some point, if we got some

23  traction under the first scenario, the scenario under which the

24  debtor represented that we owned it, then we might be presented

25  with an argument that, no, we're wrong; in fact, this Delaware

**FLETCHER INTERNATIONAL, LTD.**                                    9

1   company owns it.

2          Incidentally, Your Honor, and this is important for

3   the Court to know, we also believe that our client, Arbitrage,

4   owns almost a hundred percent of the Delaware company at issue

5   here.  And that is where the last two of the documents that we

6   submitted to the Court and that were previously submitted by

7   the debtor come into play, the first of them being the second

8   Saunders affidavit.  And that's the affidavit that said no,

9   forget about everything we represented in our 107 filing with

10  the Court previously; the Delaware company -- which I'll call

11  Fletcher Delaware -- owns a hundred percent of the debtor.

12         You'll notice the deliberate obscurity of the record

13  in case there.  The author doesn't say:  I believe as a matter

14  of economic fact that Fletcher Delaware owns a hundred percent

15  of the debtor.  What it says is:  I've been advised by counsel,

16  under certain technical rules in Bermuda, because a certain

17  registry wasn't changed, that in fact because of this technical

18  fact, as a matter of Bermuda law, the Fletcher Delaware entity

19  owns the debtor.

20         So anyway, you got that document, Your Honor.  And

21  then you have the document that appeared on the docket at the

22  end of the day on Friday, which I'm going to refer to as the

23  "lockup agreement", because that's what it is; it's a purported

24  agreement between the members of the board of the Delaware

25  company and the members of the board and the as-yet unapproved

**FLETCHER INTERNATIONAL, LTD.**                    10

1   and unpresented CRO of the debtor, who we've never heard of

2   officially until that contract was presented to Your Honor on

3   Friday, purporting to bar the board of Fletcher Delaware from

4   setting out to change the membership of the board of the

5   debtor.

6          Now, Your Honor, as I mentioned a minute ago, we

7   believe that one of our clients, Arbitrage, the same entity

8   that previously was represented to own eighty-three percent of

9   the debtor directly, owns an even -- or an equivalent

10  percentage of Fletcher Delaware, and that if we were able to

11  exercise our shareholder rights from that direction -- from the

12  Fletcher Delaware direction, then we would have been able -- we

13  would be able to achieve the same end that debtor set out to

14  enjoin us from doing when they first appeared in front of Your

15  Honor, that is, to exercise our right as the overwhelming

16  shareholder and, by far, largest creditor, by becoming what

17  we're entitled to be, in our view:  the debtor-in-possession in

18  this case.

19         So, Your Honor, it's a deeply confused and, I submit

20  all the circumstantial evidence indicates, deliberately

21  confused, state of affairs that the Court is presented with.

22  But one thing is absolutely clear, and that is that -- and I'm

23  going to be careful here but strong because I think the facts

24  merit it -- there's been a deliberate attempt to utilize this

25  Court's injunctive power to frustrate our legitimate exercise

FLETCHER INTERNATIONAL, LTD.                    11

1   of our, whether it's direct or beneficial, shareholder rights

2   in the debtor, with absolutely no basis in fact.

3              And let me add the final piece and the reason why I

4   say that so emphatically.  When Your Honor was first presented

5   in the hearing, which, again, I was not present at but of

6   course have studied the transcript of in this case, the

7   representation was made that there was some bizarre scheme to

8   frustrate the debtor from filing a Chapter 11 case in this

9   court, and that, in fact, the entire Bermuda proceeding that

10  our client had commenced before this case was filed was part of

11  that scheme to frustrate a, the term was used, reorganization,

12  but -- and I'm not going to get into the distinction in this

13  case between reorganization and liquidation because, for

14  reasons we can discuss, it's a distinction without a

15  difference.

16             But in any event, we commenced this Chapter 11 case,

17  and --

18             THE COURT:  I didn't hear that, Mr. Lurie.

19             MR. LURIE:  Sorry?  I apologize?

20             THE COURT:  I couldn't hear what you said.

21             MR. LURIE:  Oh, all that was said --

22             THE COURT:  Wait.  Time out.  You can't talk over me,

23  Mr. Lurie.

24             MR. LURIE:  Oh, I'm sorry, Your Honor.

25             THE COURT:  What I was saying is that, either because

FLETCHER INTERNATIONAL, LTD.                          12

1  you were talking so fast or the noise in my courtroom or both,

2  I didn't hear the last thing you said; it was something after

3  you were talking about the accusations of a plan before the

4  filing to thwart a reorganization.

5          MR. LURIE:  And my apologies, Your Honor, for speaking

6  fast and, oh, certainly for speaking over Your Honor.

7          THE COURT:  I still can't understand you.  If you're

8  speaking on a speakerphone, I think you need to get off.

9          MR. LURIE:  Yeah, I'm going to get off this; actually,

10 I don't know if I'm able to do that, because it's the nature of

11 the device that I'm using.  Can you hear me better now?

12         THE COURT:  Well, I hear the words "Can you hear me

13 better now," so that's a step in the right direction.  Try

14 again, please.  And try to speak slowly and clearly.

15         MR. LURIE:  Certainly, Your Honor.  The representation

16 was made on behalf of the debtor, Fletcher -- which I'll call

17 Fletcher Bermuda so as not to confuse it with the Delaware

18 entity -- that there was a scheme -- a scheme undertaken by my

19 client, the two feeder funds, Arbitrage and Leverage, as well

20 as a third defendant fund, Alpha, to set out to preemptively

21 torpedo or prevent the effective filing of a Chapter 11 case

22 before this Court.  Now, that theory was presented to the Court

23 and, as Your Honor will recall, was the subject of a one-hour

24 discovery conference in which the Court allowed the debtor, in

25 advance of Friday's hearing, to pursue discovery in order to

1  substantiate that theory, the theory that was at the heart of

2  their case, that our very filing in Bermuda of an insolvency

3  proceeding respecting a Bermuda company was improper and

4  conspiratorial because its object was to frustrate the filing

5  of a Chapter 11 case in this court.

6         Two days after the conference before Your Honor, and

7  after our clients had diligently endeavored on an extremely

8  expedited basis to satisfy the plaintiff's extensive discovery

9  demands, plaintiff sent a letter to this Court, without

10 explanation, withdrawing in its entirety their demand for an

11 injunction against shareholder action and all of their

12 discovery requests.

13         Therefore, Your Honor, as we approach the hearing on

14 Friday, there is absolutely no record evidence before the Court

15 that substantiates the lynchpin of plaintiff's claims and the

16 sole basis, I would submit, at least the sole potentially

17 legitimate basis for all their claims for injunctive relief.

18 They withdrew not only the claim but all discovery related to

19 it.

20         And so it's not just that the debtor's story about who

21 owns it has changed 180 degrees, but it's also that the

22 debtor's attempt to substantiate the substantive claim that

23 formed the entire basis for their request for injunctive relief

24 was withdrawn.

25         We submit, Your Honor, that first of all it is essential,

**FLETCHER INTERNATIONAL, LTD.**                                    14

1  days are essential, days matter here and that, at a minimum, we

2  submit that we're entitled to have that portion -- it's

3  paragraph (i)(2) of the TRO order, that bars the taking of

4  shareholder action, the exercise of shareholder rights -- that

5  that be vacated immediately.  It's been withdrawn.  The claim

6  has been -- or any attempt to substantiate the claim has been

7  withdrawn and we have seen, over the past several days, again,

8  that days matter and that the debtor, or persons affiliated

9  with it more likely, are actively attempting to undertake

10 whatever steps they can within, or potentially outside the law,

11 to frustrate our exercise of shareholder rights.  Therefore, we

12 submit that that portion of the TRO should be vacated

13 immediately.

14      But Your Honor, respectfully, I know this is not a normal

15 course request, but I also believe this is not a normal course

16 fact pattern in any respect; we submit that the entirety of the

17 TRO should be vacated at this time.  There's simply is no

18 longer even an allegation in fact, let alone any basis in fact,

19 for enjoining a legitimate first-filed insolvency proceeding in

20 Bermuda, the place of incorporation of the debtor, from

21 proceeding.  So the theory of conspiracy is gone and with it

22 any basis for that relief.

23      That is, I think, at this point, all that we have to say

24 on the matter unless the Court has questions.

25          THE COURT:  All right.  Does that take care of your

FLETCHER INTERNATIONAL, LTD.                    15

1  side, Mr. Lurie?

2          MR. LURIE:  Yes, it does Your Honor.

3          THE COURT:  All right.  Mr. Geoghan?

4          MR. HURST:  Your Honor, this is David Hurst with Young

5  Conaway representing the debtor.

6          Mr. Geoghan will have some things to talk about, but I

7  think the most important thing at this point is that we explain

8  to you the discrepancy between the first day declaration and

9  the supplemental declaration, both signed by Mr. Saunders, our

10 president.

11         Sitting here listening to Mr. Lurie, I understand why

12 Your Honor had concerns and hopefully I can explain to you

13 exactly what happened and you'll understand that there was

14 absolutely no bad intent on behalf of the debtor and actually

15 we're doing our best, at all times, to present accurate facts

16 to the Court.

17         When we were before Your Honor on July 3rd, we

18 explained, in just our opening commentary, that we had filed

19 this Chapter 11 case on less than two days' notice and that we

20 certainly had not done the, sort of, comprehensive bankruptcy

21 planning that our firm typically does.

22         But given that as it is, we did the best with what we

23 could at the time and since then have taken numerous steps to

24 understand the debtor better and to really start the process of

25 the reorganization here.

**FLETCHER INTERNATIONAL, LTD.**                    16

1    But let me explain to you exactly how the ownership

2   changed or exactly what happened there.  So when we filed the

3   case, the debtor's books and records reflected that the

4   Fletcher Income Arbitrage Fund, who I'll refer to as Arbitrage

5   was the eighty-three percent owner of the debtor and that

6   Fletcher International, Inc., which has been referred to today

7   as Fletcher Delaware, was the seventeen percent owner.  And

8   that was reflected on the corporate organizational chart that I

9   handed up to Your Honor at the July 3rd hearing.

10    That ownership structure, Your Honor, arose due to an

11   April 22nd, 2012 transaction where Fletcher International -- or

12   Fletcher Delaware, I'm sorry -- sought to redeem its stock held

13   by Arbitrage.  Okay?  As consideration for that redemption

14   Fletcher International agreed to transfer to Arbitrage a

15   portion of the stock that Fletcher International held in the

16   debtor.  So these two entities, the ones that were presented as

17   the shareholders of the debtor on July 3rd, back on April 22nd,

18   they swapped shares.  All of the shares held by Arbitrage of

19   Fletcher Delaware were sent back to Fletcher Delaware.  The

20   consideration was that shares of the debtor held by Fletcher

21   Delaware were supposed to go to Arbitrage.  That was the deal.

22    The boards of directors of Fletcher International --

23   of Fletcher International, or Fletcher Delaware, and the board

24   of Arbitrage both agreed to the transaction and it was recorded

25   in the parties' books and records.  And that's how we ended up

**FLETCHER INTERNATIONAL, LTD.**                    17

1   with the ownership structure we presented to you on July 3rd.

2          The one thing that wasn't done, and it turns out to be

3   an important thing, is that the transfer of the debtor's shares

4   was never recorded in what they call the register of members,

5   just a stock register essentially, which is maintained by

6   Appleby Services Bermuda Limited, which is the debtor's

7   corporate secretary, and it's maintained in Bermuda.

8          The debtor has Bermuda counsel in this case, Your

9   Honor, and Bermuda counsel has raised the issue with us that

10  according to the register members, the debtor is listed -- the

11  debtor's sole shareholder is listed as Fletcher Delaware.  And

12  to me, being more familiar with Delaware law, I know that a

13  share register is presumptively correct but you can --

14  obviously, it doesn't mean it's conclusive.

15          THE COURT:  Why didn't Appleby's do that?  Was it --

16  it was a ministerial act or required by contract or both,

17  right?

18          MR. HURST:  Well actually the transaction between

19  these two parties, Your Honor, was not -- they are both

20  affiliates and I have to tell you that the transaction is not

21  papered in the way a normal transaction, if it were between two

22  separate entities that each -- or different companies,

23  completely separate boards and everything, you would have a

24  document that would say, okay, this is the transaction,

25  something like that.  Here, the transaction is recorded,

FLETCHER INTERNATIONAL, LTD.                                    18

1   basically, in spreadsheets that track ownership of companies.

2   And it may be recorded in other ways as well but it's not

3   papered the way you would hope it would be papered.  And

4   unfortunately, the companies here were not paying attention to

5   certain formalities which, to a U.S. lawyer might not be all

6   that important and it could be fixed down the road, but in

7   Bermuda they have -- it's a lot more important.  And we spent

8   time, I mean, we've been drilling down with Appleby to try to

9   understand what the consequence of failing to update the

10  register is.  And what they tell us is that until you update

11  the register, shares just don't transfer.

12          If we were to update the register today -- let's just

13  say that was possible and I'll explain why it's not exactly

14  possible -- but if we updated the register today to reflect

15  what admittedly is in the debtor's books and records, the

16  shares would transfer today.  They don't relate back.  So this

17  register of members is a very significant document and the

18  parties absolutely should have paid more attention to it, but

19  they absolutely did not pay attention to it.  And as to why in

20  the world a company with as many lawyers as these companies had

21  this didn't happen, I have no idea.  But the fact is there's a

22  register of members and the second declaration of Mr. Saunders,

23  which is docketed at docket number 18, attaches it.  And sure

24  enough, if you look at it, it says all the debtor's shares are

25  owned by this company, Fletcher Delaware.  That's not -- the

FLETCHER INTERNATIONAL, LTD.                    19

1   debtors are not claiming that -- the debtor's perspective is

2   the parties' intentions were that there was a transaction, it

3   is absolutely recorded in the books but, unfortunately, the

4   parties failed to pay attention to very important, what we

5   would call a formality in the U.S., it's a much more

6   substantive thing in Bermuda.

7          Now, it's not as simple as just going to update the

8   share register.  I can't tell you that we completely understand

9   the process at this point, but if Arbitrage wanted to update

10  it, they would have to sue us, as far as we understand.  And

11  the fact is that the particular percentage ownership that was

12  transferred or was purported to be transferred from Fletcher

13  Delaware to Arbitrage is disputed.  We believe that the parties

14  intended, and the books reflect, that eighty-three percent of

15  the ownership of the debtor has transferred.

16         I heard Mr. Lurie say that they think, actually, they

17  are the rightful owners of almost a hundred percent of the

18  debtor.  So as you can see, first, the bottom line is there's

19  going to be a dispute about that transaction; Fletcher Delaware

20  and Arbitrage are going to have a big fight.  As far as the

21  debtor is concerned, we don't care.  Either way, whatever the

22  facts are, we'll deal with those facts.  But right now, we know

23  who our shareholder is; after they litigate either in, I guess,

24  Delaware or Bermuda or Cayman, I don't know where, when they --

25  the result of that fight, we'll know who the owner is and that

**FLETCHER INTERNATIONAL, LTD.**                    20

1  somebody's going to go to the court in Bermuda and fix that

2  share register.

3        There's a couple other hurdles for them, among others,

4  that apparently the debtor is considered a nonmutual fund

5  company and the significance of that in Bermuda is that the

6  shares are not even freely transferable.  It's as if it's

7  restricted stock.

8        So even if the companies decided they wanted to

9  transfer these shares, it would be illegal without getting

10  permission from the Cayman Monetary -- I mean the Bermuda

11  Monetary Authority.  The consequence of that is, you certainly

12  can still transfer them, it doesn't mean the transaction is

13  void; it means it's voidable.  It also means that the holder of

14  the share register is never going to enter a transfer until

15  it's done properly because then they would have liability.

16        So you can see the parties, here, to this transaction,

17  which wasn't the debtor -- it was Mr. Lurie's client and also

18  Fletcher Delaware -- they messed up and they messed up in a big

19  way.  Now the consequence is the debtor's in bankruptcy,

20  Arbitrage is in liquidation and they have an incredible mess

21  just because the documenta -- the deal was not papered

22  properly.

23        And so, unfortunately, Your Honor, we believe

24  everything we told you on July 3rd and it's still in the books

25  and records of the debtor, it's still in the books and records

**FLETCHER INTERNATIONAL, LTD.**                                21

1   of the other parties, but unfortunately, it's just as if it

2   never happened.

3          So that's what happened and I'm happy to explain

4   anything else, but that's pretty much what we know at this

5   point.

6          THE COURT:  All right.  Now, Mr. Hurst, are you also

7   going to be telling me, either today or at some point in the

8   future, that the standstill and consultation agreement is a

9   binding agreement without me having approved it?

10         MR. HURST:  Your Honor, I'm happy to address -- I'm

11  happy to address the agreement if you'd like.

12         THE COURT:  Well, I take it you don't dispute that

13  it's out of the ordinary course?

14         MR. HURST:  Your Honor, actually I -- well, Your

15  Honor, I would submit that it's not but I'd be happy to discuss

16  with you why we did it.

17         THE COURT:  That it's not what?  You think it is an

18  ordinary course transaction?

19         MR. HURST:  Yes, Your Honor.  We would submit it's an

20  ordinary course transaction.  But I think our judgment about

21  that, Your Honor, I think we can explain it to you, and if you

22  disagree, we're happy to seek court approval.  But even in a

23  situation where -- even in a situation where the debtor

24  conducts something or enters into an agreement or sells

25  something and mistakenly determines that it's in the ordinary

**FLETCHER INTERNATIONAL, LTD.**                                    22

1  course when really it's not, I believe that that agreement is

2  still enforceable against the counterparty; it's not

3  enforceable against the debtor.  That's not to say that was our

4  strategy.  We absolutely believe this is not something that

5  would require court approval but, Your Honor, if we got it

6  wrong then we will make it right.

7       I think, though, the constructive thing for me to do,

8  if Your Honor will listen, is for me to explain the agreement

9  and then our conclusion that it didn't require court approval,

10 and if you disagree then we will make it right.

11      Your Honor, may I proceed describing it?

12      THE COURT:  Yes, you may.

13      MR. HURST:  Okay.  Thank you, Your Honor.

14      On December 20 -- July 20th, Your Honor, the debtor

15 entered into an agreement which we called the standstill and

16 consultation agreement with Fletcher International -- or,

17 Fletcher Delaware, that is.

18      The agreement requires, Your Honor, that the debtor

19 shall consult with Fletcher Delaware in all matters that

20 involve the use, sale or lease of property outside the ordinary

21 course of business.  Okay?  It's, sort of, the same thing that

22 you would do if you were running a debtor case, the thing you

23 should do with all your significant constituents to make the

24 case run consensually.  So we agreed to do something that we

25 would do anyway but instead of just doing it as a professional

FLETCHER INTERNATIONAL, LTD.                                    23

1  courtesy, we are agreeing to do it by contract.

2         However, the debtor is not obligated to follow

3  anything that Fletcher International says; we just need to

4  give -- I'm sorry, Fletcher Delaware -- we just need to give

5  Fletcher Delaware access to the CRO and to the board so that

6  their views can be heard which, you know, that's what we should

7  provide everyone, all the significant constituents, and indeed

8  we're happy to do so.

9         The agreement -- as consideration for that, Your

10 Honor, the agreement provides that Fletcher Delaware shall not,

11 for a limited period, 180 days, hold any shareholder meeting or

12 shareholder vote to affect a change in the debtor's board or to

13 push the debtor into a foreign solvency proceeding.  There is a

14 fiduciary out for Fletcher Delaware's board because, of course,

15 otherwise it wouldn't be a valid agreement.  You can never

16 force another board to violate fiduciary duties, so there is a

17 fiduciary out.

18        The companies agreed to this and really for reasons

19 which I -- really help everyone.  The first thing is, in order

20 to facilitate a consensual Chapter 11 process, all right, it's

21 necessary that all constituents, the bankruptcy court and the

22 U.S. Trustee, all parties-in-interest, are confident that this

23 debtor is being managed independently from its corporate family

24 and that its shareholder, which is Fletcher International and

25 probably -- or Fletcher Delaware, sorry -- that Fletcher

FLETCHER INTERNATIONAL, LTD.                                    24

1  Delaware, which will be the shareholder for some period of time

2  while all this litigation plays out, that Fletcher Delaware is

3  not going to attempt to influence the outcome of this case

4  through the exercise of shareholder rights or the threat of it.

5  We don't want anything going on behind the scenes, and we don't

6  want any appearance that anything could be going on behind the

7  scenes where we're going to unfairly favor Fletcher Delaware.

8          It's also important, Your Honor, we believe -- and

9  we'll be talking more about this on Friday -- it's necessary,

10 absolutely necessary to avoid the distraction of the debtor's

11 management that would be caused by shareholder action or the

12 threat thereof.  We are spending an inordinate amount of time

13 dealing with all these things, and it's absolutely paralyzing

14 the debtor.

15         We believe a consensual process will provide the

16 greatest opportunity for the debtor to maximize value, which is

17 good for the debtor; it's good for Fletcher International,

18 which is why that board, sitting independently, determined that

19 it wanted to enter into this agreement; and it's good for all

20 parties-in-interest, in particular for Mr. Lurie's clients.

21 This is a model of an agreement, the sort of agreement we want

22 to enter into with the liquidators for Alpha, Arbitrage and FIA

23 Leveraged.  You know, it's exactly the sort of thing that you

24 want to happen.  You want the parties to consult and you want

25 them to exercise their rights through normal channels in the

FLETCHER INTERNATIONAL, LTD.                    25

1   bankruptcy process, and that's what we've agreed to here.  It's

2   not -- the debtor hasn't given up anything, hasn't given up

3   anything at all, which is why don't believe -- there's no use

4   of property sale, use or anything of property.  All we're doing

5   is agreeing to consult, which we would do anyway.  And so we

6   don't believe the consideration that's flowing, it means

7   something to the counterparty, and it means something to the

8   counterparty that we are protecting their assets.  And so to

9   FII -- to Fletcher, sorry, Fletcher Delaware there is

10  consideration, it's sufficient consideration that the board

11  there was comfortable it was getting something.  But from the

12  debtor's perspective it's not giving anything that's -- it's

13  just the sort of thing a court is going to approve.  And so we

14  thought we wanted everyone to know about this agreement; we

15  don't want to be secretive.  We want to be transparent and we

16  want everyone to know we're doing the right thing here, trying

17  to move the process forward.  And although our shareholder

18  turns out to be an affiliated entity that everyone -- there's

19  sort of a cloud of suspicion over, we wanted to make sure that

20  everyone recognized they're not pulling the strings.  No one's

21  pulling the strings.

22          We have a chief restructuring officer, Your Honor,

23  that the board appointed, and you will be seeing those papers

24  within a couple days; they're sitting with the U.S. Trustee

25  right now.  The board appointed an independent fiduciary, a man

**FLETCHER INTERNATIONAL, LTD.**                                          26

1   named Don MacKenzie from a restructuring firm called Conway

2   MacKenzie.  He's a twenty-five year veteran of the

3   restructuring industry.  His integrity stands beyond any

4   question.  He has been given sole decision-making authority of

5   the debtor.  The board has made the maximum delegation of

6   authority possible under Bermuda law.  It remains in a position

7   to monitor Mr. MacKenzie, but Mr. MacKenzie's in charge.  He

8   has no affiliation to anybody.  He could care less about all

9   these affiliates.  He could care less about Fletcher Asset

10  Management.  He could care less about Buddy Fletcher.

11           THE COURT:  Hold it, Mr. Hurst.  Now, this MacKenzie

12  retention, I take it it's agreed that I haven't approved that

13  either.

14           MR. HURST:  Absolutely, Your Honor.

15           THE COURT:  Now, is this something that you said is

16  sitting at the U.S. Trustee's office?

17           MR. HURST:  It was submitted to them, Your Honor.

18  I've spoken with Ms. Gasparini several times about it.  She

19  told me the form of agreement to use.  She asked me to follow a

20  Kodak format for a Jay Alix Protocol retention.  We did exactly

21  what she said.  We submitted the papers to her yesterday.  She

22  has provided me comments this morning.  She asked for

23  additional disclosure on one point.  I talked to Mr. MacKenzie

24  this morning and he is busy gathering the data.  We're going to

25  revise his declaration.  He will sign it and we will file it.

**FLETCHER INTERNATIONAL, LTD.**                    27

1      So it's a retention under Section 363 of the

2  Bankruptcy Code pursuant to the Jay Alix Protocol.  But it's a

3  step the debtors have taken, Your Honor, to absolutely provide

4  a firewall between what's gone on historically, whatever it may

5  be, and this debtor which is absolutely trying to do things the

6  right way as evidenced by the CRO and the complete delegation

7  of authority to the maximum extent permitted by Bermuda law and

8  this lockup and the standstill agreement further evidence we're

9  doing everything we can do so that optically and, in fact,

10  there is no issue here.

11      They're trying to create a process so clean that

12  everyone could sit down at the table and they're going to sit

13  across the table from Mr. MacKenzie, who is, you know, beyond

14  reproach.  They'll sit across the table from him and we can

15  negotiate a resolution of this case.

16      We've done everything we can to set up that dynamic,

17  Your Honor, and I'm getting a little passionate about it but we

18  have really tried, and the allegations that are being made are

19  upsetting because they're all viewed in exactly the opposite

20  light.

21      THE COURT:  Do I have a U.S. Trustee representative on

22  this call?

23      MR. HURST:  I don't believe Ms. Gasparini was invited,

24  Your Honor.

25      THE COURT:  Why didn't you guys invite her?

**FLETCHER INTERNATIONAL, LTD.**                    28

1      MR. LURIE:  That was my error, Your Honor.  I didn't

2  include her on the e-mail.

3      THE COURT:  I want all conference calls dealing with

4  the management of this case, in its future, to have the U.S.

5  Trustee's program on the call or at least invited.

6      MR. LURIE:  Yes, Your Honor.  I understand.  I

7  apologize.

8      THE COURT:  All right.  Now, Mr. Hurst, why shouldn't

9  I terminate the TRO insofar as it blocks the stockholder vote

10  right now?

11      MR. HURST:  Okay, Your Honor.  Your Honor, when we

12  discovered -- we got advice from Appleby and we discovered the

13  true state of affairs with respect to our ownership, we sat

14  back, Mr. Geoghan and myself, sat back and tried to think of

15  the implications of that.  The first implication was geez,

16  we're ramping up, we're probably going to do a half a million

17  dollars in discovery or whatever it would take, you know, a

18  couple of hundred grand at least, we're forcing these guys on

19  the other side to do the very same thing and in the end, it's

20  for a situation where we don't even have a shareholder that

21  wants to put us into insolvency.  It doesn't want to replace

22  our board.

23      And so we thought, there's no reason at this point in

24  time to go through this massive, expensive process.  Let's save

25  the money.  Let's save the aggravation and if, down the road,

1   there's a situation where we need protection, then we'll come

2   in front of Your Honor again and what --

3           THE COURT:  I'm still waiting for you to answer my

4   question, Mr. Hurst.  I didn't ask you why you weren't pressing

5   the preliminary injunction.  I asked you why I shouldn't

6   terminate the TRO right now, especially if you contend that the

7   only party with the ability to hurt you is your affiliate that

8   you've entered into this piece of paper with.

9           MR. HURST:  Okay, Your Honor.  As you'll recall, the

10  letter that was sent to you on July 19th from Mr. Brock, okay,

11  it stated they were anxious to lift this part of the TRO, so

12  that they could cease being unnecessarily restrained and may

13  accordingly exercise all their rights as shareholders

14  immediately.

15          Our intention, Your Honor, when we called them off to

16  try to save everyone a lot of money, was not to lift the TRO;

17  it was to prevent expense.  We expected the TRO would expire by

18  its own terms at the hearing on July 27th.  That was the

19  intention.  The problem is, Your Honor, if you would go ahead

20  today and you lift the TRO, I don't know what exactly they're

21  talking about, about why they are so anxious to exercise

22  shareholder rights.  I don't know what the plan is.  Maybe

23  they're going to replace -- attempt to replace all the

24  directors at Fletcher International.  Maybe they're going to

25  file an action in Bermuda to rectify the shareholder register.

**FLETCHER INTERNATIONAL, LTD.**                                      30

1  I don't know, but I have to tell you, the debtor and its

2  management and its CRO are working flat out getting ready for

3  Friday's hearing and we just do not have the manpower to handle

4  another distraction.  Four days is not the end of the world.

5  If they want to next week parachute in at Fletcher

6  International, Inc. and replace that board, and they want to

7  start a big action in Bermuda, that's fine, okay?  But that

8  wasn't our intention.

9          We were trying to do the right thing.  We certainly

10  weren't going to put ourselves in the position where we're

11  going to be under fire from two or three other directions

12  before we head into a very important hearing in front of Your

13  Honor on Friday.  Okay?

14          So I think, you know, that wasn't our intention.  The

15  letter we sent to you may have been slightly inartful, but it

16  certainly wasn't the intention, and we ask Your Honor to please

17  maintain that aspect of the TRO until Friday so that the debtor

18  can get to that hearing.  We are just --

19          THE COURT:  Mr. Hurst, can you identify for me,

20  please, any harm that you fear in the next four days?

21          MR. HURST:  Yes, Your Honor.  Mr. Lurie in his

22  conversation said they believe that they are -- they own

23  significant shares of Fletcher Delaware.  I'm afraid, Your

24  Honor, that they will use their rights as a shareholder of

25  Fletcher International, even as a purported shareholder, to

**FLETCHER INTERNATIONAL, LTD.**                    31

1  parachute in, attempt to replace directors.  When they replace

2  directors, Your Honor, maybe they'll replace -- they'll take

3  over that entity and then perhaps they'll start to somehow use

4  their position at Fletcher International to affect us.

5          They may also go into Bermuda and sue the debtor to

6  rectify the share register which is -- you're going to tie up

7  our Bermuda counsel and it's also going to tie us up trying to

8  deal with that barrage.  So --

9          THE COURT:  You agree, Mr. Hurst, that you secured the

10 TRO based on false representations of fact.

11         MR. HURST:  Your Honor, they were inaccurate but

12 not intentionally --

13         THE COURT:  Is there a difference between inaccurate

14 and false?

15         MR. HURST:  Your Honor, I'm just trying to express

16 that it wasn't -- we did not --

17         THE COURT:  Please answer my questions and don't play

18 word games with me, Mr. Hurst.  Is there a difference between

19 false and inaccurate?

20         MR. HURST:  No, Your Honor.

21         THE COURT:  And to what extent did you disclose to me

22 when you got the TRO that although you had entered into

23 agreements, as I am now told, under which eighty-three percent

24 of the shares of Fletcher International, Ltd. Bermuda would be

25 owned by Fletcher Income Arbitrage Fund, Ltd., a Caymans

**FLETCHER INTERNATIONAL, LTD.**                          32

1  Corporation, that you had failed to take the steps necessary to

2  implement that agreement?

3          MR. HURST:  Your Honor, we had no idea.  We had no

4  idea.  We were standing in front of you, the case we had been

5  dealing with for a couple of days; no idea.  We had no idea --

6  even if we knew, we wouldn't have even known it mattered.

7          THE COURT:  So you're saying that it was innocent but

8  you acknowledge that I was told facts that weren't true.

9          MR. HURST:  Your Honor, what we told you is the

10  debtor's books and records represented something, and that is

11  absolutely true.  The fact that there's some legal consequence

12  to a share register, yes, we didn't tell you that.  We had no

13  idea.  And, in fact, it's an important fact.  So you had the

14  information which was inaccurate.  At least -- and perhaps Mr.

15  Lurie's client would say that our interpretation or our

16  understanding of Bermuda law is wrong.  Our counsel, Appleby,

17  is telling us that that's the effect of the share register.

18  That's all we can tell you.  Maybe Mr. Lurie has Bermuda

19  counsel that knows something better and maybe that's why he's

20  anxious to move forward with shareholder action.  I can't tell

21  you.  We have to believe our counsel, and they've told us the

22  consequence and that's what we're telling you.

23          THE COURT:  All right.  Mr. Lurie, reply.

24          MR. LURIE:  Thank you, Your Honor.  I'd like to start

25  with that initial hearing in front of the Court in which our

**FLETCHER INTERNATIONAL, LTD.**                                                33

1   opposing counsel represented repeatedly to the Court that what

2   they were seeking was, and I quote, "a cooling off period in

3   which no substantial action would be taken on behalf of the

4   debtor."

5          And it was because of that representation by opposing

6   counsel the Court was informed that there was absolutely no

7   risk of harm, let alone irreparable harm to my client and, in

8   turn, their constituents, the pension funds in Louisiana who

9   have lost over a hundred million dollars as a result of

10  transactions like those you've heard about today, undocumented

11  transactions among related parties on a non-arm's-length basis.

12         Now, Your Honor, what is absolutely clear is that this

13  time period, the period already -- now, we haven't gotten to

14  the preliminary injunction hearing, but the couple of weeks

15  since that hearing has been used to gain all kinds of advantage

16  against and to the detriment of our client.

17         And the Exhibit number 1 is this lockup -- illegal

18  lockup agreement that the debtor is incredibly arguing is a

19  normal course of business -- reflects a normal course of

20  business transaction.  Let me be clear, Your Honor, my client

21  Arbitrage, owns Fletcher Delaware.  And the records -- now we

22  know how reliable they are from what we've heard on the call

23  today -- but the records, including SEC filings of parties-in-

24  interest here including the management company that has managed

25  all these various transactions, state that we own almost 92.5

**FLETCHER INTERNATIONAL, LTD.**                                    34

1  percent of that company.  That agreement was transparently

2  designed to prevent Arbitrage from exercising its shareholder

3  rights and that agreement was undertaken with no notice to us,

4  no consultation to us, during this cooling off period.

5          Now, Your Honor, we've heard about the need for

6  transparency in this case, and I absolutely agree that it's

7  necessary, but it's been wholly absent.  Fletcher International

8  Delaware, the entity that entered into or purported to enter

9  into this lockup agreement, the entity that we own, which our

10  rights have been purportedly contractually frustrated, it's

11  also the source of the 200,000 dollar retainer that opposing

12  counsel received for its work on this matter.  And yet its

13  ownership has never officially been disclosed to the Court.  I

14  invite you to look at the organizational chart that was

15  submitted in connection with multiple pleadings at the

16  commencement of the case, and again, I represent that we

17  believe we own it but in any event, it's never been disclosed

18  to the Court.  And the transaction reflected in this lockup

19  agreement was entered into with no notice, let alone

20  consultation with us, even though from the debtor's

21  perspective, we either own eighty percent of the debtor or at

22  the very least, are by far its largest creditor, and

23  alternatively, we own a hundred percent of Fletcher

24  International Delaware.  In this transparent process, we were

25  not even told that there was any contemplation of such an

FLETCHER INTERNATIONAL, LTD.                    35

1   agreement.

2          Now -- I'm sorry, Your Honor -- now, Your Honor,

3   that's what we know and don't know about Fletcher International

4   Delaware.  What has also occurred, again with no consultation,

5   let alone approval of us, is the engagement of a CRO who's

6   never been presented to the Court, whose engagement terms have

7   not been disclosed, but who purported to enter into this lockup

8   agreement on behalf of the debtor.

9          Again, not reflective of transparency and not

10  reflective of the use of this time period for cooling off,

11  which is what the debtor again represented was going to not --

12  you know, was going to occur during this interim time period.

13         Now, we've heard, Your Honor, about great concern on

14  the part of the purported representatives of the debtor here,

15  that we might take action to protect ourselves against various

16  of these actions during the injunction period.  For example,

17  there was great fear expressed that we might go in and seek to

18  correct the admittedly inaccurate share registry in Bermuda, or

19  God forbid, we might go and exercise our shareholder right and

20  seek to nullify this illegal lockup agreement.

21         Well, Your Honor, that's exactly what we might be

22  doing.  We might be exercising our rights if we weren't

23  enjoined, and the injunction was obtained through inaccurate

24  statements of material facts.

25         I would like to note one other thing because while not

**FLETCHER INTERNATIONAL, LTD.**                              36

1   central to the discussion, frankly it was galling.  The

2   representation was made that Arbitrage, my client, screwed up

3   the documentation of this -- one of these various complex and

4   obscure intercompany transactions.

5            THE COURT:  Mr. Lurie, hang on a second.

6            MR. LURIE:  Sure.

7            THE COURT:  I have an emergency.  Stay on the phone.

8   I am leaving the bench momentarily.

9        (Recess from 3:13 p.m. until 3:16 p.m.)

10           THE COURT:  All right, Mr. Lurie, you can continue.

11           MR. LURIE:  Thank you, Your Honor.  And the item that

12  I would like to bring to the Court's attention was the

13  statement by Mr. Hurst that Arbitrage, one of the funds now in

14  liquidation that the professionals at Ernst & Young are now

15  fiduciaries to, the statement was made that Arbitrage screwed

16  up in one of these many complicated and obscure intercompany

17  transactions and failed to document it accurately.

18           Your Honor, at that point in time, Arbitrage was

19  wholly controlled by Fletcher Management, and as Mr. Hurst

20  began to say and then cut himself off, this was a transaction

21  out of -- non-arm's-length among various related parties.  It

22  was never disclosed to us.

23           And I want to correct one item that I misspoke about

24  earlier.  I said that we always -- I'm told that I said we

25  always believed, "we" being the liquidators, that Arbitrage

**FLETCHER INTERNATIONAL, LTD.**                                    37

1   owned eighty-three percent of the Bermuda company, Fletcher

2   International; that was not accurate.  When the various pension

3   funds made their investment in the feeder funds in which they

4   now hold shares, they were told that Fletcher Delaware owned

5   Fletcher Bermuda, and as I said, Arbitrage in turn owns 92.5

6   percent of that Delaware company, but we later learned about

7   this obscure intercompany transaction undertaken by the

8   Fletcher Management people, right -- we actually learned on the

9   filing date about it, so -- and then we researched it and

10  founds the records documenting it.

11          And so then we learned, of course, right, about this

12  new theory that would allow magically that transaction to

13  evaporate.  One thing the Court should know and I'm going to

14  make a request that all of the -- if I may, Your Honor, that

15  Mr. Hurst provide each and every document purportedly

16  documenting the various and sundry transactions he's outlined

17  for the Court today -- but in any event, one of the documents

18  that I believe reflect the transfer of eighty-three percent of

19  the equity in Fletcher Bermuda from Fletcher Delaware to

20  Arbitrage is an unsigned board minutes that we've recently

21  uncovered.  Again, access to these records, because the Bermuda

22  proceedings have been enjoined, has been very difficult for us

23  to get and we relied and have been unsuccessful in -- we relied

24  on our opposing counsel to provide these materials to us.  They

25  haven't been forthcoming, and so we're quite literally firing

FLETCHER INTERNATIONAL, LTD.                                    38

1  in the dark on some of these items.

2          But I can tell you that we've found the unsigned

3  document that we believe reflects the transfer of the majority

4  interest in Fletcher Bermuda from Fletcher Delaware to

5  Arbitrage.

6          Now, there's only one other item that I'd just like to

7  note and raise, bring the Court's attention to.  Opposing

8  counsel stated that this Chapter 11 case was filed very quickly

9  over a couple of days for the -- and it was, clearly.  There

10 was a perceived need to get an anti-suit injunction and stop

11 our clients from prosecuting their rights in Bermuda as quickly

12 as possible.  But it's important for Your Honor to note, I

13 submit, that opposing counsel received their first retainer in

14 this case on May 18th, 2012, and furthermore, and my opposing

15 counsel can correct me, but -- give me ten seconds, Your Honor.

16         We believe that, based on the materials that they

17 submitted to the Court, that by the time this proceeding was

18 filed, 170,000 dollars in fees had been expended on the

19 representation of the debtor in this action.  I do not, and I

20 want to emphasize this, do not mean to accuse Mr. Hurst or Mr.

21 Geoghan, who I have the utmost respect for, intentionally

22 making any misrepresentations to the Court and I want to

23 emphasize that.  But clearly, someone on the other side of our

24 clients, someone or some person affiliated with Fletcher Asset

25 Management have been doing their darndest, including during the

1  time period in which this TRO has been in place, to frustrate

2  the exercise of our client's legitimate rights.

3          For that reason, Your Honor, and because as Mr.

4  Hurst's presentation only made even more glaringly clear, there

5  is absolutely no basis in fact for the injunctive relief in

6  this case against the exercise of my client's rights including

7  in the Bermuda court.  I believe that it's appropriate for the

8  TRO to be lifted.

9          I would also submit, Your Honor, that before we can

10  file papers that take into account the sundry additional facts

11  and the documents we have yet to see purportedly supporting

12  them that Mr. Hurst recited today, we're going to need certain

13  additional time within which to make our submission, if the

14  Court will so grant us.  Thank you, Your Honor.

15          THE COURT:  A question at the very last thing you

16  said, Mr. Lurie.  I assume you still want to go forward on

17  Friday.  You just want to give me your briefs a day or two

18  later?

19          MR. LURIE:  Yes, if the Court would so indulge us,

20  Your Honor and again, I would ask that opposing counsel provide

21  us expeditiously with the materials referenced during his

22  presentation so that we can move expeditiously.

23          THE COURT:  What's your existing deadline?

24          MR. LURIE:  It's tonight, Your Honor.

25          THE COURT:  All right.  All right, here's what we're

**FLETCHER INTERNATIONAL, LTD.**                    40

1   going to do, gentlemen.  As the colloquy you've heard has

2   indicated, I have, to put it antiseptically, a zillion

3   questions about the matters that were reported to me today.

4   The matters have the potential of being very troubling, but I

5   will hear the explanations at greater length at the hearing on

6   Friday.

7          Even with everything that has been said, I continue to

8   have questions in my mind as to how or why it is that the four

9   days remaining on the TRO is such a big deal to either side.

10  If, though I have major reservations that it's so, the

11  standstill agreement is an agreement binding on anyone, nothing

12  can happen to the debtor.  Conversely, although points could be

13  made on either side vis-a-vis whether the failure by Appleby's

14  to make the paper entry on the books is or is not legally

15  significant, the fact is that you guys would be arguing over

16  that for much more than four days anyway.

17         And, of course, this whole issue as to whether I

18  should terminate the TRO today as contrasted to Friday becomes

19  academic if I deny the preliminary injunction on Friday, after

20  which, if I were to rule that way, any otherwise existing

21  shareholder rights could be enforced on the following Monday

22  or, for all I know, the Saturday and Sunday.

23         So despite my many reservations about the propriety of

24  the debtor's conduct, I will allow the TRO to continue in place

25  until Friday at which time I will hear the evidence.

**FLETCHER INTERNATIONAL, LTD.**                    41

1        On a separate front, the debtor or its agents,

2   including anybody who might be in Bermuda, are to get the

3   defendants in this adversary, Mr. Lurie and his folks, and for

4   that matter anybody who is allied with Mr. Lurie, any and all

5   documents by 5 o'clock tomorrow night.

6        And Mr. Lurie, you have an extension of time to file

7   your brief on the PI, on the preliminary injunction, until noon

8   on Thursday.  And I will permit you, Mr. Hurst and Mr. Geoghan,

9   to give me a reply to that, but you have to do it in the five

10  hours between noon on Thursday and 5 o'clock on Thursday.

11       Now, this is still with respect solely to the

12  preliminary injunction hearing scheduled for Friday.  All

13  rights vis-a-vis other issues, appointment of an 11 trustee,

14  dismissal of the case under 1112(b), abstention under 305,

15  anything else, are all reserved.  I'm not going to make you

16  guys brief those issues between now and Friday and they may be

17  informed by matters that happen on Friday.

18       All right, with that, we're adjourned.

19     (Whereupon these proceedings were concluded at 3:29 PM)

20

21

22

23

24

25

42

1

2                                  I N D E X

3

4                                R U L I N G S

5   DESCRIPTION                                      PAGE       LINE

6   TRO to remain in place until Friday              40         23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

**C E R T I F I C A T I O N**

I, Clara Rubin, certify that the foregoing transcript is a true

and accurate record of the proceedings.

_____

CLARA RUBIN

AAERT Certified Electronic Transcriber CET**D-491

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  July 23, 2012

FLETCHER INTERNATIONAL, LTD. v.   Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
FLETCHER INCOME ARBITRAGE FUND-INVOLUNTARY LIQUIDATION   July 23, 2012

## A

**ability (1)**
29:7
**able (4)**
10:10,12,13;12:10
**absent (1)**
34:7
**absolutely (18)**
10:22;11:2;13:14;
15:14;18:18,19;19:3;
22:4;24:10,13;26:14;
27:3,5;32:11;33:6,
12:34:6;39:5
**abstention (1)**
41:14
**academic (1)**
40:19
**access (3)**
8:21;23:5;37:21
**according (1)**
17:10
**accordingly (1)**
29:13
**account (1)**
39:10
**accountants (1)**
7:17
**accounts (1)**
8:17
**accurate (2)**
15:15;37:2
**accurately (1)**
36:17
**accusations (1)**
12:3
**accuse (1)**
38:20
**achieve (1)**
10:13
**acknowledge (1)**
32:8
**acknowledges (1)**
8:4
**across (2)**
27:13,14
**act (1)**
17:16
**action (12)**
7:12,14;8:1;13:11;
14:4;24:11;29:25;
30:7;32:20;33:3;
35:15;38:19
**actions (1)**
35:16
**actively (1)**
14:9
**actually (6)**
12:9;15:14;17:18;
19:16;21:14;37:8
**add (1)**
11:3

**additional (3)**
26:23;39:10,13
**address (2)**
21:10,11
**adjourned (1)**
41:18
**admittedly (2)**
18:15;35:18
**advance (1)**
12:25
**advantage (1)**
33:15
**adversary (1)**
41:3
**advice (1)**
28:12
**advised (1)**
9:15
**affairs (4)**
8:13,14;10:21;
28:13
**affect (2)**
23:12;31:4
**affidavit (2)**
9:8,8
**affiliate (1)**
29:7
**affiliated (3)**
14:8;25:18;38:24
**affiliates (2)**
17:20;26:9
**affiliation (1)**
26:8
**afraid (1)**
30:23
**afternoon (1)**
5:17
**again (11)**
7:24;11:5;12:14;
14:7;29:2;34:16;
35:4,9,11;37:21;
39:20
**against (7)**
6:21;13:11;22:2,3;
33:16;35:15;39:6
**agents (1)**
41:1
**aggravation (1)**
28:25
**ago (3)**
7:3;8:16;10:6
**agree (2)**
31:9;34:6
**agreed (6)**
16:14,24;22:24;
23:18;25:1;26:12
**agreeing (2)**
23:1;25:5
**agreement (31)**
9:23,24;21:8,9,11,
24;22:1,8,15,16,18;
23:9,10,15;24:19,21,
21;25:14;26:19;27:8;

**32:2;33:18;34:1,3,9,
19;35:1,8,20;40:11,
11**
**agreements (1)**
31:23
**ahead (1)**
29:19
**AIETA (5)**
4:11;5:7,7,11,11
**Alix (2)**
26:20;27:2
**allegation (1)**
14:18
**allegations (1)**
27:18
**allied (1)**
41:4
**allow (2)**
37:12;40:24
**allowed (1)**
12:24
**almost (3)**
9:4;19:17;33:25
**alone (4)**
14:18;33:7;34:19;
35:5
**Alpha (4)**
4:15;5:18;12:20;
24:22
**alternatively (1)**
34:23
**although (6)**
7:16;8:3,20;25:17;
31:22;40:12
**always (2)**
36:24,25
**among (3)**
20:3;33:11;36:21
**amount (1)**
24:12
**antiseptically (1)**
40:2
**anti-suit (1)**
38:10
**anxious (3)**
29:11,21;32:20
**apologies (1)**
12:5
**apologize (3)**
7:4;11:19;28:7
**Apparently (2)**
8:3;20:4
**appearance (1)**
24:6
**appeared (3)**
7:7;9:21;10:14
**appears (1)**
6:10
**Appleby (4)**
17:6;18:8;28:12;
32:16
**Appleby's (2)**
17:15;40:13

**appointed (2)**
25:23,25
**appointment (1)**
41:13
**approach (1)**
13:13
**appropriate (1)**
39:7
**approval (4)**
21:22;22:5,9;35:5
**approve (1)**
25:13
**approved (2)**
21:9;26:12
**April (2)**
16:11,17
**Arbitrage (31)**
4:3;5:6;7:8,24;8:6;
9:3;10:7;12:19;16:4,
4,13,14,18,21,24;
19:9,13,20;20:20;
24:22;31:25;33:21;
34:2;36:2,13,15,18,
25;37:5,20;38:5
**arguing (2)**
6:1;33:18;40:15
**argument (1)**
8:25
**arose (1)**
16:10
**aspect (1)**
30:17
**Asset (2)**
26:9;38:24
**assets (1)**
25:8
**assume (1)**
39:16
**as-yet (1)**
9:25
**attaches (1)**
18:23
**attempt (6)**
10:24;13:22;14:6;
24:3;29:23;31:1
**attempting (1)**
14:9
**attention (6)**
18:4,18,19;19:4;
36:12;38:7
**author (1)**
9:13
**Authority (4)**
20:11;26:4,6;27:7
**Avenue (2)**
4:5,16
**avoid (1)**
24:10

## B

**back (5)**
16:17,19;18:16;

**28:14,14**
**bad (1)**
15:14
**bankruptcy (5)**
15:20;20:19;23:21;
25:1;27:2
**bar (1)**
10:3
**barrage (1)**
31:8
**bars (1)**
14:3
**based (2)**
31:10;38:16
**basically (1)**
18:1
**basis (9)**
11:2;13:8,16,17,
23;14:18,22;33:11;
39:5
**becomes (1)**
40:18
**becoming (1)**
10:16
**began (3)**
7:15;19:36:20
**behalf (4)**
12:16;15:14;33:3;
35:8
**behind (2)**
24:5,6
**bench (1)**
36:8
**beneficial (1)**
11:1
**Bermuda (37)**
7:12;8:1;9:16,18;
11:9;12:17;13:2,3;
14:20;17:6,7,8,9;
18:7;19:6,24;20:1,5,
10;26:6;27:7;29:25;
30:7;31:5,7,24;32:16,
18;35:18;37:1,5,19,
21;38:4,11;39:7;41:2
**best (2)**
15:15,22
**better (4)**
12:11,13;15:24;
32:19
**beyond (2)**
26:3;27:13
**big (5)**
6:24;19:20;20:18;
30:7;40:9
**binding (2)**
21:9;40:11
**bizarre (1)**
11:7
**blocked (2)**
6:3;8:20
**blocking (2)**
7:13;8:1
**blocks (1)**

FLETCHER INTERNATIONAL, LTD. v.
FLETCHER INCOME ARBITRAGE FUND-INVOLUNTARY LIQUIDATION

Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
July 23, 2012

28:9
**board (17)**
9:24,25;10:3,4;
16:23;23:5,12,14,16;
24:18;25:10,23,25;
26:5;28:22;30:6;
37:20
**boards (2)**
16:22;17:23
**books (9)**
16:3,25;18:15;
19:3,14;20:24,25;
32:10;40:14
**Boston (1)**
4:18
**both (5)**
12:1;15:9;16:24;
17:16,19
**bottom (2)**
7:18;19:18
**brief (2)**
41:7,16
**briefs (1)**
39:17
**bring (2)**
36:12;38:7
**broader (1)**
6:20
**BROCK (3)**
4:8;5:4;29:10
**Buddy (1)**
26:10
**BURKE (2)**
4:2,2
**business (3)**
22:21;33:19,20
**busy (1)**
26:24

**C**

**call (10)**
5:21,24,25;9:10;
12:16;17:4;19:5;
27:22;28:5;33:22
**called (3)**
22:15;26:1;29:15
**calls (1)**
28:3
**can (25)**
8:3;11:14;12:11,
12;14:10;15:12;
17:13;19:18;20:12,
16;21:21;23:6,15;
27:9,14,16;30:18,19;
32:18;36:10;38:2,15;
39:9,22;40:12
**care (5)**
14:25;19:21;26:8,
9,10
**careful (1)**
10:23
**case (31)**

6:8,9,12,18;8:18,
19;9:13;10:18;11:6,
8,10,13,16;12:21;
13:2,5;15:19;16:3;
17:8;22:22,24;24:3;
27:15;28:4;32:4;
34:6,16;38:8,14;
39:6;41:14
**cases (1)**
7:17
**caused (1)**
24:11
**Cayman (1)**
19:24;20:10
**Caymans (1)**
31:25
**cease (1)**
29:12
**central (2)**
8:18;36:1
**certain (4)**
9:16,16;18:5;39:12
**Certainly (7)**
6:25;12:6,15;
15:20;20:11;30:9,16
**chambers (1)**
6:6
**change (2)**
10:4;23:12
**changed (3)**
9:17;13:21;16:2
**channels (1)**
24:25
**Chapter (7)**
11:8,16;12:21;
13:5;15:19;23:20;
38:8
**charge (1)**
26:7
**chart (2)**
16:8;34:14
**chief (1)**
25:22
**circumstantial (1)**
10:20
**claim (4)**
13:18,22;14:5,6
**claiming (1)**
19:1
**claims (2)**
13:15,17
**clean (1)**
27:11
**clear (4)**
10:22;33:12,20;
39:4
**clearly (3)**
12:14;38:9,23
**client (10)**
7:23;9:3;11:10;
12:19;20:17;32:15;
33:7,16,20;36:2
**clients (7)**

7:8,16;10:7;13:7;
24:20;38:11,24
**client's (2)**
39:2,6
**cloud (1)**
25:19
**Code (1)**
27:2
**colloquy (1)**
40:1
**comfortable (1)**
25:11
**commenced (2)**
11:10,16
**commencement (1)**
34:16
**commentary (1)**
15:18
**comments (1)**
26:22
**companies (6)**
17:22;18:1,4,20;
20:8;23:18
**company (14)**
8:9,14;9:1,4,10,25;
13:3;18:20,25;20:5;
33:24;34:1;37:1,6
**complete (1)**
27:6
**completely (2)**
17:23;19:8
**complex (1)**
36:3
**complicated (1)**
36:16
**comprehensive (1)**
15:20
**Conaway (2)**
5:15;15:5
**concern (1)**
35:13
**concerned (1)**
19:21
**concerns (1)**
15:12
**concluded (1)**
41:19
**conclusion (1)**
22:9
**conclusive (1)**
17:14
**conduct (1)**
40:24
**conducts (1)**
21:24
**conference (3)**
12:24;13:6;28:3
**confident (1)**
23:22
**confuse (1)**
12:17
**confused (2)**
10:19,21

**connection (1)**
34:15
**consensual (2)**
23:20;24:15
**consensually (1)**
22:24
**consequence (5)**
18:9;20:11,19;
32:11,22
**consideration (6)**
16:13,20;23:9;
25:6,10,10
**considered (1)**
20:4
**conspiracy (1)**
14:21
**conspiratorial (1)**
13:4
**constituents (4)**
22:23;23:7,21;33:8
**constructive (1)**
22:7
**consult (3)**
22:19;24:24;25:5
**consultation (5)**
21:8;22:16;34:4,
20;35:4
**contemplated (1)**
5:25
**contemplation (1)**
34:25
**contend (1)**
29:6
**continue (3)**
36:10;40:7,24
**contract (3)**
10:2;17:16;23:1
**contractually (1)**
34:10
**contrasted (1)**
40:18
**controlled (1)**
36:19
**controversy (1)**
6:4
**conversation (1)**
30:22
**Conversely (1)**
40:12
**Conway (1)**
26:1
**cooling (3)**
33:2;34:4;35:10
**corporate (5)**
7:19;8:9;16:8;
17:7;23:23
**Corporation (1)**
32:1
**corporations (1)**
7:21
**Counsel (18)**
4:3,15,5:18;9:15;
17:8,9;31:7;32:16,19,

21;33:1,6;34:12;
37:24;38:8,13,15;
39:20
**counterparty (3)**
22:2;25:7,8
**couple (6)**
20:3;25:24;28:18;
32:5;33:14;38:9
**course (14)**
6:24;11:6;14:15,
15;21:13,18,20;22:1,
21;23:14;33:19,19;
37:11;40:17
**COURT (72)**
5:2,9,13,16,20;7:7,
24;9:3,6,10;10:21;
11:9,18,20,22,25;
12:7,12,22,22,24;
13:5,9,14;14:24,25;
15:3,16;17:15;20:1;
21:6,12,17,22;22:5,9,
12;23:21;25:13;
26:11,15;27:21,25;
28:3,8;29:3;30:19;
31:9,13,17,21;32:7,
23,25;33:1,6;34:13,
18;35:6;36:5,7,10;
37:13,17;38:17,22;
39:7,14,15,19,23,25
**courtesy (1)**
23:1
**courtroom (1)**
12:1
**Court's (3)**
10:25;36:12;38:7
**create (1)**
27:11
**creditor (2)**
10:16;34:22
**critical (1)**
8:21
**CRO (5)**
10:1;23:5;27:6;
30:2;35:5
**cut (1)**
36:20

**D**

**Daniel (1)**
5:14
**dark (1)**
38:1
**darndest (1)**
38:25
**data (1)**
26:24
**date (1)**
37:9
**DAVID (4)**
4:9;5:4,14;15:4
**day (3)**
9:22;15:8;39:17

**days (14)**
6:24;13:6;14:1,1,7,
8;23:11;25:24;30:4,
20;32:5;38:9;40:9,16
**days' (1)**
15:19
**deadline (1)**
39:23
**deal (6)**
7:1;16:21;19:22;
20:21;31:8;40:9
**dealing (3)**
24:13;28:3;32:5
**debtor (68)**
5:15;6:10;7:7,9,11,
23,25;8:3,3,8,12,15,
24;9:7,11,15,19;10:1,
5,9,13;11:2,8;12:16,
24;14:8,20;15:5,14,
24;16:5,16,17,20;
17:8,10;19:15,18,21;
20:4,17,25;21:23;
22:3,14,18,22;23:2,
13,23;24:14,16,17;
25:2;26:5;27:5;30:1,
17;31:5;33:4,18;
34:21;35:8,11,14;
38:19;40:12;41:1
**debtor-in- (1)**
8:18
**debtor-in-possession (1)**
10:17
**debtors (2)**
19:1;27:3
**debtor's (16)**
13:20,22;16:3;
17:3,6,11;18:15,24;
19:1;20:19;23:12;
24:10;25:12;32:10;
34:20;40:24
**December (1)**
22:14
**decided (1)**
20:8
**decision-making (1)**
26:4
**declaration (5)**
6:6;15:8,9;18:22;
26:25
**deeply (1)**
10:19
**defendant (2)**
5:19;12:20
**defendants (6)**
5:5,8,12;7:6;8:6;
41:3
**degrees (1)**
13:21
**Delaware (45)**
8:9,14,25;9:4,10,
11,14,18,24;10:3,10,
12;12:17;16:7,12,19,
19,21,23;17:11,12;

18:25;19:13,19,24;
20:18;22:17,19;23:4,
5,10,25;24:1,2,7;
25:9;30:23;33:21;
34:8,24;35:4;37:4,6,
19;38:4
**Delaware's (1)**
23:14
**delegation (2)**
26:5;27:6
**deliberate (2)**
9:12;10:24
**deliberately (2)**
7:18;10:20
**demand (1)**
13:10
**demands (1)**
13:9
**deny (1)**
40:19
**depends (1)**
6:15
**describing (1)**
22:11
**designed (1)**
34:2
**despite (1)**
40:23
**determined (1)**
24:18
**determines (1)**
21:25
**detriment (1)**
33:16
**device (1)**
12:11
**difference (4)**
6:1;11:15;31:13,18
**different (2)**
8:8;17:22
**difficult (2)**
7:16;37:22
**diligently (1)**
13:7
**direct (1)**
11:1
**direction (3)**
10:11,12;12:13
**directions (1)**
30:11
**directly (1)**
10:9
**directors (4)**
16:22;29:24;31:1,2
**disagree (2)**
21:22;22:10
**disclose (1)**
31:21
**disclosed (4)**
34:13,17;35:7;
36:22
**disclosure (1)**
26:23

**disclosures (1)**
6:22
**discovered (2)**
28:12,12
**discovery (6)**
12:24,25;13:8,12,
18;28:17
**discrepancy (1)**
15:8
**discuss (2)**
11:14;21:15
**discussion (1)**
36:1
**dismissal (1)**
41:14
**dispute (2)**
19:19;21:12
**disputed (1)**
19:13
**distinction (2)**
11:12,14
**distraction (1)**
24:10;30:4
**docket (2)**
9:21;18:23
**docketed (1)**
18:23
**document (7)**
9:20,21;17:24;
18:17;36:17;37:15;
38:3
**documenta (1)**
20:21
**documentation (1)**
36:3
**documenting (2)**
37:10,16
**documents (4)**
9:5;37:17;39:11;
41:5
**dollar (1)**
34:11
**dollars (3)**
28:17;33:9;38:18
**Don (1)**
26:1
**done (4)**
15:20;17:2;20:15;
27:16
**down (4)**
18:6,8;27:12;28:25
**drilling (1)**
18:8
**due (1)**
16:10
**during (5)**
34:4;35:12,16;
38:25;39:21
**duties (1)**
23:16
**dynamic (1)**
27:16

**E**

**earlier (2)**
6:8;36:24
**economic (1)**
9:14
**effect (1)**
32:17
**effective (1)**
12:21
**eighty (1)**
34:21
**eighty-seven (1)**
8:7
**eighty-three (7)**
8:7;10:8;16:5;
19:14;31:23;37:1,18
**either (8)**
11:25;19:21,23;
21:7;26:13;34:21;
40:9,13
**else (3)**
6:14;21:4;41:15
**elsewhere (1)**
6:21
**e-mail (2)**
6:5;28:2
**emergency (1)**
36:7
**emphasize (2)**
38:20,23
**emphatically (1)**
11:4
**end (5)**
6:19;9:22;10:13;
28:19;30:4
**endeavored (1)**
13:7
**ended (1)**
16:25
**enforceable (2)**
22:2,3
**enforced (1)**
40:21
**engagement (2)**
35:5,6
**enjoin (1)**
10:14
**enjoined (2)**
35:23;37:22
**enjoining (1)**
14:19
**enough (1)**
18:24
**enter (5)**
20:14;24:19,22;
34:8;35:7
**entered (5)**
22:15;29:8;31:22;
34:8,19
**enters (1)**
21:24

**entire (2)**
11:9;13:23
**entirely (2)**
8:8,17
**entirety (2)**
13:10;14:16
**entities (2)**
16:16;17:22
**entitled (2)**
10:17;14:2
**entity (7)**
9:18;10:7;12:18;
25:18;31:3;34:8,9
**entry (1)**
40:14
**equity (1)**
37:19
**equityholder (1)**
7:11
**equivalent (1)**
10:9
**Ernst (1)**
36:14
**error (1)**
28:1
**especially (1)**
29:6
**ESQ (5)**
4:8,9,10,11,20
**essential (2)**
13:25;14:1
**essentially (1)**
17:5
**estoppel (1)**
6:16
**evaporate (1)**
37:13
**even (14)**
10:9;14:18;20:6,8;
21:22,23;28:20;
30:25;32:6,6;34:20,
25;39:4;40:7
**event (3)**
11:16;34:17;37:17
**everyone (8)**
23:7,19;25:14,16,
18,20;27:12;29:16
**evidence (5)**
7:20;10:20;13:14;
27:8;40:25
**evidenced (1)**
27:6
**exactly (9)**
15:13;16:1,2;
18:13;24:23;26:20;
27:19;29:20;35:21
**example (1)**
35:16
**exercise (13)**
7:11;10:11,15,25;
14:4,11;24:4,25;
29:13,21;35:19;39:2,
6

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:03:39    Main Document
Pg 83 of 265

FLETCHER INTERNATIONAL, LTD. v.
FLETCHER INCOME ARBITRAGE FUND-IN-VOLUNTARY LIQUIDATION

Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
July 23, 2012

**exercising (2)**
34:2;35:22
**Exhibit (1)**
33:17
**existing (2)**
39:23;40:20
**expected (1)**
29:17
**expedited (1)**
13:8
**expeditiously (2)**
39:21,22
**expended (1)**
38:18
**expense (1)**
29:17
**expensive (1)**
28:24
**experienced (1)**
7:17
**expiration (1)**
6:2
**expire (1)**
29:17
**explain (8)**
6:1;15:7,12;16:1;
18:13;21:3,21;22:8
**explained (1)**
15:18
**explanation (1)**
13:10
**explanations (1)**
40:5
**express (2)**
7:13;31:15
**expressed (1)**
35:17
**extension (1)**
41:6
**extensive (1)**
13:8
**extent (2)**
27:7;31:21
**extremely (1)**
13:7

## F

**facilitate (1)**
23:20
**fact (20)**
7:9,22;8:25;9:14,
17,18;11:2,9;14:16,
18,18;18:21;19:11;
27:9;31:10;32:11,13,
13;39:5;40:15
**facts (9)**
6:7;8:18;10:23;
15:15;19:22,22;32:8;
35:24;39:10
**failed (3)**
19:4;32:1;36:17
**failing (1)**

18:9
**failure (1)**
40:13
**false (3)**
31:10,14,19
**familiar (1)**
17:12
**family (1)**
23:23
**far (4)**
10:16;19:10,20;
34:22
**fast (2)**
12:1,6
**favor (1)**
24:7
**fear (2)**
30:20;35:17
**feeder (1)**
12:19;37:3
**fees (1)**
38:18
**few (1)**
7:3
**FIA (2)**
4:4;24:22
**fiduciaries (1)**
36:15
**fiduciary (4)**
23:14,16,17;25:25
**fight (3)**
6:24;19:20,25
**FII (1)**
25:9
**file (4)**
26:25;29:25;39:10;
41:6
**filed (10)**
7:12,13,13;8:1,2;
11:10;15:18;16:2;
38:8,18
**filing (7)**
9:9;11:8;12:4,21;
13:2,4;37:9
**filings (2)**
8:16;33:23
**final (1)**
11:3
**find (1)**
5:2
**fine (1)**
30:7
**fire (1)**
30:11
**firewall (1)**
27:4
**firing (1)**
37:25
**firm (2)**
15:21;26:1
**first (14)**
6:15,23;7:7,12;
8:23;9:7;10:14;11:4;

13:25;15:8;19:18;
23:19;28:15;38:13
**first-filed (1)**
14:19
**five (1)**
41:9
**fix (1)**
20:1
**Fixed (2)**
4:15;18:6
**flat (1)**
30:2
**Fletcher (67)**
4:3;15:9;11,14,18;
10:3,10,12;12:16,17;
16:4,6,7,11,12,14,15,
19,19,20,22,23,23;
17:11;18:25;19:12,
19;20:18;22:16,17,
19;23:3,4,5,10,14,24,
25,25;24:2,7,17;25:9,
9;26:9,10;29:24;
30:5,23,25;31:4,24,
25;33:21;34:7,23;
35:3;36:19;37:1,4,5,
8,19,19;38:4,4,24
**Floor (1)**
4:17
**flowing (1)**
25:6
**folks (1)**
41:3
**follow (1)**
23:2;26:19
**following (1)**
40:21
**forbid (1)**
35:19
**force (1)**
23:16
**forcing (1)**
28:18
**foreign (1)**
23:13
**forensic (1)**
7:17
**forget (1)**
9:9
**form (1)**
26:19
**formalities (1)**
18:5
**formality (1)**
19:5
**format (1)**
26:20
**formed (1)**
13:23
**forth (1)**
7:2
**forthcoming (1)**
37:25
**forward (3)**

25:17;32:20;39:16
**found (2)**
7:20;38:2
**founds (1)**
37:10
**four (3)**
6:24;30:4,20;40:8,
16
**four-day (1)**
6:1
**frankly (1)**
36:1
**freely (1)**
20:6
**Friday (14)**
9:22;10:3;13:14;
24:9;30:13,17;39:17;
40:6,18,19,25;41:12,
16,17
**Friday's (2)**
12:25;30:3
**front (6)**
10:14;29:2;30:12;
32:4,25;41:1
**frustrate (6)**
10:25;11:8,11;
13:4;14:11;39:1
**frustrated (1)**
34:10
**Fund (7)**
4:3,4,15;12:20;
16:4;20:4;31:25
**Funds (6)**
5:18;12:19;33:8;
36:13;37:3,3
**further (2)**
7:20;27:8
**furthermore (1)**
38:14
**future (2)**
21:8;28:4

## G

**gain (1)**
33:15
**galling (1)**
36:1
**games (1)**
31:18
**Gasparini (2)**
26:18;27:23
**gathering (1)**
26:24
**geez (1)**
28:15
**Gentlemen (2)**
5:20;40:1
**Geoghan (6)**
5:15;15:3,6;28:14;
38:21;41:8
**Gerber (1)**
5:2

**given (4)**
6:21;15:22;25:2,2;
26:4
**giving (1)**
25:12
**glaringly (1)**
39:4
**God (1)**
35:19
**good (4)**
5:17;24:17,17,19
**grand (1)**
28:18
**grant (1)**
39:14
**great (3)**
7:1;35:13,17
**greater (1)**
40:5
**greatest (1)**
24:16
**guess (2)**
6:14;19:23
**guys (5)**
5:25;27:25;28:18;
40:15;41:16

## H

**half (1)**
28:16
**handed (1)**
16:9
**handle (1)**
30:3
**hang (1)**
36:5
**happen (4)**
18:21;24:24;40:12;
41:17
**happened (4)**
15:13;16:2;21:2,3
**happy (6)**
21:3,10,11,15,22;
23:8
**harm (1)**
30:20;33:7,7
**head (1)**
30:12
**hear (11)**
5:9;21;6:23;11:18;
20;12:2,11,12,12;
40:5,25
**heard (8)**
10:1;19:16;23:6;
33:10,22;34:5;35:13;
40:1
**hearing (14)**
6:20;11:5;12:25;
13:13;16:9;29:18;
30:3,12,18;32:25;
33:14,15;40:5;41:12
**heart (1)**

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:03:39    Main Document
FLETCHER INTERNATIONAL, LTD. v.    Pg 84 of 265
FLETCHER INCOME ARBITRAGE FUND–INVOLUNTARY LIQUIDATION

Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
July 23, 2012

13:1
**held (4)**
16:12,15,18,20
**Hello (1)**
5:2
**help (1)**
23:19
**here's (1)**
39:25
**himself (1)**
36:20
**historically (1)**
27:4
**hold (3)**
23:11;26:11;37:4
**holder (1)**
20:13
**HOLLAND (2)**
4:14;5:18
**Honor (86)**
5:17;6:25;7:5,15;
8:13,20;9:2,20;10:2,
6,15,19;11:4,24;12:5,
6,15,23;13:6,13,25;
14:14;15:2,4,12,17;
16:9;10;17:9,19;
20:23;21:10,14,15,
19,21;22:5,8,11,13,
14,18;23:10;24:8;
25:22;26:14,17;27:3,
17,24;28:1,6,11,11;
29:2,9,15,19;30:13,
16,21,24;31:2,11,15,
20;32:3,9,24;33:12,
20;34:5;35:2,2,13,21;
36:11,18;37:14;
38:12,15;39:3,9,14,
20,24
**hope (1)**
18:3
**hopefully (1)**
15:12
**hours (1)**
41:10
**hundred (9)**
8:12,14;9:4,11,14;
19:17;28:18;33:9;
34:23
**hurdles (1)**
20:3
**Hurst (33)**
5:14,14;15:4,4;
17:18;21:6,10,14,19;
22:13;26:11,14,17;
27:23;28:8,11;29:4,
9;30:19,21;31:9,11,
15,18,20;32:3,9;
36:13,19;37:15;
38:20;39:12;41:8
**Hurst's (1)**
39:4
**hurt (1)**
29:7

**I**

**i2 (1)**
14:3
**idea (6)**
18:21;32:3,4,5,5,13
**identify (1)**
30:19
**illegal (3)**
20:9;33:17;35:20
**immediately (4)**
6:19;14:5,13;29:14
**implement (1)**
32:2
**implication (1)**
28:15
**implications (3)**
6:10,13;28:15
**important (11)**
7:2;9:2;15:7;17:3;
18:6,7;19:4;24:8;
30:12;32:13;38:12
**improper (1)**
13:3
**inaccurate (6)**
31:11,13,19;32:14;
35:18,23
**inartful (1)**
30:15
**Inc (2)**
16:6;30:6
**Incidentally (2)**
8:13;9:2
**include (1)**
28:2
**including (8)**
6:23;7:20,25;
33:23,24;38:25;39:6;
41:2
**Income (4)**
4:3,15;16:4;31:25
**inconsistent (1)**
8:17
**incorporation (1)**
14:20
**incredible (1)**
20:20
**incredibly (2)**
7:18;33:18
**indeed (1)**
23:7
**independent (1)**
25:25
**independently (2)**
23:23;24:18
**indicated (1)**
40:2
**indicates (1)**
10:20
**indulge (1)**
39:19
**industry (1)**

26:3
**influence (1)**
24:3
**information (2)**
8:21;32:14
**informed (2)**
33:6;41:17
**initial (1)**
32:25
**initially (1)**
5:25
**injunction (11)**
6:20,21;13:11;
29:5;33:14;35:16,23;
38:10;40:19;41:7,12
**injunctive (4)**
10:25;13:17,23;
39:5
**innocent (1)**
32:7
**inordinate (1)**
24:12
**insofar (1)**
6:2;28:9
**insolvency (4)**
7:12;13:2;14:19;
28:21
**instead (1)**
22:25
**integrity (1)**
26:3
**intended (1)**
19:14
**intent (1)**
15:14
**intention (5)**
29:15,19;30:8,14,
16
**intentionally (2)**
31:12;38:21
**intentions (1)**
19:2
**intercompany (3)**
36:4,16;37:7
**interest (3)**
7:9;33:24;38:4
**interim (1)**
35:12
**International (19)**
16:6,11,14,15,22,
23;22:16;23:3,24;
24:17;29:24;30:6,25;
31:4,24;34:7,24;
35:3;37:2
**interpretation (1)**
32:15
**into (17)**
9:7;11:12;21:24;
22:15;23:13;24:19,
22;28:21;29:8;30:12;
31:5,22;34:8,9,19;
35:7;39:10
**investigate (2)**

7:15,20
**investment (1)**
37:3
**invite (2)**
27:25;34:14
**invited (2)**
27:23;28:5
**involve (1)**
22:20
**irreparable (1)**
33:7
**issue (5)**
7:21;9:4;17:9;
27:10;40:17
**issues (2)**
41:13,16
**item (3)**
36:11,23;38:6
**items (1)**
38:1

**J**

**James (1)**
4:16
**Jay (1)**
26:20;27:2
**JOHN (2)**
4:20;5:17
**Judge (2)**
5:4,14
**judgment (1)**
21:20
**judicial (1)**
6:16
**July (8)**
15:17;16:9,17;
17:1;20:24;22:14;
29:10,18
**juncture (1)**
6:13
**JUSTIN (2)**
4:10;5:5

**K**

**kinds (1)**
33:15
**KLEIN (2)**
4:10;5:5
**knew (1)**
32:6
**KNIGHT (2)**
4:14;5:18
**known (1)**
32:6
**knows (1)**
32:19
**Kodak (1)**
26:20

**L**

**largest (2)**
10:16;34:22
**last (3)**
9:5;12:2;39:15
**lateness (1)**
7:4
**later (2)**
37:6;39:18
**law (6)**
9:18;14:10;17:12;
26:6;27:7;32:16
**lawsuit (1)**
8:2
**lawyer (1)**
18:5
**lawyers (1)**
18:20
**learned (2)**
37:6,8,11
**lease (1)**
22:20
**least (6)**
6:7;13:16;28:5,18;
32:14;34:22
**leaving (1)**
36:8
**legal (1)**
32:11
**legally (1)**
40:14
**legitimate (4)**
10:25;13:17;14:19;
39:2
**length (1)**
40:5
**less (4)**
15:19;26:8,9,10
**letter (3)**
13:9;29:10;30:13
**letter-writing (1)**
6:4
**Leverage (1)**
12:19
**Leveraged (3)**
4:4;5:6;24:23
**liability (1)**
20:15
**lift (3)**
29:11,16,20
**lifted (1)**
39:8
**light (1)**
27:20
**likely (1)**
14:9
**limit (1)**
5:24
**Limited (2)**
17:6;23:11
**line (1)**
19:18
**liquidation (3)**
11:13;20:20;36:14

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:03:39    Main Document
Pg 85 of 265

FLETCHER INTERNATIONAL, LTD. v.                                    Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
FLETCHER INCOME ARBITRAGE FUND-INVOLUNTARY LIQUIDATION                              July 23, 2012

**liquidators (2)**
24:22;36:25
**listed (2)**
17:10,11
**listen (1)**
22:8
**listening (1)**
15:11
**literally (1)**
37:25
**litigate (1)**
19:23
**litigation (1)**
24:2
**little (1)**
27:11
**LLP (2)**
4:2,14
**lockup (8)**
9:23;27:8;33:17,
18;34:9,18;35:7,20
**longer (1)**
14:18
**look (2)**
18:24;34:14
**lost (1)**
33:9
**lot (4)**
5:21;8:21;18:7;
29:16
**Louisiana (1)**
33:8
**Ltd (3)**
4:15;31:24,25
**LURIE (33)**
4:9;5:4,4;6:23,25;
11:18,19,21,23,24;
12:5,9,15;15:1,2,11;
19:16;28:1,6;30:21;
32:18,23,24;36:5,6,
10,11;39:16,19,24;
41:3,4,6
**Lurie's (4)**
6:5;20:17;24:20;
32:15
**lynchpin (1)**
13:15

**M**

**MA (1)**
4:18
**MacKenzie (6)**
26:1,2,7,11,23;
27:13
**MacKenzie's (1)**
26:7
**magically (1)**
37:12
**maintain (1)**
30:17
**maintained (2)**
17:5,7

**major (1)**
40:10
**majority (1)**
38:3
**making (1)**
38:22
**man (1)**
25:25
**managed (2)**
23:23;33:24
**management (8)**
24:11;26:10;28:4;
30:2;33:24;36:19;
37:8;38:25
**manpower (1)**
30:3
**many (3)**
18:20;36:16;40:23
**MARIO (3)**
4:11;5:7,11
**massive (1)**
28:24
**material (1)**
35:24
**materials (4)**
7:3;37:24;38:16;
39:21
**matter (7)**
9:13,18;14:1,8,24;
34:12;41:4
**mattered (1)**
32:6
**matters (4)**
22:19;40:3,4;41:17
**maximize (1)**
24:16
**maximum (2)**
26:5;27:7
**May (13)**
5:2;8:5,16;18:2;
22:11,12;27:4;29:12;
30:15;31:5;37:14;
38:14;41:16
**Maybe (3)**
29:22,24;31:2;
32:18,19
**mean (5)**
17:14;18:8;20:10,
12;38:20
**means (4)**
20:13,13;25:6,7
**meeting (1)**
23:11
**members (6)**
9:24,25;17:4,10;
18:17,22
**membership (1)**
10:4
**mentioned (1)**
10:6
**merit (1)**
10:24
**mess (1)**

20:20
**messed (2)**
20:18,18
**might (9)**
8:22,24;18:5;
35:15,17,19,21,22;
41:2
**million (2)**
28:16;33:9
**mind (2)**
6:11;40:8
**minimum (1)**
14:1
**ministerial (1)**
17:16
**minority (1)**
8:10
**minute (1)**
10:6
**minutes (3)**
7:3,21;37:20
**misrepresentations (1)**
38:22
**misrepresented (1)**
6:8
**misspoke (1)**
36:23
**mistakenly (1)**
21:25
**model (1)**
24:21
**momentarily (1)**
36:8
**MONAGHAN (3)**
4:20;5:17,18
**Monday (1)**
40:21
**Monetary (2)**
20:10,11
**money (2)**
28:25;29:16
**monitor (1)**
26:7
**more (8)**
14:9;17:12;18:7,
18;19:5;24:9;39:4;
40:16
**morning (2)**
26:22,24
**most (2)**
6:5;15:7
**move (3)**
25:17;32:20;39:22
**much (6)**
6:4,4;7:10;19:5;
21:4;40:16
**multiple (2)**
7:8;34:15
**myself (1)**
28:14

**N**

**named (1)**
26:1
**nature (1)**
12:10
**necessary (5)**
23:21;24:9,10;
32:1;34:7
**need (10)**
6:9,17,18;12:8;
23:3,4;29:1;34:5;
38:10;39:12
**negotiate (1)**
27:15
**New (3)**
4:6;6:21;37:12
**next (2)**
30:5,20
**night (1)**
41:5
**noise (2)**
5:21;12:1
**non-arm's-length (2)**
33:11;36:21
**nonmutual (1)**
20:4
**noon (2)**
41:7,10
**normal (2)**
14:14,15;17:21;
24:25;33:19,19
**note (4)**
8:21;35:25;38:7,12
**notice (4)**
9:12;15:19;34:3,19
**nullify (1)**
35:20
**number (3)**
5:24;18:23;33:17
**numerous (1)**
15:23
**NY (1)**
4:6

**O**

**object (1)**
13:4
**obligated (1)**
23:2
**obscure (2)**
7:18;36:4,16;37:7
**obscurity (1)**
9:12
**obtained (1)**
35:23
**obviously (1)**
17:14
**occur (1)**
35:12
**occurred (2)**
8:5;35:4
**o'clock (2)**
41:5,10

**off (8)**
5:23;12:8;9;29:15;
33:2;34:4;35:10;
36:20
**office (1)**
26:16
**officer (1)**
25:22
**officially (2)**
10:2;34:13
**one (10)**
6:17;7:8,21,22;8:6,
17;10:7,22;17:2;
26:23;35:25;36:3,13,
16,23;37:13,17;38:6
**one-hour (1)**
12:23
**ones (1)**
16:16
**one's (1)**
25:20
**only (5)**
8:11;13:18;29:7;
38:6;39:4
**opening (1)**
15:18
**opportunity (1)**
24:16
**opposing (8)**
33:1,5;34:11;
37:24;38:7,13,14;
39:20
**opposite (1)**
27:19
**optically (1)**
27:9
**order (3)**
12:25;14:3;23:19
**ordinary (4)**
21:13,18,20,25;
22:20
**organizational (2)**
16:8;34:14
**original (1)**
5:20
**others (1)**
20:3
**otherwise (2)**
23:15;40:20
**ourselves (2)**
30:10;35:15
**out (13)**
5:3;10:4,13;11:22;
12:20;17:2;21:13;
23:14,17;24:2;25:18;
30:2;36:21
**outcome (1)**
24:3
**outlined (1)**
37:16
**outset (2)**
6:12;7:1
**outside (2)**

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:03:39    Main Document
Pg 86 of 265

FLETCHER INTERNATIONAL, LTD. v.                    Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
FLETCHER INCOME ARBITRAGE FUND-INVOLUNTARY LIQUIDATION                    July 23, 2012

14:10;22:20

**over (11)**
6:1,4,24;11:22;
12:6;14:7;25:19;
31:3;33:9;38:9;40:15
**overwhelming (1)**
10:15
**own (8)**
10:8;29:18;30:22;
33:25;34:9,17,21,23
**owned (6)**
7:8;8:24;18:25;
31:25;37:1,4
**owner (3)**
16:5,7;19:25
**owners (1)**
19:17
**ownership (11)**
7:19,22,23;16:1,
10;17:1;18:1;19:11,
15;28:13;34:13
**owning (1)**
8:11
**owns (13)**
8:6,11,14,18;9:1,4,
11,14,19;10:9;13:21;
33:21;37:5

---

**P**

**paid (1)**
18:18
**paper (2)**
29:8;40:14
**papered (4)**
17:21;18:3,3;20:21
**papers (3)**
25:23;26:21;39:10
**parachute (2)**
30:5;31:1
**paragraph (1)**
14:3
**paralyzing (1)**
24:13
**Park (1)**
4:5
**part (4)**
6:15;11:10;29:11;
35:14
**participants (1)**
5:24
**particular (2)**
19:11;24:20
**parties (9)**
17:19;18:18;19:4,
13;20:16;21:1;24:24;
33:11;36:21
**parties' (2)**
16:25;19:2
**parties-in- (1)**
33:23
**parties-in-interest (1)**
23:22;24:20

**party (1)**
29:7
**passionate (1)**
27:17
**past (1)**
14:7
**pattern (1)**
14:16
**pay (2)**
18:19;19:4
**paying (1)**
18:4
**pension (2)**
33:8;37:2
**people (1)**
37:8
**perceived (1)**
38:10
**percent (19)**
8:7,7,12,15;9:4,11,
14;10:8;16:5,7;
19:14,17;31:23;34:1,
21,23;37:1,6,18
**percentage (2)**
8:11;10:10;19:11
**perhaps (2)**
31:3;32:14
**period (10)**
23:11;24:1;33:2,
13,13;34:4;35:10,12,
16;39:1
**permission (1)**
20:10
**permit (1)**
41:8
**permitted (1)**
27:7
**person (1)**
38:24
**persons (1)**
14:8
**perspective (3)**
19:1;25:12;34:21
**phone (3)**
5:3,22;36:7
**PI (1)**
41:7
**piece (2)**
11:3;29:8
**place (4)**
8:9;14:20;39:1;
40:24
**plaintiff (1)**
13:9
**plaintiff's (2)**
13:8,15
**plan (2)**
12:3;29:22
**planning (1)**
15:21
**play (2)**
9:7;31:17
**plays (1)**

24:2
**pleadings (2)**
7:8;34:15
**please (6)**
5:3,10;12:14;
30:16,20;31:17
**pm (3)**
36:9,9;41:19
**point (10)**
7:6;8:22;14:23;
15:7;19:9;21:5,7;
26:23;28:23;36:18
**points (1)**
40:12
**portion (3)**
14:2,12;16:15
**position (3)**
26:6;30:10;31:4
**possession (1)**
8:19
**possible (7)**
8:5,8,22;18:13,14;
26:6;38:12
**potential (1)**
40:4
**potentially (2)**
13:16;14:10
**power (1)**
10:25
**preemptively (1)**
12:20
**preliminary (6)**
6:20;29:5;33:14;
40:19;41:7,12
**present (2)**
11:5;15:15
**presentation (2)**
39:4,22
**presented (9)**
8:17,24;10:2,21;
11:4;12:22;16:16;
17:1;35:6
**president (1)**
15:10
**pressing (1)**
29:4
**presumptively (1)**
17:13
**pretty (1)**
21:4
**prevent (3)**
12:21;29:17;34:2
**previously (5)**
6:2;8:10;9:6,10;
10:8
**probably (2)**
23:25;28:16
**problem (1)**
29:19
**proceed (1)**
22:11
**proceeding (9)**
7:10,12,25;11:9;

13:3;14:19,21;23:13;
38:17
**proceedings (3)**
6:21;37:22;41:19
**process (9)**
15:24;19:9;23:20;
24:15;25:1,17;27:11;
28:24;34:24
**professional (1)**
22:25
**professionals (1)**
36:14
**program (1)**
28:5
**properly (2)**
20:15,22
**property (3)**
22:20;25:4,4
**propriety (1)**
40:23
**prosecuting (1)**
38:11
**protect (1)**
35:15
**protecting (1)**
25:8
**protection (1)**
29:1
**Protocol (2)**
26:20;27:2
**provide (6)**
23:7;24:15;27:3;
37:15,24;39:20
**provided (1)**
26:22
**provides (1)**
23:10
**pulling (2)**
25:20,21
**purported (6)**
9:23;19:12;30:25;
34:8;35:7,14
**purportedly (3)**
34:10;37:15;39:11
**purporting (1)**
10:3
**purpose (2)**
5:21;7:13
**pursuant (1)**
27:2
**pursue (1)**
12:25
**push (1)**
23:13
**put (3)**
28:21;30:10;40:2

---

**Q**

**quickly (2)**
38:8,11
**quiet (1)**
5:22

**quite (2)**
7:18;37:25
**quote (1)**
33:2

---

**R**

**raise (1)**
38:7
**raised (1)**
17:9
**ramping (1)**
28:16
**ready (1)**
30:2
**reality (1)**
8:9
**really (6)**
8:6;15:24;22:1;
23:18,19;27:18
**reason (3)**
11:3;28:23;39:3
**reasons (2)**
11:14;23:18
**recall (2)**
12:23;29:9
**received (2)**
34:12;38:13
**recent (1)**
6:5
**recently (2)**
7:22;37:20
**Recess (1)**
36:9
**recited (1)**
39:12
**recognized (1)**
25:20
**record (2)**
9:12;13:14
**recorded (5)**
16:24;17:4,25;
18:2;19:3
**records (10)**
16:3,25;18:15;
20:25,25;32:10;
33:21,23;37:10,21
**rectify (2)**
29:25;31:6
**redeem (1)**
16:12
**redemption (1)**
16:13
**refer (2)**
9:22;16:4
**referenced (1)**
39:21
**referred (1)**
16:6
**reflect (3)**
18:14;19:14;37:18
**reflected (3)**
16:3,8;34:18

---

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:03:39    Main Document
Pg 87 of 265

FLETCHER INTERNATIONAL, LTD. v.                    Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
FLETCHER INCOME ARBITRAGE FUND-INVOLUNTARY LIQUIDATION                    July 23, 2012

**reflective (2)**
35:9,10
**reflects (2)**
33:19;38:3
**register (17)**
17:4,5,10,13;18:10,
11,12,14,17,22;19:8;
20:2,14;29:25;31:6;
32:12,17
**registry (2)**
9:17;35:18
**relate (1)**
18:16
**related (3)**
13:18;33:11;36:21
**reliable (1)**
33:22
**relied (2)**
37:23,23
**relief (4)**
13:17,23;14:22;
39:5
**remaining (1)**
40:9
**remains (1)**
26:6
**reorganization (4)**
11:11,13;12:4;
15:25
**repeat (1)**
5:9
**repeatedly (2)**
6:8;33:1
**replace (7)**
28:21;29:23,23;
30:6;31:1,1,2
**reply (2)**
32:23;41:9
**reported (1)**
40:3
**represent (2)**
7:6;34:16
**representation (5)**
11:7;12:15;33:5;
36:2;38:19
**representations (1)**
31:10
**representative (1)**
27:21
**representatives (1)**
35:14
**represented (12)**
7:7,10,11,24;8:10,
15,24;9:9;10:8;
32:10;33:1;35:11
**representing (2)**
5:15;15:5
**reproach (1)**
27:14
**request (3)**
13:23;14:15;37:14
**requests (1)**
13:12

**require (3)**
5:23;22:5,9
**required (1)**
17:16
**requires (1)**
22:18
**researched (1)**
37:9
**reservations (2)**
40:10,23
**reserved (1)**
41:15
**resolution (1)**
27:15
**respect (5)**
6:11;14:16;28:13;
38:21;41:11
**respectfully (1)**
14:14
**respecting (1)**
13:3
**restrained (1)**
29:12
**restricted (1)**
20:7
**restructuring (3)**
25:22;26:1,3
**result (2)**
19:25;33:9
**results (1)**
6:16
**retainer (1)**
34:11;38:13
**retention (3)**
26:12,20;27:1
**revise (1)**
26:25
**right (28)**
5:13,16,20;10:15;
12:13;14:25;15:3;
17:17;19:22;21:6;
22:6,10;23:20;25:16,
25;27:6;28:8,10;
29:6;30:9;32:23;
35:19;36:10;37:8,11;
39:25,25;41:18
**rightful (1)**
19:17
**rights (18)**
7:11;10:11;11:1;
14:4,11;24:4,25;
29:13,22;30:24;34:3,
10;35:22;38:11;39:2,
6;40:21;41:13
**risk (1)**
33:7
**road (2)**
18:6;28:25
**Robert (1)**
5:2
**rule (1)**
40:20
**rules (1)**

9:16
**run (1)**
22:24
**running (1)**
22:22

---

## S

**Saint (1)**
4:16
**sale (2)**
22:20;25:4
**same (4)**
10:7,13;22:21;
28:19
**sat (2)**
28:13,14
**satisfy (1)**
13:8
**SATTERLEE (4)**
4:2;5:5,7,11
**Saturday (1)**
40:22
**Saunders (3)**
9:8;15:9;18:22
**save (3)**
28:24,25;29:16
**saw (1)**
6:4
**saying (3)**
6:11;11:25;32:7
**scenario (2)**
8:23,23
**scenes (2)**
24:5,7
**scheduled (1)**
41:12
**scheme (4)**
11:7,11;12:18,18
**screwed (2)**
36:2,15
**SEC (2)**
8:15;33:23
**second (3)**
9:7;18:22;36:5
**seconds (1)**
38:15
**secretary (1)**
17:7
**secretive (1)**
25:15
**Section (1)**
27:1
**secured (1)**
31:9
**seeing (1)**
25:23
**seek (3)**
21:22;35:17,20
**seeking (1)**
33:2
**seems (1)**
6:7

**sells (1)**
21:24
**sent (4)**
13:9;16:19;29:10;
30:15
**separate (3)**
17:22,23;41:1
**series (1)**
7:18
**Services (1)**
17:6
**set (4)**
7:2;10:13;12:20;
27:16
**setting (1)**
10:4
**seventeen (1)**
16:7
**several (3)**
8:16;14:7;26:18
**shall (2)**
22:19;23:10
**share (8)**
17:13;19:8;20:2,
14;31:6;32:12,17;
35:18
**shareholder (28)**
6:3,14,19;10:11,
16;11:1;13:11;14:4,
4,11;17:11;19:23;
23:11,12,24;24:1,4,
11;25:17;28:20;
29:22,25;30:24,25;
32:20;34:2;35:19;
40:21
**shareholders (3)**
8:10;16:17;29:13
**shares (13)**
8:11;16:18,20;
17:3;18:11,16,24;
20:6,9;30:23;31:24;
37:4
**side (6)**
5:22;15:1;28:19;
38:23;40:9,13
**sign (1)**
26:25
**signed (1)**
15:9
**significance (1)**
20:5
**significant (5)**
18:17;22:23;23:7;
30:23;40:15
**simple (1)**
19:7
**simply (1)**
14:17
**sit (3)**
27:12,12,14
**Sitting (4)**
15:11;24:18;25:24;
26:16

**situation**
21:23,23;28:20;
29:1
**slightly (1)**
30:15
**slowly (1)**
12:14
**small (1)**
8:11
**sole (4)**
13:16,16;17:11;
26:4
**solely (1)**
41:11
**solvency (1)**
23:13
**somebody's (1)**
20:1
**somehow (1)**
31:3
**someone (2)**
38:23,24
**Sorry (7)**
11:19,24;16:12;
23:4,25;25:9;35:2
**sort (6)**
15:20;22:21;24:21,
23;25:13,19
**sought (1)**
16:12
**source (1)**
34:11
**speak (2)**
8:4;12:14
**speakerphone (2)**
5:23;12:8
**speaking (3)**
12:5,6,8
**spending (1)**
24:12
**spent (1)**
18:7
**spoken (1)**
26:18
**spreadsheets (1)**
18:1
**standing (1)**
32:4
**stands (1)**
26:3
**standstill (4)**
21:8;22:15;27:8;
40:11
**start (4)**
15:24;30:7;31:3;
32:24
**state (6)**
8:8,13,14;10:21;
28:13;33:25
**stated (2)**
29:11;38:8
**statement (2)**
36:13,15

**statements (1)**
35:24

**status (1)**
6:20

**Stay (1)**
36:7

**step (2)**
12:13;27:3

**STEPHENS (4)**
4:2;5:5,7,11

**steps (3)**
14:10;15:23;32:1

**still (9)**
6:3;12:7;20:12,24,
25;22:2;29:3;39:16;
41:11

**stock (4)**
16:12,15;17:5;20:7

**stockholder (1)**
28:9

**stop (1)**
38:10

**story (1)**
13:20

**strategy (1)**
22:4

**strings (2)**
25:20,21

**strong (1)**
10:23

**structure (3)**
7:19;16:10;17:1

**studied (1)**
11:6

**subject (1)**
12:23

**submission (1)**
39:13

**submit (11)**
6:25;10:19;13:16,
25;14:2,12,16;21:15,
19;38:13;39:9

**submitted (7)**
7:3;9:6,6;26:17,21;
34:15;38:17

**submitting (1)**
7:4

**substantial (1)**
33:3

**substantiate (3)**
13:1,22;14:6

**substantiates (1)**
13:15

**substantive (2)**
13:22;19:6

**sue (2)**
19:10;31:5

**sufficient (1)**
25:10

**suggest (1)**
6:7

**Sunday (1)**
40:22

**sundry (1)**
37:16;39:10

**super-majority (1)**
7:9

**supplemental (2)**
6:6;15:9

**supporting (1)**
39:11

**supposed (1)**
16:21

**sure (4)**
8:6;18:23;25:19;
36:6

**suspicion (1)**
25:19

**swapped (1)**
16:18

**T**

**table (3)**
27:12,13,14

**talk (2)**
11:22;15:6

**talked (1)**
26:23

**talking (4)**
12:1,3;24:9;29:21

**technical (2)**
9:16,17

**telling (3)**
21:7;32:17,22

**ten (1)**
38:15

**term (1)**
11:11

**terminate (3)**
28:9;29:6;40:18

**terms (2)**
29:18;35:6

**theory (5)**
12:22;13:1,1;
14:21;37:12

**Therefore (2)**
13:13;14:11

**thereof (1)**
24:12

**third (1)**
12:20

**though (3)**
22:7;34:20;40:10

**thought (2)**
25:14;28:23

**threat (2)**
24:4,12

**three (1)**
30:11

**Thursday (3)**
41:8,10,10

**thwart (1)**
12:4

**tie (2)**
31:6,7

**times (2)**
15:15;26:18

**timing (1)**
7:2

**TIMOTHY (2)**
4:8;5:4

**today (12)**
16:6;18:12,14,16;
21:7;29:20;33:10,23;
37:17;39:12;40:3,18

**told (12)**
6:12,15,17;20:24;
26:19;31:23;32:8,9,
21;34:25;36:24;37:4

**tomorrow (1)**
41:5

**tonight (1)**
39:24

**torpedo (1)**
12:21

**track (1)**
18:1

**traction (1)**
8:23

**transaction (19)**
8:4;16:11,24;
17:18,20,21,24,25;
19:2,19;20:12,16;
21:18,20;33:20;
34:18;36:20;37:7,12

**transactions (6)**
33:10,11,25;36:4,
17;37:16

**transcript (1)**
11:6

**transfer (9)**
16:14;17:3;18:11,
16;20:9,12,14;37:18;
38:3

**transferable (1)**
20:6

**transferred (5)**
7:22,23;19:12,12,
15

**transparency (2)**
34:6;35:9

**transparent (2)**
25:15;34:24

**transparently (1)**
34:1

**tried (2)**
27:18;28:14

**TRO (19)**
6:2,19;14:3,12,17;
28:9;29:6,11,16,17,
20;30:17;31:10,22;
39:1,8;40:9,18,24

**troubling (1)**
40:4

**true (4)**
6:10;28:13;32:8,11

**Trustee (4)**
23:22;25:24;27:21;

**times (2)**
41:13

**Trustee's (2)**
26:16;28:5

**truth (1)**
6:15

**Try (4)**
12:13,14;18:8;
29:16

**trying (6)**
25:16;27:5,11;
30:9;31:7,15

**turn (2)**
33:8;37:5

**turns (2)**
17:2;25:18

**twenty-five (1)**
26:2

**two (10)**
8:17;9:5;12:19;
13:6;15:19;16:16;
17:19,21;30:11;
39:17

**typically (1)**
15:21

**U**

**unapproved (1)**
9:25

**uncovered (1)**
37:21

**under (9)**
8:23,23;9:16;26:6;
27:1;30:11;31:23;
41:14,14

**undertake (1)**
14:9

**undertaken (3)**
12:18;34:3;37:7

**undocumented (1)**
33:10

**unfairly (1)**
24:7

**unfortunately (4)**
18:4;19:3;20:23;
21:1

**unless (1)**
14:24

**unnecessarily (1)**
29:12

**unpresented (1)**
10:1

**unsigned (2)**
7:21;37:20;38:2

**unsuccessful (1)**
37:23

**up (12)**
16:9,25;20:18,18;
25:2,2;27:16;28:16;
31:6,7;36:2,16

**update (5)**
18:9,10,12;19:7,9

**updated (1)**

**18:14**

**upsetting (1)**
27:19

**use (7)**
22:20;25:3,4;
26:19;30:24;31:3;
35:10

**used (2)**
11:11;33:15

**using (1)**
12:11

**utilize (1)**
10:24

**utmost (1)**
38:21

**V**

**vacated (3)**
14:5,12,17

**valid (1)**
23:15

**value (1)**
24:16

**various (7)**
8:15;33:25;35:15;
36:3,21;37:2,16

**veteran (1)**
26:2

**view (1)**
10:17

**viewed (1)**
27:19

**views (1)**
23:6

**violate (1)**
23:16

**vis-a-vis (2)**
6:14;40:13;41:13

**void (1)**
20:13

**voidable (1)**
20:13

**vote (5)**
6:3,14,19;23:12;
28:9

**W**

**Wait (1)**
11:22

**waiting (1)**
29:3

**wants (1)**
28:21

**way (4)**
17:21;18:3;19:21;
20:19;27:6;40:20

**ways (1)**
18:2

**week (1)**
30:5

**weeks (1)**

FLETCHER INTERNATIONAL, LTD. v.
FLETCHER INCOME ARBITRAGE FUND-IN-VOLUNTARY LIQUIDATION

Case No. 12-12796-reg; Adv. Proc. No. 12-01740-reg
July 23, 2012

33:14
**weren't (4)**
29:4;30:10;32:8;
35:22
**what's (2)**
27:4;39:23
**Whereupon (1)**
41:19
**whole (1)**
40:17
**wholly (2)**
34:7;36:19
**who's (2)**
5:3;35:5
**whose (1)**
35:6
**withdrawing (1)**
13:10
**withdrawn (3)**
13:24;14:5,7
**withdrew (1)**
13:18
**within (3)**
14:10;25:24;39:13
**without (4)**
11:14;13:9;20:9;
21:9
**word (1)**
31:18
**words (1)**
12:12
**work (1)**
34:12
**working (1)**
30:2
**world (2)**
18:20;30:4
**wrong (3)**
8:25;22:6;32:16

---

**Y**

**year (1)**
26:2
**years (1)**
8:16
**yesterday (1)**
26:21
**York (1)**
4:6
**Young (3)**
5:15;15:4;36:14

---

**Z**

**zillion (1)**
40:2

---

**0**

**02116 (1)**
4:18

---

**1**

**1 (1)**
33:17
**10 (1)**
4:16
**10169 (1)**
4:6
**107 (1)**
9:9
**11 (8)**
11:8,16;12:21;
13:5;15:19;23:20;
38:8;41:13
**1112b (1)**
41:14
**11th (1)**
4:17
**170,000 (1)**
38:18
**18 (1)**
18:23
**180 (2)**
13:21;23:11
**18th (1)**
38:14
**19th (1)**
29:10

---

**2**

**20 (1)**
22:14
**200,000 (1)**
34:11
**2012 (2)**
16:11;38:14
**20th (1)**
22:14
**22nd (2)**
16:11,17
**230 (1)**
4:5
**27th (1)**
29:18

---

**3**

**3:13 (1)**
36:9
**3:16 (1)**
36:9
**3:29 (1)**
41:19
**305 (1)**
41:14
**363 (1)**
27:1
**3rd (5)**
15:17;16:9,17;
17:1;20:24

---

**5**

**5 (2)**
41:5,10

---

**9**

**92.5 (2)**
33:25;37:5

## EXHIBIT B

**July 18, 2012, Letter to the Court Withdrawing Request for *Manville* Injunction**

# YC&T  YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Attorneys at Law*

**WILMINGTON**
RODNEY SQUARE

**NEW YORK**
ROCKEFELLER CENTER

Daniel F.X. Geoghan
P 212.332.8851
F 212.332.8859
dgeoghan@ycst.com

July 18, 2012

**VIA HAND DELIVERY**

The Honorable Robert E. Gerber
The United States Bankruptcy Court for the
Southern District of New York
Courtroom 621
One Bowling Green
New York, NY 10004-1408

Re:  *Fletcher International, Ltd. v. Fletcher Income Arbitrage Fund, et al.*, Adv.
Proc. 12-01740 (REG) (Bankr. S.D.N.Y.)

Dear Judge Gerber:

We write to notify the Court that the Debtor has withdrawn, without prejudice, Debtor's Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief and Declaration Regarding the Applicability of 11 U.S.C. § 362 (Docket Number 3) (the "**Debtor's Preliminary Injunction Motion**") to the extent it seeks to enjoin the holding of any shareholder meeting or shareholder vote to change the Debtor's Board of Directors (the "**Manville Issue**"). The Debtor reserves the right to reinstate and/or seek the same relief or other relief in the future related to any shareholder meeting or shareholder vote to change the Debtor's Board of Directors or other acts or omissions.

The Debtor preserves and will continue to seek the relief sought in the Debtor's Preliminary Injunction Motion to the extent it seeks to enjoin each of Fletcher Income Arbitrage Fund ("**Fletcher Income Arbitrage**"), FIA Leveraged Fund ("**FIA Leveraged**"), and Fletcher Fixed Income Alpha Fund ("**Fletcher Fixed Income Alpha**", together with Fletcher Income Arbitrage and FIA Leveraged, the "**Defendants**") from taking any action in furtherance of securing the appointment of a liquidator, including a joint provisional liquidator, in connection with the Winding Up Petition Filed In the Matter of Fletcher International Ltd and the Matter of the Companies Act of 1981 pending in the Supreme Court of Bermuda (Commercial Court) Civil Jurisdiction.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
July 18, 2012
Page 2

Because the vast majority of the Debtor's discovery requests ("**Discovery Requests**") sought information regarding the Manville Issue, the Debtor has withdrawn, without prejudice, all such requests, including:  (i) Debtor's First Requests for Production of Documents and Debtor's First Set of Interrogatories as they apply to the Defendants;  (ii) the Notices of Deposition of the liquidators including Robin Lee McMahon, Roy Bailey, Gordon McRae, Tammy Fu and Jenna Wise;  and (iii) the Notices of Rule 30(b)(6) Deposition and Rule 45 Subpoena *Ad Testificandum* and *Duces Tecum* of each of Firefighters' Retirement System, Municipal Employees' Retirement System of Louisiana, New Orleans Fire Fighters' Pension & Relief Fund and Massachusetts Bay Transportation Authority Retirement Fund.  The Debtor reserves the right to seek discovery (including the depositions of the individuals and parties referenced above) in the future.

The Debtor informed the Defendants yesterday, July 17, 2012, that it was withdrawing the Debtor's Preliminary Injunction Motion to the extent it seeks relief related to the Manville Issue and the Discovery Requests.  We will coordinate with the Defendants regarding the remaining relief sought in the Debtor's Preliminary Injunction Motion to determine if an evidentiary hearing is still necessary or if the parties can proceed with only oral argument.

Respectfully submitted,

Daniel F.X. Geoghan

cc:    Don Mackenzie (via electronic mail)
       David Hurst
       Melanie Sharp
       David Lurie (via electronic mail)
       Tim Brock (via electronic mail)
       John Monaghan (via electronic mail)

# EXHIBIT C

**Supplemental Declaration of Floyd Saunders**

David R. Hurst
Daniel F. X. Geoghan
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone: 212-332-8840
Facsimile: 212-332-8855

*Proposed Counsel to the Debtor-and-Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FLETCHER INTERNATIONAL, LTD., | Case No. 12-12796 (REG) |
| Debtor. | |

**SUPPLEMENTAL DECLARATION OF FLOYD SAUNDERS PURSUANT**
**TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

I, Floyd Saunders, being duly sworn, deposes and states:

1.     I am the President and a member of the board of directors of Fletcher

International, Ltd., the debtor and debtor-in-possession in the above-captioned chapter 11 case

(the "**Debtor**"). In such capacity I am generally familiar with the Debtor's business, day-to-day

operations and financial affairs.

2.     I submit this supplemental declaration (the "**Supplemental Declaration**")

pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1 to supplement and

amend the Declaration of Floyd Saunders Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York (Docket No. 2) (the "**Original Declaration**").

3.     Except as otherwise indicated, the facts set forth in this Supplemental

Declaration are based upon my review of relevant documents, information provided to me or

verified by other officers or the Debtor's professional advisors, including Young Conaway

Stargatt & Taylor, LLP and Appleby (Bermuda) Limited, and my experience, knowledge and

information concerning the Debtor's operations.  I am authorized to submit this Supplemental

Declaration on behalf of the Debtor and, if called upon to testify, I would testify competently to

the facts set forth herein.

## THE DEBTOR'S CORPORATE OWNERSHIP STRUCTURE

4.      In paragraph 13 of the Original Declaration I stated that the Debtor is

directly owned by Fletcher Income Arbitrage Fund ("**Fletcher Income Arbitrage**") and Fletcher

International Inc. ("**Fletcher International Delaware**"), which statement was based on the

Debtor's books and records. *Original Declaration at Para. 13.* I have since been advised by

counsel that, according to the Register of Members of the Debtor maintained by Appleby

Services (Bermuda) Ltd., the Secretary of Fletcher International, Ltd., the Debtor is the wholly-

owned subsidiary of Fletcher International Delaware.  A true and correct copy of the Register of

Members, as of July 19, 2012, is attached hereto as Exhibit A.

5.      I have further been advised by counsel that such Register of Members

provides *prima facie* evidence of the corporate ownership of the Debtor and, accordingly, the

Debtor is the wholly-owned subsidiary of Fletcher International Delaware.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.


Dated:  July 19, 2012
        New York, New York


                                        By:    /s/ Floyd Saunders
                                               Floyd Saunders
                                               President

**Exhibit A**

**Register of Members**

## CERTIFICATE

Appleby Services (Bermuda) Ltd., Secretary of Fletcher International, Ltd. (the "Company"), a company registered and existing under the laws of the Islands of Bermuda, **HEREBY CERTIFIES** that the documents attached hereto are true and correct copies of the following documents of the Company:

1.      Register of Members

IN WITNESS WHEREOF Appleby Services (Bermuda) Ltd. has caused this certificate to be executed by its duly authorised representative this 19th day of July, 2012.

Signed for and on behalf of:
Appleby Services (Bermuda) Ltd.
Secretary

# Fletcher International, Ltd.

## Register of Members
## as at 19 July 2012

Pursuant to §65 of the Companies Act 1981

**Class:  Common, voting**
**Currency:  USD**
**Par Value:  1,000.00**

| Member | No. of Shares | % Paid | Date of Entry as a member |
|--------|--------------:|-------:|---------------------------|
| Fletcher International, Inc.<br>1209 Orange Street<br>Wilmington DE 19801<br>USA | 120 | 100 | 1–Dec–2003 |

| Total No. of Issued Common Shares | 120 |
|-----------------------------------|-----|

## **EXHIBIT D**

**Transcript of July 3, 2012, TRO Hearing**

FLETCHER INTERNATIONAL, LTD.

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 12-12796-reg

4  - - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  FLETCHER INTERNATIONAL, LTD.

7          Debtors.

8  - - - - - - - - - - - - - - - - - - - - - -x

9

10

11          United States Bankruptcy Court

12          One Bowling Green

13          New York, New York

14

15          July 3, 2012

16          9:46 AM

17

18

19

20

21  B E F O R E:

22  HON. ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25

FLETCHER INTERNATIONAL, LTD.

1    **HEARING re Temporary Restraining Order**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **Transcribed by:  Sheila Orms**

FLETCHER INTERNATIONAL, LTD.

```
1    A P P E A R A N C E S :

2

3    YOUNG CONAWAY STARGATT & TAYLOR, LLP

4         Attorneys for Debtors

5         Rodney Square

6         1000 North King Street

7         Wilmington, DE  19801

8

9    BY:   DAVID R. HURST, ESQ.

10        MELANIE J. SHARP, ESQ.

11

12   YOUNG CONAWAY STARGATT & TAYLOR, LLP

13        Attorneys for Debtors

14        Rockefeller Center

15        1270 Avenue of the Americas

16        New York, NY  10020

17

18   BY:   DANIEL F.X. GEOGHAN

19

20

21

22

23

24

25
```

Page 4

```
 1   COHEN

         & GRESS, LLP

 2       Attorneys for Fletcher Income Arbitrage

 3       Fund and the FIA Leverage Fund

 4       and Official Liquidators

 5       800 Third Avenue

 6       New York, NY  10022

 7

 8   BY:   NATHANIEL P.T. READ, ESQ.

 9         DANIEL H. TABAK, ESQ.

10

11   OFFICE OF THE UNITED STATES TRUSTEE

12       Attorneys for U.S. Department of Justice

13       33 Whitehall Street

14       21st Floor

15       New York, NY  10004

16

17   BY:   ELISABETTA G. GASPARINI, ESQ.

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2             THE COURT:  Good morning.  Have seats, everybody.

 3    All right.  Have a seat for a second, please.

 4             We're here on Fletcher International.  As this is the

 5    first hearing that we have in the case, I'm going to give

 6    Debtors' counsel and then any other parties that, who wish to

 7    be heard -- what I customarily do on first day motions which is

 8    to supplement the 1007-2 affidavit to help me better understand

 9    that which is to be accomplished in this Chapter 11, and to

10    give me any perspectives on the Debtors' potential

11    reorganization.

12             As I always do, I've read the 1007-2.  I,

13    nevertheless, allow Debtors' counsel to supplement that and to

14    make any remarks they want to make to the public.

15             Upon review of the papers and it's discussion of the

16    issues I sensed rightly or wrongly that other parties-in-

17    interest, such as the provisional liquidators of what appear to

18    be three corporate entities that may have some skin in this

19    game may wish to be heard too, and I'm going to give them a

20    comparable opportunity.

21             Then we're going to go into the TRO application which

22    as my Chambers explained to Debtors' counsel I take only on

23    notice.  I don't hear ex parte except in those very rare cases

24    where providing notice would vitiate the purposes of the

25    application.
```

FLETCHER INTERNATIONAL, LTD.

Page 6

1          I do have a bunch of questions about the TRO which

2     are a preview to what I would raise if we got to a preliminary

3     injunction point or when we did.  And after I get people's

4     appearances, I'm going to want to people to sit down so that I

5     can brief you on the matters that I want each side to address

6     when we get to that point.

7          Before we continue I'd like to get appearances of

8     anybody who thinks that he or she might want to be heard today,

9     starting with Debtors' counsel.

10          MR. HURST:  Good morning, Your Honor, David Hurst

11     from Young Conaway Stargatt & Taylor on behalf of the Debtor.

12          THE COURT:  Okay.  Thank you, Mr. Hurst.

13          MR. GEOGHAN:  Good morning, Your Honor, Daniel

14     Geoghan, Young Conaway Stargatt & Taylor as well on behalf of

15     the Debtor.

16          THE COURT:  Okay, thank you, Mr. Geoghan.

17          MS. SHARP:  Good morning, Your Honor, Melanie Sharp

18     from Young Conaway Stargatt & Taylor on behalf of the Debtor.

19          THE COURT:  Okay, thank you, Ms. Sharp.

20          MR. TABAK:  Good morning, Your Honor, Dan Tabak from

21     Cohen & Gresser on behalf of Fletcher Income Arbitrage Fund in

22     Voluntary Liquidation acting by its joint official liquidators

23     Robin Lipman --

24          THE COURT:  Forgive me Mr. Taback or is it Tabak?

25          MR. TABAK:  Tabak.

FLETCHER INTERNATIONAL, LTD.

1           THE COURT:  Tabak.  Okay.  Which of the various

2    liquidators do you have?

3           MR. TABAK:  The first two on the caption.  That may

4    be easier than going through them, so the Fletcher Income

5    Arbitrage Fund and the FIA Leverage Fund and Official

6    Liquidators.

7           THE COURT:  Okay.  So you, the arbitrage is the 83

8    percent stockholder of Fletcher International Limited.

9           MR. TABAK:  That's correct.

10          THE COURT:  And then the other one that you had was

11   Alpha Fund?

12          MR. TABAK:  I do not represent Alpha Fund.  I don't

13   know --

14          THE COURT:  Oh, you have the FIA Leverage Fund which

15   was referred to by the acronym FIAL?

16          MR. TABAK:  That's correct, Your Honor.

17          THE COURT: Okay.  Thank you.

18          MR. TABAK:  Thank you, Your Honor.

19          MR. READ:  Good morning, Your Honor, Nathaniel Read,

20   also from Cohen & Gresser for the Liquidators as described.

21          THE COURT:  Okay, thank you, Mr. Read.  Anybody else?

22   And I see Ms. Gasparini from the U.S. Trustee's Office.

23          MS. GASPARINI:  Yes, Your Honor.

24          THE COURT:  I don't know if you're going to have a

25   dog in this fight or not, but --

FLETCHER INTERNATIONAL, LTD.

Page 8

1              MS. GASPARINI:  I'm taking no position on the TRO.

2     Thank you.

3              THE COURT:  Okay, all right.

4              Okay.  Mr. Hurst do you want to make opening remarks?

5              MR. HURST:  Good morning, Your Honor.  I suggest to

6     start off that I had up a org chart.  It's the same one that

7     was attached to the declaration --

8              THE COURT:  I think I have one.

9              MR. HURST:  It has all the acronyms written on it if

10    that would be helpful for Your Honor.

11             THE COURT:  Yes, it is.  Although I'm telling you

12    that after you read my case management order this is the last

13    time we're going to use acronyms.  I don't speak acronym.  I

14    can't work with acronyms and that's why my case management

15    orders in every one of the other hundred or so Chapter 11 cases

16    I have say you can't use them unless you're referring to

17    something like that FCC or something like that.

18             But if you have a supplemental corporate

19    organizational chart, hand it up to me, please.

20             MR. HURST:  Your Honor, I've --

21             THE COURT:  I take it's the same one that you gave

22    me, you just added the acronyms.

23             MR. HURST:  I just added the acronyms and I provided

24    a copy to counsel, to the defendants also.

25             THE COURT:  Actually, you know what, in my prep I had

```
 1    already put the acronyms on to figure out what you were talking

 2    about.  So I'm with you.  Thank you.

 3                MR. HURST:  Okay, thank you, Your Honor.

 4                Your Honor, as you know, we filed a petition for

 5    Chapter 11 on Friday night, June 29th.  We filed the petition

 6    without anything else, without even the 1007 affidavit due to,

 7    we just didn't really have time to prepare anything else.  Of

 8    course, spent the weekend working on the 1007 and filed that

 9    yesterday at approximately 4:30.  At that time we, of course,

10    provided copies to Chambers and the Office of the U.S. Trustee

11    as had been requested by your clerk.

12                Earlier in the day, your Honor, as you know, we had

13    spoken with your clerk regarding the TRO and the fact that we

14    wanted to try to get in front of Your Honor this week if

15    possible.  Due to Your Honor's schedule we realized today was

16    the only day available and we had to deal with, sort of the

17    notice issue.  Initially we had told your clerk that we didn't

18    know if it would be possible for us to get the TRO on today,

19    but you know in the end it turned out that we were able to get

20    the papers done.

21                After speaking to your clerk at approximately 12:30,

22    discussing notice, it was clear to us that it was important to

23    give notice if there was not a strategic or important material

24    reason why we couldn't give notice, we sought counsel from our

25    Bermuda counsel which is Applebee and discussed the matter and
```

FLETCHER INTERNATIONAL, LTD.

Page 10

1    ultimately determined that there was no reason why we should

2    not provide notice if we could, and we did.  We sent notice at

3    approximately 1:30 p.m. yesterday to both the liquidators at

4    FIAL, who are also the liquidators at Arbitrage and then

5    additionally served the liquidators of the Alpha, who is Zolfo

6    Cooper.

7              THE COURT:  Does Alpha have counsel, if you know?

8              MR. HURST:  Your Honor, we're not aware if they have

9    counsel or not.  We know that we got to the right people, but

10   they didn't respond.  So we don't know.  They -- I'm sure they

11   have counsel --

12             THE COURT:  Well Zolfo is obviously a fairly

13   sophisticated entity and if they have counsel I assume they

14   know how to pick up the phone and call them.

15             MR. HURST:  Right.

16             THE COURT:  You did give notice to Zolfo itself?

17             MR. HURST:  We did and Your Honor if you'd like I can

18   hand up the notice that we gave them at approximately 1:30.

19             THE COURT:  Your creditability is fine with me at

20   this point, Mr. Hurst.  If you represent to me that you gave

21   notice to -- that will serve for my purposes unless somebody

22   wants to put the matter into issue.

23             MR. HURST:  Okay.  Well just for the record we

24   provided notice to Tammy Foo (ph) and Jenny Wise -- Jenna Wise

25   (ph) both at Zolfo Cooper and we know that at least Tammy Foo

1    is one of the joint provisional liquidators or the joint

2    voluntary liquidators, I guess is the proper title.

3            So then going down the chronology, as I said, we

4    filed the 1007 at about 4:30.  I, at this point, you know you

5    said you've read it.  I don't want to rehash all those facts

6    unnecessarily.  We'll have to get into the facts a bit

7    obviously when we're talking about the TRO, but I was going to

8    leave that to my partner, Mr. Geoghan to discuss.

9            You notice we didn't file any first day papers and

10   that's because although we have an operating business this is,

11   you know, a master fund it makes investments, it's active.

12   There's nothing urgent at this point that we need the Court's

13   relief or the Court's intervention on.

14           For instance we don't have, we don't have employees.

15   We don't have trade vendors, except for a bunch of lawyers and

16   I don't think we'd call them trade vendors.  So we don't need

17   the normal sort of relief, the first day employee order or the

18   critical vendor order.

19           In the coming days you'll see there are a couple of

20   matters we do need the Court's attention on, but those are

21   things we can send out on notice.

22           THE COURT:  Uh-hum.

23           MR. HURST:  For instance we're going to need a short

24   extension of the time to file schedules and statements just

25   because it's, even though it's not a huge enterprise it's

Page 12

1    complicated to -- it's going to be complicated for us to go

2    through all the books and provide the necessary information in

3    15 days.

4            So very sort of routine things we're going to be

5    looking for.  There's a possibility that we are going to have

6    to file an adversary proceeding to seek turnover of our money

7    held in our prime brokerage account.  Credit Suisse is holding

8    money and right now doesn't want to release it.  We think we

9    can probably work with them consensually, it's possible it

10   won't work and we'll have to file an adversary.

11           Other than that, you'll see the normal retention

12   applications.  Young Conaway, and Applebee.  There's going to

13   be some 327(e) retentions for counsel who are engaged in active

14   litigation on behalf of the Debtor.  But other than that, you

15   know, there are not going to be a whole lot of motion practice

16   initially.

17           THE COURT:  Pause, please, Mr. Hurst.  Have you

18   gotten your draft retention papers to the U.S. Trustee's Office

19   yet?

20           MR. HURST:  No, we haven't, Your Honor.  Honestly the

21   determination to file Chapter 11 occurred in the middle of last

22   --

23           THE COURT:  This case doesn't have the usual

24   premeditation and prefiling planning that your firm is famous

25   for.

FLETCHER INTERNATIONAL, LTD.

1          MR. HURST:  I very much wish it did.

2          THE COURT:  Okay.

3          MR. HURST:  It was a little bumpy over the weekend.

4    Nonetheless we'll get those papers done quickly.  They're not

5    very complicated.  The number of entities that are involved for

6    conflicts purposes is not expansive and that's usually the

7    thing that takes the most time.

8          THE COURT:  Okay.

9          MR. HURST:  So we'll get that done in short order,

10   Your Honor.

11         THE COURT:  Stand by for a second, please, Mr. Hurst.

12         Ms. Gasparini, if he gets it in fairly promptly will

13   you be okay with a nunc pro tunc to today?

14         MS. GASPARINI:  Certainly, Your Honor, I think so.

15         THE COURT:  Okay.  Thanks.

16         MR. HURST:  Your Honor, in your opening remarks you

17   asked -- you said we could supplement the 1007.  I guess, first

18   of all we put a lot of effort into that and I think it really

19   painted a picture of the situation we're in.  You did -- you

20   mentioned sort of where are we looking to go, sort of what is

21   the end game here.

22         You'll see when we file the schedules and statements,

23   and you've already got a little taste of it in the 1007, we

24   have assets.  Some of those assets are more easily convertible

25   to cash than others.  And obviously we have cash with Credit

```
 1    Suisse, we have some securities that can be liquidated in the

 2    more short term and some things that are going to take longer.

 3    These are, you know, typically the company has very complex

 4    financial instruments, sometimes they are illiquid, doesn't

 5    mean they can never been liquidated but it's a situation where

 6    you have to find the right buyer in order to maximize value.

 7          The company also has a couple of different litigation

 8    actions going on that are, they arise out of securities trying

 9    to determine parties rights under those securities, potentially

10    with huge recoveries that the company spent a lot of money

11    pursuing already.

12          So in the end, Your Honor, I think there's going to

13    be significant funds in the estate for distribution.  Certainly

14    to creditors.  You know, at least everything we know right now

15    we would expect creditors to be paid in full, but you know as

16    you'll see, you know, as things unfold -- you know, we

17    recognize these securities are hard to value.  Okay.  You would

18    hope that there would also be a recovery for shareholders.

19          And, you know, that's at least what we know now.  If

20    we were to go to an evidentiary hearing today maybe it would

21    come out differently.  But you know I can only tell you what

22    we've seen so far with our best due diligence and understanding

23    in speaking with the company.

24          So I think, you know, as we sit here right now with

25    my experience as a restructuring professional this could
```

FLETCHER INTERNATIONAL, LTD.

Page 15

```
 1   certainly be a reorg case.  Now it's going to take, you know,

 2   the defendants and my client have a, sort of a rough history

 3   and you can read, see there's been a lot of sort of adversarial

 4   actions taken probably by both sides and our hope is, coming

 5   and involved with this and with the other counsel whose

 6   reasonable that we will be able to come to some sort of

 7   consensual resolution to how we put an end to the litigation

 8   and focus on maximizing the value of this estate so that their

 9   client, in their capacity as a creditor at FIAL, and in their

10   capacity as a shareholder at Arbitrage, get maximum return.

11          The problem here is if you have someone take over the

12   Debtor, someone who is not familiar with these assets, these

13   litigations, you know, that doesn't have the experience or the

14   technical knowledge, there's a great risk that liquidations

15   occur at a lower value to the detriment of everyone.

16          And we have in addition to their client, who is a

17   majority shareholder on the one hand and also an important

18   creditor, we also have minority shareholder who is entitled to

19   protection.  And we also have creditors and they're nothing but

20   sympathetic creditors maybe, it's called law firms and

21   consultants and whatever, but you know people who have worked

22   hard for the company and deserve to ultimately be paid.

23          But the bottom --

24          THE COURT:  Pause, please, Mr. Hurst.  I saw your

25   list of top 20 unsecureds and unless Ms. Gasparini wants to put
```

1   together a creditors' committee filled with law firms and law

2   firms choose to volunteer, I'm not sure if we're going to have

3   a creditors' committee or not.  This seems to raise more in the

4   way of corporate governance and equity concern issues rather

5   than the more common creditors wanting to get paid issue.

6          But I gather there is a really big intercompany

7   obligation or potentially big intercompany obligation to the

8   leverage fund FIA which while you think it could be cut down in

9   the ballpark of about six million bucks has a potential for

10  being, what -- something as high 100, well I don't know how to

11  convert to Euros.  I think a Euro even with the stuff going on

12  in Europe is still worth more than a dollar.  So it has a

13  potential of being in the 120, 130 million buck U.S. dollar

14  range?

15         MR. HURST:  Well no it's, I think we believe that

16  note, the intercompany note is about $5 million U.S.  I think

17  that would make it in Euros less than 5 million.  If that's --

18         THE COURT:  Pause, please.  Because I thought in the

19  1007-2 it had a gross amount much higher than that although I

20  gather that you take the position that it can be reduced by

21  reason of past transactions.

22         MR. HURST:  Yeah, I'm sorry, Your Honor.  I'd -- I

23  slightly misunderstood what you were asking and Mr. Geoghan has

24  helped me.

25         On the face of the note, I put that piece of paper in

1    front of you, you would see that it's approximately 20 million

2    Euro.

3              THE COURT:  20 million or 120 million.

4              MR. HURST:  20.

5              THE COURT:  2-0?

6              MR. HURST:  2-0.  And so that converts --

7              THE COURT:  Oh, forgive me.  I'm sorry.  Yes.

8              MR. HURST:  That converts to about 25 million in U.S.

9    dollars roughly, at least at the time we were thinking about

10   the conversation which was before recent events perhaps.  But

11   in any case, it's roughly 20 to 25 million dollars.

12             THE COURT: So the delta is roughly between 25 million

13   and 5 million or 6 million?

14             MR. HURST:  Right.

15             THE COURT:  In difference in perspective as to what

16   might be due on it?

17             MR. HURST:  Well the thing is I guess you could say

18   that's a best case and even the defendants have recognized in,

19   in Court papers that they're not necessarily sure what the

20   value is.  It's the sort of thing that floats and so, you know,

21   according to our books and records, you know, keeping track of

22   the amount of this note, it has floated down to 5.1 or perhaps

23   even right now it's a little lower.  Ultimately, you know, we

24   think the evidence would bear that out.  But you're right.  So

25   it's a swing of, you know, at worst case it could be up to 25

FLETCHER INTERNATIONAL, LTD.

1    million, best case for us is right around five.

2              THE COURT:  Am I right that even if it's five that

3    still swamps the remainder of your unsecured claims?

4              MR. HURST:  I don't have that list in front of me.

5              THE COURT:  Well I have your top 20 unsecureds.

6              MR. HURST:  Okay.  The top 20 unsecureds comes out to

7    what -- my colleague here says it's about three million total

8    of their.  So there are significantly more than the total of

9    unsecured creditors on that list, you're correct.

10             THE COURT:  Uh-hum.  Okay.  Continue, please.

11             MR. HURST:  Okay.  So in any way, where I was going

12   is I think based on everything we know right now this could be

13   a reorganization, especially if we're able to work

14   cooperatively with the liquidators and their counsel and try to

15   find some solution where we're not spending quite as much time

16   in Court and we're letting the business focus on maximizing

17   value.

18             And that's actually a good segue, Your Honor, I

19   should have done this right in the beginning, we have people

20   from the company here right now and I'd just like to introduce

21   them because these are the faces that you're going to see

22   during the proceeding.

23             We'll start on my right is Mr. Lloyd Saunders (ph),

24   he's a Director, he's the President and he was also the

25   declarant for the 1007.  Sitting next to Mr. Saunders is

```
 1    Stewart Turner (ph).  Stewart is a Director and he's also the

 2    Treasurer of the Debtor.  And the third individual sitting next

 3    to Stewart is Stu MacGregor (ph).  Stu is not an employee, he's

 4    a consultant but he's really a key member of the Debtor's

 5    management.

 6          These three guys are really, you know, they are

 7    really the Debtor.  There are some other people involved and we

 8    have consulting agreements to obtain services, which was

 9    detailed in the 1007, but these guys are the, you know, the

10    day-to-day guys who really make this thing work.  So I just

11    wanted to introduce them and you'll see them during the case.

12          THE COURT:  Pause, please.  Mr. Hurst, how are Debtor

13    Fletcher International Limited, a Bermuda corporation, is one

14    of many funds that are managed by Fletcher Asset Management?

15          MR. HURST:  Right, correct, Your Honor.

16          THE COURT:  Okay.

17          MR. HURST:  Your Honor, I really didn't -- unless you

18    had specific questions for me I don't have any more to add.

19          THE COURT:  Well I asked them as we went along.  The

20    remainder of my questions go to the TRO application.

21          MR. HURST:  Okay.

22          THE COURT:  So let me give anybody else who wants to

23    be heard like perhaps Mr. Tabak.

24          MR. HURST:  Okay, thank you, Your Honor.

25          MR. TABAK:  Thank you, Your Honor.
```

Page 20

1          We unfortunately see this as not possibly a

2     reorganization.  We see this only as a potential liquidation,

3     it will have to be a liquidation.  I would add the -- Your

4     Honor noted that the FIA Leverage Fund is a creditor not listed

5     on the schedules and in fact greater than, you know, the entire

6     rest of the schedule put together.  We believe that investors

7     of the fund as well have claims that exceed a $100 million or

8     have asserted such claims.

9          THE COURT:  Claims against which fund?

10         MR. TABAK:  It is, it's from the FIA Leverage Fund

11    and I be --

12         THE COURT:  No, but, but -- the Leverage Fund is the

13    feeder fund and that's the one that deals with the investors,

14    so I assume that their claims are against the Leverage Fund

15    rather than our debtor unless you believe that they have direct

16    claims against the Debtor apart from their claims against the

17    Fund in which they invested.

18         MR. TABAK:  And Your Honor I apologize I learned of

19    this matter fairly late yesterday evening, so I'm not on top of

20    all of the details as well as I would like.  My understanding

21    is that the claims are against the Debtor here.

22         I would offer to you, this is the not the first

23    proceeding involving this Debtor.  There is a proceeding in

24    Bermuda to wind up this Debtor.  That proceeding was filed in

25    May of this year.  In that proceeding, I would offer Your Honor

FLETCHER INTERNATIONAL, LTD.

Page 21

1    I have the winding up petition from that proceeding and an

2    affidavit verifying that petition, and I would appreciate the

3    opportunity to hand it up to Your Honor.  I'll, of course, give

4    copies to Debtor's counsel as well.

5            THE COURT:  Give copy to Debtor's counsel, hand it up

6    to me.

7            MR. TABAK:  Thank you, Your Honor.

8        (Pause)

9            MR. TABAK:  I'd open it to --

10           THE COURT:  Do you want to give me a second to look

11   at it.

12           MR. TABAK:  Sure.

13       (Pause)

14           THE COURT:  I think this was mentioned in the 1007-2

15   as having been filed but not relief -- relief not having yet

16   been granted.  Is that, is my understanding in that respect,

17   correct?

18           MR. TABAK:  It is, Your Honor.  The Court in Bermuda

19   has set a briefing schedule and, I believe, an August 31st

20   hearing date.

21           THE COURT:  And I need your help and then your

22   opponent's help when it's their turn to be heard, but I want

23   you to stay up there for now, with respect to Bermuda law.  In

24   the U.S. for voluntary petitions the order for relief is

25   simultaneous with the petition filing.  Under Bermuda law is

12-01740-reg    Doc 44    Filed 07/26/12    Entered 07/26/12 13:08:39    Main Document
Pg 121 of 265
FLETCHER INTERNATIONAL, LTD.

Page 22

1    the rule the same or does the Bermuda Court have to take action

2    before, what we would think of as an order for relief is

3    entered?

4              MR. TABAK:  I'm going to ask my colleague Mr. Read,

5    if it may please the Court.  He has looked into these issues

6    more than I have, and I'd rather give you a correct answer than

7    the --

8              THE COURT:  Of course.  I don't stand on that kind of

9    formality.  Mr. Read can you help?

10             MR. READ:  Thank you, Your Honor.  I'm not an expert

11   in Bermuda law either but it is my general understanding that

12   Your Honor has it correct that it's the latter, that action

13   needs to be taken by the Court in order for relief to

14   affirmatively be granted.  The proceeding, obviously, has been

15   commenced and is ongoing.  There is a briefing schedule but I

16   do not believe that relief has yet been granted.

17             THE COURT:  Okay, thanks, Mr. Read.

18             MR. READ:  You're welcome.

19             THE COURT:  Back to you, Mr. Tabak.

20             MR. TABAK:  So based on what our understanding is of

21   the claims against the Debtor and the Debtor's assets we don't

22   see that this is possibly every organization.  I think as Mr.

23   Hurst candidly said, you know, if there were an evidentiary

24   hearing now, you know, it may not show that.

25             Really we're looking at whether this is going to be

FLETCHER INTERNATIONAL, LTD.

Page 23

```
 1    liquidated here in the second filed action or in the first

 2    filed action in a process by court-appointed liquidators who

 3    have -- represent the interest of the shareholders of the 83

 4    percent shareholders of the company and of large creditors of

 5    the company.

 6              THE COURT:  Would you pause, please, Mr. Tabak.

 7              MR. TABAK:  Sure.

 8              THE COURT:  I got the impression from your opponent's

 9    papers that one of the things your guys either are considering

10    or have already started to do, but haven't finished doing, is

11    to call a stockholder vote to replace the Board.  If you

12    succeeded in that and the Second Circuit's best terminal market

13    case or best terminal case and other aspects of Johns Manville

14    that your opponents de-emphasized suggest that you might have

15    the right to do that unless you were trying to interfere with

16    reorganization.

17              Then  your guys would be captains of the ship here in

18    my Court and would presumably have their own Board in place

19    that could propose a liquidating plan or otherwise manage the

20    fiduciary duties of the Debtor.  That would not necessarily

21    lead to an immediate liquidation although that would depend on

22    the shape of the plan that your guys thought made the most

23    sense.

24              Am I wrong in proceeding on those assumptions in your

25    view?
```

Page 24

1              MR. TABAK:  I think those are very good assumptions,

2     Your Honor.  Our liquidators are affiliated with Ernst & Young.

3     They are professionals.  This is what they do for a living.

4     They would not, you know, my understanding is that they would

5     not do some fire sale of assets simply to unwind but that they

6     would do this in a manner to get the, you know, the highest

7     liquidation value possible because that's the interest that

8     they're representing.

9              And so yes, Your Honor, it's essentially whether this

10    is going to be done by the professional liquidators chosen by

11    the shareholders or this is going to be done by the management

12    that has brought the entity to this state.

13             I should also add part of the situation is that there

14    is an SEC investigation.  There is an investigation by CIMA

15    which is, you don't like acronyms, I believe it's the Cayman

16    Islands Monetary Authority into one of the feeder funds.  The

17    press has reported investigations by the FBI as well into the

18    Fletcher management structure.

19             So the choice is between professional liquidators

20    from Ernst & Young or the current Board of Directors that has

21    brought us to this state of affairs.

22             I should also add as Mr. Hurst had mentioned the

23    current management and Board of Directors has alienated the

24    prime broker, Credit Suisse.  The Saunders' affidavit that you

25    have in the TRO papers says that Credit Suisse has cut off

FLETCHER INTERNATIONAL, LTD.

1    access to its funds.  Essentially every constituency that we're

2    aware of prefers that a professional liquidator do this rather

3    than the current Board of Directors.

4            THE COURT:  Continue, please.

5            MR. TABAK:  I think that essentially encompasses the

6    points I have on the 1007 and we would have more on the TRO

7    unless you have more questions at this point, Your Honor.

8            THE COURT:  No, that's very helpful, thank you, Mr.

9    Tabak.

10            MR. TABAK:  Thank you, Your Honor.

11            THE COURT:  Okay.  Let's turn to my questions on the

12    TRO.

13            And I -- when I did my homework preparing for this I,

14    of course, didn't know what Mr. Tabak was going to be saying.

15    Mr. Geoghan, you don't need to stand while I raise my

16    questions.

17            MR. GEOGHAN:  Very well, Your Honor.

18            THE COURT:  It's going to take a couple of minutes

19    for me to get them all out.

20            MR. GEOGHAN:  Very well, Your Honor.  Thank you.

21            THE COURT:  So why don't you just sit down and you

22    can take any notes you think you need.

23            Neither of the two main sides here have appeared

24    before me before although the players in the bankruptcy

25    community are not totally unknown to me.  But my style is I'm

1    not an appellate court so you don't have to answer my questions

2    first and write up, but I want you to cover them before you're

3    done.

4            I sensed when I read the papers that there would be

5    different perspectives on this controversy and it appears to me

6    that a TRO hearing -- this is, of course, subject to

7    everybody's rights to be heard -- is not the time to deal with

8    disputed issues of fact or to do anything more than trying to

9    protect the status quo until people have an opportunity to get

10   in papers and to be heard in a more extensive way.

11           That's even apart from the fact that Mr. Tabak told

12   me that apparently he may have been signed up yesterday and

13   doesn't have even the head start that his opponents have which

14   appears to be more limited than many debtors in, or debtors'

15   lawyers have in terms of getting ready.

16           So I want both sides to focus on what I need to do on

17   this TRO just to protect everybody's interests until I can have

18   a more extensive preliminary injunction hearing where people

19   can have a more appropriate opportunity to be heard.

20           I reviewed the draft TRO that was given to me.  The

21   first clause I pretty much understood which is to in essence

22   stay the continuation of the proceeding in Bermuda.

23           I had problems with the breadth of the D Second and

24   in each case I have questions as to whether it would be

25   appropriate to consider them -- continue them for more than 14

1    days even if I granted them.  But, again, I need to protect

2    against irreparable injury for 14 days.

3            Mr. Geoghan, it looks to me like you're trying to

4    block the actions of your 83 percent shareholder in exercising

5    corporate governance rights that have been respected, even in

6    bankruptcy in the Second Circuit where we are now, since the

7    best terminal case back in about 1935 which if you dealt with

8    it in your brief I missed it.  I didn't see it for instance in

9    your Table of Authorities, but you know I had to read all your

10   papers from about 6:30 this morning up until the time of this

11   hearing and I don't know if it was there and I overlooked it.

12           But the combination of best terminal, Potter

13   Instrument, and most significantly Johns Manville seem to say

14   that in general shareholders maintain the right to change the

15   Board but that they can be blocked from doing so when it

16   constitutes a serious abuse, and the purpose is to thwart a

17   reorganization as compared and contrasted to reshaping the

18   direction of the reorganization more in keeping with the

19   equity's desires.

20           Mr. Geoghan, you have had a chance to look at the

21   stuff more than your opponent has.  I want both sides

22   eventually to address that more, but it seems to me whether I

23   can block the shareholder vote for more than 14 days, or some

24   relatively modest period beyond that, depends on whether I'm

25   reading the law incorrectly and how the facts here match up to

FLETCHER INTERNATIONAL, LTD.

Page 28

1    that law if it, in fact, turns out to be so.

2           If I understand you right the very vague language

3    that you have in the second decretal paragraph of your proposed

4    TRO, which if I grant it would have to be tightened so your

5    opponent knows what they're enjoined from doing and what they

6    don't, in a much tighter way than we have now.  But putting

7    that aside, I sense that paragraph two is to block the

8    shareholder vote.  If it's something different than that, of

9    course, that's exactly why it's too vague because I don't know

10   what you're asking me to prevent, and I'm not the guy who would

11   be subject to contempt for failure to comply with it.

12          So I need to get clarification from you Mr. Geoghan

13   as to exactly what you want to block.  I sense that paragraph

14   one, the first decretal paragraph is to stay the proceedings in

15   Bermuda.  And paragraph two is to stay the efforts to cause

16   there to be a shareholder vote.

17          If there is something else that you want to block you

18   got to tell me what it is.

19          We already talked about the law that's to be applied

20   when I get to the merits, which subject to people's rights to

21   be heard, would be my application of Johns Manville, Bush

22   Terminal and Potter Instrument.  If you think there's something

23   else that's going to determine this, I want to hear from you

24   Mr. Geoghan and from Mr. Tabak.

25          It seems to me the issue is not whether a bankruptcy

FLETCHER INTERNATIONAL, LTD.

Page 29

```
 1    court has the power to block a shareholder vote to change the

 2    Board, I think that those cases make clear that the Court has

 3    the power, but the issue is should the Court exercise that

 4    power which the cases seem to suggest should be applied very

 5    sparingly.

 6              Though it may not be relevant today I would like you,

 7    Mr. Geoghan, to tell me how your guys could have thought that

 8    giving a promissory note was consistent with the duty to cash

 9    out the Louisiana funds by cash or by payment in kind.  It

10    seems to me it's the exact opposite of those things, but I'm

11    not sure if that's relevant to me today.  And I'm also not sure

12    if there are some facts of which I'm unaware.

13              I gathered that an appeal in Bermuda -- excuse me, in

14    the Caymans.  I assume it's in the Caymans not Bermuda,

15    involving the Leverage Fund and whether it was right or wrong

16    to put the Leverage Fund into liquidation is scheduled for July

17    31st or August 1st.  I don't know if you guys or your

18    counterparts in the Caymans, either the liquidators or their

19    counsel, know whether it's the custom of the appellate courts

20    in the Caymans to rule from the bench or whether that's just

21    the date of an oral argument.  But if you can help me on that I

22    would like to know because one thing that I'm considering is

23    protecting the status quo for a very limited period of time and

24    then doing this stop, look and listen as soon as the Cayman

25    Appellate Court has ruled.
```

1        Mr. Geoghan, you need to help me whether you're going

2    to continue to fight your opponents if you lose in the Caymans.

3    I'm not sure what is left to fight on that front, but you tell

4    me.

5        A question that I have to both sides, but mainly to

6    you Mr. Geoghan, is will changing the Board seriously threaten

7    reorganization or will it just put control of the Debtor,

8    that's on my watch, where it belongs?

9        And you talked about your guys doing their fiduciary

10    duties and I'm sure they're well advised of their fiduciary

11    duties.  Certainly I know your firm does that routinely, but

12    can't I assume that if there's a new Board they're going to

13    equally satisfactorily comply with their fiduciary duties?  And

14    the question I have is why should I assume at this juncture

15    that any Board in a Chapter 11 case on my watch, at least if as

16    seems to be the case, both sides, both alternative Boards would

17    be advised by responsible counsel, wouldn't the Judge's

18    presumption be that any Debtor complies with its fiduciary

19    duties?

20        And that in proposing any plan, whether it be for

21    continued operation or controlled or orderly liquidation or

22    anything in between be handled with fiduciary duties in mind?

23        The converse of that is, is this a clear abuse or is

24    this in substance what we see in the Federal Bankruptcy Courts

25    all the time which is creditors trying to get paid back?

1           Lastly, there were citations to the line of cases we

2      have in this district, they're probably all over, that

3      authorize bankruptcy judges on a separate use of 105A power to

4      protect officers and directors from being distracted.  And we

5      normally grant those, but at least I normally grant them only

6      for relatively short periods of, say 90 days at a pop.  After

7      which we've got to see whether management and the Board are

8      still distracted, and I need clarification since you were

9      relying on cases that applied that principle whether that's a

10     basis for which you were looking for relief from me or whether

11     or not you're not really relying on that aspect of it.

12          Okay.  Now Mr. Geoghan I'll hear from you -- oh, one

13     last thing.  If, as is very possible, I can't find that you

14     have a likelihood of success and injunction, both a TRO and a

15     preliminary injunction could still be appropriate if there are

16     issues that are subject to fair debate and if the balance of

17     the equities tips -- or hardships, excuse me, tips decidedly in

18     favor of the moving party.  I probably can make that kind of a

19     finding in the short term, but if you're trying to show a

20     likelihood of success given what I understand to be the law on

21     stockholders exercising their corporate governance rights

22     you'll have to help me understand why you think you got that.

23          I would think that I can't make a judgment as to the

24     likelihood of success in the Bermuda courts -- excuse me,

25     Cayman's courts, Cayman Appellate Court, but that could get

1    clarified real easily once they rule sometime after July 31st

2    or thereabouts.

3            So with those things in mind make your presentation,

4    but those are the questions and concerns that I want you to

5    address before you're done.

6            MR. GEOGHAN:  Thank you, Your Honor.  As I mentioned

7    earlier, Daniel Geoghan, Young Conaway Stargatt & Taylor, and

8    thank you for taking the time to see us today.

9            Your Honor, we are here on temporary restraining

10   order and seeking a status quo stay.  I think Your Honor said

11   it best.  We are looking at the moment in the short term just

12   to get status quo.  Everyone stops trying to kill each other in

13   Bermuda, in the U.S. and in this Court and also in the New York

14   State Court action which we will discuss and again I think the

15   New York State Court action is an important part of this

16   process as counsel stated this was not, they didn't run to the

17   Court before us in Bermuda.  We were in Court in New York and

18   they tried to end run around us to get to Bermuda.

19           THE COURT:  Well, pause, Mr. Geoghan.  You're on

20   offensive in New York State Court if I recall, you're

21   plaintiff, am I correct?

22           MR. GEOGHAN:  We are.

23           THE COURT:  And they filed in Bermuda -- I don't

24   know, but you can tell me after I'm done with my question

25   whether Bermuda has an automatic stay like we do or not, and if

Page 33

1    they do whether it's effective on the filing of the petition or

2    only upon the Bermuda equivalent of an order for relief.

3          But the debtors of the world file petitions to block

4    litigation against them all the time.  At least they do in the

5    United States, I don't know if they do in other countries.  Do

6    you think I should be finding fault with a debtor doing that

7    when dozens, if not hundreds, of the debtors in Chapter 11s on

8    my watch have done exactly the same thing?

9          MR. GEOGHAN:  Your Honor there is a certain fault

10   here.  I would say that.  And the fault is, and Your Honor had

11   the Bermuda petition in front of him, nowhere in that Bermuda

12   petition do they mention that the debt underlying the petition

13   is a disputed debt in claim litigation in New York, and that

14   we've offered to pay it and it's just determining how much.

15         Nowhere did the ENY liquidators walk into the Bermuda

16   Court and say, "Your Honor, we know we have a dispute going on

17   somewhere else.  We're here to liquidate."  Instead they tried

18   to show up and not tell anybody about it, and waited for us to

19   come in and say, "Wait a second we're already in New York

20   litigating this issue, we're not even sure -- we've agreed to

21   pay you and we're not even sure, we're just not sure how much

22   we owe you."  Yes, there was -- there is in that regard a

23   little bit of an end run or an underhanded issue going on.

24         Your Honor, if I may, I think it would helpful if I

25   take a moment to discuss the facts, how we get to where we are

FLETCHER INTERNATIONAL, LTD.

1    and how this somewhat contentious relationship did develop.

2           And I want to say at the outset we did have

3    communications with Mr. McMann (ph) last night, Rod McMann, one

4    of the liquidators, e-mailed us last night objecting to the

5    short notice and saying he was going to hire counsel.  And we

6    responded immediately and offered to compromise and said, Mr.

7    McMann, we're looking for nothing more than status quo for a

8    few weeks, we want the parties to get together and talk about

9    how we're going to move forward through this process.  There is

10   a lot of litigation going on here, it is costing a lot of

11   parties money and is not necessary for all of this, for

12   everyone to keep doing this if we can find a way to compromise.

13   And if we can't find a way to compromise or work something out

14   between the Bermudan process and the U.S. process, then we all

15   can go back to trying to beat each other up in our respective

16   courts.

17          Your Honor, this did, as Your Honor pointed out, this

18   whole process and I'm not going to get into all the detail of

19   it way back in the day, but it did start about a year ago with

20   the redemption requests by the Louisiana funds.  And I'm not

21   sufficiently familiar with why they rejected the promissory

22   notes or what the valuation issue is there.

23          THE COURT:  You're not -- wouldn't any competent

24   person given a promissory note, when the obligation is to pay

25   in cash or in kind, say are you serious, what piece of garbage

1    are you giving me?

2         MR. GEOGHAN:  My understanding was that was not their

3    response.  Their response was, and they've never given the

4    notice back, their response was, Well we don't think that's

5    sufficient, what else can you give us because you owe us more

6    than that.  And because they then sought to redeem everything.

7         And actually, and again this is getting a little out

8    of step, it brings up a very important point.  The pension

9    funds were given up the line in February an asset valued at

10   $136 million through -- it was given by the Debtor to the, they

11   created a subsidiary, put the asset in the subsidiary and then

12   sent it up the chain to leveraged, to the FIA Leverage Fund to

13   distribute to the funds as payment.

14        It was an option to buy shares.  That option expires

15   today and has not been exercised.  That option was pulled back

16   from Louisiana Funds because once, because of the petition --

17   my understanding is the liquidators pulled the distribution of

18   the shares of that subsidiary back from Louisiana Funds and

19   that option went back into their estate.

20        That option was never exercised.  And whether, even

21   if they want to dispute the value of that option because as I

22   said it's a complex instrument, we estimate it's a $136 million

23   instrument.  If they estimate it's a half million dollar

24   instrument, they didn't do anything with it.  It's sitting

25   there.  It expires at 5 o'clock today and nothing has been done

FLETCHER INTERNATIONAL, LTD.

Page 36

1    with it.

2           THE COURT:  Is the option in the money?

3           MR. GEOGHAN:  My understanding is -- it is.  The

4    option, the dispute on the option is a simple one.  There was,

5    it's a New York option.  It's under New York law.  The option

6    had a strike price of somewhere in the five, six, seven dollar

7    range.  The company did a reverse 5-for-1 stock split.  The

8    company is called United Community Bank, reverse 5-to-1 stock

9    split.

10          There was a dispute as to whether or not that drove

11   the strike price up by a 5-to-1 ratio.  There is clear New York

12   law, and I don't have the cite, but I know the case is called

13   Reese (ph).  There is clear New York law that says it does not

14   move that strike price, the strike price remains the same, and

15   it is just a matter of exercising the option and let the

16   company try and challenge you on it.

17          But it was an option in the money.  And even if, back

18   in February those liquidators looked at it and said, Fletcher

19   International Limited, you're out of your mind.  This isn't

20   worth $136 million dollars.  It was worth a million dollars to

21   somebody.  Somebody was going to take that up.  And it was

22   worth something to somebody and it could have been sold.

23   Instead it's withered on the vine and it's going to die at 5

24   o'clock this afternoon.

25          And it brings up an important point.  A question,

Page 37

1    Your Honor did ask which is the question about what is the

2    difference between what we would do through our Board and what

3    they would do.  Counsel spoke quite clearly about that.

4    They're here to liquidate it.  That's what they're here to do.

5    They're not here to do anything else with it.  They're

6    liquidators.  It's a voluntary liquidation or it's a forced

7    liquidation, but it's a liquidation and that's all it is.

8    There's no plan for reorganization.  He said it himself.

9           Whether or not this company in the end could be

10   reorganized no one can tell you today, three days in.  We

11   believe it can.  We believe that we can pay off -- we wanted to

12   pay off their note, we believe we can.  And this goes back --

13   I'll take it back to the facts in a second.

14           I know we started and we'll get back into it, there's

15   a lot of process here that has gone on and the reason we are

16   here today is because everyone moved so swiftly against each

17   other, particularly the steps taken by the liquidators -- and I

18   honestly would, I would separate a little bit in this regard,

19   the ENY liquidators versus the Zolfo Cooper folks who I, some

20   of whom we do know, who have taken less of an active role in

21   this process than the ENY guys.  This has moved very quickly

22   since mid-May.  It's really since April 18th.

23           But if I may, Your Honor, with regard to the

24   Louisiana Funds, otherwise known as the Series N shares, yes,

25   there was a dispute with regard to these promissory notes.  And

1    the company entered into discussions with them because the

2    issue the Louisiana Funds had was that they, the governing

3    documents provided the absolute right for us to pay them in

4    kind.  So fine, they disputed what the in kind would be.

5            Parties got together in July of 2011 and began

6    negotiating over that.  What is that going to be?  The Fund

7    said we want you to open the kimono, let us come in, let us

8    look at the books and records, establish you've got the assets,

9    establish the valuations.  And we did.

10           And the Funds issued statements in July 11th, 2011,

11   July 28th, 2011, September 9th, 2011.  All of those statements

12   say clearly, and they're referenced in the 1007 that they were

13   conducting the investigation completely satisfied with

14   everything they were found, they believed their investments

15   were completely safe, the assets had the valuation we believe

16   they had and that they were making profit on them.  They

17   estimated they had made a $40 million profit on their

18   investments.

19           So everything appeared to be safe.  It was moving

20   along in a fine fashion.  They kept extending their time to

21   redeem while the parties worked it out as long as they felt

22   safe.

23           Now I don't know why in January 2012 ENY -- and it's

24   important to note actually, the Louisiana Funds were

25   represented throughout this investigation by ENY, they were the

1    hired guns for the Louisiana Funds -- we don't know why they

2    turned around and then filed the winding up petition.  But we

3    know that in late January, I believe the date was January 20th

4    or so they -- Louisiana Funds made again a renewed demand and

5    said that's it, you've got seven days, pay us now in cash or we

6    wind you up.

7            We didn't have the ability to pay them right then in

8    cash.  We said to them we need a minute, we'll pay you, we'll

9    give you something in kind, let's agree to an asset and you can

10   take it.  And they stopped talking and they wound us -- they

11   filed a petition to wind us up.

12           Then two weeks later that was January 31st, 2012 --

13   two weeks later, February 13th 2012 the Debtor here, Fletcher

14   International Limited which has no connection to the Louisiana

15   Funds directly, there's no contractual obligation between the

16   parties.  They have no communication.  They have no direct

17   connection to each other.  Louisiana Funds were exclusively the

18   problem of FIA Leverage Fund, the feeder fund.

19           But because FAM is a family of funds, because the

20   Fletcher Funds are a family and they want to be good corporate

21   citizens and they have other investors they said, Wait a

22   second, let's try to figure out how we can make you happy

23   before you do this.

24           So that in February once the winding up petition got

25   filed FIAL, so Fletcher International Limited, the Debtor here

FLETCHER INTERNATIONAL, LTD.

Page 40

1    -- and I'll use the names not the acronyms -- Fletcher

2    International Limited the Debtor here took this $136 million

3    option to purchase to United Community Bank shares.  Put it

4    into an LLC, called Fletcher -- it was actually, had an

5    acronym, it was actually called FIALB Coinvestments LLC, a

6    Delaware company.  They put that asset into the company and

7    they sent it up, they dividend it up the chain.  It goes up to

8    Leverage, Leverage gives it out to Louisiana Funds.  We hear

9    nothing more from Louisiana Funds.

10           Then it goes -- they go through the briefing process

11   from January 31st through April 18th.

12           THE COURT:  Of 2012?

13           MR. GEOGHAN:  All of 2012.  So leading us up to April

14   18th of 2012 at which time there is the hearing in Cayman.  The

15   Judge in Cayman -- again the substance with this issue about,

16   it was -- the debt, the underlying debt which was disputed was

17   Louisiana Funds could they be -- excused me, redeemed the way

18   we were redeeming.  The Judge having heard evidence said, I

19   don't think it was worth $136 million dollars.  It's not clear

20   that you'll be able to pay what you owe, we're putting you into

21   liquidation.  And they appointed ENY.

22           So the barbarians who were chasing the Fund down in

23   July are now in control of it.  And it is not, and just as an

24   important point, while they were in New York, people from the

25   ENY office in New York in Fletchers' offices examining the

12-01740-reg   Doc 44   Filed 07/26/12   Entered 07/26/12 13:08:39   Main Document
Pg 140 of 265
FLETCHER INTERNATIONAL, LTD.

Page 41

1   books and the ENY liquidators are Cayman folk -- when the ENY

2   liquidators from Cayman wanted to act upon us, the Debtor here,

3   Fletcher International Limited, to get its books and records --

4   excuse me, when they wanted to act on Fletcher Leverage, FIA

5   Leverage Fund to get its books and records, they sent the same

6   people who had been in the office for weeks during the summer

7   to come get it.  So they're, this is not, was not a separation.

8   We moved straight from the barbarians to the liquidators.

9           Your Honor, April 18th the order gets --

10          THE COURT:  Do me a favor, Mr. Geoghan, there was a

11  little bit in your papers maybe barbarians is subject to

12  multiple entendres but let's try not to use adjectives, nouns

13  and anything else that have such a -- trying to be diplomatic,

14  hoping that you would be equally diplomatic, disparaging

15  characteristics.

16          MR. GEOGHAN:  Your Honor, I apologize and you are

17  correct.  I shouldn't be -- and I guess after three days or

18  four days of living with this, it was -- I get a little

19  passionate about it.  But I agree, we shouldn't be because the

20  reality is we do want to sit down with the ENY liquidators and

21  come up with a plan.  And again we've offered to fly to Cayman

22  next week to sit down with them to see if we can figure

23  something out here.

24          Your Honor, after the April 18th order was entered

25  winding up FIA Leverage Fund, the Debtor -- sorry, FIA Leverage

FLETCHER INTERNATIONAL, LTD.

1    Fund's Board which still had rights, but not duties, took an

2    appeal of that.  Now that appeal has been briefed and is

3    scheduled to be heard on July 31st or August 1st.  Your Honor,

4    I do not -- Your Honor, asked the question do we know if the

5    Court will rule from the bench, I do not.  We will make an

6    inquiry with counsel in Cayman, I believe, it's Walkers, but I

7    don't know as we stand here today.  No, we don't know as we

8    stand here today.

9            Your Honor, on May 1, so two weeks later on May 1 the

10   liquidators make their first demand for this intercompany note.

11   They're looking at a 20 million Euro note.  They make a demand

12   it for it and say, Pay us.  We responded and said about -- I

13   was not involved, I got involved a little later so Fletcher

14   International Limited responded and said, Wait a second that's

15   an intercompany note, it's not a $20 million note, it's

16   something much smaller.  We need to figure out what that number

17   is.  That's number one.

18           Number two, it was never intended to be a demand

19   note.  So we're not sitting with, even if it were 20 million,

20   or 20 million sitting in a pocket somewhere, so we have to sell

21   something.

22           Number three, we think we have the right to pay you

23   in kind and the reason is, this was an intercompany note.  The

24   family of funds had intercompany notes floating around, and

25   they were moved back and forth and paid off in kind between the

FLETCHER INTERNATIONAL, LTD.

Page 43

1    companies.

2            So the practice between the parties, that's how they

3    were paid, and it's important to note, the note -- although

4    it's a note, it doesn't say to be paid in cash, to be paid in

5    U.S. dollars, paid in Euro dollars.  It just says when it's

6    demanded, it's to be paid.

7            THE COURT:  Pause please, Mr. Geoghan.  Because I

8    would understand that argument if the debtor were not now in

9    bankruptcy.  But I take it you would agree that in whatever

10   amount it is ultimately to be allowed, the intercompany amount

11   is a claim, and wouldn't the claim be satisfied in the currency

12   by which claims in the bankruptcy system are normally

13   addressed, which is as a plan would provide, which

14   occasionally, I guess, but not often, provides distributions in

15   kind, but more commonly it provides distributions in either

16   securities of a reorganized debtor, or cash, if the debtor is

17   one of those relatively few debtors that has cash, or chooses

18   to liquidate its assets to create cash, or provides some

19   alternate currency by which its claims to its creditor

20   community will be satisfied?

21           MR. GEOGHAN:  Yes, Your Honor, as we stand here

22   today, it will be a claim, it will be, or it is.  We don't --

23   but at that time, it was an intercompany note that they were

24   trying to work out.

25           THE COURT:  Okay.  So you're with me so far and then

FLETCHER INTERNATIONAL, LTD.

Page 44

```
 1    the follow-up question I have is, normally if you have a claim

 2    that you've got to satisfy, especially one if the claim is held

 3    by what seems to be your biggest creditor, and at least

 4    seemingly $5 million would make that claim the biggest

 5    creditor, then isn't what you do in Chapter 11, you negotiate

 6    with your creditor community to see what kind of a plan they're

 7    going to vote for, and what kind of currency they want to get

 8    paid in?

 9              MR. GEOGHAN:  Yes, that will be part of the process

10    here, now that we're here.  That will be part of the process,

11    that will have to be determined.  We want to have that

12    discussion with them because we have these two processes going

13    on at the same time.

14              THE COURT:  Okay.  So again we're together and we're

15    with each other, and then the next question that I ask you

16    after that is, don't you have to get your creditors to like the

17    currency that you're giving it or face the risk that they're

18    going to vote against the plan?

19              MR. GEOGHAN:  Yes.  Yes.  That is, as I said, Your

20    Honor, that's going to be -- once we stabilize, that is going

21    to be the process, is to figure out how we're going to address

22    the situation.  Did you want to say something?

23              MR. HURST:  If you don't mind, I'll just jump in for

24    a second, Your Honor.  You're right.  This is -- there are a

25    lot of ways you could deal with that claim, that plan.  Okay.
```

FLETCHER INTERNATIONAL, LTD.

Page 45

1   If it's on par with the other unsecured --

2           THE COURT:  Come closer to a microphone, please, Mr.

3   Hurst.

4           MR. HURST:  Sorry.  If that claim was treated the

5   equivalent to other unsecured claims, you're right, they would

6   have to be on board.  I could also see a situation where it's

7   characterized and subordinated because of the nature of the

8   claim, in which case, you'd have the other unsecured creditors

9   voting in favor of the plan, and perhaps you could cram this

10  down.  Or perhaps you separately classify it because it arose

11  under different circumstances, and maybe the treatment under

12  the plan that it is paid in kind.

13          There are a multitude of ways to deal with it,

14  because it's a different kind of claim.  It arose under much

15  different circumstances than the various professional claims.

16  So you're right, you have to get -- the whole Chapter 11

17  process is about negotiation.  But their one creditor, the

18  situation under which that note arose is very different.

19          We know we have a whole other $3 million of

20  professional claims, they're real claims for people who did

21  work and deserve to be -- to have recoveries.  We have a

22  majority shareholder, we have a minority shareholder that

23  deserves to be respected.  So it's a whole lot of interest in

24  this case, and all of them have to be part of the negotiation.

25          THE COURT:  Well, if you are proposing a scenario

1    under which your largest creditor is subordinated, and the end

2    game is to benefit a minority equity holder, that's going to be

3    an ambitious strategy, Mr. Hurst.  And of course subordinating

4    a creditor would at least normally still entitle that creditor

5    to be paid before equity can get a distribution.  The 2nd

6    Circuit has made that clear to the extent it wasn't clear to

7    anybody, even in a gifting context in DBSD.

8         MR. HURST:  Right.  Your Honor, all I was trying to

9    say is that as we sit here today, and we're trying to theorize

10   how different things are going to be paid under a claim,

11   there's a lot we don't know, and there are a lot of things you

12   can do, creative lawyers can do with a plan.

13        Now, my expectation would be ultimately they want to

14   be paid, and they want to be made whole.  And so I think at the

15   end of the day, they sit down with the debtor, and we figure

16   out a way to do that.  If they're not happy with an in-kind

17   distribution, I assume they'll be paid in cash.  And over time,

18   the debtor's skilled management would have the opportunity to

19   liquidate the appropriate assets and turn it into as much cash

20   as it could possibly be turned into.

21        So one way or another, I think they would end up

22   probably happy.  But I don't think it means they drive the

23   process.  When we come into bankruptcy court, U.S., we're doing

24   it to protect all constituents.  And we do have other

25   constituents, which their clients do not control.  And I think

FLETCHER INTERNATIONAL, LTD.

Page 47

1    it's important that we stand up for the people who are not

2    standing up for themselves right now, and we protect them too.

3           Anyway, I'm sorry I jumped in.  I just -- I felt it

4    was important that we really think about how this does play out

5    in plan mechanics.  I think there are just a lot of

6    permeations.  It's hard to sit here today and say, well,

7    they're the biggest creditor, so they should control

8    everything.  Because I don't really know that ultimately that's

9    how it will play out.

10          THE COURT:  Uh-huh.  All right.  Mr. Geoghan.

11          MR. GEOGHAN:  Thank you, Your Honor.  So moving back

12   into where we were, so as they made demands, there was

13   discussion back and forth with regard to what to do with demand

14   for the note, how to make payment, and what the valuation of

15   the note would be.  There were letters exchanged over the

16   course of a couple of weeks.

17          On May 14th, they came back and informed us that they

18   were making a demand, they wanted to be paid.  Because we

19   couldn't resolve the dispute and the note was governed by New

20   York law, had submitted and provided for submission in New York

21   courts, an action was filed here.

22          There was actually an initial action filed on May

23   19th in the Southern District.  That action was dismissed and

24   refiled on May 24th, because we determined that we couldn't

25   maintain jurisdiction in the Southern District, so it was

FLETCHER INTERNATIONAL, LTD.

1    refiled in the New York State Supreme Court, Commercial

2    Division.  And it's currently pending before Justice Oing.

3              THE COURT:  Uh-huh.  Pause.  You mean there was no

4    subject jurisdiction in the federal district court?

5              MR. GEOGHAN:  No, Your Honor, it was a diversity

6    problem.  The -- both FIA leverage fund and FI -- Fletcher

7    International Limited are foreign.  They're both foreign.

8    Because one's in Bermuda, one's Cayman.  You may not maintain

9    under any circumstance in a federal court jurisdiction on

10   diversity for that -- based on diversity if on both sides of

11   the V, you have a foreign entity, a non-U.S. entity, a non-U.S.

12   citizen.

13             THE COURT:  Uh-huh.  I always thought diversity as --

14   that's 1322, 28 U.S.C. 1332.

15             MR. GEOGHAN:  Yes.

16             THE COURT:  That's one of the subject matter

17   jurisdiction provisions.

18             MR. GEOGHAN:  Yes.  But for diversity purposes we

19   couldn't manage it.  We --

20             THE COURT:  I understand.

21             MR. GEOGHAN:  Okay.

22             THE COURT:  Okay.  The rest of my question was, it

23   was subject matter jurisdiction, it wasn't in personam

24   jurisdiction.

25             MR. GEOGHAN:  It was not in personam, it was subject

FLETCHER INTERNATIONAL, LTD.

1    matter jurisdiction.

2           THE COURT:  Okay.  Continue.

3           MR. GEOGHAN:  And just to be clear, the note they had

4    submitted to the jurisdiction of the courts, the New York

5    courts.

6           THE COURT:  Uh-huh.

7           MR. GEOGHAN:  On May 23rd, and this is just sort of

8    the role of how we started to really get into where we are

9    today.  On May 23rd, Credit Suisse announced that it was

10   terminating the prime brokerage agreements.  There is a

11   question mark as to how much communication was going back and

12   forth at that point with FIA leveraged, but it is our

13   understanding that there was communication going back and

14   forth.  Credit Suisse determined that it didn't want to worry

15   about what was going to happen with the funds, it terminated,

16   and determined to liquidate the positions.  Which it did.

17          It liquidated on June 15th, it liquidated a position

18   that we believe is worth approximately $70 million and

19   liquidated it for 32 million.  Which was the face value of the

20   common shares plus a small amount for future interest that

21   would be payable under the arrangement.

22          Your Honor, so on May 24th, we commenced the

23   litigation in New York State Supreme Court, a copy of the

24   complaint was immediately sent by letter and e-mail to the

25   liquidators.  And then we began the process of service, which

FLETCHER INTERNATIONAL, LTD.

Page 50

1    takes a few weeks in four jurisdictions.

2            On May 30th, with full knowledge of the New York

3    action, the liquidators commenced the Bermuda action, the

4    Bermuda winding up petition.

5            Then, Your Honor -- and I mentioned earlier, Your

6    Honor, a key importance in that is that no where in that

7    Bermuda petition does it mention that there's anything going on

8    in New York.  It just says there's a debt they owe us, and they

9    haven't paid us.

10           On June 13th, Fletcher -- the entity Alpha and

11   Fletcher and FIA Leveraged called a shareholder meeting of

12   arbitrage.  They initially called it for a meeting for early in

13   July, but then under some circumstance that I don't understand

14   under Bermuda law -- or excuse me under Cayman law, managed to

15   move it up to June 29th, which was this past week.

16           During the interim, Credit Suisse liquidated our

17   positions and worth noting is that Credit Suisse is currently

18   sitting on approximately $1.7 million of our cash, and certain

19   of our securities still as well, but their claims have been

20   satisfied.

21           They are holding it pursuant -- we received a letter

22   from Milbank, their counsel, they are holding the money under

23   the belief that there may be third parties claims asserted

24   against it, and the possibility of having to pay Milbank's

25   fees.

1            On June 29th, Alpha and Fletcher and FIA Leverage

2    held their shareholder meeting.  So at that point, Alpha was in

3    voluntary liquidation, FIA Leverage was in official

4    liquidation, they held a meeting for Arbitrage as their

5    shareholders.  They displaced the board.  They replaced them at

6    the meeting, the first thing they did.  The second thing they

7    did was have a vote to have a voluntary liquidation.

8            They sent us a letter that afternoon, Arbitrage put

9    into voluntary liquidation.  At that point it becomes, if it

10   hadn't been already, quite clear that the next step was the

11   debtor.  So the only solution at the time was to put the debtor

12   into bankruptcy here in the U.S., since we weren't able to

13   resolve the disputes at the New York process, the New York

14   State process, to put the debtor into bankruptcy here, in order

15   to give the parties an opportunity to cool down and maintain

16   the status quo for a brief period of time.

17           Your Honor, it's important to note that despite the

18   fact that the FIA leveraged appeal is pending, and that the

19   liquidators ultimately may be found to have no authority to act

20   on their behalf, on July 31st or August 1st when that's

21   decided, the liquidators here continue to use their current

22   appointment to walk up the chain and take down companies with

23   disputed debts, where we've offered, we've said we recognize

24   there's a debt there, we have to figure out how much it is, you

25   disagree with us, so let's go get a declaratory judgment, get a

1    Court to tell us how much it is, and we can work that out.

2             Instead they have resorted to seeking to liquidate

3    the company, which is an effort we believe, to get up the chain

4    farther into the other funds.  And eventually up to potentially

5    the fund manager itself.

6             Your Honor, we're seeking to maintain the status quo

7    here, really nothing more for a brief period of time.  We're

8    seeking to, and Your Honor asked, what are we specifically

9    really seeking here.  In regard to Alpha, FIA Leveraged and

10   Arbitrage, we are seeking to stop them at the outset from going

11   to court today or tomorrow in Bermuda to appoint provisional

12   liquidators.

13            The appointment of a provisional liquidator right now

14   would, in effect, take away the board.  The board would no

15   longer have its management rights.  And it would effectively

16   take control unless we were able to go into the Bermuda court

17   and then defeat it on a trial -- on a hearing there.

18            So that is part one of it.

19            Part two of it, Your Honor, is to stop Arbitrage, who

20   is acting as an agent of the liquidators from trying to put

21   this company into a voluntary liquidation, which it would take

22   time.  We don't think they can do it in 14 days, in two weeks.

23   It would take a little -- we think and I caveat that, we spoke

24   with Bermudian counsel, Bermudian counsel doesn't think they

25   can do it in less than 21 days.  But with that being said, they

FLETCHER INTERNATIONAL, LTD.

Page 53

1    can't rule out the possibility that Arbitrage would come in as

2    a shareholder, as a matter of right under Section 23.1 of the

3    Company's Act Winding Up 1982, to seek to have their own

4    provisional liquidators appointed pending the shareholder vote,

5    and in effect, stop us again.

6           THE COURT:  Pause here, Mr. Geoghan.  Decretal

7    paragraph number 1 of your proposed TRO talks about taking any

8    action in furtherance of securing appointment of a liquidator

9    including a joint provisional liquidator.  I thought that was

10   what you said a moment ago.

11          Now, what else are you trying to enjoin in Bermuda

12   because you talked to continue with the liquidation, which you

13   thought would take 21 days.  But I thought that was another way

14   to say the first thing.  Is that something different?

15          MR. GEOGHAN:  Your Honor, it would -- let me see if I

16   can clarify.  It would take 21 days minimum just to try and get

17   a shareholder meeting.  And if the shareholder meeting wasn't

18   granted, they could go to court to try and get one thereafter,

19   or they could force one is my understanding.

20          And again, not being an expert in Bermudian law, the

21   problem we would have, and the reason we would seek to stop

22   that action is that it's a total distraction for this board,

23   and this management, who would then because there's another

24   shareholder out there, the -- from doing what we're trying to

25   do.

FLETCHER INTERNATIONAL, LTD.

1          The -- it's not clear that the 83 percent shareholder

2    can by itself put this company into liquidation.  It's not

3    clear that the minority shareholder won't have certain rights.

4    And it's also now there's a Chapter 11 pending, not clear that

5    they should be able to force the liquidation of this company

6    for what is essentially their own benefit under Bermudian law,

7    and not as opposed to the reorganization that would seek to

8    benefit more than just that.

9          THE COURT:  So you want me to block the shareholder

10   vote?

11         MR. GEOGHAN:  Well, there's no -- we would seek to

12   block them calling a meeting at this time, Your Honor, because

13   it is a distraction of the board.  It is a distraction to

14   management, it would be a problem for this company.

15         The -- we think it would take some period of time

16   before they would be able to do it.  We believe -- their

17   attempts to do so would be an extraordinary step.  This is not

18   an ordinary shareholders -- would not be the ordinary meeting.

19   It's an extraordinary step, and we believe would be an abuse of

20   process in that regard.

21         THE COURT:  Well, wouldn't it depend on whether or

22   not it fits within the parameters of the 2nd Circuit case law

23   in this area, most significantly Johns Manville?

24         MR. GEOGHAN:  Yes, Your Honor, it does.  Yes, Your

25   Honor, it would be a question of whether or not it fits

FLETCHER INTERNATIONAL, LTD.

Page 55

```
 1    squarely within the parameters of those cases, and we believe

 2    that, as I understand those cases, it's a question of whether

 3    or not this process would be an attempt to thwart, essentially

 4    thwart the reorganization process.  And I believe as counsel

 5    stated, the sole intent of the liquidators is to liquidate the

 6    company, not in any way shape or form, to attempt to reorganize

 7    the company.  And I think by definition, that could be mean

 8    nothing less than an attempt to thwart the process of

 9    reorganizing.

10              THE COURT:  Well, it's a mixed question of fact and

11    law, right, as to what your opponent would have the ability to

12    be heard?

13              MR. GEOGHAN:  Excuse me?

14              THE COURT:  Whether or not it passes muster under

15    Johns Manville in the two cases that Johns Manville followed is

16    a mixed question of fact and law.  You know, I'm looking at

17    pages 64 and 65 of Johns Manville and it says that they have

18    the right to change the board unless it constitutes clear

19    abuse.  So I need to hold a hearing or unless you guys can

20    stipulate, which I don't think is very likely, as to whether or

21    not their desire to change the board is a clear abuse or

22    otherwise permissible as one of the exceptions to the general

23    rule of Best Terminal, right?

24              MR. GEOGHAN:  Yes, Your Honor.  There would be a very

25    high standard and a need to provide further evidence on that.
```

FLETCHER INTERNATIONAL, LTD.

Page 56

1    And we -- I recognize that a hearing would be necessary.  In

2    the short period of time we've had here, we don't have the

3    opportunity to bring in all the necessary evidence we would

4    need, other than what's been provided in the 1007 affidavit.

5            And we don't -- nor do we have our leading counsel

6    here to better explain what the process look like under

7    ordinary circumstance, under Bermudian law.  However, part of

8    that process, part of it as I understand those cases, is the

9    question of whether or not the steps that they are taking will

10   seek to thwart the reorganization process, the basic principal

11   of what we're trying to do in Chapter 11, and by definition of

12   what they've already stated, it would seek to do that.

13           It would simply seek to immediately start liquidating

14   the company.  And given the -- and again, this is an important

15   aspect that we discussed earlier, Mr. Hurst mentioned, these

16   securities that are held in this company are very complex

17   matters.  They're not simple things.  And it requires the

18   historical and specialized knowledge of the management team

19   here to -- and any experience they've had, to really be able to

20   understand it, and be able to put it altogether and unwind it

21   in a fashion that works, and to find the right buyers.

22           It's not like we can sell the shares in the New York

23   Stock Exchange.  We need to find -- most of these are not

24   market securities in that regard.  They're going to have to be

25   dealt with on a piece-by-piece basis if we were to liquidate

FLETCHER INTERNATIONAL, LTD.

1    them.

2            THE COURT:  Aren't these decisions made by Fletcher

3    Asset Management under the advisory agreement?

4            MR. GEOGHAN:  Fletcher Asset Management provides some

5    of the, much of the necessary bodies and knowledge to

6    facilitate that process.

7            THE COURT:  Fletcher Asset Management does the

8    thinking.

9            MR. GEOGHAN:  They do a lot of the thinking.

10           THE COURT:  And that's under a contract, which

11   presumably is an executory contract in this court.

12           MR. GEOGHAN:  Yes.

13           THE COURT:  If you're the litigator and Mr. Hurst is

14   your bankruptcy guy, if you want to go tag team with him, I

15   won't be offended by that.

16           MR. GEOGHAN:  Okay.

17           THE COURT:  But I would've thought that like a lot of

18   mutual funds or hedge funds, decisions are made by the advisor,

19   and the know how and the knowledge of the underlying assets are

20   in the hands of the advisor.

21           MR. GEOGHAN:  Yes, Your Honor, a lot of it is in the

22   hands of the advisor.  But a lot of it is also in the hands of

23   the gentleman standing behind me, it's not all of whom work for

24   the advisor.  And they're the ones who have a lot of the

25   institutional knowledge that would be necessary, in order to

FLETCHER INTERNATIONAL, LTD.

Page 58

1   really capitalize and liquidate these.

2           I have not looked at the advisory agreement to

3   determine whether or not it's something that could be easily

4   assumed, nor -- excuse me, in order to bring FAM (ph) into

5   play, I don't know.

6           THE COURT:  Well, your main concern is that they

7   would take control and they'd reject it, right?

8           MR. GEOGHAN:  Yes.

9           THE COURT:  As long as that contract has neither been

10  assumed or rejected, I would've thought that Fletcher Asset

11  Management keeps providing advice to this debtor.

12          MR. GEOGHAN:  Your Honor, I believe they will have to

13  keep providing advice.  Yes, I believe they would.  But I also

14  believe that again, the gentleman behind me are the people who

15  need to provide that advice, more so than the handful of people

16  at Fletcher Asset Management.

17          Now, I don't know everyone that's at Fletcher Asset

18  Management, but it's the consultants sitting behind us and the

19  officers that would need to really be involved in providing

20  that advice, the directors.

21          THE COURT:  All right.  Continue.  You've been

22  talking for a long time, and I'm not going to put a sock in

23  your mouth, but I'm waiting for the answer to an important

24  question, which is what happens to the future of this case and

25  what you're trying to do if the Cayman court affirms and

1    determines that FLA Leverage Fund was properly taken over by

2    its present liquidators?

3             MR. GEOGHAN:  Well, Your Honor, FLA Leverage Fund is

4    a creditor, and they would have the right to seek -- you know,

5    their rights to pursue their rights in this court, but they are

6    a creditor.

7             So what would happen we would continue to fight -- we

8    would continue the Chapter 11 process.

9             THE COURT:  Then why do you -- if it's just the one

10   -- if it's a creditor either way, and you're only talking about

11   who the identity of a creditor is that owes a claim -- that's

12   owed a claim of a certain amount, why is the proceeding in the

13   Caymans on the appeal such a big deal?

14            MR. GEOGHAN:  Because if the liquidators were not

15   properly put in place, the company would come back into the

16   family of funds, and the debt could be dealt with as it always

17   is between the companies.  And the investors behind the

18   leverage could be dealt with as they always are, with the value

19   of their investments.

20            It would allow the company -- it would bring the

21   company back into the fold, and to be dealt with as it always

22   has been, as opposed to being a creditor asserting claims

23   against the estate.

24            THE COURT:  I guess I understand that, but the

25   underlying question remains.  There is a debt owed anyway.

FLETCHER INTERNATIONAL, LTD.

Page 60

```
 1   You're saying in substance that the counter party to

 2   negotiating or litigating the amount of the debt will be easier

 3   to work with than these guys will be?

 4            MR. GEOGHAN:  Well, it's not they would be easier to

 5   work with, Your Honor, I guess in some respects, because it

 6   would be back within the family, it would be easier to work

 7   with.  But it's still a debt that would need to be paid and

 8   need to be addressed.

 9            As we said in the New York action, we'd be -- the

10   company's prepared to deal with that, but in the current state

11   of affairs with these liquidators in place, this is not a

12   matter of what FIA Leveraged Funds' rights are, because they're

13   walking it all the way up the chain to get into the other

14   funds.

15            So this is not a matter of -- if this was simply a

16   matter of do we owe them $5 million or don't we, then it's a

17   matter of how much do we owe them, and how are we going to pay

18   them.  That's not what this today is a matter of, because now

19   they're walking off liquidating the funds as they go, and we

20   don't know where the next stop will be.  We know it'll come to

21   the debtor next, but we don't know where it goes if they will

22   seek to go beyond that at that point.

23            THE COURT:  Do you want to say something?

24            MR. HURST:  Your Honor, David Hurst again.

25            This note, the intercompany note, we've
```

FLETCHER INTERNATIONAL, LTD.

Page 61

```
 1   oversimplified and if you -- I'm not sure how much of this is

 2   in the 1007.  This was a note that varied, that the amount of

 3   the note varied, with shareholder redemptions and

 4   subscriptions, Series 6 shares, okay.  So it's more of a --

 5   it's a recordkeeping device in many aspects.

 6          So if FILA, FIA Leverage came back into the family,

 7   they wouldn't be demanding payment right not.  Because

 8   historically, no one ever called these notes.  The only reason

 9   it's being called is because you had a third party come in to

10   the family, was unaware of historical practice, and didn't

11   fully care about this historical practice and called the note.

12   It never has been called in the past.

13          Because the only time there's ever a payment

14   obligation by the debtor is when there's a shareholder

15   redemption at FILA.  That's what causes the value of the note

16   to change.  There's a shareholder redemption at FIA Leverage,

17   the value of the note drops, and that creates a payment

18   obligation from the debtor to FILA.  That's how it works

19   historically.

20          So if they're back in the family, there's no -- they

21   don't call the note.  You're right, there is an obligation

22   there, but it's a contingent obligation contingent upon the

23   redemptions of shareholders.

24          So that's why it's a completely different ballgame.

25   It's not something that we have to deal with right now.  It's
```

1    something that would be dealt with in the ordinary course of

2    business as there are redemptions.  The problem is that you had

3    an outsider come in, they go, they takeover FIA Leveraged, they

4    looked through the books and records as they should.  They find

5    a piece of paper that says intercompany note, and they call it.

6    And I'd do the same thing and I don't blame them.

7         But it's because what it looks like on its face is

8    not what it really is.  And it seems bizarre to me, and it --

9    when we first got involved I, you know, it was the craziest

10   thing.  But as we understand how these entities operated, it

11   doesn't seem so strange to me now that I understand how it

12   worked.

13        And the whole New York action, the New York State

14   court action is to go in there and ask that court to evaluate

15   the note and say, first of all, determine the value, and then

16   determine that it can be paid in kind, just like it always had

17   been.

18        What never made it into that complaint, it was in

19   there, but we removed it, we were going to ask the Court to

20   declare that you can't even call it.  Because the historical

21   course of practice between the parties was it could not be

22   called.

23        Now, for litigation purposes, we felt that was asking

24   too much of the Court.  It just seemed too much.  And so we

25   decided we're going to back off on that request, even though if

Page 63

1    we really looked at historical practice, it never would have

2    been called.

3           So we go back, the family is reunited, FIA Leverage

4    is not going to be able to call that note, and wouldn't call

5    it.  So that's all I had unless you had a question for me, but

6    I just wanted to clarify.

7           THE COURT:  No.  I'll let Mr. Geoghan wind up now.

8           MR. HURST:  All right.

9           THE COURT:  Mr. Geoghan, you've been on it for a

10   while.  Take your last couple of minutes to talk about the

11   balance of hardships.

12          MR. GEOGHAN:  Well, Your Honor, the balance of

13   hardships, which actually was where I was going to go, is

14   clearly in favor of the debtor here.

15          If the management is displaced, there's no -- there's

16   really no fixing it, because as we've seen, the liquidators,

17   once they're in place move very quickly onto the next entity

18   and begin liquidating assets.

19          In addition as we have seen and what the liquidators

20   do do, in their failure to liquidate the warrant we discussed

21   earlier, the option, the United Community Bank option that

22   expires today.  They're not taking the steps to actually

23   preserve the estate.  We need to maintain status quo for a

24   brief period of time so that the parties can determine what the

25   best steps are in this process.

FLETCHER INTERNATIONAL, LTD.

Page 64

```
 1           The harm, the greater harm would clearly be to this

 2    entity to the debtor if the liquidators were able to put in

 3    provisional liquidators, and/or voluntary liquidation and

 4    remove the board and the management from the company.

 5           And Mr. Hurst just pointed out one other thing,

 6    there's no harm to the liquidators.  This is -- if we remain

 7    status quo for two more weeks, there's no harm.  Their position

 8    hasn't changed.  We're not running out to sell assets, even if

 9    we did or could, the money will still be in the estate because

10    of the process going on here.

11           There's no harm to them if we all just sit still for

12    a couple of weeks.  The Bermudian case is still going on.  So

13    that's what we had said.  Thank you, Your Honor.

14           THE COURT:  Thank you.  Okay.  Mr. Tabak.

15           MR. TABAK:  Thank you, Your Honor.  I wanted just

16    briefly start with Mr. Geoghan -- am I pronouncing it

17    correctly?

18           MR. GEOGHAN:  Geoghan.

19           MR. TABAK:  Where Mr. Geoghan started was not at all

20    with Johns Manville --

21           THE COURT:  Forgive me, I need to say -- is it Geon

22    or Geoghan?

23           MR. GEOGHAN:  It's Geoghan, Your Honor.

24           THE COURT:  With a hard G?

25           MR. GEOGHAN:  With a hard G.
```

```
 1              THE COURT:  All right.  Thank you.

 2              MR. TABAK:  Thank you for clarifying that for my sake

 3     as well, Your Honor.

 4              So where Mr. Geoghan started was not at all with

 5     Johns Manville, it was with throwing dirt at my clients.  I do

 6     want to just briefly respond to some of those points, and I

 7     will be brief.  Mr. Geoghan talked about how in the petition in

 8     Bermuda it didn't reference the New York court action.  It

 9     didn't need to.  And the New York court action had not even

10     been served at that point.

11              In contrast I'll note that the bankruptcy petition

12     here on the second page, all prior bankruptcy cases filed

13     within the eight years is blank, pending bankruptcy cases filed

14     by any spouse, partner, or affiliate of this debtor.  An

15     affiliate had already gone through the process, blank.

16              Now, the debtors cured that very quickly.  It's not

17     an issue.  I don't think there's any need for the Court to take

18     any action whatsoever about it, but the same process in

19     Bermuda.  The debtors had an opportunity to raise the New York

20     action in Bermuda.  So to suggest in any way that my clients

21     did anything wrong, I think is wholly inappropriate.

22              I also, as I heard more about the note, and that this

23     is an intercompany notes that they never act on, didn't make me

24     anymore comforted about them.  And I want to talk about the

25     option now.
```

Page 66

```
 1              The option, we understand, has very limited value.  I
 2    understand that there's an action being filed today in the
 3    Southern District of New York, and with regards to the option.
 4              Now, I don't have many more details on it, but I can
 5    tell you that the option, we believe, is a very limited value.
 6    We do want to get that limited value.
 7              It -- with regard to --
 8              THE COURT:  Well, is it possible that -- I mean, I
 9    assume, you know, exercising an option requires putting in more
10    money, and I don't know if your guys have or the Louisiana
11    Funds or whoever would have the money to do it, but normally an
12    option that's in the money can be sold to somebody else and
13    somebody will pay for it.  Is that an option, an opportunity
14    here?
15              MR. TABAK:  My understanding is that that's what the
16    Louisiana Funds tried to do, and they're not just able to get a
17    buyer for anywhere near the value that the option was purported
18    to have to them.  That's the problem is yes, you can find a
19    buyer, but not for anything like what you'd -- you know, what
20    you --
21              THE COURT:  Of course if you can't get what you're
22    looking for, you can get some lesser sum, which is still better
23    than zero.
24              MR. TABAK:  That's right.  But, you know, not $136
25    million by any stretch.
```

1          Mr. Geoghan talked about, well, the debtor came here

2     because they had no other choice.  No, there was a proceeding

3     in Bermuda, they could've -- and they have a full and fair

4     opportunity to participate in that proceeding.

5          Bermuda is where the debtor is incorporated.  There's

6     a -- you know, there was a choice to try to do an end run

7     around the Bermuda proceeding.  And I want to talk a little bit

8     more in particular about a temporary restraining order.

9          It's an extraordinary remedy.  And it requires

10    evidentiary proof by the debtor in this case that has met all

11    of the requirements for obtaining a temporary restraining

12    order.  It's not simply a, you know, let's just have a cooling

13    off period for a period of time, it's something where the

14    debtor must introduce proof of each and every element that it's

15    required to obtain the temporary restraining order.  And the

16    debtor has not done so here.

17         First, I wanted to address the issue of -- it's both

18    irreparable harm, and I think the likelihood of relief, the

19    Johns Manville cases, he said, Your Honor, the shareholders are

20    entitled to have a vote, unless it would jeopardize a

21    reorganization.

22         What we don't have here is any evidence that there's

23    going to be a reorganization.  In fact, the debtor has not

24    tried to do so in its papers on this motion.  I would point

25    Your Honor to the affidavit of Floyd Saunders, which was

1    introduced in support of the motion.  It's the only affidavit

2    that was introduced in support of it.  Paragraph 7 explains,

3    "Due to the nature of the debtor's investments, it will take

4    time along with very specific knowledge and experience to

5    ensure that the debtor's assets are liquidated in a manner that

6    provides the maximum benefit to the debtor's creditors and

7    shareholders.  The liquidators have neither time, nor the

8    specific knowledge of the debtor's assets --"

9              THE COURT:  Well, I saw that in the affidavit, too,

10    Mr. Tabak.  But you know, debtors in this court have

11    liquidating plans for all the time.  For God's sake, General

12    Motors has a liquidating plan.  Nobody would suggest that that

13    is a fraudulent bankruptcy or anything like that.  Frankly, in

14    the sell and sue era, most of the debtors in cases on my watch,

15    are liquidating plans.

16              The fact that they want to confirm a plan that

17    envisions an orderly liquidation, and there's apparently a

18    difference of perspective between your guys and theirs as to

19    how fast the liquidation should take place, that by itself,

20    doesn't make either side's position inappropriate, much less

21    more evil than that, does it?

22              MR. TABAK:  I apologize if I was suggesting that it

23    in any way was inappropriate.  I don't believe that this is an

24    inappropriate filing.  But what it is, is it's the debtor's

25    burden here to show that what the defendants here are trying to

1  do is to prevent a reorganization, not to have a more rapid

2  liquidation.

3          It is -- in Johns Manville.  I think as you look at,

4  you know, the history of Johns Manville, there was a

5  reorganization plan that had already been negotiated.

6  That's --

7          THE COURT:  I hear you, but essentially what you're

8  saying then is that when I ultimately hold the Johns Manville

9  hearing, you should win then?

10         MR. TABAK:  Well, I think, Your Honor, we should win

11  now.  Because the same standard applies on a TRO as a

12  preliminary injunction.  The debtor has to introduce evidence

13  that the likelihood of success also is that they have a

14  reasonable change of reorganization.

15         There's absolutely nothing in Mr. Saunders' affidavit

16  that suggests a likely plan of reorganization, nothing

17  whatsoever.  In fact, in paragraph 53, Mr. Saunders writes,

18  "And the debtor has," and I quote, "no access to its cash."

19         As you heard, Your Honor, as you know, there was no

20  first day motions, there's no DIP lender coming in.  So we have

21  a debtor with no access to its cash according to this

22  affidavit, and no evidence whatsoever that they plan to

23  reorganize.  If that's the case, they simply have not met their

24  burden either of irreparable harm, for having shareholder vote,

25  or likelihood of success.

FLETCHER INTERNATIONAL, LTD.

Page 70

1           It's just a question of who's going to be doing the

2    liquidation.  And I think that it's vital to understand, this

3    is the debtor's burden on an extraordinary remedy to show that

4    they are entitled to a temporary restraining order.  They have

5    not met their burden.

6           And I think Your Honor, I was going to talk about the

7    narrow tailoring of the injunction.  I think you obviously have

8    addressed that issue quite clearly.

9           THE COURT:  Well, I certainly asked questions about

10   it.  I'm not confident that we've resolved it yet.

11          It seems to me that to the extent that relief is

12   granted, we're talking about two things.  One, staying

13   proceedings in Bermuda, so that they neither move forward nor

14   that anything that's happened so far is erased, and stopping

15   the clock on your taking a shareholder vote, pending the

16   completion of a Johns Manville hearing to find out if your guys

17   are acting to an evil enough extent or a damaging enough extent

18   to depart from the best term of the rule.

19          That is what I am inclined to grant, subject to your

20   opponent's right to be heard and yours, if I otherwise find TRO

21   relief appropriate.

22          In your view, should -- if you lose, and of course,

23   you don't want to lose, but if you lose on me issuing something

24   today, do you think the TRO should be narrower than that, or

25   broader than that?

FLETCHER INTERNATIONAL, LTD.

1          MR. TABAK:  I think, Your Honor, I think the TRO

2     should be -- I think at least that narrow, and I'd have to

3     consider it a little bit further than what we've had the

4     opportunity to consider was a TRO that was obviously, vastly

5     overbroad.

6          But I do want to get back, this is the debtor's Johns

7     Manville hearing.  You don't get a TRO unless your evidence,

8     then you get a preliminary injunction.  This is their

9     opportunity.  They introduced an affidavit that doesn't say one

10    word about the possibility of reorganizing.  And, in fact, it

11    says that they're going to liquidate.  It says they have no

12    access to cash.

13         Your Honor, I've handed to you the verified affidavit

14    from the winding up petition in Bermuda, and that's evidence as

15    well, evidence that this debtor is hopelessly insolvent.  That

16    regardless of whether there is a shareholder vote or not, this

17    debtor will not be reorganizing.

18         It's not even my burden, but if it were, I would've

19    met that evidentiary burden.  The debtor on the other hand has

20    not met the evidentiary burden for the extraordinary relief of

21    a temporary restraining order.

22         It -- when I -- it was interesting when the gentleman

23    was talking about what's the hardship.  It was that the

24    Louisiana Funds would go after another entity in the chain.

25    This Court is not here to protect another entity in the chain.

FLETCHER INTERNATIONAL, LTD.

1     The debtor should not be here to protect another entity in the

2     chain.  That's not what the balance of hardships is all about.

3     It's about the parties here.

4          The debtors had a fair and full opportunity, and I've

5     asked Mr. Read to talk about some of the law in this area, they

6     have the opportunity to seek stays in Bermuda, and to seek a

7     stay in the Cayman Islands proceedings.  That's where their

8     opportunities for injunctive relief belong.  They're trying to

9     make an end run around those proceedings at the very last

10    minute here in New York.  And Mr. Read will talk a little bit

11    more about that.

12         That's what's inappropriate here, is that.  And also

13    in terms of the hardships, Your Honor, it's a matter of record

14    that the SEC, the Cayman Islands' monetary authority both are

15    investigating it, the debtor.  One, I should say the debtor is

16    investigating one of the feeder funds, the press reports that

17    the FBI is investigating as well.  We're entitled to have the

18    protections --

19         THE COURT:  If you had more than that, Mr. Tabak,

20    obviously that would get my attention.  But one of the problems

21    I have is that a) what you tell me ain't evidence, and b) that

22    if you gave me the newspaper articles or something like that,

23    since newspaper articles are hearsay anyway, I'd have a problem

24    with relying on that.

25         So it seems to me that matters of this character

1    might be relevant on a Johns Manville hearing, or maybe even on

2    for more than that, to the extent you get stuff that passes

3    muster under evidentiary standards at a preliminary injunction

4    hearing.  It's a little hard for me to take it at a TRO

5    hearing.

6             MR. TABAK:  And, Your Honor, we actually do have

7    evidence of the SEC investigation and the Cayman Islands'

8    monetary authority.  The winding up petition, which again, the

9    verified affidavit, verifies this and the facts therein.

10             At paragraph 1 and again later, the investment

11   manager is the subject of an investigation by the Securities

12   Exchange Commission, and at least one of its feeder funds is

13   the subject of an investigation by the Cayman Islands monetary

14   authority.  So this is part of the evidentiary record that's

15   before you now.

16             THE COURT:  Okay.  Fair enough.  But you're not

17   telling me they've made any findings yet, have you?

18             MR. TABAK:  No, and I'm not aware of any findings.

19             I want to turn it over to Mr. Read to talk about the

20   principles of commonity and this Court's recognition of the

21   proceedings, particularly in the Bermuda courts where the

22   debtor is a Bermuda incorporated entity.  So if I may, Your

23   Honor, I'd like Mr. Read to --

24             THE COURT:  Sure, Mr. Read.

25             MR. TABAK:  Thank you.

1          MR. READ:  Thank you, Your Honor.  Briefly, I think

2     it is clear that what the debtor is seeking here is an anti-

3     suit injunction.  And I don't think under the case law in the

4     2nd Circuit those are issued lightly.  In fact, it's quite the

5     opposite, Judge, that it is issued sparingly, and should be

6     granted only with care and great restraint.

7          And as Your Honor indicated earlier, this Court, and

8     perhaps Your Honor in particular are familiar with Bermudian

9     insolvency proceedings.  Unfortunately I do not have the full

10    expertise that I might like to have, and I hope to gain over

11    time, but just very recently it was held by Judge Gropper, that

12    Bermuda has a sophisticated, fair, and impartial legal system

13    that has been recognized in --

14          THE COURT:  Pause please, Mr. Read.

15          MR. READ:  Yes, sir.

16          THE COURT:  Because I'm aware of that, and even if

17    Judge Gropper hadn't held that, I would've had that view.  But

18    the commonity cases and I'm -- as far as I'm aware, we've never

19    denied commonity to a country in the British Commonwealth or

20    that has a British based legal system.  Certainly, the

21    Caribbean countries is a part from Canada, the U.K., Australia

22    and the like.  But isn't the law in that area that once the

23    Bermuda court or the Canadian court or the English court has

24    made a decision, we granted commonity, at this point we're

25    talking about something where people are going to have future

1   proceedings in that court, but nobody's asking me to disregard

2   the order of a Bermuda judge.

3           MR. READ:  Your Honor, that's right.  There's not an

4   order that's being asked that someone's saying, you know, is

5   not entitled to commonity, and I'm sure Your Honor is right,

6   that the British Virgin Islands and the territories, and the

7   former territories in the commonwealth are routinely granted

8   commonity.

9           What the principal here is, Judge, is that this is an

10  anti-suit injunction, and saying to our clients, you can't go

11  forward in a proceeding that's filed with notice to the debtor.

12  In fact, it is an insolvency proceeding with regard to this

13  debtor.

14          And that is an anti-suit injunction, Judge.  What it

15  says is, and the 2nd Circuit said in the -- this is a bad case

16  for acronyms, L-I-A-F-X-S-P-R-L case, 390 F3d 194, that to

17  enjoin a party from pursuing a foreign action is actually to --

18  though it's directed at litigants, it effectively restricts the

19  jurisdiction of the Court of a foreign sovereign, a foreign

20  sovereign that I think Your Honor accurately recognize is

21  entitled to commonity, not just the decisions that come out of

22  that court, but the actual proceedings therein.

23          And that's critical here, Judge.  That is the first

24  filed insolvency case in a forum and at a location entitled to

25  commonity and recognition by this Court.

FLETCHER INTERNATIONAL, LTD.

1           We have, I think to a certain extent here, the

2     reverse of, you know, the typical Chapter 15 case, where a

3     liquidator would come in and seek recognition of that

4     proceeding.  And that may well be appropriate at some point in

5     time, but to say that we can't go forward is an extreme remedy,

6     and it is sparingly granted under the 2nd Circuit's case law.

7           And as my learned co-counsel I think accurately

8     described, you know, for the same reasons, that the Johns

9     Manville TRO wouldn't be warranted, this anti-suit TRO and

10    injunction would not be warranted.  In fact, this issue is not

11    raised by the papers, it's another whole area of the law that's

12    simply not addressed.

13          And I think it does raise an important public policy

14    issue, Your Honor.  These are ongoing insolvency proceedings

15    brought in open court pursuant to which they have Bermuda

16    counsel.  We've heard the firm referred to, I believe it's

17    Appleby (ph) more than once, and they have Cayman Islands'

18    counsel, and they are actively fighting in the Cayman Islands

19    and in Bermuda.  And it's not appropriate to end run those

20    proceedings by invoking the jurisdiction of this Court.

21          Now, we're not here seeking to stay this matter at

22    this time, or seek abstention of this time, that's not what

23    we're here to say.  But it is, I think Your Honor has

24    pinpointed the exact issue here.  This is an issue of control.

25    And as my co-counsel I think ably described, the question is,

Page 77

```
1    who's going to control this proceeding.  Is it going to be the
2    people who invested over $100 million, that was used by the
3    current management of the debtors in ways that frankly are
4    still being discovered, Judge.
5            And we've heard some description today, there's a lot
6    more to learn about that.  And I think it's important that we
7    have liquidators in place that have duties to the Cayman
8    Islands' court, who would be responsible to the Bermudian
9    court, and who, as Your Honor I think accurately understood,
10   and stated, the assumption would be, to the extent that they
11   control this proceeding, they would have duties to this court,
12   of course, Your Honor, that they would live up to.
13           This is not -- you know, these are not people trying
14   to destroy value.  These are professional people advised by
15   learned counsel, advised by financial advisors when necessary
16   and appropriate.  And they're trying to maximize value for the
17   people who put up the money that was invested here.  I think
18   it's a point that shouldn't be lost, Judge.
19           This money that's at issue, that's being moved back
20   and forth pursuant to notes, it came from the funds.  And I
21   think those are constituencies that our clients to represent in
22   part, and that need to be heard.
23           THE COURT:  All right.  Thank you, Mr. Read.  I'll
24   take brief reply, much, much briefer than the opening remarks
25   and limited to the new stuff that I heard from Mr. Tabak and
```

1    Mr. Read.

2            MR. GEOGHAN:  I will do, Your Honor, and I'll start

3    with something Mr. Read said at the very end.  The liquidators

4    are in place to protect the interest of the pension funds, not

5    all constituents.  They were hired by investors to protect

6    their interests, not all the constituents involved.

7            Your Honor, I'll talk about a couple of very brief

8    points that were raised.  First, in regard to what was stated,

9    something that was stated, the 1007 affidavit, Your Honor, some

10   of the -- we recognize, the debtor recognizes that some of the

11   assets here may need to be liquidated to pay off creditors.

12   They may need to be liquidated.  We recognize that, and that

13   was acknowledge in the 1007 affidavit.

14           An important part with regard to the comments about

15   the SEC, FBI investigation, the comments first came out in the

16   Cayman petition, based on -- and there, they actually stated

17   that they were based on the Wall Street Journal article that

18   people were referencing earlier, but yes, Your Honor, would be

19   hearsay.

20           The fact that they were simply restated in the

21   petition in Bermuda makes them no more than the same hearsay.

22   To the extent there is an SEC investigation, and I have not

23   confirmed, nor can I tell you if there is one, my understanding

24   is nothing -- no one's investigating the debtor to my knowledge

25   -- to our knowledge.

FLETCHER INTERNATIONAL, LTD.

Page 79

1          Your Honor, in regard to the issue of the cash, the

2    money that we need that is in the hands of Credit Suisse First

3    Boston, we have not yet had a chance to contact Milbank, their

4    counsel with regard to this matter.  We believe that they will

5    cooperate now that the company's in Chapter 11.  If they don't

6    want to cooperate as Mr. Hurst stated quite clearly, we are

7    more than prepared to go forward with an adversary proceeding.

8    We have the papers already in draft, and we'll be ready to go

9    forward with that to free up the cash as soon as possible.  And

10   that is $1.7 million plus certain securities that are held

11   there.

12          Your Honor, in regard to reorganization, based on

13   what was stated in the schedules alone, the assets in this case

14   exceed the liabilities.  There is, you know, a belief that

15   there is something to reorganize here.  There is always a

16   question of what the value is of the inventory, and we

17   appreciate that the liquidators might have a different value

18   than what we might see on certain things and that it's

19   somewhere in between, but there is a value to this inventory

20   and it's not zero.

21          I was not familiar with the fact they are considering

22   a Southern District action as soon as today.  Your Honor, I

23   think finally worth remarking is on something else that was

24   stated, the -- this matter, and this goes to the 105 argument,

25   Your Honor.  This matter, this -- the fight that's going on

FLETCHER INTERNATIONAL, LTD.

Page 80

```
 1    here in the Bermuda matter is very distracting to this company

 2    and to the very limited number of management people we have.

 3            We don't have a lot of employees to put people on

 4    different tracks at the same time.  And the company -- it will

 5    be very difficult for the company to really get into what it

 6    needs to get into, if it's distracted for the next three months

 7    with fighting in the Bermudian courts.  And while we appreciate

 8    a TRO would not extend that far, not necessarily extend that

 9    far, we would like the opportunity to at least get some

10    breathing room so that we can come back in here for a proper

11    injunction hearing, at which time we could present evidence,

12    more evidence and more information to the Court to allow it to

13    better make its determination.

14            THE COURT:  All right.  Thank you.  We'll take a

15    recess.  I want --

16            MR. TABAK:  May I briefly raise just two quick

17    points, Your Honor?

18            THE COURT:  Very briefly, Mr. Tabak.

19            MR. TABAK:  Yeah, just very briefly.  Mr. Geoghan

20    referred to the schedules.  We saw that the schedules don't

21    even list the FIA Leveraged Fund claim, so and I understand

22    that the debtor's counsel put it together very quickly, and I

23    completely understand that, but then we can't rely on the

24    schedules and say, well, the schedules say, you know, we'd like

25    to have the reorganization.  The affidavit that was introduced
```

1    today did not say that.

2         In terms of distraction, the debtor has no employees

3    to be distracted.  This is really again talking about the

4    manager and other folks being distracted.

5         Finally, the source of the information for the FBI

6    was the Wall Street Journal.  The source of the information for

7    the SEC and the Cayman Islands monetary authority for, I

8    believe it was the manager, and I know that the Cayman Islands

9    monetary authority has participated in some of these

10   proceedings.  Thank you, Your Honor.

11        THE COURT:  All right.  Recess.  I want you all back

12   here at five of 12:00 by the clock on my left.  I can't

13   guarantee you that I'll be ready then, but we're in recess now.

14        (Recessed at 11:43 a.m.; reconvened at 12:03 p.m.)

15        THE COURT:  Have seats, please.

16        Ladies and gentlemen, while the issues that we're

17   going to need to deal with down the road are more difficult,

18   the issues that are before me today are much easier.

19        While the TRO that's been proposed for my

20   consideration is overly broad, I'm granting it for the 14-day

21   duration that's authorized under Federal Rule 65(b), and

22   Federal Bankruptcy Rule 7065 in two respects, even though

23   whether it will continue as a preliminary injunction will

24   deserve greater debate, evidence, and briefing.

25        In substance, I'm asked to preserve the status quo

1    pending consideration of a preliminary injunction hearing,

2    which translates into two specific things.  Anything more than

3    that, would have to be justified for me and would cause due

4    process concerns by reason of its vagueness.

5              One, I asked to stay further proceedings to appoint

6    liquidators or provisional liquidators in Bermuda.  And

7    secondly, I'm asked to stay measures to secure a shareholder

8    vote to change the director's board here in the U.S.

9              I will grant the TRO in those two respects pending

10   consideration of the preliminary injunction motion, at which

11   time we're going to do a full stop, look and listen on all of

12   these matters, for reasons that I think were telegraphed during

13   the oral argument, and which will undoubtedly be telegraphed

14   later on when we hear the PI.

15             The standards for a TRO are well established.  As I

16   described them in one of my Adelphia decisions, this one being

17   Adelphia versus The America Channel, LLC, 2006 West Law

18   1529357, Bankruptcy Southern District of New York 2006, a

19   decision I issued almost exactly six years ago.

20             And I'm reading from page 4.  "The standards for a

21   TRO and preliminary injunction in this circuit, which are not

22   materially different are well established.  To prevail, the

23   moving party must show a) that it will suffer irreparable harm

24   in the absence of an injunction; and b) either (i) the

25   likelihood of success on the merits or (ii) sufficiently

1   serious questions going to the merits to make them a fair

2   ground for a litigation, and a balance of hardships tipping

3   decidedly in the movant's favor."  Internal quotation marks

4   have been deleted.

5           I cited Zervos versus Verizon New York, Inc., 252 F3d

6   at page 172, a decision of the 2nd Circuit in 2001.  And three

7   other cases as well.  Those matters being so fundamental, I

8   don't need to discuss them further.

9           I'm not just going to briefly take a few minutes to

10  talk about the application of those standards, which as Mr.

11  Tabak properly observed, are the standards under which motions

12  of this character are determined.

13          Here, I do find the requisite irreparable injury.

14  Either of the two matters that I'm enjoining could, if not

15  enjoined, result in the displacement of the board.  One, by the

16  provisional liquidator to be or liquidators to be appointed in

17  Bermuda, and the other by board members designated by the 83

18  percent shareholder.

19          Either way, the change of a board inevitably results

20  at the least in a change in the direction of the company, and

21  at least the former raises material risks, if not a certainty

22  of an inability to unscramble the omelet.

23          If the former relief is granted, and if an order were

24  to be entered by the Bermuda court, it would put two courts in

25  at least the risk, if not the certainty of doing jurisdiction,

FLETCHER INTERNATIONAL, LTD.

1    although as I said in oral argument, I think deference to court

2    orders of other nation's judges is a much bigger deal than

3    efforts to secure orders from those people.  Although I'm

4    giving the defendants in the adversary proceeding before me

5    here a full reservation of rights on that.  And I do want

6    further briefing and argument, and if need be, evidence of

7    foreign law on how I should deal with the situation where

8    people are asking for relief from a foreign court, but that

9    foreign court hasn't granted any yet.

10           It was suggested to me that if the defendant, the

11   joint provisional liquidators take over and sell assets of this

12   debtor, that might result in irreparable injury to the estate.

13   I can't go quite so far as to make that finding, because it

14   would depend on the skill and patience by which they approach

15   that measure.  I can say at this point that it's a risk of

16   such, but not a certainty of such.  But in any event, because I

17   found irreparable injury in other respects, I don't need to

18   rely on this additional factor.

19           Ultimately this matter is going to be based on the

20   remaining factors.  The next, of course, is likelihood of

21   success.

22           I do not make a finding of likelihood of success

23   today if I ever will.  As I indicated, it may ultimately be

24   determined by how much deference I have to give to proceedings

25   in a foreign nation, which have been requested, but not yet

1   ruled upon.  I do need more briefing on that.

2          We also have a major wild card in terms of the

3   outcome of the appeal in the Cayman Islands, which I'm not

4   persuaded is quite as important as I thought it was at the

5   outset of argument, but which I can't make a prediction of

6   likelihood of success on.  In any event, that issue may become

7   moot once the Cayman Appellate Court rules, not necessarily on

8   August 31st -- July 31st or August 1st, but at some point.

9          On the shareholder vote, it is not obvious to me now,

10  if it ever will be that the issue, which is what we've referred

11  to in slang as the Johns Manville issue is one upon which the

12  debtors have -- debtor has a likelihood of success.  It will

13  all be about compliance with the standards articulated in Bush

14  Terminal, Potter Instrument, and Johns Manville.  Those cases

15  set up a general rule, and my brief characterization of them

16  now are subject to the more precise language set forth in those

17  decisions, that corporate governance rights don't end in

18  bankruptcy.  But that the right to call a shareholder vote can,

19  in some instances, be blocked to accomplish bankruptcy needs

20  and concerns.

21         Those cases can be summarized by saying that the

22  Court has the power to block a shareholder vote, but that its

23  power to do is sparingly exercised, and that it's decision to

24  exercise the power is very different and more difficult than

25  finding that the Court has the power in the first place.

FLETCHER INTERNATIONAL, LTD.

Page 86

1          The 2nd Circuit in Johns Manville stated at page 64,

2    801 F2d 64, "A bankruptcy court should not lightly employ its

3    equitable power to block an election of a new board of

4    directors," quoting Potter Instrument, and it went on to say,

5    "that the right to call a meeting may be impaired only if the

6    equity holders," and I'm diverting from the quotation, "is

7    guilty of 'clear abuse' in attempting to call one."

8          That will be the focus of what I call the Johns

9    Manville hearing, and both sides will have the opportunity to

10   help me decide whether the desired stockholder vote should be

11   blocked on the one hand, or allowed to proceed on the other,

12   consistent with the standards imposed under Johns Manville.

13         At this point, I do not find the likelihood of

14   success on the merits in favor of the debtor.  But I can and do

15   find that the debtor's desire to do so does raise matters that

16   a fair ground for litigation.

17         So the alternate first prong which is the substitute

18   for likelihood of success has been satisfied, and then we go to

19   the last one, which in my view is very important under the

20   facts of this.  Which is the balance of hardships.

21         I think that the TRO should now be granted for these

22   14 days or as the parties may consent to an extended period, or

23   we take the opportunity provided by 65(b) to have another one

24   of these.  Because preserving the status quo at this point is

25   just not a big deal, has no material prejudice to the defendant

1    side.  And permits the more focused inquiry into the issues

2    I've articulated on a more suitable record, and with a more

3    appropriate opportunity for the defendants to respond.

4         I expressly find that it's no big deal to stay

5    proceedings in Bermuda by a couple of weeks.  That's really all

6    we're talking about.  Likewise, it's no big deal to delay the

7    shareholder vote by a couple of weeks.  I can guess the outcome

8    of that shareholder vote, since the debtor wants to block

9    action by its 83 percent stockholder.  But even assuming, as I

10   do, that the vote, if permitted, would yield an inevitable

11   result, it is no material hardship to the defendant and

12   Fletcher Income Arbitrage Fund Limited in particular, if its

13   rights to exercise its power to vote as a stockholder are

14   delayed by a couple of weeks for this TRO.

15        In short, preserving the status quo as it is,

16   especially since the debtors are operating under my wing, with

17   Court supervision, and with full opportunity for the defendants

18   to be heard, before anything happens in this case, has no

19   material harm or indeed any harm to them at all.

20        I additionally find for the next couple of weeks that

21   an alternate basis for granting the TRO, one that's

22   traditionally been granted under 105(a) which protects the

23   management of the debtor from distraction, will be satisfied

24   for the next couple of weeks.  Because certainly having to do

25   what is necessary in this case at the same time as liquidating

1    in Bermuda would, by reason of the latter, give rise to a

2    distraction.

3              The debtors will also be free to raise the

4    distraction point on the preliminary injunction hearing, but

5    they and their opponents, I say they, the debtor and its

6    opponents, should be mindful of the fact that when I give

7    105(a) distraction injunctions, I do them only for 90 days at a

8    pop, authorizing the enjoined party to get a stop, look, listen

9    after 90 days, and I never grant them for indefinite periods.

10   I grant them only for the time during which they're going to be

11   really busy.  And they're not a get out of jail free card for

12   avoiding the consequences of an ultimate end to a 105(a)

13   injunction of that character.

14             So we're going to have a preliminary injunction

15   hearing in which all of these issues will be more fully

16   explored.  It's going to be a Johns Manville hearing, which

17   will be, unless you agree upon the facts, to determine whether

18   the shareholder vote requested here does or does not pass

19   muster under the standards articulated in Johns Manville, Bush

20   Terminal Company, and Potter Instrument.

21             The case management order has only been in place for

22   an hour or two.  Read it, understand how direct testimony is

23   taken in my court.  The parties are instructed to caucus to

24   determine whether they want to have an evidentiary hearing on

25   the subject within the 14-day period.  If I need to, I can give

FLETCHER INTERNATIONAL, LTD.

Page 89

1    it to you on July 16.  But since you've got a ton of work to do

2    in terms of getting up to speed on the facts, getting in your

3    direct testimony, affidavits, getting in reply briefs and

4    allowing me time to read the reply briefs before the

5    preliminary injunction hearing, you may want to see whether

6    allowing an extra time to get that all done makes sense,

7    especially since I'm issuing an injunction, which is what I

8    regard as the bare bones to simply preserve the status quo, and

9    which is not imposing any particularly draconian relief on the

10   defendant side.

11          I'm not going to take reargument.  I will take

12   argument if there is any, on whether an injunction broader than

13   the one I said I'm going to give is essential.  Although it's

14   going to be an up hill fight to get an injunction that has

15   anymore in it.  I'm very concerned about the breadth of the

16   original injunction.

17          If I were on the receiving end of an injunction of

18   that character, I would know what I'm allowed to do or wouldn't

19   be allowed to do.  And my desire, folks, is to so order the

20   record with what I think is a very clear injunction at this

21   point.

22          First you, Mr. Geoghan.

23          MR. GEOGHAN:  No, Your Honor, we don't seek anything

24   further, sorting the record will be acceptable to us.

25          THE COURT:  Okay.  Do you want to be heard further,

1    Mr. Tabak, before your chance to be heard on the preliminary

2    injunction hearing?

3              MR. TABAK:  No, thank you, Your Honor.  Obviously we

4    want to have no written record at the injunction so we can be

5    very clear as to what it covers.

6              THE COURT:  Okay.  I'm so ordering the record now.

7    Mr. Geoghan, you are to give me a superseding proposed TRO at

8    your earliest reasonable convenience.  Hopefully, this

9    afternoon.

10             Okay.  Anything else?  Thank you, folks.  We're

11   adjourned.

12             MR. GEOGHAN:  Thank you, Your Honor.

13        (Whereupon these proceedings were concluded at 12:23 PM)

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                  R U L I N G S

3                                          Page     Line

4    Temporary Restraining Order            81       15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1                    C E R T I F I C A T I O N

2

     I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6    Dated:  July 6, 2012

7

8

9     Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

***Cambridge Gas Transp. Corp. v. Official Comm. of Unsecured Creditors of Navigator Holdings plc*, [2006] UKPC 26, [2007] 1 A.C. 508 (P.C.) (Appeal taken from Mann)**

Privy Council                                                          *A*

# Cambridge Gas Transportation Corpn *v* Official Committee of Unsecured Creditors of Navigator Holdings plc and others

## [2006] UKPC 26

2006  March 20, 21;     Lord Bingham of Cornhill, Lord Hoffmann, Lord Hutton,     *B*
May 16                Lord Rodger of Earlsferry and Lord Carswell

*Isle of Man — Bankruptcy — Jurisdiction — European investors borrowing money*
*from New York bond market for purchase of ships — Ships owned and managed*
*by Manx group of companies being subsidiaries of holding company — Holding*
*company owned by companies incorporated in other offshore jurisdictions —*
*Investors becoming insolvent and petitioning for Chapter 11 relief under United*     *C*
*States Bankruptcy Code — United States Federal Bankruptcy Court confirming*
*reorganisation plan for creditors taking over assets including shares of holding*
*company — Federal Bankruptcy Court requesting Manx High Court for*
*assistance in implementing plan — Whether jurisdiction to enforce Federal*
*Bankruptcy Court order*

European investors in a shipping business borrowed US$300m on the New York     *D*
bond market for the purchase of five gas transport vessels and commenced trading.
Subsequently, the investors of the business became insolvent and petitioned for relief
in New York under Chapter 11 of the United States Bankruptcy Code, which
allowed insolvent companies to negotiate a plan of reorganisation with their
creditors. The Federal Bankruptcy Court for the Southern District of New York
confirmed a plan providing for the assets to be taken over by the creditors and
ordered that it be carried into effect. The ships, registered in Liberia, were owned     *E*
and managed by a group of Manx companies, each ship owned by a separate
subsidiary of a management company and all the shares in the management
company held by a holding company, N, which was in turn held through a web of
companies incorporated in other offshore jurisdictions, including the appellant, a
Cayman-registered company which owned 70% of the issued share capital of N.
Pursuant to clause 22 of the plan, the shares in N would be vested in the creditors'
representatives, which would enable the creditors to control the shipping companies     *F*
and implement the plan. The Federal Bankruptcy Court sent a letter of request to
the High Court of Justice of the Isle of Man, asking for assistance in giving effect to
the plan. The respondents petitioned the Manx High Court for an order vesting the
shares in their representatives. The appellant cross-petitioned, asking the Manx
High Court not to recognise or enforce the terms of the plan, on the basis that it was
a separate legal entity registered in the Cayman Islands which had never submitted
to the jurisdiction of the Federal Bankruptcy Court and that no order of that court
could affect its rights of property in the Isle of Man. The deemster held that     *G*
clause 22, as confirmed by the Federal Bankruptcy Court's order, was a judgment in
rem purporting to change the title to property outside the jurisdiction and could not
be recognised. On appeal by the respondents the Staff of Government Division,
reversing the deemster, held that the bankruptcy court's order was not a judgment in
rem but a judgment in personam in proceedings in which N, by its voluntary
petition, had submitted to its jurisdiction.

On the appellant's appeal to the Judicial Committee—                          *H*

*Held*, dismissing the appeal, that bankruptcy proceedings were neither
judgments in rem nor judgments in personam and rules of private international law
concerning the recognition and enforcement of judgments did not apply; that the
purpose of bankruptcy proceedings was not to establish the existence of rights, but
to provide a mechanism of collective execution against the property of the debtor

509

[2007] 1 AC                                    Cambridge Corpn v Unsecured Creditors (PC)

A   by creditors whose rights were admitted or established; that corporate insolvency
was different from personal insolvency in that, even in the case of moveables, there
was no question of recognising a vesting of the company's assets in some other
person, and they remained the assets of the company; but that the underlying
English common law principle that fairness between creditors required bankruptcy
proceedings to have universal application was given effect by recognising the
person who was empowered under the foreign bankruptcy law to act on behalf of
B   the insolvent company; that the Manx High Court had jurisdiction to assist the first
respondent, as appointed representatives under an order made pursuant to Chapter
11 of the US Bankruptcy Code; that, in the circumstances, it would not be unfair
for the plan to be given effect; and that, accordingly, the Staff of Government
Division had been right to order its implementation (post, paras 13–15, 20–21,
26–27).
    Decision of the Staff of Government Division of the High Court of Justice of the
Isle of Man affirmed.

C
    The following cases are referred to in the judgment of their Lordships:

    *African Farms Ltd, In re* [1906] TS 373
    *Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All
        ER 537, HL(E)
    *Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279
D   *Davidson's Settlement Trusts, In re* (1873) LR 15 Eq 383
    *Lines Bros Ltd, In re* [1983] Ch 1; [1982] 2 WLR 1010; [1982] 2 All ER 183, CA
    *Oceanic Steam Navigation Co Ltd, In re* [1939] Ch 41; [1938] 3 All ER 740
    *Solomons v Ross* (1764) 1 H Bl 131n
    *Wight v Eckhardt Marine GmbH* [2003] UKPC 37; [2004] 1 AC 147; [2003] 3 WLR
        414, PC

    The following additional cases were cited in argument:
E   *Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
        [2005] 1 All ER 871, PC
    *Anderson, In re* [1911] 1 KB 896
    *Bank of Credit and Commerce International SA, In re (No 3)* [1993] BCLC 1490,
        CA
    *Bank of Credit and Commerce International SA, In re (No 9)* [1994] 2 BCLC 636
    *Bank of Credit and Commerce International SA, In re (No 10)* [1995] 1 BCLC 362
F   *Bank of Credit and Commerce International SA, In re (No 10)* [1997] Ch 213; [1997]
        2 WLR 172; [1996] 4 All ER 796
    *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112
    *Barclays Bank plc v Homan* [1993] BCLC 680, CA
    *Brady v Brady* [1988] BCLC 20, CA
    *Brassard v Smith* [1925] AC 371, PC
    *Buchanan v Rucker* (1808) 9 East 192
G   *Business City Express Ltd, In re* [1997] 2 BCLC 510
    *Chief Constable of Kent v V* [1983] QB 34; [1982] 3 WLR 462; [1982] 3 All ER 36,
        CA
    *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818; [1997] 3 WLR 871; [1997]
        3 All ER 673, CA
    *DAP Holdings NV, In re* (unreported) 26 September 2005, Lewison J
    *Drax Holdings Ltd, In re* [2003] EWHC 2743 (Ch); [2004] 1 WLR 1049; [2004]
H       1 All ER 903
    *Equitable Life Assurance Society, In re* [2002] EWHC 140 (Ch); [2002] 2 BCLC
        510
    *Erie Beach Co Ltd v Attorney General for Ontario* [1930] AC 161, PC
    *Felixstowe Dock and Railway Co v United States Lines Inc* [1989] QB 360; [1989]
        2 WLR 109; [1988] 2 All ER 77

510
**Cambridge Corpn v Unsecured Creditors (PC)**                    [2007] 1 AC

*Green, In re Petition of* (1952) 60 MLR 254                                    A
*Hoicrest Ltd, In re* [2000] 1 WLR 414, CA
*Impex Services Worldwide Ltd, In re* [2004] BPIR 564
*Inland Revenue Comrs v Maple & Co (Paris) Ltd* [1908] AC 22, HL(E)
*Invercargill City Council v Hamlin* [1996] AC 624; [1996] 2 WLR 367; [1996]
    1 All ER 756, PC
*La Mutuelle Du Mans Assurances* (unreported) 12 July 2005, Pumfrey J
*Lawson's Trusts, In re* [1896] 1 Ch 175                                        B
*Macmillan Inc v Bishopsgate Investment Trust plc (No 3)* [1996] 1 WLR 387; [1996]
    1 All ER 585, CA
*New Millennium Experience Co Ltd, In re* [2003] EWHC 1823 (Ch); [2004] 1 All
    ER 687
*New York Breweries Co Ltd v Attorney General* [1899] AC 62, HL(E)
*Regatta Trading Ltd, In re* (unreported) 21 July 1998, Common Law Division of the
    High Court of Justice of the Isle of Man                                    C
*SW v United Kingdom* (1995) 21 EHRR 363
*Schemmer v Property Resources Ltd* [1975] Ch 273; [1974] 3 WLR 406; [1974]
    3 All ER 451
*Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] AC 670, PC
*Stegmann, Ex p* [1902] TS 40
*Sussex Brick Co, In re* [1904] 1 Ch 598, CA
*T & N Ltd, In re* [2004] EWHC 2361 (Ch)                                        D
*TTR Ltd, In re* (unreported) 19 February 2002, Lawrence Collins J
*Turners & Growers Exporters Ltd v The ship Cornelis Verolme* [1997] 2 NZLR 110
*West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, CA
*World Duty Free Co Ltd, In re* (unreported) 14 November 2003, Chancery Division
    of the High Court of Justice of the Isle of Man

**APPEAL** from the Staff of Government Division of the High Court of Justice
of the Isle of Man                                                             E

The appellant, Cambridge Gas Transportation Corpn, appealed from the
decision of the Staff of Government Division of the High Court of Justice of
the Isle of Man (Tattersall QC, JA and Teare QC, acting deemster), dated
21 March 2005, reversing the decision, dated 14 October 2004, of Deemster
Kerruish QC in proceedings brought by the respondents, the Official
Committee of Unsecured Creditors of Navigator Holdings plc and its             F
subsidiaries, that, inter alia, the order of the United States Federal
Bankruptcy Court for the Southern District of New York confirming a plan
of reorganisation made under Chapter 11 of the United States Bankruptcy
Code was in rem and holding instead that it was in personam.

The facts are stated in the judgment of their Lordships.

                                                                               G
*Robert Howe* and *Shaheed Fatima* for the appellant. The Staff of
Government Division's decision that the US Federal Bankruptcy Court's
order regarding the vesting of the appellant's shares was in personam
rather than in rem and that it could be recognised and enforced against the
appellant as a matter of comity was erroneous and contravened the basic
rule of common law concerning the recognition and enforcement of
foreign judgments or orders in personam, namely, that the domestic court     H
will not accept the self-asserted jurisdiction of a foreign court, but can only
recognise or enforce an order of a foreign court if the latter had
jurisdiction over the party in question in the eyes of the domestic court:
see *Buchanan v Rucker* (1808) 9 East 192. Comity between different

511

**[2007] 1 AC**                    Cambridge Corpn v Unsecured Creditors (PC)

A  jurisdictions in cross-border insolvency, although of great importance and
a relevant factor in the exercise by the court of discretionary powers, does
not enable the court to alter or dispense with mandatory provisions of the
law which it administers: see *In re T & N Ltd* [2004] EWHC 2361 (Ch).
The approach of English courts to recognising and enforcing foreign
insolvency judgments is to take pains over jurisdictional points where third
B  parties, not party to the foreign proceedings, are involved and to subject
the case to rigorous analysis to see whether recognition and enforcement
are merited: see *Felixstowe Dock and Railway Co v United States Lines
Inc* [1989] QB 360 and *In re Bank of Credit and Commerce International
SA (No 10)* [1997] Ch 213.

C  Even if it were possible to enforce an order in personam based only on
the self-asserted jurisdiction of the foreign court, the Staff of Government
Division erred in concluding that the Federal Bankruptcy Court's order was
in personam. The unambiguous wording of clause 22 of the plan as
confirmed by the Federal Bankruptcy Court's order regarding the vesting of
the appellant's shares makes it an order in rem. Since the shares in
Navigator Holdings plc were not situated in the USA at the time of the
bankruptcy proceeding, the order of the Federal Bankruptcy Court, as a
D  judgment in rem, is not capable of recognition or enforcement in the Isle of
Man: see *New York Breweries Co Ltd v Attorney General* [1899] AC 62,
*Inland Revenue Comrs v Maple & Co (Paris) Ltd* [1908] AC 22, *Brassard v
Smith* [1925] AC 371, *Erie Beach Co Ltd v Attorney General for Ontario*
[1930] AC 161 and *Macmillan Inc v Bishopsgate Investment Trust plc
(No 3)* [1996] 1 WLR 387.

E  The Staff of Government Division also held that, independently of the
general common law jurisdiction to assist a foreign court, section 101 of the
Companies Act 1931, the Manx equivalent of section 359 of the English
Companies Act 1985, enabled it to make the order confiscating the
appellant's shares. Section 101 gives the court power to rectify the register
of shares to reflect the true ownership of the shares, but the section does not
confer on the court an original power or discretion to alter the ownership of
F  the shares: see *In re Hoicrest Ltd* [2000] 1 WLR 414. [Reference was also
made to *Chief Constable of Kent v V* [1983] QB 34 and *Sirdar Gurdyal
Singh v Rajah of Faridkote* [1894] AC 670.]

*Ewan McQuater QC* for the respondents. In addressing issues of private
international law the court must look at "the substance of the issue rather
than the formal clothes in which it may be dressed": *Wight v Eckhardt
G  Marine GmbH* [2004] 1 AC 147, para 12. The substance of the issue in the
present case is whether the Manx High Court had jurisdiction to recognise
the US bankruptcy proceedings and to give the assistance requested by the
Federal Bankruptcy Court in implementing the plan of reorganisation
approved by the court in those proceedings. Insolvencies give rise to
different considerations under private international law and are accorded
special treatment. A civil judgment, whether foreign or English, generally
H  concerns only the parties. Insolvency has a broader impact. It is, almost
invariably, a collective procedure instigated for the benefit of the creditors
as a body. The status of the insolvent is likely to be affected. More
importantly, the rights of others may also be affected: see *Ex p Stegmann*
[1902] TS 40.

512
**Cambridge Corpn v Unsecured Creditors (PC)**                    [2007] 1 AC

A
The commercial necessity for international co-operation between courts in matters of cross-border insolvency has long been recognised and is repeatedly stressed in the authorities: see *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818 and *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112. Foreign insolvency proceedings may be recognised in England at common law if the debtor company submitted to the jurisdiction of the foreign court: see *Barclays Bank plc v Homan* [1993] BCLC 680 and *Turners & Growers Exporters Ltd v The ship Cornelis Verolme* [1997] 2 NZLR 110. The European Court of Human Rights in *SW v United Kingdom* (1995) 21 EHRR 363 described the development of the common law to meet changing circumstances as a well entrenched and necessary part of legal tradition. [Reference was also made to *Invercargill City Council v Hamlin* [1996] AC 624 and *Schemmer v Property Resources Ltd* [1975] Ch 273.]

B

C

Recognition of a foreign insolvency by the court carries with it the active assistance of the court: see *In re African Farms Ltd* [1906] TS 373, *In re Impex Services Worldwide Ltd* [2004] BPIR 564 and *In re Business City Express Ltd* [1997] 2 BCLC 510. Nor is such assistance restricted to procedural matters: see *Al Sabah v Grupo Torras SA* [2005] 2 AC 333. Under section 425 of the Companies Act 1985 the English court may give effect to a scheme of arrangement in relation to either the share capital or the creditors of a company, where that arrangement has been approved by a vote of the relevant shareholders or creditors and is considered by the court to operate fairly: see *In re Drax Holdings Ltd* [2004] 1 WLR 1049, *In re DAP Holdings NV* (unreported) 26 September 2005 and *La Mutuelle Du Mans Assurances* (unreported) 12 July 2005. Schemes of arrangement under section 425 of the 1985 Act do not infringe the dissentient shareholders' rights of property under article 1 of the First Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms: see *In re Equitable Life Assurance Society* [2002] 2 BCLC 510. Where a company is insolvent, it is the interests of the creditors and not the interests of the shareholders, whose shares have become worthless, which must be regarded as the interests of the company. To allow the interests of the shareholders to prevail over the interests of the creditors runs contrary to well established principles of insolvency law: see *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, *Brady v Brady* [1988] BCLC 20 and *In re Bank of Credit and Commerce International SA (No 10)* [1995] 1 BCLC 362.

D

E

F

G
The discretion to assist foreign insolvencies at common law is not too vague to be workable: see *Turners & Growers Exporters Ltd v The ship Cornelis Verolme* [1997] 2 NZLR 110, *In re Impex Services Worldwide Ltd* [2004] BPIR 564, *In re TTR Ltd* (unreported) 19 February 2002, *In re Petition of Green* (1952) 60 MLR 254, *In re Regatta Trading Ltd* (unreported) 21 July 1998, *Felixstowe Dock and Railway Co v United States Lines Inc* [1989] QB 360 and *In re Bank of Credit and Commerce International SA (No 3)* [1993] BCLC 1490.

H
If the Staff of Government Division was right to recognise the US bankruptcy proceedings, then the court must approach section 101 of the 1931 Act on the basis that it wishes to give the active assistance sought by the Federal Bankruptcy Court if it properly can. Navigator Holdings plc is an Isle of Man company, so section 101 applies to it. The respondent is a

513
**[2007] 1 AC**                              Cambridge Corpn v Unsecured Creditors (PC)

A   "person aggrieved": compare *In re New Millennium Experience Co Ltd*
[2004] 1 All ER 687. [Reference was also made to *In re Sussex Brick Co*
[1904] 1 Ch 598, *In re Bank of Credit and Commerce International
SA (No 9)* [1994] 2 BCLC 636, *In re World Duty Free Co Ltd* (unreported)
14 November 2003, *In re Anderson* [1911] 1 KB 896, *In re Lawson's Trusts*
[1896] 1 Ch 175 and *In re Davidson's Settlement Trusts* (1873) LR 15 Eq
B   383.]

*Howe* replied.

*Cur adv vult*

16 May. The judgment of their Lordships was delivered by **LORD
HOFFMANN**

C   1  In 1997 four European businessmen decided to invest in a shipping
business. The lead appears to have been taken by a Mr Giovanni Mahler,
a Swiss resident who had about 10% of the equity. The investors borrowed
some US$300m on the New York bond market and ordered five gas
transport vessels with which they commenced trading at the beginning of
2001. Unfortunately the venture was a failure. Freight rates were lower
D   than expected and the ships never earned enough to cover even the interest
on the loans. At the end of 2003 the investors ran out of credit. The business
was heavily insolvent. They petitioned for relief in New York under
Chapter 11 of the US Bankruptcy Code, which allows insolvent companies,
under supervision of the court and cover of a moratorium, to negotiate a
plan of reorganisation with their creditors. In March 2004 the Federal
E   Bankruptcy Court for the Southern District of New York confirmed a plan
approved by virtually all the outside creditors and ordered that it be carried
into effect. Essentially, the plan was for the assets to be taken over by the
creditors.

2  This is a simple enough story, though unhappy, and the only
complications arise out of the corporate structure adopted by the investors.
The business was, as is frequently the case, held through offshore companies
F   incorporated in various jurisdictions. The ships, registered in Liberia, were
owned and managed by a group of Isle of Man companies, each ship owned
by a separate subsidiary of a management company and all the shares in the
management company held by a holding company, Navigator Holdings plc.
It will be convenient to refer to the group as "Navigator" and the shares in
the holding company as the shares in Navigator.

G   3  Navigator was in turn held through a web of companies incorporated
in other offshore jurisdictions, of which it is for present purposes necessary
to mention only two: Cambridge Gas Transport Corpn ("Cambridge"), a
Cayman company which owns, directly or indirectly, at least 70% of the
issued share capital of Navigator, and Vela Energy Holdings Ltd ("Vela"),
a Bahamian company which (through an intermediate wholly owned
Bahamian subsidiary) owns all the issued share capital in Cambridge.
H   Mr Mahler is a director of Vela, Cambridge, the Navigator companies and
various other associated offshore companies.

4  The use of a scheme of arrangement agreed by a statutory majority
of creditors to replace what would otherwise be the liquidation of an
insolvent company has existed in England (in somewhat rudimentary form)

since the Joint Stock Companies Arrangement Act 1870 (33 & 34 Vict     *A*
c 104). The 1870 Act is reproduced in the Isle of Man as section 152 of
the Companies Act 1931 and remains the only form of arrangement
between a company and its creditors available in that jurisdiction. Chapter
11 is considerably more sophisticated and will ordinarily allow the
management of the insolvent company to remain in control (as "debtor in
possession") until a plan of reorganisation has been approved by the court.     *B*
The debtor has a priority right to propose a plan; if this is rejected or the
priority period expires, other parties in interest may put forward a different
plan. In this case, the debtor put forward a plan under which the assets of
the business, that is to say the ships, would be sold, nominally by auction
but in fact to Mr Mahler and his associates, who were referred to as "the
Vela interests". This plan did not appeal to the bond holders, who put
forward their own plan under which the assets of Navigator would be     *C*
vested in the creditors and the equity interests of the previous investors
extinguished. The judge rejected the Vela plan and approved the creditors'
plan.

5    The mechanism which the plan used to vest the assets in the creditors
was to vest the shares in Navigator in their representatives. That would
enable the creditors to control the shipping companies and implement the     *D*
plan. So clause 22 provided:

    "Immediately upon entry of this confirmation order, title to the old
common stock [of Navigator] shall automatically vest in the interim
shareholders [the creditors' committee] without any further act by any
person or under any applicable law, regulation, order or rule. The interim
shareholders shall then, in their capacities as shareholders of [Navigator],     *E*
take all necessary steps under the laws of the Isle of Man or otherwise to
implement [the plan]."

6    The New York court was of course aware that such a provision could
not automatically have effect under the law of the Isle of Man. The order
confirming the plan therefore recorded the intention of the court to send a
letter of request to the High Court of Justice of the Isle of Man, asking for     *F*
assistance in giving effect to "the plan and the confirmation order". Such a
letter was duly sent.

7    The committee of creditors then petitioned the High Court for an
order vesting the shares in their representatives. They were met by a cross-
petition by Cambridge, the wholly-owned Cayman subsidiary of Vela in
which, it will be remembered, most of the shares in Navigator were vested,     *G*
asking the court not to recognise or enforce the terms of the plan. The basis
of the cross-application was that Cambridge, as a separate legal entity
registered in the Cayman Islands, had never submitted to the jurisdiction of
the New York court. An order of that court could therefore not affect its
rights of property in shares in the Isle of Man.

8    This submission bore little relation to economic reality. The New     *H*
York proceedings had been conducted on the basis that the contest was
between rival plans put forward by the shareholders and the creditors. Vela,
the parent company of Cambridge, participated in the Chapter 11
proceedings and arranged the finance which was to have been the
cornerstone of the shareholders' plan. It is therefore not surprising that the

515
**[2007] 1 AC**                                   Cambridge Corpn v Unsecured Creditors (PC)

A    New York court did not trouble to ask whether the voluntary petition
     presented by Navigator had the formal consent of its own stockholder
     company when that company was the creature of the real parties in interest
     who were actively participating in the proceedings. For Cambridge, which
     was no doubt administered by lawyers in Cayman on the instructions of
     Mr Mahler, the claim that it had not submitted to the jurisdiction was
B    technical in the highest degree. Mr Mahler was, it appears, a director of
     Cambridge as well as Vela and the Navigator companies, although he
     himself was not entirely sure about the full extent of his directorships. Given
     the intricate corporate structure of the Vela interests, this is quite
     understandable. He was, as he explained in a deposition "not a person who
     goes into details".

C        9   The other remarkable feature about the position which Cambridge
     has taken and persisted in before the High Court, the Court of Appeal and
     now the Privy Council, is that the shares in Navigator which it complains
     have been confiscated by the exorbitant extra-territorial reach of the
     US Bankruptcy Court are completely and utterly worthless. Navigator's
     petition disclosed debts of some US$390m and assets of $197m. The Board
     is therefore left to wonder about the purpose of this litigation. Mr Howe, in
D    his brave and able submissions for Cambridge, said that drawing attention
     to these matters was a jury point. The shares might be worthless now,
     perhaps in the foreseeable future, but some day freight rates might rise
     sufficiently to float the business and make the shares valuable property. An
     alterative possibility is that the purpose is to wreck or delay implementation
     of the confirmed plan in an attempt to drive the creditors back to
     the negotiating table and secure better terms.
E        10   Before the High Court, Cambridge's objection succeeded. The
     deemster found as a fact that although Vela had participated in the
     bankruptcy proceedings in New York, its subsidiary Cambridge had not
     submitted to the New York jurisdiction. This finding is somewhat surprising
     but was upheld by the Court of Appeal and the creditors' committee, faced
     with concurrent findings of fact, have not appealed against it. So the New
F    York court had no personal jurisdiction over Cambridge. The deemster then
     held that clause 22 of the plan, as confirmed by the court's order, was a
     judgment in rem purporting to change the title to property outside the
     jurisdiction. According to general principles of private international law,
     judgments in rem can affect only property within the court's territorial
     jurisdiction. The judgment could therefore not be recognised.
G        11   The Court of Appeal, reversing the deemster, held that upon its true
     construction, the New York order was not a judgment in rem. It was a
     judgment in personam in proceedings in which Navigator, by its voluntary
     petition, had submitted to jurisdiction of the New York court. At common
     law, the Manx court has a broad discretionary jurisdiction to assist a foreign
     court dealing with the bankruptcy of a company over which that court had
     jurisdiction. It could and should assist by vesting the Navigator shares in the
H    creditors' committee to enable the implementation of the plan.
         12   Mr Howe's argument for Cambridge was straightforward. The
     New York order was either a judgment in rem or in personam. If it was in
     rem, then as everyone agrees, it could not affect the title to shares in the Isle
     of Man. On the other hand, if it was in personam, it was only binding upon

persons over whom the New York court had jurisdiction. The fact that *A* Navigator had submitted to the jurisdiction was irrelevant. The Court of Appeal, having found that the judgment was in personam, then proceeded to enforce it against the wrong persona. Cambridge was the relevant persona because the order purported to deprive Cambridge of its property. On the finding that Cambridge did not submit to the jurisdiction, there was no basis upon which the order of the New York court could bind it. Cambridge was *B* a Cayman company whose sole business was to own shares in the Isle of Man. It had nothing whatever to do with New York.

13  Mr Howe's submissions as to the rules of private international law concerning the recognition and enforcement of judgments in rem and in personam are of course correct. If the New York order and plan had to be classified as falling within one category or the other, the appeal would have to be allowed. But their Lordships consider that bankruptcy proceedings do *C* not fall into either category. Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source *D* of the right.

14  The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. That mechanism may vary in its details. For example, in personal bankruptcy in England, the assets of the bankrupt are vested in a trustee for realisation and distribution to creditors. So the *E* mechanism operates by divesting the bankrupt of his property. In corporate insolvency, on the other hand, the insolvent company continues to be owner of its property but holds it in trust for the creditors in accordance with the provisions of the Insolvency Act 1986: see *Ayerst v C & K (Construction) Ltd* [1976] AC 167. In the case of personal bankruptcy, the bankrupt may afterwards be discharged from liability for his pre-bankruptcy debts. In the *F* case of corporate insolvency, there is no provision for discharge. The company remains liable but when all its assets have been distributed, there is nothing more against which the liability can be enforced: see *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147, 155–156. At that point, the company is usually dissolved.

15  But these are matters of detail. The important point is that *G* bankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. Of course, as Brightman LJ pointed out in *In re Lines Bros Ltd* [1983] Ch 1, 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute over whether or not a particular item of property belonged to the debtor and is available for distribution. There are procedures by which these *H* questions may be tried summarily within the bankruptcy proceedings or directed to be determined by ordinary action. But these again are incidental procedural matters and not central to the purpose of the proceedings.

A    16  The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated. For example, in

B  *Solomons v Ross* (1764) 1 H Bl 131n a firm in Amsterdam was declared bankrupt and assignees were appointed. An English creditor brought garnishee proceedings in London to attach £1,200 owing to the Dutch firm but Bathurst J, sitting for the Lord Chancellor, decreed that the bankruptcy had vested all the firm's moveable assets, including debts owed by English debtors, in the Dutch assignees. The English creditor had to surrender the fruits of the garnishee proceedings and prove in the

C  Dutch bankruptcy.

    17  This doctrine may owe something to the fact that 18th and 19th century Britain was an imperial power, trading and financing development all over the world. It was often the case that the principal creditors were in Britain but many of the debtor's assets were in foreign jurisdictions. Universality of bankruptcy protected the position of British creditors. Not

D  all countries took the same view. Countries less engaged in international commerce and finance did not always see it as being in their interest to allow foreign creditors to share equally with domestic creditors. But universality of bankruptcy has long been an aspiration, if not always fully achieved, of United Kingdom law. And with increasing world trade and globalisation, many other countries have come round to the same view.

E    18  As Professor Fletcher points out (*Insolvency in Private International Law*, 1st ed (1999), p 93) the common law on cross-border insolvency has for some time been "in a state of arrested development", partly no doubt because in England a good deal of the ground has been occupied by statutory provisions such as section 426 of the Insolvency Act 1986, the European Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (OJ 2000 L160, p 1) and the Cross-Border Insolvency

F  Regulations 2006 (SI 2006/1030), giving effect to the UNCITRAL Model Law. In the present case, however, we are concerned solely with the common law.

    19  The underdeveloped state of the common law means that unifying principles which apply to both personal and corporate insolvency have not been fully worked out. For example, the rule that English moveables vest

G  automatically in a foreign trustee or assignee has so far been limited to cases in which he was appointed by the court of the country in which the bankrupt was domiciled (in the English sense of that term), as in *Solomons v Ross*, or in which he submitted to the jurisdiction: *In re Davidson's Settlement Trusts* (1873) LR 15 Eq 383. It may be that the criteria for recognition should be wider, but that question does not arise in this case. Submission to the jurisdiction is enough. In the case of immovable property belonging to a

H  foreign bankrupt, there is no automatic vesting but the English court has a discretion to assist the foreign trustee by enabling him to obtain title to or otherwise deal with the property.

    20  Corporate insolvency is different in that, even in the case of moveables, there is no question of recognising a vesting of the company's

assets in some other person. They remain the assets of the company. But the underlying principle of universality is of equal application and this is given effect by recognising the person who is empowered under the foreign bankruptcy law to act on behalf of the insolvent company as entitled to do so in England. In addition, as Innes CJ said in the Transvaal case of *In re African Farms Ltd* [1906] TS 373, 377, in which an English company with assets in the Transvaal had been voluntarily wound up in England, "recognition which carries with it the active assistance of the court". He went on to say that active assistance could include:

> "A declaration, in effect, that the liquidator is entitled to deal with the Transvaal assets in the same way as if they were within the jurisdiction of the English courts, subject only to such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws."

21   Their Lordships consider that these principles are sufficient to confer upon the Manx court jurisdiction to assist the committee of creditors, as appointed representatives under the Chapter 11 order, to give effect to the plan. As there is no suggestion of prejudice to any creditor in the Isle of Man or local law which might be infringed, there can be no discretionary reason for withholding such assistance.

22   What are the limits of the assistance which the court can give? In cases in which there is statutory authority for providing assistance, the statute specifies what the court may do. For example, section 426(5) of the Insolvency Act 1986 provides that a request from a foreign court shall be authority for an English court to apply "the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction". At common law, their Lordships think it is doubtful whether assistance could take the form of applying provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing whatever it could have done in the case of a domestic insolvency. The purpose of recognition is to enable the foreign office holder or the creditors to avoid having to start parallel insolvency proceedings and to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum.

23   Mr McQuater for the creditors placed some reliance upon the court's power, under section 101 of the Companies Act, to order rectification of the share register. But that power cannot provide an independent justification for transferring shares into the names of the representatives of the creditors. It is exercisable when "the name of any person is, without sufficient cause, entered in or omitted from the register". Thus the power is exercisable only if the company ought to have entered the representatives of the creditors in the register as shareholders. But for that purpose it is necessary to show that by the law of the Isle of Man the company was obliged to do so. And the source of such an obligation can be found only in an order of the court, pursuant to its common law power of assistance, which requires the company to make such an entry. The argument based on section 101 is therefore circular. The prior question is whether the court has power to declare that the Chapter 11 plan should be carried into effect.

A   24   In the present case it is clear that the New York creditors, by starting proceedings to wind up the Navigator companies and then proposing a scheme of arrangement under section 152 of the Companies Act 1931, could have achieved exactly the same result as the Chapter 11 plan. The Manx statute provides:

B       "(1) Where a compromise or arrangement is proposed between a company and its creditors . . . the court may on the application in a summary way of the company or of any creditor or member of the company, or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors . . . to be summoned in such manner as the court directs.

C       (2) If a majority in number representing three-fourths in value of the creditors . . . agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the court, be binding on all the creditors . . . and also on the company or, in the case of a company in the course of being wound up, on the liquidator and contributories of the company."

D   25   The jurisdiction is extremely wide. All that is necessary is that the proposed scheme should be a "compromise or arrangement" and that it should be approved by the appropriate majority. Why, therefore, should the Manx court not provide assistance by giving effect to the plan without requiring the creditors to go to the trouble of parallel insolvency proceedings in the Isle of Man? Mr Howe accepts that if the plan had provided that all the assets of Navigator, that is to say, the shares in the management company and the shipowning companies, should be transferred to the representatives of the creditors, he could have had no objection. But he says that because the plan achieved the same economic effect by transferring the shares in Navigator, it was beyond the jurisdiction of the Manx court to give effect to it. The Navigator shares were not the same thing as the assets of Navigator. They were separate items of property belonging to a person who was not party to the bankruptcy proceedings. The plan might just as well have attempted to confiscate the assets of any other citizen who had nothing to do with the bankruptcy.

26   Their Lordships consider that this argument is based upon a misunderstanding of the nature of shares in a company. In the classic definition of Farwell J (*Borland's Trustee v Steel Bros & Co Ltd* [1901] 1 Ch 279, 288), "A share is the interest of a shareholder in the company measured by a sum of money, for the purpose of liability in the first place, and of interest in the second". In the case of fully paid shares, the question of liability does not of course arise. So a share is the measure of the shareholder's interest in the company: a bundle of rights against the company and the other shareholders. As against the outside world, that bundle of rights is an item of property, a chose in action. But as between the shareholder and the company itself, the shareholder's rights may be varied or extinguished by the mechanisms provided by the articles of association or the Companies Act. One of those mechanisms is the scheme of arrangement under section 152. As a shareholder, Cambridge is bound by the transactions into which the company has entered, including a plan under Chapter 11 or a scheme under section 152. It is

the object of such a scheme to give effect to an arrangement which varies *A*
or extinguishes the rights of creditors and shareholders. Thus, in the case
of an insolvent company, in which the shareholders have no interest of
any value, the court may sanction a scheme which leaves them with
nothing: see *In re Oceanic Steam Navigation Co Ltd* [1939] Ch 41. The
scheme may divest the company of its assets and leave the shareholders
with shares in an empty shell.  It may extinguish their shares and *B*
recapitalise the company by issuing new shares to others for fresh
consideration.  Or it may, as in this case, provide that someone else is to
be registered as holder of the shares.  Whatever the scheme, it is, by virtue
of section 152, binding upon the shareholders when it receives the
sanction of the court.  The protection for the shareholders is that the court
will not sanction a scheme, even if adopted by the statutory majority, if it
appears unfair.  And no doubt the discretion to refuse assistance in the *C*
implementation of an equivalent plan which has been confirmed in a
foreign jurisdiction would be exercised on similar lines.  But no such
question arises in this case.  Although it must be accepted that Cambridge
did not technically submit to the jurisdiction in New York, it had no
economic interest in the proceedings and ample opportunity to participate
if it wished to do so.  It would therefore not be unfair for the plan to be
carried into effect.  Their Lordships therefore consider that the Court of *D*
Appeal was right to order its implementation.

27   They will humbly advise Her Majesty that the appeal should be
dismissed with costs.

*Solicitors: Trowers & Hamlins; Freshfields Bruckhaus Deringer.*

M F     *E*

*F*

*G*

*H*

## EXHIBIT F

*Re Dickson Group Holdings Ltd*, [2008] Bda L.R. 34 (Berm.)

**In The Supreme Court of Bermuda**

**Commercial Jurisdiction 2008 No. 94**

**In the Matter of Dickson Group Holdings Limited (in Hong Kong liquidation)**

**And in the Matter of section 99 of the Companies Act 1981**

Dated the 9th May 2008

Ms J Fraser for the Applicant

**Application for leave to summon meeting to consider scheme of arrangement - Cooperation with Hong Kong court for parallel scheme of arrangement - Jurisdiction to recognise foreign winding-up orders in respect of local companies**

10   The following cases were referred to in the judgment:

*Re App China Group Ltd* [2003] Bda LR 50
*Interform Ceramics Technology Ltd* [unreported]
*Cambridge Gas Transportation Corp v Committee of Unsecured Creditors* [2007] 1 AC 508
*Informission Group Inc v Convertix Corporation* [2000] Bda LR 75
*Re Akai Holdings Ltd; Re Kong Wah Holdings Ltd* [2001] Bda LR 31
*McGrath v Riddell (Re HIH Casualty and General Insurance Co Ltd)* [2008] UKHL 21

**RULING of KAWALEY, J**

**Introductory**

1.   The Applicant, acting by its Hong Kong Joint Liquidators, applied pursuant to section
20       99 of the Companies Act 1981 by Originating Summons dated April 29, 2008 for leave
         to summon a meeting to consider a scheme of arrangement ("the Scheme"). The
         Applicant, a Bermudian incorporated company, has not only been placed into
         provisional liquidation in Hong Kong, but a winding-up order has been made and
         permanent liquidators appointed by the Hong Kong Court.

2.   Implicit in the application, which arose on what appeared to me to be unusual facts,
     was a request that this Court not simply accede to a routine section 99 application, but
     also both (a) recognise the orders of the Hong Kong Court winding-up the Company
     and appointing permanent joint liquidators, and (b) cooperate with the Hong Kong
     Court in supervising the promotion and potential implementation of parallel schemes
30       of arrangement under Bermudian and Hong Kong law designed to restructure the
         Company's debt and capital so that its shares (substantially under new ownership) can
         once again trade on the Hong Kong Stock Exchange.

3.   This Court has cooperated with foreign insolvency courts in the context of
     restructurings where a Bermuda company has been in provisional liquidation here but
     the US Bankruptcy Court has assumed the role of the primary liquidation court. It
     seemed to be unprecedented, however, for this Court to recognise and enforce
     insolvency orders of a foreign court in respect of a Bermudian company in
     circumstances where (a) no parallel insolvency proceedings have been commenced in
     Bermuda, and (b) the Bermudian company has not only been placed into a
40       restructuring proceedings abroad, but has been placed into "full-blown" liquidation in
         what amount to primary (as opposed to ancillary) proceedings abroad.

4.   In advance of the ex parte hearing counsel was requested to address the jurisdictional
     issues raised by the application. Counsel satisfied the Court that the jurisdiction to
     grant the application clearly existed and that commercial logic strongly supported such
     a result as well. It was obvious without the need for any reasoned analysis that the
     Court could properly accede to the application for leave to convene a section 99
     meeting on its merits. After deciding to grant the application, I indicated that I would
     give reasons for what appeared to me to be a novel jurisdictional decision.

**Counsel's submissions**

5.    Ms. Fraser firstly explained the commercial background to the proposed application. Although the Company was incorporated in Bermuda, no business activities took place here. The main focus of its business was Hong Kong and elsewhere in the People's Republic of China.

6.    Secondly, counsel pointed out that although the Company had been placed into liquidation in Hong Kong, the aim of the Scheme was to restructure its affairs leaving it in a solvent position. The estate was relatively small, the winding-up took place on a creditor's petition and the Hong Kong liquidators had seen no need for a winding-up in Bermuda. The directors had remained in place for Bermuda law purposes, and they had passed a resolution supporting the present application.

7.    Accordingly, bearing in mind that section 99 of the Companies Act 1981 implicitly permitted the promotion and sanctioning of schemes of arrangements in relation to insolvent companies independently of liquidation proceedings, it was submitted that the application could properly be granted without any need to formally recognise the foreign winding-up order or the appointment of the permanent liquidators. *Re APP China Group Ltd.* [2003] Bda LR 50 was cited as an illustration of an insolvent scheme being approved by this Court outside of a liquidation proceeding.

8.    Ms. Fraser accepted that no precedents existed for parallel schemes of arrangement being implemented in Bermuda and elsewhere in circumstances where the Bermudian company was only in liquidation abroad. However, she referred by way of analogy to the unreported case of *Interform Ceramics Technology Ltd.*, Supreme Court of Bermuda, Civil Jurisdiction 2001: 12, as an example of a case where parallel schemes of arrangement were implemented in Bermuda and Hong Kong in relation to a Bermudian company which was only in receivership in Hong Kong. Nevertheless it was clear that if the Court was required to recognise the Hong Kong winding-up and liquidator appointment orders, the jurisdiction to do so existed and there were good grounds for this Court exercising its discretion to do so.

9.    Counsel referred to the leading authority on the common law power to recognise foreign corporate rescue proceedings without the need to commence parallel proceedings in the place of incorporation: *Cambridge Gas Transportation Corp. v Committee of Unsecured Creditors* [2007] 1 AC 508 (PC). She fairly conceded that there was no judicial authority illustrating the recognition of a foreign winding-up order in respect of a local company. However, counsel referred to academic authority which suggested that any general rule that such an order would not ordinarily be recognised was subject to an exception. The exception was that where there was no likelihood of a winding-up at all in the place of incorporation, which was precisely the present case, the foreign order might be recognised by the courts of the company's domicile: Smart, '*Cross-Border Insolvency*' (Butterworths: London, 1998) pages 178-180; Lawrence Collins (ed.), '*Dicey and Morris on the Conflict of Laws*' 13th edition, paragraph 30-094.

10.   However Ms. Fraser also made the subtle yet practical point that in substance the foreign winding-up order was really irrelevant, because the ultimate goal of the Scheme was to permanently stay the foreign winding-up proceedings[1]. Counsel insisted that although cases might exist where this Court would be reluctant to assist the foreign liquidation of a Bermudian company in the absence of parallel proceedings here, the facts of the present case did not give rise to such concerns.

**The issues falling for determination**

11.   Two issues of legal principle arose for consideration. Firstly, and most technically, did this Court possess the jurisdictional competence to recognise the winding-up order

---

[1] If approved, the Scheme will discharge the Company's debt to its unsecured creditors, so that a new investor can acquire most the Company's shares which will be re-listed on the Hong Kong Stock Exchange. While the liquidation return to unsecured creditors is likely to be only 4%, the return if the Scheme is approved is likely to be in the region of 9%.

made in Hong Kong and the related order appointing the Hong Kong liquidators, both made in relation to a Bermudian company which was not being wound-up in its place of incorporation.? Secondly, and more practically, what factors were relevant to the exercise of any discretion the Court possessed to recognise the foreign proceedings, and were the principles governing recognition of and judicial cooperation with foreign restructuring proceedings brought into play?

12.    Two important factual issues arose for determination. Firstly, and more technically, could the Court simply dodge any recognition bullets on the grounds that in substance the application for leave to promote the Scheme was made on behalf of the Company and its directors, as a matter of Bermuda law, despite the fact that the application was on its face made by the Company in liquidation under Hong Kong law? Secondly, and more substantively, did the present case not in real terms essentially fall within the well recognised parameters of this Court playing an ancillary role in relation to a primary foreign insolvency proceeding aimed at restructuring a Bermudian company whose business was more closely tied to the foreign forum than to Bermuda?

**Jurisdiction to recognise foreign winding-up orders in respect of local companies**

13.    In the absence of statutory provisions delineating the circumstances in which foreign winding proceedings, orders and appointments of liquidators may be recognised, recourse must be had to the common law. The present concern is not the commonplace issue of recognising foreign ancillary proceedings in respect of a local company; rather it is how the courts of a company where a company is incorporated should respond to foreign proceedings which have been prosecuted as if they were a liquidation taking place in the company's place of incorporation. The common law position appears to be that this Court undoubtedly possesses a discretionary jurisdiction to recognise foreign primary or non-ancillary insolvency proceedings in relation to a Bermudian company, although the conditions governing the exercise of that discretion are not crystal clear. This conclusion may be supported as a matter of inference by a review of some of the leading academic texts. The learned authors of such texts appear to assume that jurisdiction to recognise foreign proceedings in relation to a local company exists and merely question whether or not and, if so, in what precise circumstances, such jurisdiction would be exercised. By common accord, no direct judicial authority on point can be found.

14.    In Lawrence Collins (ed.), *Dicey and Morris on the Conflict of Laws*', 12th edition, Rule 160 provides as follows[2]: "*The authority of a liquidator appointed under the law of the place of incorporation is recognised in England.*" The learned authors caution against regarding this statement as representing the global position:

"Rule 160…merely states the position which has been established to date. First, and generally, in determining whether to exercise its jurisdiction to wind up a foreign corporation, we have seen that the English court will consider whether there is any other jurisdiction which is more appropriate for the winding-up and it is possible that a more appropriate jurisdiction might be in a country other than the place of incorporation. This does not suggest that in the admittedly different context of recognition, that such recognition should only be accorded to an appointment under the law of the place of incorporation. More particularly, it has been suggested that an appointment made in a country other than the place of incorporation may be recognised in England if it is recognised under the law of incorporation of the company. More speculatively it may also be possible that an appointment made under the law of the country where the company carries on business will, in appropriate circumstances, be similarly recognised.

Recognition of a liquidator's authority may be sought by reference to an appointment made in the exercise of a foreign jurisdiction similar to that conferred on the English courts in regard to companies incorporated outside

---

[2] (Sweet and Maxwell: London, 1993), Volume 2, page 1137.

Re Dickson Group Holdings Limited                                    [2008] Bda L.R. 34
                                                                            page 4

the United Kingdom…This treatment of the argument based on comity is defensible because where there is a liquidation in the country of incorporation and the English courts exercise their own jurisdiction to make an order, they seem concerned to ensure that the liquidator should not go beyond dealing with the company's English affairs without special direction. Such concern is not shown where there is no likelihood of a liquidation in the country of incorporation."[3]

15.    The tentative nature of the foregoing views is perhaps understandable in the context of a text which does not focus on the insolvency terrain. Writers specifically addressing insolvency law may be expected to be more instructive to present concerns. Nevertheless in Philip R Wood, '*Principles of International Insolvency Law*' 2nd edition, writing after Britain adopted the UNCITRAL Model Law on Cross-Border Insolvency, the learned author reflects (for the benefit of other common law countries) on what used to be the position under English common law in equally tentative terms :

"A liquidation at the place of incorporation would always be recognized in England…But, it was possible that a liquidation at the principal place of business abroad would be recognized in England in an appropriate case, eg where the company was a mere brass-plate at its place of incorporation, but England would probably not have recognized a foreign liquidation of an English-incorporated company…

The disadvantage of recognizing a liquidation only at the country of incorporation is that many companies are incorporated in one jurisdiction, but carry on their principal business elsewhere. This is true of tax-haven countries, such as Cayman, or shipping jurisdictions such as Panama and Liberia. It would seem odd therefore to refuse recognition of liquidation where the main assets are located."[4]

16.    A more positive statement of principle may be derived from Ian F Fletcher, '*Insolvency in Private International Law*', where the learned author opines as follows:

"Where the foreign liquidation has been commenced in a country other than that in which the company's incorporation occurred, there is considerable uncertainty with regard to the prospects of such proceedings being recognized in England, and as to the principles on which such recognition might be based. The lack of explicit authority on this matter in reported cases is to be regretted. Clearly, the possible circumstances in which such foreign liquidations may take place can vary considerably, so that it is important that a flexible approach should be adopted. One situation in which the English position seems to be reasonably predictable is where the foreign liquidation concerns a company actually formed and registered in England. The primacy of the law of the country of incorporation is likely to form the basis of the English court's reaction to such a case….However, if no winding-up proceedings are taking place in England, despite the company having been formed here (as may be the case if there are no assets in this country, and perhaps no English creditors with interests to defend), it may be that the foreign proceedings can be considered to be the most appropriate way in which to wind up the company, although it is possible that the final process of effecting the dissolution might be reserved by English law to itself, using the power of the Registrar of companies to strike it off the register as a defunct company."[5]

17.    The latter analysis is now supported by high judicial authority. Where a shareholder of an insolvent Isle of Man company sought to challenge a Chapter 11 Plan which transferred all shares to the company's creditors under US bankruptcy law without implementing a Manx parallel proceeding or even a scheme, the Judicial Committee of

---

[3] Ibid, pages 1137-1138.
[4] (Sweet and Maxwell: London, 2007), paragraph 28-041.
[5] Second Edition (Oxford University Press: Oxford, 2005) paragraph 3.93.

the Privy Council held that the Manx court could recognize the US Plan in the exercise of its common law discretion: *Cambridge Gas Transportation Corp. v Committee of Unsecured Creditors* [2007] 1 AC 508 (PC). Lord Hoffman (at pages 517-518) opined as follows:

"**18** As Professor Fletcher points out (Insolvency in Private International Law, 1st ed (1999), p 93) the common law on cross-border insolvency has for some time been "in a state of arrested development", partly no doubt because in England a good deal of the ground has been occupied by statutory provisions such as section 426 of the Insolvency Act 1986, the European Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (OJ 2000 L160, p 1) and the Cross-Border Insolvency Regulations 2006 (SI 2006/1030), giving effect to the UNCITRAL Model Law. In the present case, however, we are concerned solely with the common law.

**19** The underdeveloped state of the common law means that unifying principles which apply to both personal and corporate insolvency have not been fully worked out. For example, the rule that English moveables vest automatically in a foreign trustee or assignee has so far been limited to cases in which he was appointed by the court of the country in which the bankrupt was domiciled (in the English sense of that term), as in Solomons v Ross, or in which he submitted to the jurisdiction: *In re Davidson's Settlement Trusts* (1873) LR 15 Eq 383. It may be that the criteria for recognition should be wider, but that question does not arise in this case. Submission to the jurisdiction is enough. In the case of immovable property belonging to a foreign bankrupt, there is no automatic vesting but the English court has a discretion to assist the foreign trustee by enabling him to obtain title to or otherwise deal with the property.

**20** Corporate insolvency is different in that, even in the case of moveables, there is no question of recognising a vesting of the company's assets in some other person. They remain the assets of the company. But the underlying principle of universality is of equal application and this is given effect by recognising the person who is empowered under the foreign bankruptcy law to act on behalf of the insolvent company as entitled to do so in England. In addition, as Innes CJ said in the Transvaal case of In re African Farms Ltd [1906] TS 373, 377, in which an English company with assets in the Transvaal had been voluntarily wound up in England, "recognition which carries with it the active assistance of the court". He went on to say that active assistance could include:

'A declaration, in effect, that the liquidator is entitled to deal with the Transvaal assets in the same way as if they were within the jurisdiction of the English courts, subject only to such conditions as the court may impose for the protection of local creditors, or in recognition of the requirements of our local laws.'

**21** Their Lordships consider that these principles are sufficient to confer upon the Manx court jurisdiction to assist the committee of creditors, as appointed representatives under the Chapter 11 order, to give effect to the plan. As there is no suggestion of prejudice to any creditor in the Isle of Man or local law which might be infringed, there can be no discretionary reason for withholding such assistance."

18.    This decision is most notable for confirming the scope of the common law discretionary power of the Bermuda court to recognize a foreign restructuring order and to assist a foreign insolvency court. But it also is important, for present purposes, in confirming that such recognition and assistance is not automatic: it may be withheld in order to avoid any prejudice to any local creditors or any infringement of local law. These principles, which draw upon cases dealing with traditional winding-up proceedings long

before the modern corporate rescue culture evolved, hold good for recognizing foreign winding-up orders and their consequences as well.

19.  All of this learning suggests the following principles which I adopt: (a) the fact that this Court would in similar circumstances entertain primary winding-up proceedings in respect of a foreign company is an important factor in deciding whether or not to recognize a foreign principal winding-up proceeding in relation to a local company which is not being wound-up at all its own domicile; and (b) the main practical consideration is whether or not a foreign primary proceeding is the most convenient means of winding-up the company's affairs, having regard to all relevant commercial and/or public policy concerns in the case at hand. These two broad considerations must in my judgment be applied having regard to two fundamental principles of insolvency law: (a) the universalist principle under which all reasonable efforts ought normally to be made to subject a company's liquidation to a single coherent regime so that all creditors share ratably, irrespective of the accidental location of creditors outside the jurisdiction of the primary liquidation court; and (b) the presumption that most creditors dealing with the company before it became insolvent would reasonably have contemplated that their rights in any insolvency would be dealt with in accordance with the law of the company's place of incorporation, irrespective of the accidental location of assets outside of that jurisdiction. The application of all of these guiding principles will vary depending on the facts of the specific case.

20.  This Court has apparently only on one occasion exercised its own jurisdiction to wind-up an overseas company which carried on all of its business from Bermuda in proceedings which essentially amounted to primary liquidation proceedings: *Informission Group Inc. v Convertix Corporation* [2000] Bda LR 75. In this case, the company was incorporated in the British Virgin Islands ("BVI") but was commercially managed from Bermuda. The respondent company was not registered as an overseas permit company in which case the bare jurisdiction to wind-up in Bermuda would have been far clearer. A creditor's petition was presented and the Court was explicitly invited to wind-up the company on the basis that the Bermuda proceedings would be the only winding-up proceedings in connection with the BVI-incorporated company. Justice Norma Wade[6] granted the winding-up order observing (at pages 3-4):

"Finally I deal with the question of whether these liquidation proceedings will operate as ancillary or principal winding-up proceedings.

The essence of [counsel]'s argument on this question is this-whenever a winding up order is sought against a company outside the domicile of its incorporation this question arises irrespective of whether winding up proceedings are on foot or anticipated in the place of the Company's incorporation. He says that it is clear that this Court can exercise primary winding up competence where Bermuda is shown to be the most appropriate forum for compulsory winding up. In support he referred to the affidavit of the Provisional Liquidator which he says provides a basis for concluding in accordance with applicable law in this area that Bermuda is the most appropriate forum. In this respect he relied upon the learning found in Smart Cross Border Insolvency (Butterworths: London), 1991, pp 236-238 where the learned author said at p237:

'...when dealing with the insolvency of a foreign corporation it is necessary to consider whether, in the interests of all the parties and for the ends of justice, the English court is the proper tribunal in which a liquidation should proceed. If the English court is the appropriate forum, then the English winding-up need not be ancillary to any other liquidation.'

[counsel] also relied upon the decision in Re A Company (No. 00359 of 1987) [1988] Ch 210 where it was held:

---

[6] Now Justice Wade-Miller.

'that for the Court to make a winding up order against a foreign company it was not necessary to show that the company had assets within the jurisdiction, but a sufficiently close connection with the jurisdiction had to be established; that the facts that the loan agreement had been negotiated, executed and performed in England, the company's directors were resident in England, the company had bank accounts in England, while there was no evidence that the company had carried on business outside England, demonstrated a sufficient connection with the jurisdiction; and that accordingly, since there was no more appropriate jurisdiction for the winding up of the company and since there was a reasonable possibility of benefit accruing to the creditors from the making of the winding up order, an order would be made and the provisional liquidator appointed'.

**Having considered the authorities relied upon in this matter I accept** [counsel]**'s submission as to the principles to be applied to this case.**"

21.    The *Convertix* judgment, like the present Judgment, was rendered following an ex parte hearing and so the relevant principles have not been decided by a court which has received the benefit of full argument. Nevertheless, it does provide explicit support for the proposition that this Court might well feel inclined to make a winding-up order in relation to a Hong Kong company that had conducted all of its business in Bermuda and had only formal constitutional ties with its place of incorporation, despite the absence of parallel winding-up proceedings its place of incorporation . So as regards the Company in the present case, it appears that the Hong Kong Court has done no more than to assert jurisdiction which this Court presented with equivalent facts might potentially assert. The factual matrix of the present case will be considered further below.

### Factors relevant to the exercise of the Court's discretion

22.    The facts of the present case make it unnecessary to consider in any depth what sort of policy factors might give this Court cause to decline to recognize foreign winding-up proceedings in relation to a Bermudian company. Although a winding-up order was made in Hong Kong, it is no longer intended to actually wind-up the Company at all. The winding-up is intended to be stayed and the restructured business returned to solvency. This Court, through the Scheme, is to cooperate in the restructuring process in a manner which is now well established both with respect to parallel schemes of arrangement and parallel insolvency proceedings. In *Re Akai Holdings Ltd; Re Kong Wah Holdings Ltd* [2001] Bda LR 31, the companies were wound-up firstly in Hong Kong and shortly thereafter in Bermuda. Recognition will obviously come more easily when the foreign proceedings take place in a jurisdiction such as Hong Kong which has a similar legal system and a long history of judicial cooperation ties.

23.    Text writers tend to treat the recognition of foreign corporate rescue proceedings and the orders made therein as a distinct topic from the recognition of a foreign winding-up order[7]. This distinction, subject to at least two obvious exceptions alluded to below, may have greater historical than current significance in the context of considering the factors relevant to the exercise of this Court's discretion to recognize. The Court's focus will usually be on, broadly speaking, whether the foreign proceeding as a whole ought to be recognized. In the offshore world in particular, the traditional delineations between principal and ancillary proceedings will often be blurred. Cooperation will take place through parallel proceedings, be they corporate rescue proceedings, winding-up proceedings or insolvent schemes implemented without winding-up proceedings at all with the leading role typically being determined by the commercial centre of gravity rather than the jurisdictional centre of gravity. This does not mean that in the context of parallel proceedings where this Court recognizes the foreign proceedings generally that each and every order made in the foreign court will be given effect to here. But the traditionally fixed notion that a foreign insolvency court is only competent to deal

---

[7] See e.g. Fletcher, '*Insolvency in Private International Law*', paragraphs 3.114-3.118.

with matters within its ancillary jurisdiction is potentially always subject to modification in the case of Bermudian companies which have few tangible connections here. While the centre of main interest ("COMI") concept appears to have mandatory statutory force under European insolvency law and the UNCITRAL Model Law, its underlying assumptions are hardly anathema to Bermudian common law.

24.    Nevertheless, it may be useful to note that persons incorporating companies in Bermuda which are substantially managed abroad ought not to expect this Court to give "rubber-stamp" recognition to foreign principal winding-up proceedings which are commenced without parallel proceedings here. In most cases, commercial logic will likely be the best guide as to whether it is appropriate to commence winding-up proceedings abroad in respect of a local company without also commencing proceedings here. Legally, a Bermuda company can never be wound-up and dissolved for all purposes without a dissolution taking place under Bermuda law. Even if a company is struck-off the register and dissolved without a winding-up under Bermuda law, any disgruntled creditor (or perhaps, a shareholder as well) may subject to limitation constraints apply to set aside a dissolution and open a winding-up under local law. In any liquidation of substance, it will be impossible for the place of incorporation to be ignored. And where the way in which a Bermudian company is wound-up has implications for the reputation of Bermuda as an international financial centre, public policy may well dictate that this forum ought to play a more significant role than purely commercial concerns might otherwise dictate.

25.    One obvious exception to the rule contended for above, namely that no distinction generally arises between recognizing foreign restructuring proceedings and foreign liquidation proceedings, relates to the issue of management and control. The practice has developed in jurisdictions such as Bermuda which lack statutory corporate rescue rules of appointing a provisional liquidator to supervise the company's management as it affects the restructuring under supervision of the local and any relevant foreign court. Where there are parallel restructuring proceedings, the company's management will remain in place both in Bermuda and in the foreign forum. If a foreign winding-up order is made without an equivalent Bermudian order, the foreign order displaces the directors under the foreign law but does not displace them under Bermuda law. From a Bermuda regulatory perspective, it may be problematic to countenance a situation where the only persons responsible for a Bermudian company as a matter of Bermuda law are still in office yet have lost effective control of the company under the law which governs the company's entire commercial operations. This suggests that it is probably accurate to regard the approach to recognition of foreign corporate rescue proceedings generally as being more generous than the approach to foreign winding-up proceedings, to this extent. The position would likely be less problematic if Bermudian directors stayed in place under local law while in their company's principal place of business abroad their corporate powers were merely limited by the appointment of provisional liquidators appointed with "soft" monitoring powers.

26.    The second and somewhat less concrete exception to the posited rule that no distinction ordinarily arises between recognizing foreign corporate rescue and winding-up proceedings is as follows. In resolving jurisdictional conflicts in the cross-border context generally, regard is often informally had to what the reasonable expectations of persons dealing with the company before it became insolvent must have been. However the proposition that the expectations of those dealing with the company as to what would happen in the event of insolvency is relevant in the cross-border context is explicitly articulated in Lord Hoffman's most recent exposition on this area of the law in the House of Lords decision in *McGrath and others v Riddell and others (Re HIH Casualty and General Insurance Co. Ltd)* [2008] UKHL 21. Here, the universalist principle was reiterated with greater force as justifying the remittal of UK assets to the Australian liquidators of HIH to be distributed under Australian insolvency rules which were different to those prevailing under English law[8]. Although the primary focus was

---

[8] It appears that these legal differences were insignificant by the time the case reached the House of Lords.

section 426 of the UK Insolvency Act 1986, the common law power to assist a foreign liquidation was also considered. The following observations of Lord Hoffman are therefore highly persuasive in seeking to answer the broad question of how a Bermuda court should determine where the principal winding-up of a company should take place:

"*31* In the present case I do not see that it would offend against any principle of justice for the assets to be remitted to Australia. In some cases there may be some doubt about how to determine the appropriate jurisdiction which should be regarded as the seat of the principal liquidation. I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the "centre of a debtor's main interests" as a test, with a presumption that it is the place where the registered office is situated: see article 3(1). That may be more appropriate. But in this case it does not matter because on any view, these are Australian companies. They are incorporated in Australia, their central management has been in Australia and the overwhelming majority of their assets and liabilities are situated in Australia.

*32* It is true that Australian law would treat insurance creditors better and non-insurance creditors worse than English law did at the relevant time. But that seems to me no reason for saying that the Australian law offends against English principles of justice. As it happens, since the appointment of the provisional liquidators, English law has itself adopted a regime for the winding up of insurance companies which gives preference to insurance creditors: see regulation 21(2) of the Insurers (Reorganisation and Winding Up) Regulations 2004 (SI 2004/353), giving effect to the European Parliament and Council Directive 2001/17/EC on the reorganisation and winding up of insurance companies. So English courts are hardly in a position to say that an exception to the pari passu rule for insurance creditors offends against basic principles of justice.

**33 Furthermore, it seems to me that the application of Australian law to the distribution of all the assets is more likely to give effect to the expectations of creditors as a whole than the distribution of some of the assets according to English law. Policy holders and other creditors dealing with an Australian insurance company are likely, so far as they think about the matter at all to expect that in the event of insolvency their rights will be determined by Australian law. Indeed, the preference given to insurance creditors may have been seen as an advantage of a policy with an Australian company.**" [emphasis added]

27.    So when one is considering an actual winding-up of a Bermuda company's business and a distribution of assets under an insolvency regime, the reasonable expectations of the creditors as to what law would apply will be potentially relevant to this Court's decision as to whether to recognize a foreign winding-up proceeding as the sole or primary winding-up in relation to a Bermudian company, especially where materially different distribution rules apply in the respective fora. This concern would not necessarily arise in relation to a corporate rescue procedure which does not substantially engage the winding-up process and its distribution rules at all but instead merely reflects a commercial bargain assented to by the requisite statutory majorities and sanctioned by the relevant court.

**Does the Scheme application require the Court to recognize the Hong Kong winding-up order and the order appointing the Joint Liquidators?**

28.    Ms. Fraser's submission that no need to recognize the foreign winding-up order nor the appointment of the Joint Liquidators truly arises because the directors who remain in place as a matter of Bermuda law support the application is an elegant yet highly technical point. This sort of point, I believe, is sometimes referred to in the barrister's trade as "*a Temple point*". It would in my judgment be completely artificial to hold that this Court can grant leave to promote the Scheme without implicitly recognizing (a) the validity of the Hong Kong winding-up order; and (b) the validity of the Hong Kong order appointing the Joint Liquidators. This conclusion is inevitable for the following reasons.

10    29.    Firstly, the Ex Parte Originating Summons under which the application is made is expressed to be made by "*Dickson Group Holdings Limited (in Hong Kong liquidation)*". The application is supported by the Affirmation of Stephen Liu Yiu Keung, one of the Joint Liquidators appointed by the Hong Kong High Court on May 29, 2007. Quite rightly, there is no pretence that the application is being made by the Company on the basis that it is not in liquidation as a matter of Bermuda law. So formally, therefore, the Court is being requested to grant an application made by the Company in its capacity as a company in liquidation in Hong Kong, not in its capacity as a company which is not in liquidation in Bermuda.

20    30.    Secondly, it is clear that this Court is being asked to permit the Joint Liquidators appointed in Hong Kong to promote the Scheme. There is no suggestion that the directors have any material control over the Company in liquidation in Hong Kong, or are intended to promote the Bermuda version of the Scheme. It is true that on March 27, 2008, all the Company's directors passed a resolution confirming Mr. Liu's authority to make the application. But this resolution has a hollow ring to it. As long ago as December 16, 2006, Madam Justice Kwan of the Hong Kong High Court of First Instance ordered the Company to be wound-up in its principal place of business displacing the directors from operational control of the Company. The directors under Hong Kong law (which substantively governs the Company's business affairs) have no competence to empower the Joint Liquidators at all. Paragraph 31 of the Liu
30    Affirmation moreover provides as follows:

"It is suggested that the Scheme Meeting should be held in Hong Kong because to the best of my knowledge and belief a vast majority of the Company's creditors are located in Hong Kong. It is also suggested that I, or failing me, a director of Ernst & Young Transactions Limited who is an individual qualified to act as liquidator of a company in Hong Kong and/or experienced in the restructuring or insolvency of companies in Hong Kong be appointed Chairman of such Scheme Meeting."

31.    So it is clearly legally and/or factually impossible to grant leave to convene the Scheme meeting intended to be chaired by a Joint Liquidator without implicitly
40    recognizing the validity of his appointment. More substantively still, the Scheme is unequivocally being promoted by the Hong Kong Joint Liquidators. The letter which was proposed to accompany the Scheme is headed "*LETTER FROM THE LIQUIDATORS*". The Explanatory Statement is according to its terms prepared by the Liquidators and Notices of Claim for voting purposes are to be sent to the Liquidators. The Explanatory Statement contemplates that "*the Company, acting by the Joint Liquidators may consent, for and on behalf of all persons concerned, to any modifications or additions to the Scheme or any condition which the Bermuda Court may see fit to approve or impose.*" (paragraph 7.12). This merely confirms what is otherwise obvious; that the Joint Liquidators are making the present application and
50    promoting the Scheme; further, if the Scheme is approved by the requisite majority, they will be seeking its sanction.

32.    Finally, it is clear from the Scheme documentation which was placed before the Court that the Scheme is to be administered by one of the Joint Liquidators together with a Scheme Committee comprised of creditors. One of the Joint Liquidators is a Scheme Administrator (Scheme, paragraph 1.1) who will adjudicate creditors' claims and make distributions. The other Scheme Administrator is also a professional liquidator although

not formally appointed as such in relation to the Company. In practical terms, the Joint Liquidators are the Scheme Administrators.

33.     In all the circumstances granting the application under section 99 of the Companies Act 1981 unarguably required this Court to implicitly recognize the Hong Kong winding-up order and the subsequent appointment of the Joint Liquidators.

**Should this Court recognize the Hong Kong winding-up and permanent liquidator appointment orders in the exercise of this Court's well-established common law discretion to cooperate with a foreign restructuring court?**

34.     When the commercial realities are looked at in isolation from the legal formalities, the Hong Kong Joint Liquidators in promoting parallel schemes of arrangement in Hong Kong and Bermuda are in essence requesting this Court to assist the Hong Kong Court to restructure the Company. It is impossible on the facts to identify any or any cogent reasons why this assistance may properly be declined.

35.     The aim of the Scheme, most directly, is to eliminate the Company's existing unsecured debt. But this debt restructuring will only become operative if the Restructuring Agreement in relation to the Company's share capital become effective, outside of the Scheme. Under the latter arrangements, an Investor will acquire most of the Company's shares. The purchase monies will fund the creditors' Scheme claims. The Company will be returned to solvency, its shares will be re-listed and the Hong Kong winding-up proceedings will be permanently stayed. As Ms. Fraser rightly submitted, the foreign winding-up order will (if the scheme is implemented) fall away, and no question of the need for a winding-up in Bermuda will arise.

36.     This Court is being invited to assist the Hong Kong Court through implementing a parallel scheme of arrangement in Bermuda in circumstances where (a) the Company was registered as an overseas company in Hong Kong where its principal business and the majority of its assets are clearly located, (b) the estate is apparently not a large one and (c) there is no suggestion of any prejudice to local interests. In these circumstances there is no apparent reason why this Court should decline to assist the Hong Kong Joint Liquidators merely because no winding-up proceedings have been started here. As I observed in the context of parallel receivership proceedings:

"In the present case, with its centre of gravity clearly more in Hong Kong than Bermuda, this Court has, in my view rightly, been content to accord a leading role as regards assessment of costs and otherwise to the High Court of Hong Kong. In cases where Bermuda-based office holders subject to the primary supervisory jurisdiction of this Court were involved, this jurisdiction would logically expect to play a larger role." [9]

37.     At the end of the day this Court was not asked to recognize a foreign winding-up order which purported to wind-up, for all purposes, the business of a Bermuda-incorporated company.

**Conclusion**

38.     For the above reasons, the Company's application for leave to promote the Scheme in tandem with the Hong Kong Scheme, in relation to which a similar order was previously made in Hong Kong on March 11, 2008 by Mr. Justice Reyes, was granted on May 2, 2008 despite the fact that (a) a winding-up order has been made in Hong Kong, (b) permanent liquidators have been appointed in Hong Kong, and (c) no parallel liquidation proceedings have been commenced in respect of the Company here, in its place of incorporation.

---

[9] *Re Shanghai Merchants Holding Ltd.* [2004] Bda LR 33 at page 6.

**<u>EXHIBIT G</u>**

**Ian R.C. Kawaley,** *Chapter 17: Bermuda, in Cross-Border Judicial Cooperation in Offshore Litigation (The British Offshore World)* **(Ian R.C. Kawaley, et al., eds. 2009)**

# CROSS-BORDER JUDICIAL COOPERATION IN OFFSHORE LITIGATION

## (THE BRITISH OFFSHORE WORLD)

EDITORS

Ian R. C. Kawaley, Andrew J. Bolton
and Robin J. Mayor

Wildy Simmonds & Hill Publishing

# JUDICIAL COOPERATION IN CIVIL AND COMMERCIAL LITIGATION

## The British Offshore World

Edited by
Ian Kawaley, Andrew Bolton and
Robin Mayor



WS
&H

Wildy, Simmonds & Hill Publishing

Copyright © 2009 Wildy, Simmonds & Hill Publishing

*Judicial Cooperation in Civil and Commercial Litigation*
*The British Offshore World*

British Library Cataloguing in Publication Data
A catalogue record for this book is available from the British Library

ISBN 978 0 85 490043 5

Typeset in Times New Roman by Cornubia Press Ltd
Printed and bound in the United Kingdom by CPI Antony Rowe, Chippenham,
Wiltshire

All rights reserved. No part of this book may be reproduced, stored in a retrieval
system, or transmitted, in any form or by any means, electronic, mechanical,
photocopying, recording or otherwise, without the consent of the copyright
owners, application for which should be addressed to the publisher. Such a
written permission must also be obtained before any part of this publication is
stored in a retrieval system of any nature.

First published in 2009 by
Wildy, Simmonds & Hill Publishing
58 Carey Street
London WC2A 2JF
England

# Table of Contents

*About the Authors*                                                      xi
*Foreword*                                                               xxiii
*Preface*                                                                xxvii
*Table of Cases*                                                         xxxi
*Table of Statutes and Secondary Legislation*                           xliii
*Table of International Materials*                                       lv
*Summary of Legal Systems in the Subject Jurisdictions*                 lvii

**Part I – Overview**                                                    1

Chapter 1   Why Judicial Cooperation in Civil and Commercial
            Litigation in the British Offshore World Matters:
            An Overview                                                  3
            1.1   'Judicial cooperation' defined                         4
            1.2   Key legal elements of judicial cooperation             4
            1.3   The international commercial significance of
                  offshore jurisdictions and the importance judicial
                  cooperation plays internationally                      7
            1.4   Objectives of the present study                        14

**Part II – Obtaining Evidence for use in Foreign Proceedings**          17

Chapter 2   Shared Legal Heritage                                       19
            2.1   The status of English law                             19
            2.2   Methods of obtaining evidence                         20
            2.3   The Evidence (Proceedings in Other Jurisdictions)
                  Act 1975                                              22
            2.4   Information orders                                     32

*Table of Contents*                                                    vi

Chapter 3    Bermuda                                                    37
             3.1    Introduction                                       37
             3.2    Letters of request                                 38
             3.3    Information orders                                 45
             3.4    Voluntary gathering of evidence                   47
             3.5    Confidentiality                                   47

Chapter 4    The British Virgin Islands                               51
             4.1    Introduction                                       51
             4.2    Letters of request                                 52
             4.3    Information orders                                 55
             4.4    Voluntary gathering of evidence                   57
             4.5    Confidentiality                                   58

Chapter 5    The Cayman Islands                                        59
             5.1    Introduction                                       59
             5.2    Letters of request                                 60
             5.3    Information orders                                 70
             5.4    Voluntary gathering of evidence                   72
             5.5    Confidentiality                                   72

Chapter 6    The Isle of Man                                           77
             6.1    Introduction                                       77
             6.2    Letters of request                                 77
             6.3    Information orders                                 81
             6.4    Voluntary gathering of evidence                   83
             6.5    Confidentiality and privilege                     85

Chapter 7    Guernsey                                                  87
             7.1    Introduction                                       87
             7.2    Letters of request                                 87
             7.3    Information orders                                 91
             7.4    Voluntary gathering of evidence                   94
             7.5    Confidentiality                                   94

Chapter 8    Jersey                                                    95
             8.1    Introduction                                       95
             8.2    Letters of request                                 96
             8.3    Information orders                                101
             8.4    Voluntary gathering of evidence                  105
             8.5    Confidentiality                                  106

vii *Table of Contents*

**Part III – Enforcing Foreign Judgments**                                      107

Chapter 9     Shared Legal Heritage                                             109
              9.1   The status of English law                                   109
              9.2   Statutory methods of enforcement of foreign
                    judgments                                                   110
              9.3   Enforcement of foreign judgments at common law              111

Chapter 10    Bermuda                                                           113
              10.1  Introduction                                                113
              10.2  Statutory provisions for enforcement                        115
              10.3  Enforcement at common law                                   125
              10.4  Future developments                                         135

Chapter 11    The British Virgin Islands                                        141
              11.1  Introduction                                                141
              11.2  Enforcement by registration of foreign judgments            142
              11.3  Enforcement of foreign judgments at common law              144
              11.4  Future developments                                         151

Chapter 12    The Cayman Islands                                                153
              12.1  Introduction                                                153
              12.2  Statutory regime for enforcement of foreign
                    judgments                                                   153
              12.3  Enforcement at common law                                   160
              12.4  Non-money judgments                                         164
              12.5  Bars to recognition or enforcement                          166

Chapter 13    The Isle of Man                                                   169
              13.1  Introduction                                                169
              13.2  Enforcement by registration                                 170
              13.3  Enforcement at common law                                   172
              13.4  Issue of execution                                          174
              13.5  Enforcement of execution                                    175
              13.6  Future developments                                         176

Chapter 14    Guernsey                                                          181
              14.1  Enforcement                                                 181
              14.2  Enforcement at common law                                   182
              14.3  Statutory enforcement                                       185
              14.4  Methods of execution                                        189
              14.5  Conclusion                                                  191

*Table of Contents*                                                    viii

Chapter 15   Jersey                                                    193
             15.1   Introduction                                      193
             15.2   Statutory enforcement                             194
             15.3   Customary law rules                               200

**Part IV – Judicial Cooperation in Cross-Border Insolvency**         205

Chapter 16   Shared Legal Heritage                                    207
             16.1   The status of English law                         207
             16.2   Shared statutory insolvency law rules             209
             16.3   Recognition of appointment of foreign liquidator  210
             16.4   Common law judicial cooperation generally         211
             16.5   Conclusion                                        213

Chapter 17   Bermuda                                                  215
             17.1   Introduction                                      215
             17.2   Statutory basis for judicial cooperation          216
             17.3   Common law judicial cooperation – the recognition
                    of foreign insolvency proceedings                 219
             17.4   Ancillary winding-up proceedings                  223
             17.5   Cooperation through parallel insolvency proceedings  226
             17.6   Recognition of foreign winding-up orders in relation
                    to local companies                                232
             17.7   Possible future developments                      238
             17.8   Summary                                           240

Chapter 18   The British Virgin Islands                               241
             18.1   Introduction                                      241
             18.2   Cooperation in insolvency matters                 242
             18.3   Approaches to cross-border insolvency             243
             18.4   The statutory regime                              244
             18.5   Foreign companies registered to do business in the
                    British Virgin Islands                            248
             18.6   UK Insolvency Act 1986                            249
             18.7   Other examples of judicial cooperation by the BVI
                    courts                                            250
             18.8   Conclusion                                        251

ix                              *Table of Contents*

Chapter 19  The Cayman Islands                                        253
            19.1  Introduction                                        253
            19.2  The jurisdiction of the court to wind up foreign
                  companies                                           255
            19.3  The appointment of foreign insolvency practitioners 257
            19.4  Restraint of foreign proceedings                    258
            19.5  The effect of a foreign winding up order in the
                  Cayman Islands                                      259
            19.6  Judicial cooperation                                262
            19.7  Conclusion                                          268

Chapter 20  The Isle of Man                                           269
            20.1  Introduction                                        269
            20.2  Statutory basis for judicial cooperation            269
            20.3  Common law rules                                    272
            20.4  Future developments                                 275
            20.5  Summary                                             276

Chapter 21  Guernsey                                                  277
            21.1  The international status of the Bailiwick of Guernsey
                  and the basis of common law                         277
            21.2  Statutory provisions – cross-border issues          277
            21.3  Common law procedures                               279
            21.4  Obtaining evidence                                  288
            21.5  Problematic legal issues                            290
            21.6  Future developments                                 290

Chapter 22  Jersey                                                    293
            22.1  Introduction                                        293
            22.2  Statutory assistance                                294
            22.3  Non-statutory assistance                            297
            22.4  Use of parallel proceedings                         299
            22.5  Problematic legal issues                            301

Part V – Conclusion                                                   303

Chapter 23  Conclusion                                                305

# CHAPTER 17

# BERMUDA

*Ian Kawaley*

17.1  Introduction                                                                                  215
17.2  Statutory basis for judicial cooperation                                                      216
17.3  Common law judicial cooperation – the recognition of foreign insolvency proceedings           219
17.4  Ancillary winding-up proceedings                                                              223
17.5  Cooperation through parallel insolvency proceedings                                           226
17.6  Recognition of foreign winding-up orders in relation to local companies                       232
17.7  Possible future developments                                                                  238
17.8  Summary                                                                                       240

## 17.1 INTRODUCTION

The legal principles governing the extent to which the Bermudian courts may
cooperate with foreign courts in cross-border corporate insolvency cases are
primarily to be found in common law rules developed in judicial decisions
emanating from the courts. Cross-border cooperation in insolvency cases
depends on a parochial statutory framework based on the English Companies
Act 1948 insolvency regime modified on a case by case basis to meet the more
internationalist needs of the modern global era.

Bermuda's statutory framework of insolvency law has no equivalent of the United
States Bankruptcy Code, Chapter 15 or the UK Insolvency Act 1986, section 426
as read with the Cross-Border Insolvency Regulations 2006.[1] Foreign
representatives cannot seek assistance from the Bermuda Court praying in aid any

---

[1]  SI 2006/1030.

statutory provisions of Bermuda law. But a substantial body of common law practice has evolved over the last 10 years which makes it clear that the Bermudian courts will use their statutory discretion and inherent jurisdiction to cooperate with foreign insolvency courts. Most commonly, Bermudian companies with strong US ties have been restructured under the US Bankruptcy Code, Chapter 11 proceedings combined with parallel provisional liquidation proceedings in Bermuda. Less commonly, ancillary liquidation proceedings have been commenced in Bermuda in respect of an overseas company which has conducted business locally.

This practice may not necessarily reflect the true extent to which common law cooperation may be capable of responding to the commercial needs of cross-border cases with a Bermudian element. More importantly, it signals the reality that the absence of 'state of the art' legislative cross-border rules, it would be inaccurate to conclude that Bermuda insolvency law is unresponsive to modern highly internationalised commercial insolvency needs. Whether, absent statutory intervention, a foreign liquidator may commence ancillary proceedings aimed at: (1) preserving local assets; or (2) obtaining information about assets belonging to the foreign insolvent estate, in circumstances where the Bermuda court does not possess statutory jurisdiction over the overseas company, remains far from clear.

## 17.2 STATUTORY BASIS FOR JUDICIAL COOPERATION

While Bermuda's entire statutory insolvency law regime may, indirectly, have implications for the scope of judicial cooperation which may take place, attention will now be given to those statutory provisions of more direct relevance to present concerns. What statutory provisions of Bermuda law impact directly on the ability of the Bermudian courts to assist a foreign insolvency court? The only obvious provisions are those governing the jurisdiction of the Bermuda court to entertain ancillary insolvency proceedings in respect of companies incorporated abroad which have local assets or other sufficient connections. The relevant statutory rules are to be found in the Companies Act 1981 and the External Companies (Jurisdiction in Actions) Act 1885. These rules provide a statutory basis for jurisdiction only, and do not set out the principles governing the extent and forms of cooperation which may take place.

It seems to be uncontroversial to assert that where an overseas company has been conducting business in Bermuda either: (1) as a permit company under the Companies Act 1981, section 134; or (2) as a non-resident insurance undertaking,[2] the winding-up provisions in the Act, Part XIII will apply. The Companies Act 1981, section 2 provides:

---

[2]    Under the Non-Resident Insurance Undertakings Act 1967.

Knowledge Management

Appleby

*Bermuda*                                            217

'company' means a company to which this Act applies by virtue of section 4(1).

The Companies Act 1981, section 4(1A) provides:

In respect of —

(a)  non-resident insurance undertakings, section 2 and Parts XIII and XIV shall apply to them except those sections in Part XIII relating exclusively to members' voluntary liquidations and for the purposes of section 2 and Parts XIII and XIV 'insurance business' has the meaning assigned to it in the Non-Resident Insurance Undertakings Act 1967 [title 5 item 17];

(b)  permit companies, section 2 and Parts III, V, XI and XIII except those sections in Part XIII relating exclusively to members' voluntary liquidations shall apply to them.

The only winding-up provisions which do not apply are those relating to solvent winding-up proceedings, which would be of no interest to the liquidator of a foreign insolvent estate. What of companies which are conducting business in or from Bermuda without bringing themselves into the ambit of section 4(1A), or (perhaps more significantly) which merely have assets in Bermuda? The External Companies (Jurisdiction in Actions) Act 1889, section 1 provides as follows:

**Actions against companies incorporated outside Bermuda**

1(1)  Companies and corporate bodies incorporated out of Bermuda, for banking, insurance or other trading purposes, and doing business in Bermuda by agents or branches, may be sued in the Supreme Court for any cause of action, legal or equitable, arising in whole or in part in Bermuda, by the name whereby they are, or purport to be, associated or incorporated, or under which they carry on business, in Bermuda.

(2)  Service of any process, pleading, rule or notice on the agent, or any one of the agents, or manager, of the company or association in Bermuda shall be deemed good and sufficient service on the company.

(3)  All such suits may be prosecuted and carried on to judgment or decree in like manner as if the defendant company were formed, or incorporated, or established in Bermuda, or had its principal place of business therein: Provided that in all such suits and proceedings it shall be competent to the Supreme Court to make such orders with respect to pleading and practice as the Court may deem necessary for securing the defendant company against surprise or undue haste in prosecuting the suit or other proceeding.

The Companies Act 1981, section 133 provides that an overseas company is deemed to be conducting business in Bermuda if it has an office here, even if it

has not obtained a permit under section 134. The 1889 Act, section 1, expressly confers jurisdiction over overseas incorporated companies if they are doing business in Bermuda not just through a branch office, but also through agents as well. It is not at first blush obvious whether the words:

> may be sued in the Supreme Court for any cause of action, legal or equitable, arising in whole or in part in Bermuda

apply to winding-up proceedings. However, the Supreme Court has entertained a petition to wind-up an overseas company which has been operating through a Bermuda office without a permit in *Informission v Convertix Corporation Ltd*,[3] where a winding-up order was made by Judge Norma Wade-Miller on 31 March 2000, albeit at an unopposed hearing. This decision was followed, without a reasoned judgment being handed down, in a case where an overseas bank provided certain services through an agent incorporated in Bermuda.[4]

Both these first instance decisions were made effectively on an *ex parte* basis, and were reached without the benefit of full argument, so the position cannot necessarily be regarded as conclusively settled under Bermuda law. Assuming them to be correct, there still remains open for future consideration the question of what jurisdiction the Bermuda court possesses to open ancillary winding-up proceedings in respect of an insolvent overseas company where the only connecting factors are the presence of assets within the jurisdiction of the court. It has been argued in a leading practitioner's text that the Supreme Court's winding-up jurisdiction may be as extensive as that enjoyed by the English courts, extending to any case where it is just and equitable that an insolvent overseas company be wound-up.[5] This argument assumes that the just and equitable winding-up ground contained in the Companies Act 1981, section 161(g) can be applied to overseas companies by virtue of the somewhat ambiguous (in this context) provisions of section 4(1)(d) of the same Act:

(1)    This Act shall apply to —

(d)    any overseas company so far as any provision of this Act requires it to apply.

---

[3]    [2000] Bda LR 75.

[4]    In the Matter of Horizon Bank Ltd (in liquidation), Companies (Winding-Up) 2005: 359. The decision is referred to in para 5 of the judgment in *Walsh and Taal v Horizon Bank Limited (in liquidation)* [2006] Bda LR 42.

[5]    See Terry O'Neill and Jan Woloniecki, *The Law of Reinsurance in England and Bermuda*, 2nd edn (London: Sweet & Maxwell, 2006), para 17-13.

*Bermuda*                                         219

This point has yet to be considered by the Supreme Court. It is only fair to point out that the English case law under the UK Companies Act 1948 suggesting a broad jurisdiction to wind-up overseas companies was seemingly based on the following statutory provision which was omitted from the Bermudian 1981 Act:

> 399(1) Subject to the provisions of this Part of this Act, any unregistered company may be wound up under this Act, and all the provisions of this Act with respect to winding up shall apply to an unregistered company, with the exceptions and additions mentioned in the following provisions of this section.[6]

Prior to the 1981 Act, section 399(1) formed part of Bermuda law which incorporated all of the winding-up provisions of the now repealed UK Companies Act 1948. It is unclear whether this provision was deliberately omitted, or accidentally lapsed with the enactment for the first time of an uniquely Bermudian overseas company regime.

These fine distinctions notwithstanding, the Bermuda court has a fairly broad jurisdiction to open ancillary winding-up proceedings in relation to insolvent overseas companies which have strong jurisdictional ties with the local forum. Such proceedings would open the door to the full range of the Court's statutory winding-up powers being deployed for the benefit of the foreign company. But the ancillary liquidation option is a rather crude implement compared with the modern post-UNCITRAL notion of a foreign representative being able to access the full panoply of another jurisdiction's insolvency laws, merely by making a simple application for recognition. To obtain a more complete picture of the true legal position, it is necessary to explore the common law position.

## 17.3 COMMON LAW JUDICIAL COOPERATION – THE RECOGNITION OF FOREIGN INSOLVENCY PROCEEDINGS

Statutory and public policy considerations apart, the Bermuda common law position will generally be consistent with the English common law position. Bermuda's conflict of law rules will in most cases be no different than the English conflicts rules. The following analysis of Professor Ian Fletcher[7] probably reflects the position under Bermudian law:

---

[6]  Cited in *In re Compania Merabello San Nicholas SA* [1973] Ch 75 at 83.

[7]  *Insolvency in Private International Law*, 2nd edn (Oxford: Oxford University Press, 2005), para 3.92.

> It follows therefore that winding-up proceedings that have been commenced in the country under whose laws the company was originally incorporated will be recognised in England ... An important aspect of the recognition accorded to proceedings conducted under the law of the company's country of incorporation-also constituting the corporate domicile-is that the office holder appointed under those proceedings will be accepted in England as the person with standing to represent the collective interests of creditors and to invoke the assistance of courts here.

One indirect statutory source for a liberal approach to judicial cooperation at common law, at least with UK courts, is the fact that such cooperation is mandated in personal bankruptcy cases. The Bankruptcy Act 1989, section 144 provides as follows:

### Assistance to courts of the United Kingdom

144.  (1)  The Court and the officers of that Court shall assist the courts having bankruptcy jurisdiction in any part of the United Kingdom.

(2)  For the purposes of subsection (1), a request for assistance made to the Court by a court having bankruptcy jurisdiction in any part of the United Kingdom is sufficient authority for the Court to which the request is made to exercise in relation to any matters specified in the request such jurisdiction as it [is?] or the court making the request could exercise with respect to comparable matters falling within its own jurisdiction; however, in exercising its discretion under this subsection the Courts shall have regard in particular to the rules of private international law.

It is clearly anomalous for there to be greater legal scope for cooperation in personal bankruptcy cases than there is in corporate insolvency cases, where the numbers of cases and sums involved, as well as the numbers of creditors impacted, will usually be far higher. And this highlights possibly the most significant dilemma of common law cooperation falling short of opening ancillary proceedings in Bermuda. It also anomalous for the Supreme Court to be the consistent beneficiary of judicial assistance for Bermudian insolvency proceedings from foreign courts, particularly the US Bankruptcy Court[8] and the English High Court.[9] Courts in cases with a private international law aspect typically have regard to the public international law requirement 'to promote comity and good relations between states through the respect of another state's sovereignty'.[10] The precise juridical boundaries of 'comity' are rather sketchy, but the principle

---

[8]    Under the US Bankruptcy Code, Chapter 15, formerly under s 304.

[9]    Under the Insolvency Act 1986, s 426.

[10]   *Jones v Ministry of Interior of Saudi Arabia* [2007] 1 AC 270 at 285 per Lord Bingham.

*Bermuda*                    221

appears to be essentially a legal expression of the globally recognised moral and religious principle, 'do unto others as you would have them do unto you'.

Absent a statutory trigger for the application of Bermuda insolvency law to a foreign representative who has merely been recognised, what forms of assistance can the Bermudian court provide?

It is only obvious that the Supreme Court, having recognised the title of a foreign liquidator, can grant ordinary private law relief. No automatic stay of actions or attachments will come into play in favour of the insolvent overseas company, but its liquidator could perhaps seek: (1) a declaration that the assets belong to the foreign estate: (2) an interim injunction freezing the assets in question; and/or (3) an order staying creditor actions against the insolvent foreign company. The foreign liquidator whose appointment has been recognised could obtain evidence for use in foreign adversarial proceedings, but possibly not evidence about the existence or location of assets for use in the foreign liquidation itself. Recognition of the foreign liquidation order or liquidator's appointment is only supported by authority where the foreign order is made in the company's place of incorporation.[11]

Professor Ian Fletcher has argued that the English law distinction between bankruptcy law, according to which title to the bankrupt's property automatically vests in the trustee from the date of his appointment, and corporate insolvency law, where large losses may be sustained by the estate while the liquidator is taking steps to protect the assets abroad, should be re-thought. Bermuda law suffers from the same ailment, but it is doubtful whether this gap can be filled without statutory intervention. In light of the Judicial Committee of the Privy Council's decision in *Cambridge Gas Transport Corp v Official Committee of Unsecured Creditors (of Navigator Holdings plc)*,[12] all that can confidently be stated is that the Supreme Court does possess a common law discretionary power to recognise any foreign insolvency order, even an order relating to a Bermudian company which is not the subject of domestic insolvency proceedings.

But whenever an overseas company becomes subject to ancillary winding-up proceedings in circumstances where no primary liquidation has been commenced in its place of incorporation, its shareholders' rights will be extinguished and superseded by creditor interests as regards the assets within that forum. That legal process is governed by the jurisdictional rules of the *lex fori*; assuming jurisdiction

---

[11]   Fletcher, *Insolvency in Private International Law*, 2nd edn (Oxford: Oxford University Press, 2005), paras 3.91–3.94.

[12]   [2007] 1 AC 508.

222        *Part IV – Judicial Cooperation in Cross-Border Insolvency*

to wind-up exists, then the local statutory insolvency rules come into play, and these rules will invariably operate to extinguish shareholder interests if the company is demonstrably insolvent. If any issue arises in the domicile of the company as to whether or not a foreign insolvency order or proceeding is operative, the Bermuda law position would be that the foreign order or proceeding could be recognised, on a discretionary basis, with or without the commencement of Bermudian insolvency proceedings. This much is clear from the *Navigator Holdings plc* decision. The extent of recognition would in most cases be fact-specific. But, on the other hand, it is difficult to envisage circumstances in which the extinguishment of shareholder rights under the company's constitutional law could be established more decisively than by commencing parallel insolvency proceedings in the domiciliary forum.

Recognition of a foreign representative's status does not mean that any form of relief a foreign representative seeks will be unquestioningly granted, especially where exercising a common law discretionary power to cooperate with a foreign court would be inconsistent with a mandatory statutory duty. In *Ace Bermuda Insurance Ltd v Pedersen et al*,[13] the Plan Trustee of the Boston Chicken group sought to resist the Bermuda plaintiff's attempt to enforce an arbitration clause with a view to obtaining a declaration of non-liability under an insurance policy. The Trustee argued that under the Barton doctrine, all claims against the bankruptcy estate should be determined by the US Bankruptcy Court. The Supreme Court rejected this application, holding:

47.    The Plaintiff's claim for injunctive relief by way of enforcement of an arbitration agreement with a view to establishing that it is not a debtor of the Defendants is obviously not the sort of claim which should be subjected to proof in BCI's winding-up. It is not a personal claim for damages at all, and the inclusion in the original Writ of a prayer for damages was never supported by the evidence before this Court on March. All the Plaintiff seeks to do is to determine whether or not it is liable to the Applicants/Defendants using the same contractually agreed dispute resolution provision which these parties would be entitled to use to assert their claims to payment. Arbitration of the dispute will not prejudice creditors in the sense of conferring an entitlement of preferential payment on the Plaintiff. Therefore, if the issue of lifting a Bermuda liquidation stay or permitting the matter to be resolved in the Arizona bankruptcy Court fell to be determined, it is difficult to see on what grounds this Court could properly refuse to lift the liquidation stay to permit the arbitration proceedings to proceed. The position would be entirely different if the Bermuda plaintiff were a creditor of BIC seeking to obtain preferential access to assets of BIC located in Bermuda.

---

[13]    [2005] Bda LR 44

48.   It seems at first blush to be the case that the contingent asset of the BCI estate is located in Bermuda, as the situs of a debt is generally under Bermudian conflict of law rules the domicile of the debtor or where a contractual obligation to pay falls to be performed. The Plaintiff/insurer is a Bermuda company which appears to have executed the policy in Bermuda. It would be surprising if the position under New York internal law, the Policy's governing law, is different. So in the event that the Applicants establish that an estate asset in the form of a sum due under the Policy is duly owed in Bermuda, in due course some basis for judicial cooperation may exist.

But there is no application presently before the Court which properly raises for determination the issue of judicial cooperation between two insolvency courts. The Applicants merely seek, in the ordinary civil jurisdiction of this Court, to set aside leave granted ex parte to serve them with these proceedings abroad. And so the question of whether or not the arbitration agreement cannot enforced on forum grounds must be adjudicated upon on the basis of established principles applicable to this commercial context. Is there in fact any discretion to refuse leave under Order 11 rule 1(1) where the parties have contractually agreed arbitration in a specified forum? Mr Hargun submitted that the answer to this question should be a resounding 'no': *Toepfer International v Societe Cargill France* [1997] 2 *Lloyd's Law Reports* 98, at 110 (per Colman, J.). I accept Counsel's submissions in this regard. The New York Convention on the Reciprocal Enforcement of Arbitration Awards of 1958 applies to Bermuda, which is under an international obligation to enforce arbitration agreements. This international obligation has been incorporated into Bermuda law through section 8(1) of the 1986 Arbitration Act. It is settled law that section 8(1) entitles an applicant to a mandatory stay of any proceedings brought in breach of an arbitration agreement. Where the Court is under a mandatory statutory duty to enforce an agreement to arbitrate, it cannot evade that duty on discretionary common law grounds.

It remains to consider, in broad outline, the forms of common law judicial cooperation which have taken place in practice.

## 17.4 ANCILLARY WINDING-UP PROCEEDINGS

One of the earlier examples of judicial cooperation with a foreign insolvency court is provided by Confederation Life Insurance Company, Companies (Winding-Up) 1994: No 309. Confederation Life Insurance Company, a Canadian company, was wound up by the Ontario Court of Justice General Division on 15 August 1994, on the application of the Attorney-General. The Superintendent of Financial Institutions was appointed provisional liquidator.[14]

---

[14]   Available at: www.confederationlife.com/main_areas/windup_appointment.html.

224          *Part IV – Judicial Cooperation in Cross-Border Insolvency*

The company's life insurance operations were carried out through branch offices located predominantly in the United States, but also in the United Kingdom, Bermuda and Cuba.[15] The Ontario order dated 15 August 1994 appointing the provisional liquidator provided as follows:

> 33. THIS COURT SEEKS AND REQUESTS the aid and recognition of any Court or administrative body in … Canada … the United States of America … the United Kingdom or elsewhere to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

Then Registrar of Companies, Mr Malcolm Butterfield, petitioned the Supreme Court to wind-up the company as an overseas company, and was appointed provisional liquidator (with standard powers) in ancillary winding-up proceedings on 26 August 1994. The Petition referred to the fact of the Ontario liquidation proceedings and anticipated Michigan rehabilitation proceedings, however. And the Affidavit of the Registrar of Companies expressly foreshadowed consultation with the Canadian liquidator and regulatory authorities, as well as repatriation of the Bermudian assets of the company. Despite the absence of any statutory rules governing cooperation with foreign insolvency courts, the Supreme Court authorised the Bermuda provisional liquidator to remit all of the company's local assets to the Canadian provisional liquidator, and the Bermudian ancillary proceedings were stayed.[16] This cooperation appears to have been prompted not so much by a direct request for assistance by the Ontario court as by an indirect request through the liquidator appointed by the Canadian court. Justice Vincent Meerabux on 20 March 1995 ordered as follows:

> **UPON THE APPLICATION** by Summons dated the 3rd day of March, 1995 of the Registrar of Companies
>
> **AND UPON HEARING** counsel for the Applicant and counsel for Peat Marwick Thorne Inc., Agent for the Superintendent of Financial Institutions (Canada) as Provisional Liquidator of Confederation Life Insurance Company ('the Canadian Liquidator')
>
> **AND UPON READING** the Confidential Report of Malcolm L. Butterfield dated 28th February, 1995 together with the letter of George Gutfreund dated 27th February, 1995 exhibited thereto
>
> **IT IS HEREBY ORDERED AS FOLLOWS:-**

---

[15]  Provisional Liquidator's Report, 3 September 1997, also on the company's website.

[16]  Moss, Kawaley, Seife and Montgomery (eds), *Cross-Frontier Insolvency of Insurance Companies* (London: Sweet & Maxwell, 2001), p 87.

*Bermuda*                                                              225

1.  The appointment of Malcolm L. Butterfield as Provisional Liquidator of
    Confederation Life Insurance Company ('the Company') in Bermuda
    pursuant to an Order of Meerabux J. on the 26th August, 1994 shall be
    terminated effective upon the lodging by Mr. Butterfield of a notice to this
    Court confirming that the transfer of assets referred to in paragraph 4(b)
    below has been completed.

2.  The Petition of the Registrar of Companies presented in these proceedings on
    the 26th August, 1994 is dismissed, effective upon the lodging by Malcolm
    L. Butterfield of the notice referred to in paragraph 1 above.

3.  The costs of the Provisional Liquidator in relation to this application, and the
    costs incurred or to be incurred by the Provisional Liquidator (a) in relation to
    his administration since his appointment and (b) in carrying out the steps
    required or authorized by this order to be taken, shall be taxed on an attorney-
    and-own-client basis and be paid out of the assets of the Company in the
    possession and control of the Provisional Liquidator as a first priority.

4.  The Provisional Liquidator shall take all steps necessary to effect an orderly
    transfer from himself to the Canadian Liquidator of the ongoing
    administration of the affairs of the Bermudian branch of the Company.
    Without restricting the generality of the foregoing, the Provisional Liquidator
    shall forthwith:-

    (a)  release to the Canadian Liquidator all of the books and records,
         including any records electronically stored, of the Company presently
         in his possession or control;
    (b)  after deducting the taxed costs (such taxation to commence within
         twenty-one days of the notice being lodged in accordance with
         paragraph 1 above) and charges of the Provisional Liquidator, deliver
         over to the Canadian Liquidator all of the assets of the Company,
         presently in his possession or control;
    (c)  instruct and facilitate the changing of signing authorities in relation to
         bank accounts of the Company in Bermuda;
    (d)  deliver over to the Canadian Liquidator premium monies which have
         been or may hereafter be received by Malcolm L. Butterfield his
         servants or agents;

5.  The Provisional Liquidator shall be at liberty to take such other steps as may,
    in his absolute discretion, appear necessary or desirable in order to carry out
    the purposes of this order.

6.  The Provisional Liquidator is hereby released from any claim, liability,
    obligation or responsibility in relation to his administration of the affairs of
    the Company to date.

7.    A copy of this order shall be served upon all persons who, according to the records of the Company, hold policies or other contracts issued through the Bermudian branch of the Company.

This process appears to have been exceptional and seemingly occurred without opposition from any interested parties, but there is no reason why this form of cooperation should not be replicated in appropriate future cases.

## 17.5 COOPERATION THROUGH PARALLEL INSOLVENCY PROCEEDINGS

What was once exotic is now old hat to Bermudian insolvency practitioners and judges. The concept of parallel insolvency proceedings began with the comparatively 'soft' cooperation through the implementation of parallel schemes of arrangement, in Bermuda and England in the mid-1990s. By the turn of the century however, the complexity of judicial cooperation had hardened considerably through the frequent implementation of parallel restructurings in Bermuda and the United States (principally the US Bankruptcy Court for the Southern District of New York, but occasionally the Delaware Bankruptcy Court as well).

The forms of cooperation involved in the implementation of parallel schemes may fairly be described as 'soft', because the degree of court involvement in approving a scheme of arrangement, in England and in Bermuda, is ordinarily comparatively limited, even when it is being implemented within winding-up proceedings. Under the Bermuda Companies Act 1981, section 99, which is substantially similar to the UK Companies Act 1985, section 425, two court applications are required. Firstly, the liquidator or provisional liquidator applies for leave to convene a meeting of creditors to approve the proposed scheme, and secondly the liquidator or provisional liquidator applies for court's sanction of the scheme, assuming the statutory majority in number and three-quarters in value have voted in favour of the arrangement in question. However, before this takes place, the parallel winding-up proceedings will typically have established the principle of the two courts working *in tandem* with each other.

The only cooperation which really takes place is, perhaps, principally of an administrative nature, in that the respective court hearings are typically scheduled to take place as close to simultaneously as possible. However, the courts in the respective jurisdictions must implicitly acknowledge the desirability of harmonising the parallel proceedings. What drives the collaboration commercially in such cases is the fact that the business of the Bermudian and English companies is completely intermingled so that the

winding-up process can only be rationally conducted on a consolidated basis. As schemes of arrangement, whether implemented before a winding-up order has been made or after, typically provide for a private adjudication process for scheme claims, the courts will have no real involvement in the parallel winding-up process at all once the schemes have been approved in Bermuda and London.

Possibly the first of such parallel schemes arose in relation to the 'KWELM' companies, four of which were incorporated in England, and the fifth (Mutual Reinsurance Company Limited-in liquidation) was incorporated in Bermuda. The companies were all Weavers Stamp companies who had reinsured mainly US risks and become hopelessly insolvent by 1990. Winding-up petitions were filed in London and Bermuda on 30 August 1990. These petitions were adjourned while a scheme was drafted and provisional liquidators (Ian Bond and Chris Hughes of Coopers and Lybrand) were appointed over the English and Bermudian companies on 2 and 3 March 1992, respectively. A composite Scheme Document was prepared for the purposes of seeking leave to convene the scheme meetings and, after leave was obtained, separate notices were sent out and consecutive meetings were convened for each company at Alexandra Palace, Wood Green, London, for 17 November 1993. The proposed scheme was approved by creditors, and received court sanction by orders dated 15 December 1993 in both London and Bermuda.[17]

The KWELM scheme was modified with a view to bringing the run-off of the companies' business to an end in 2003. On 28 November 2003, the English Court gave leave to all companies (including the Bermudian company) to convene consecutive meetings to consider an Amending Scheme of Arrangement at the offices of the British Insurance institute in London on 29 January 2004. The Supreme Court made a corresponding order in respect of the 'M' company on 2 December 2003. The English court and the Supreme Court sanctioned the Amending Scheme on 24 and 27 February 2004, respectively. On 3 April 2007, the Scheme Administrators circulated their 13th Report to Creditors, which suggested a final distribution would be made in two to five years. Most illuminating, however, bearing in mind that this winding-up process has been on foot for 15 years, is the projected return to creditors for each of the five KWELM companies: 83%; 100%; 100%; 86% and 74%.[18] These figures appear to vindicate the commercial logic underlying a collaborative approach to cross-border insolvencies.

A more extensive form of judicial cooperation subsequently evolved between the Supreme Court and the US Bankruptcy Court. The parallel proceeding

---

[17]   See generally the KWELM website: www.kwelm.com.

[18]   Ibid.

concept was the same, but because the US Chapter 11 process involves many more court applications than the scheme of arrangement process and is a debtor in possession process, traditional Bermuda insolvency practice was modified to a far greater extent in the absence of a statutory 'corporate rescue' regime. Although these US-Bermuda parallel proceedings typically resulted in a US Plan and a Bermuda Scheme, the practice evolved of the US proceedings being formally conferred with the status of primary proceedings, even as regards a Bermuda incorporated company. Orders of the US court would specifically be approved by the Supreme Court, contrary to the KWELM approach where the Supreme Court would make duplicative orders in its own right. This innovative approach was explained by L Austin Ward Chief Justice (now Sir Austin Ward, Justice of Appeal), in his 26 November 1999 Judgment in *Re ICO Global Communications (Holdings) Ltd*:[19]

> A look at the background to the application may be instructive. On 27th August, 1999 a Petition was filed by the company which was insolvent seeking the appointment of joint provisional liquidators. There was no prayer that the company be wound up immediately. On the same date the company filed for protection under Chapter 11 of the U.S. Federal Bankruptcy Code to allow it to consider a re-financing/re-organisation which, if successful, would result in the company continuing business.
>
> An Order was made that Messrs. Wallace and Butterfield be appointed joint provisional liquidators. I am satisfied that the Court is given a wide discretion and had jurisdiction under section 170 of the Companies Act 1981 and Rule 23 of the Companies (Winding-Up) Rules 1982 to make such an Order. Under it the directors of the company remained in office with continuing management powers subject to the supervision of the joint provisional liquidators and of the Bermuda Court.
>
> I do not accept that because the company is a Bermuda registered company therefore the Bermuda Court should claim primacy in the winding-up proceedings and deny the joint provisional liquidators the opportunity of implementing a U.S. Chapter 11 re-organisation. Nor do I accept that a Chapter 11 re-organisation will, of its very nature, destroy the rights of creditors and contributories under the regime being established. Such an approach would be to deny the realities of international liquidations where action must be taken in many jurisdictions simultaneously. In this case proceedings are being conducted in the USA and in the Cayman Islands as well as in Bermuda. The aim of the proceedings is to enable the company to re-finance in the sum of $1.2 billion or to re-organise so as to continue in operation. Under such circumstances the Court should co-operate with Courts in other jurisdictions which have the same aim in relation to the affairs of the company. It is not a question of surrendering jurisdiction as much as harmonisation of effort. Moreover, the joint provisional liquidators are officers of this Court who

---

[19]   Civil Jurisdiction 1999, No 288, pp 2–3.

*Bermuda*                                                                    229

submit confidential Reports informing the court of progress being made in the liquidation from time to time. I am satisfied that proceedings in many jurisdictions relating to the same subject matter may properly be conducted at the same time where there is a connecting factor. *Barclays Bank plc v Homan and others* [1993] BCLC 680.

So this form of judicial cooperation has entailed the following broad characteristics. Firstly, winding-up proceedings are commenced almost simultaneously in Bermuda with Chapter 11 proceedings in Bermuda. In Bermuda, an application will be made for the appointment of a provisional liquidator (or joint provisional liquidators) with limited powers. These powers will essentially be supervising the restructuring of the company in the Chapter 11 proceedings and monitoring the management of the company, which remain in place under the supervision of the provisional liquidator. In the United States, an Official Unsecured Creditors Committee will be appointed to protect creditor interests; in Bermuda, the provisional liquidator will be charged with ensuring that such interests are not prejudiced as a matter of Bermuda law. The process will typically involve, at an early stage, some form of protocol which sets out the framework for cooperation and, in particular, how the fees of the Bermuda provisional liquidators will be taxed and paid. Problems can result later if these matters are not dealt with at the outset, particularly if all of the assets are under the control of one court. To resolve such problems in one such Bermuda-US case, the American Law Institute/International Insolvency Institute Guidelines on Court to Court Communications in Cross-Border Cases were used as persuasive authority for a telephone conference between the Bermudian judge and the US Bankruptcy Court judge.[20]

One important, usually unarticulated, legal factor which implicitly justifies the Bermuda court ceding primacy to the US Bankruptcy Court, in such cases, is the common scenario that the majority of unsecured creditors of the company involved in the restructuring are bondholders or noteholders under instruments governed by New York law. Under Bermuda conflict of law rules, the validity and enforceability of the creditors' claims in a traditional liquidation would be governed by New York law as the proper law of the relevant contracts. In such a case, it is not incongruous for the US Bankruptcy Court to play a leading role in adjusting the creditors' rights, all other factors being equal. The creditors' expectations when contracting with the Bermudian company would have been that in the event of the company's insolvency, their contractual rights would fall to be determined under New York law, even if they were merely claimants in a Bermudian liquidation. This approach might not be followed where the US connecting factors are not so strong.

---

[20] The writer and Judge Drain of the Southern District of New York: *Re Refco* [2006] Bda LR 94.

The viability of this form of common law judicial cooperation has never yet been contested in the Supreme Court. However, a strong indication of a commitment towards judicial cooperation between the courts of Bermuda and foreign insolvency courts was recently given when the Commercial Court of Bermuda adopted the *Guidelines on Court to Court Communications in Cross-Border Cases*.[21] These Guidelines are based on the American Law Institute International Insolvency Institute Guidelines, as is acknowledged in the Introduction:

> One of the most essential elements of cooperation in cross-border cases is communication among the administering authorities of the countries involved. Because of the importance of the courts in insolvency and reorganization proceedings, it is even more essential that the supervising courts be able to coordinate their activities to ensure the maximum available benefit for the stakeholders of financially troubled enterprises.

> These Guidelines were originally adopted and promulgated in 'Trans-national Insolvency: Principles of Cooperation Among the NAFTA Countries' by the American Law Institute on May 16, 2000, and adopted by the International Insolvency Institute on June 10, 2001. The Guidelines have since been adopted by British Commonwealth courts, such as the British Columbia Supreme Court and the Ontario Commercial List. Extensive Indirect communication between the Supreme Court of Bermuda and courts in, inter alia, the United States and Canada in cross-border insolvency cases has taken place on an ad hoc basis for many years.

> The Commercial Court of Bermuda now adopts the Guidelines for application in relation to cross-border insolvency proceedings involving any other jurisdiction where the foreign court has either adopted the Guidelines, or substantially similar procedural rules, or where the foreign court has agreed to apply the Guidelines to the case in question.

> These Guidelines are intended to enhance coordination and harmonization of insolvency proceedings that involve more than one country through communications among the jurisdictions involved. Communications by judges directly with judges or administrators in a foreign country, however, raise issues of credibility and proper procedures. The context alone is likely to create concern in litigants unless the process is transparent and clearly fair. Thus, communication among courts in cross-border cases is both more important and more sensitive than in domestic cases.

> These Guidelines encourage such communications while channelling them through transparent procedures. The Guidelines are meant to permit rapid cooperation in a developing insolvency case while ensuring due process to all concerned.

---

[21]    Practice Direction, Circular No 17 of 2007, 1 October 2007.

*Bermuda*                                                                    231

The Guidelines are not meant to be static, but are meant to be adapted and modified to fit the circumstances of individual cases and to change and evolve as the international insolvency community gains experience from working with them. They are to apply only in a manner that is consistent with local procedures and local ethical requirements. They do not address the details of notice and procedure that depend upon the law and practice in each jurisdiction.

However, the Guidelines represent approaches that are likely to be highly useful in achieving efficient and just resolutions of cross-border insolvency issues. Their use, with such modifications and under such circumstances as may be appropriate in a particular case, is therefore recommended.

The cross-border collaboration will typically come to an end with the implementation of a Chapter 11 Plan of Reorganisation and a Bermuda Scheme of Arrangement. Where the process is driven by the US bankruptcy process, there may be a tendency to minimise the significance of the Bermuda proceeding and dispense with the Bermuda scheme altogether. This may create difficulties, unless the Plan is approved not only by the two-thirds majority in number required under US bankruptcy law, but also the three-quarters majority in number required under Bermuda law. And if the Supreme Court can give effect to the Plan in the absence of a scheme on the basis that a scheme was in practical terms approved, details relating to how the ultimate winding-up and dissolution of the Bermuda company are to take place need to be carefully spelt out. In a non-contentious context, the Supreme Court took a robust approach and gave effect to a Plan even though its terms did not explicitly modify the normal statutory regime for winding up companies under Bermuda law. In *Re Loral Space and Communications*[22] (where the Privy Council decision in the *Navigator Holdings plc* case[23] was applied), the court observed:

> In my view, the Plan clearly contemplated that (a) the Company would have no shareholders or creditors by the time the winding-up order was made, and (b) that the provisional liquidators appointed when the winding-up order was made, in the event the present JPLs, would in due course be appointed permanent liquidators to complete the winding-up process. The creditors of the Company, in approving the Plan, effectively agreed that the JPLs should be appointed as liquidators, even though the subtle modifications of the statutory Bermudian insolvency regime were not explicitly spelt out. This is because the Plan explicitly contemplated that whoever became provisional liquidator on the making of the winding-up order would subsequently become permanent liquidators.

---

[22] [2007] Bda LR 26.

[23] [2006] 3 WLR 689.

232        *Part IV – Judicial Cooperation in Cross-Border Insolvency*

In a more contentious context, the decision to dispense with a Bermuda scheme, combined with the failure to deal more explicitly with distinctive Bermuda law issues in the Plan, could have been more problematic.

A similar problem arose in relation to a Bermuda registered company which was actually wound up in Hong Kong before winding-up proceedings were commenced in Bermuda. This scenario will be considered below.

## 17.6 RECOGNITION OF FOREIGN WINDING-UP ORDERS IN RELATION TO LOCAL COMPANIES

In *Re Dickson Holdings Ltd*,[24] the Supreme Court recognised the Hong Kong winding-up proceedings and appointment of provisional liquidators in respect of a Bermudian-incorporated company, but expressed the following views about the recognition question. Firstly, there was no doubt that the local court had the discretion to recognise the foreign winding-up order in relation to the local company. Having considered various authorities, notably the *Cambridge Gas* case, the court opined as follows:

19.    All of this learning suggests the following principles which I adopt: (a) the fact that this Court would in similar circumstances entertain primary winding-up proceedings in respect of a foreign company is an important factor in deciding whether or not to recognize a foreign principal winding-up proceeding in relation to a local company which is not being wound-up at all its own domicile; and (b) the main practical consideration is whether or not a foreign primary proceeding is the most convenient means of winding-up the company's affairs, having regard to all relevant commercial and/or public policy concerns in the case at hand. These two broad considerations must in my judgment be applied having regard to two fundamental principles of insolvency law: (a) the universalist principle under which all reasonable efforts ought normally to be made to subject a company's liquidation to a single coherent regime so that all creditors share ratably, irrespective of the accidental location of creditors outside the jurisdiction of the primary liquidation court; and (b) the presumption that most creditors dealing with the company before it became insolvent would reasonably have contemplated that their rights in any insolvency would be dealt with in accordance with the law of the company's place of incorporation, irrespective of the accidental location of assets outside of that jurisdiction. The application of all of these guiding principles will vary depending on the facts of the specific case.

20.    This Court has apparently only on one occasion exercised its own jurisdiction to wind-up an overseas company which carried on all of its business from

---

[24]    [2008] Bda LR 34

*Bermuda*                                                    233

Bermuda in proceedings which essentially amounted to primary liquidation proceedings: *Informission Group Inc.-v- Convertix Corporation* [2000] Bda LR 75. In this case, the company was incorporated in the British Virgin Islands ('BVI') but was commercially managed from Bermuda. The respondent company was not registered as an overseas permit company in which case the bare jurisdiction to wind-up in Bermuda would have been far clearer. A creditor's petition was presented and the Court was explicitly invited to wind-up the company on the basis that the Bermuda proceedings would be the only winding-up proceedings in connection with the BVI-incorporated company. Justice Norma Wade[25] granted the winding-up order observing (at pages 3–4):

> 'Finally I deal with the question of whether these liquidation proceedings will operate as ancillary or principal winding-up proceedings.
>
> The essence of [counsel]'s argument on this question is this-whenever a winding up order is sought against a company outside the domicile of its incorporation this question arises irrespective of whether winding up proceedings are on foot or anticipated in the place of the Company's incorporation. He says that it is clear that this Court can exercise primary winding up competence where Bermuda is shown to be the most appropriate forum for compulsory winding up. In support he referred to the affidavit of the Provisional Liquidator which he says provides a basis for concluding in accordance with applicable law in this area that Bermuda is the most appropriate forum. In this respect he relied upon the learning found in Smart *Cross Border Insolvency* (Butterworths: London), 1991, pp 236–238 where the learned author said at p 237:
>
> > '... when dealing with the insolvency of a foreign corporation it is necessary to consider whether, in the interests of all the parties and for the ends of justice, the English court is the proper tribunal in which a liquidation should proceed. If the English court is the appropriate forum, then the English winding-up need not be ancillary to any other liquidation.'
>
> [counsel] also relied upon the decision in *Re A Company (No. 00359 of 1987)* [1988] Ch 210 where it was held:
>
> > 'that for the Court to make a winding up order against a foreign company it was not necessary to show that the company had assets within the jurisdiction, but a sufficiently close connection with the jurisdiction had to be established; that the facts that the loan agreement had been negotiated, executed and performed in

---

[25] Now Justice Wade-Miller.



234                  *Part IV – Judicial Cooperation in Cross-Border Insolvency*

> England, the company's directors were resident in England, the
> company had bank accounts in England, while there was no
> evidence that the company had carried on business outside
> England, demonstrated a sufficient connection with the
> jurisdiction; and that accordingly, since there was no more
> appropriate jurisdiction for the winding up of the company and
> since there was a reasonable possibility of benefit accruing to
> the creditors from the making of the winding up order, an order
> would be made and the provisional liquidator appointed'.
>
> Having considered the authorities relied upon in this matter I accept
> [counsel]'s submission as to the principles to be applied to this case.'

21.  The *Convertix* judgment, like the present Judgment, was rendered following
     an ex parte hearing and so the relevant principles have not been decided by a
     court which has received the benefit of full argument. Nevertheless, it does
     provide explicit support for the proposition that this Court might well feel
     inclined to make a winding-up order in relation to a Hong Kong company
     that had conducted all of its business in Bermuda and had only formal
     constitutional ties with its place of incorporation, despite the absence of
     parallel winding-up proceedings its place of incorporation. So as regards the
     Company in the present case, it appears that the Hong Kong Court has done
     no more than to assert jurisdiction which this Court presented with equivalent
     facts might potentially assert.

Having considered the question of jurisdiction, the Supreme Court proceeded to
consider in somewhat tentative terms what principles were generally relevant to
the exercise of the discretion to recognise a foreign winding-up order in relation
to a local company where no parallel insolvency proceedings had bee
commenced in the place of incorporation:

22.  The facts of the present case make it unnecessary to consider in any depth
     what sort of policy factors might give this Court cause to decline to recognize
     foreign winding-up proceedings in relation to a Bermudian company.
     Although a winding-up order was made in Hong Kong, it is no longer
     intended to actually wind-up the Company at all. The winding-up is intended
     to be stayed and the restructured business returned to solvency. This Court,
     through the Scheme, is to cooperate in the restructuring process in a manner
     which is now well established both with respect to parallel schemes of
     arrangement and parallel insolvency proceedings. In *Re Akai Holdings Ltd:
     Re Kong Wah Holdings Ltd* [2001] Bda LR 31, the companies were wound-
     up firstly in Hong Kong and shortly thereafter in Bermuda. Recognition will
     obviously come more easily when the foreign proceedings take place in a
     jurisdiction such as Hong Kong which has a similar legal system and a long
     history of judicial cooperation ties.

23.  Text writers tend to treat the recognition of foreign corporate rescue
proceedings and the orders made therein as a distinct topic from the
recognition of a foreign winding-up order. This distinction, subject to at least
two obvious exceptions alluded to below, may have greater historical than
current significance in the context of considering the factors relevant to the
exercise of this Court's discretion to recognize. The Court's focus will
usually be on, broadly speaking, whether the foreign proceeding as a whole
ought to be recognized. In the offshore world in particular, the traditional
delineations between principal and ancillary proceedings will often be
blurred. Cooperation will take place through parallel proceedings, be they
corporate rescue proceedings, winding-up proceedings or insolvent schemes
implemented without winding-up proceedings at all with the leading role
typically being determined by the commercial centre of gravity rather than
the jurisdictional centre of gravity. This does not mean that in the context of
parallel proceedings where this Court recognizes the foreign proceedings
generally that each and every order made in the foreign court will be given
effect to here. But the traditionally fixed notion that a foreign insolvency
court is only competent to deal with matters within its ancillary jurisdiction is
potentially always subject to modification in the case of Bermudian
companies which have few tangible connections here. While the centre of
main interest ('COMI') concept appears to have mandatory statutory force
under European insolvency law and the UNCITRAL Model Law, its
underlying assumptions are hardly anathema to Bermudian common law.

24.  Nevertheless, it may be useful to note that persons incorporating companies
in Bermuda which are substantially managed abroad ought not to expect this
Court to give 'rubber-stamp' recognition to foreign principal winding-up
proceedings which are commenced without parallel proceedings here. In
most cases, commercial logic will likely be the best guide as to whether it is
appropriate to commence winding-up proceedings abroad in respect of a local
company without also commencing proceedings here. Legally, a Bermuda
company can never be wound-up and dissolved for all purposes without a
dissolution taking place under Bermuda law. Even if a company is struck-off
the register and dissolved without a winding-up under Bermuda law, any
disgruntled creditor (or perhaps, a shareholder as well) may subject to
limitation constraints apply to set aside a dissolution and open a winding-up
under local law. In any liquidation of substance, it will be impossible for the
place of incorporation to be ignored. And where the way in which a
Bermudian company *is* wound-up has implications for the reputation of
Bermuda as an international financial centre, public policy may well dictate
that this forum ought to play a more significant role than purely commercial
concerns might otherwise dictate.

25.  One obvious exception to the rule contended for above, namely that no
distinction generally arises between recognizing foreign restructuring
proceedings and foreign liquidation proceedings, relates to the issue of
management and control. The practice has developed in jurisdictions such as

Bermuda which lack statutory corporate rescue rules of appointing a provisional liquidator to supervise the company's management as it affects the restructuring under supervision of the local and any relevant foreign court. Where there are parallel restructuring proceedings, the company's management will remain in place both in Bermuda and in the foreign forum. If a foreign winding-up order is made without an equivalent Bermudian order, the foreign order displaces the directors under the foreign law but does not displace them under Bermuda law. From a Bermuda regulatory perspective, it may be problematic to countenance a situation where the only persons responsible for a Bermudian company as a matter of Bermuda law are still in office yet have lost effective control of the company under the law which governs the company's entire commercial operations. This suggests that it is probably accurate to regard the approach to recognition of foreign corporate rescue proceedings generally as being more generous than the approach to foreign winding-up proceedings, to this extent. The position would likely be less problematic if Bermudian directors stayed in place under local law while in their company's principal place of business abroad their corporate powers were merely limited by the appointment of provisional liquidators appointed with 'soft' monitoring powers.

26.   The second and somewhat less concrete exception to the posited rule that no distinction ordinarily arises between recognizing foreign corporate rescue and winding-up proceedings is as follows. In resolving jurisdictional conflicts in the cross-border context generally, regard is often informally had to what the reasonable expectations of persons dealing with the company before it became insolvent must have been. However the proposition that the expectations of those dealing with the company as to what would happen in the event of insolvency is relevant in the cross-border context is explicitly articulated in Lord Hoffman's most recent exposition on this area of the law in the House of Lords decision in *McGrath and others-v-Riddell and others (Re HIH Casualty and General Insurance Co. Ltd)* [2008] UKHL 21. Here, the universalist principle was reiterated with greater force as justifying the remittal of UK assets to the Australian liquidators of HIH to be distributed under Australian insolvency rules which were different to those prevailing under English law. Although the primary focus was section 426 of the UK Insolvency Act 1986, the common law power to assist a foreign liquidation was also considered. The following observations of Lord Hoffmann are therefore highly persuasive in seeking to answer the broad question of how a Bermuda court should determine where the principal winding-up of a company should take place:

'31 In the present case I do not see that it would offend against any principle of justice for the assets to be remitted to Australia. In some cases there may be some doubt about how to determine the appropriate jurisdiction which should be regarded as the seat of the principal liquidation. I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I

do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on insolvency proceedings (Council Regulation (EC) No 1346/2000 of 29 May 2000) uses the concept of the 'centre of a debtor's main interests' as a test, with a presumption that it is the place where the registered office is situated: see article 3(1). That may be more appropriate. But in this case it does not matter because on any view, these are Australian companies. They are incorporated in Australia, their central management has been in Australia and the overwhelming majority of their assets and liabilities are situated in Australia.

32. It is true that Australian law would treat insurance creditors better and non-insurance creditors worse than English law did at the relevant time. But that seems to me no reason for saying that the Australian law offends against English principles of justice. As it happens, since the appointment of the provisional liquidators, English law has itself adopted a regime for the winding up of insurance companies which gives preference to insurance creditors: see regulation 21(2) of the Insurers (Reorganisation and Winding Up) Regulations 2004, giving effect to the European Parliament and Council Directive 2001/17/EC on the reorganisation and winding up of insurance companies. So English courts are hardly in a position to say that an exception to the pari passu rule for insurance creditors offends against basic principles of justice.

33. *Furthermore, it seems to me that the application of Australian law to the distribution of all the assets is more likely to give effect to the expectations of creditors as a whole than the distribution of some of the assets according to English law. Policy holders and other creditors dealing with an Australian insurance company are likely, so far as they think about the matter at all, to expect that in the event of insolvency their rights will be determined by Australian law. Indeed, the preference given to insurance creditors may have been seen as an advantage of a policy with an Australian company.'* (emphasis added)

27.    So when one is considering an actual winding-up of a Bermuda company's business and a distribution of assets under an insolvency regime, the reasonable expectations of the creditors as to what law would apply will be potentially relevant to this Court's decision as to whether to recognize a foreign winding-up proceeding as the sole or primary winding-up in relation to a Bermudian company, especially where materially different distribution rules apply in the respective fora. This concern would not necessarily arise in relation to a corporate rescue procedure which does not substantially engage the winding-up process and its distribution rules at all but instead merely reflects a commercial bargain assented to by the requisite statutory majorities and sanctioned by the relevant court.

*Bermuda*                                                  239

(3)  For the purposes of this section, relevant country or territory means any country or territory designated from time to time for the purposes of this section by the Minister by order made by statutory instrument.

(4)  Without prejudice to the power of the Minister to designate or revoke the designation of any country or territory for the purposes of subsection (3) of this section, including countries or territories to which this subsection applies, the countries and territories listed in the Eleventh Schedule to this Act shall be a relevant country or territory for the purposes of this section.'

9A.  A new Eleventh Schedule should be added to the Companies Act as follows:

ELEVENTH SCHEDULE (section 264A(4)

Relevant countries and territories

1.  United Kingdom.
2.  United States of America.

This recommendation is currently under active consideration by the relevant Governmental authorities. If this legislative proposal were to be implemented, the legal basis for judicial cooperation between the Bermuda and the UK and US courts, at least, would be placed on even firmer ground.

However, the Insolvency Law Reform Sub-Committee has expressed doubts about whether the UNCITRAL Model Law on Cross-Border Insolvency would work in the Bermudian context because of the way in which the COMI concept might be interpreted in the offshore domain. It is worth noting that these insightful concerns were expressed well before the *Bear Stearns* case in which the US Bankruptcy Court's refusal to recognise for Chapter 15 purposes the Cayman-appointed liquidators of a Caymanian mutual fund raised doubts about how the US version of UNCITRAL would impact on the offshore insolvency world.[28] One legislative answer might be for the COMI concept to be drafted in a way which permits appropriate weight to be given to an offshore concept of establishment, although it may plausibly be argued that the fact of incorporation alone should ordinarily suffice to give rise to an obligation to recognise a liquidation in the place of incorporation. The Bermuda court's judicial cooperation to date has, in any event, been broadly consistent with the UNCITRAL COMI principles.

---

[28]  See Chapter 19 (below). The refusal to recognise the Cayman liquidation even as an ancillary proceeding was probably based on evidential rather than legal policy grounds.

238          *Part IV – Judicial Cooperation in Cross-Border Insolvency*

## 17.7 POSSIBLE FUTURE DEVELOPMENTS

This writer has made the case for Bermuda modernising its insolvency law by implementing some of the features of the UK Insolvency Act 1986 elsewhere.[26] On the topic of cooperation with foreign representatives, the following observations were made:

> Section 426 of the 1986 U.K. Act ('Co-operation between Court's exercising jurisdiction in relation to insolvency') implements a recommendation of the Cork Committee and provides for co-operation, thus far, between the U.K. and various Commonwealth countries and dependent territories including Bermuda ... However, the limitation of section 426 to these foreign courts has been criticized ... Bearing in mind that the U.K. approach in extending the section 426 relief appears to have been unilateral, and not based on reciprocity, Bermuda should adopt a similar approach but extend its equivalent provision to a wider range of territories including, in particular the United States. Section 304 relief is consistently extended to Bermudian and U.K. liquidators and scheme administrators, and it is an embarrassment (in terms of comity) that no explicit statutory basis for reciprocal assistance to U.S. companies exists under Bermuda (or indeed U.K.) law.[27]

A Law Reform Sub-Committee on Insolvency Law Reform, Chaired by Ms Robin Mayor, has, however, in its 25 May 2005 Report recommended that provisions based on the Insolvency Act 1986, section 426 be implemented in Bermuda. The relevant recommendation provides as follows:

8.    Assistance to courts of other jurisdictions: new section 264A

'264A (1) The Court and the officers of the Court shall assist the courts having jurisdiction in relation to insolvency law of any relevant country or territory.

(2)    For the purposes of subsection (1), a request for assistance made to the Court by a court having jurisdiction in relation to insolvency law in any relevant country or territory is sufficient authority for the Court to exercise in relation to any matters specified in the request such jurisdiction as it or the court making the request could exercise with respect to comparable matters falling within its own jurisdiction; however, in exercising its discretion under this subsection the Court shall have regard in particular to the rules of private international law.

---

26    Moss et al (eds), *Cross-Frontier Insolvency of Insurance Companies* (London: Sweet & Maxwell, 2001), pp 89–95.

27    Ibid, at p 94.

## 17.8 SUMMARY

The Supreme Court has, on a regular basis in respect of insolvency cases, exercised common law discretionary powers to cooperate with foreign insolvency courts for more than 15 years. Exceptionally, this has entailed commencing an ancillary proceeding to turn over assets to the foreign insolvency court. On occasion, parallel schemes of arrangement have been implemented. Most frequently, however, cooperation has taken place in relation to restructurings with modified[29] Bermuda provisional liquidation proceedings running in parallel with the US Bankruptcy Code, Chapter 11 proceedings in the United States. On 1 October 2007, Bermuda's Commercial Court formally adopted Guidelines on Court-to-Court Communications in Cross-Border Insolvency Cases, based on the American Law Institute and International Law Institute Guidelines for NAFTA countries.

The absence of statutory frameworks for such cooperation, whether based on the older UK Insolvency Act 1986, section 426 or the modern UNCITRAL Model Law on Cross-Border Insolvency (adopted by the United Kingdom and the United States in 2006), means that the content of Bermuda law on this topic is both more uncertain and more fluid. Can judicial assistance be given by the Bermuda court to a foreign representative outside of the rubric of an ancillary proceeding? If so, what triggers the operation of Bermuda insolvency law? If the foreign court would like relief from the Supreme Court, which is not available in respect of a Bermuda insolvency proceeding, can such relief be granted? Can injunctive relief offer protection similar to an automatic insolvency stay, albeit at greater expense? These questions have yet to be answered, and it remains to be seen whether common law judicial powers or legislation will provide the primary answers.[30] But recent experience suggests that the highly internationalised nature of Bermuda's commercial environment will encourage an internationalist rather than a parochial approach to cross-border insolvency cases in the future.

---

[29] The provisional liquidators' powers have been modified so as to limit their role to one of monitoring the previous management rather than replacing them, as in the traditional provisional liquidation model.

[30] On 29 June 2009, the Bermuda Commercial Court: (a) recognised the appointment of Caymanian joing provisional liquidators of a Caymanian company; (b) ordered a stay of proceedings against the company, and (c) directed that the liquidators were empowered to deploy the statutory powers available in a Bermudian liquidation, without commencing an ancillary proceeding: *Re Founding Partners Global Fund Limited*, Commercial Court 2009: 190, judgment dated 29 July 2009.

## EXHIBIT H

**Declaration of Donald S. MacKenzie in Support of Reply Brief**

David R. Hurst
Daniel F. X. Geoghan
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas, Suite 2210
New York, New York 10020
Telephone:  212-332-8840
Facsimile:  212-332-8855

*Proposed Counsel to the Debtor-and-Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FLETCHER INTERNATIONAL, LTD., | Case No. 12-12796-REG |
| Debtor. | |
| FLETCHER INTERNATIONAL, LTD., | |
| Plaintiff, | |
| v. | |
| FLETCHER INCOME ARBITRAGE FUND IN VOLUNTARY LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey, FIA LEVERAGED FUND-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Robin Lee McMahon and Roy Bailey, AND FLETCHER FIXED INCOME ALPHA FUND, LTD-IN OFFICIAL LIQUIDATION, acting by its Joint Official Liquidators Tammy Fu and Jenna Wise, | Adv. Proceeding No. 12-01740 (REG) |
| Defendants. | |

**DECLARATION OF DONALD S. MACKENZIE IN SUPPORT**
**OF DEBTOR'S REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION, AS SUBSEQUENTLY MODIFIED TO**
**WITHDRAW THE REQUEST FOR A *MANVILLE* INJUNCTION**

I, Donald S. Mackenzie, being duly sworn, depose and state:

1.      I am the Chief Restructuring Officer of Fletcher International, Ltd., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**").

2.      I submit this declaration (the "**Declaration**") in support of the Debtor's Reply Memorandum of Law in Further Support of its Motion for Temporary Restraining Order and Preliminary Injunction, as Subsequently Modified to Withdraw the Request for a *Manville* Injunction, filed concurrently herewith.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my review of relevant documents, information provided to me or verified by other officers, consultants or the Debtor's professional advisors, including Young Conaway Stargatt & Taylor, LLP and Appleby (Bermuda) Limited, and the experience and knowledge that I have gained during my work over the last twenty-five years in the restructuring industry.  I am authorized to submit this Declaration on behalf of the Debtor and, if called upon to testify, I would testify competently to the facts set forth herein.

4.      I was appointed by the Debtor's board of directors as the Debtor's Chief Restructuring Officer (the "**CRO**") on July 14, 2012, and the agreement between the Debtor and Conway MacKenzie Management Services, LLC ("**CMS**") regarding my engagement is memorialized in an engagement letter dated as of July 15, 2012 (the "**Engagement Letter**"). The *Debtor's Motion for Entry of an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing and Approving (i) Debtor's Designation of Donald S. Mackenzie as Chief Restructuring Officer, and (ii) Retention and Employment of Conway Mackenzie Management Services, LLC, Effective as of July 15, 2012*, which motion seeks approval of my retention by the Court, was transmitted to the Office of the United States Trustee (the "**U.S.**

2

Trustee") on July 21, 2012, and will be submitted to the Court as soon as possible, after being

revised in accordance with comments received from the U.S. Trustee.

5.      The primary purpose of my Declaration is to provide a description of the

substantial burdens that the Debtor's management is facing and will continue to face for the next

ninety days and beyond during the pendency of the Debtor's chapter 11 case.

**The Burdens Being Faced by the Debtor's Management**

6.      The Debtor has no employees, but rather employs two consultants who

work for the Debtor on a part-time basis: Stewart Turner and Stu MacGregor.  The Debtor also

has two directors who also serve as officers: Floyd Saunders (Director and President) and Teddy

Stewart (Director and Vice President).  These directors and officers do not have day-to-day

responsibilities to the Debtor.

7.      Upon information and belief the Debtor has received services pursuant to

an investment management agreement with Fletcher Asset Management ("**FAM**"), and an

administrative services agreement with SS&C Technologies Inc. ("**SS&C**").  Post-petition the

Debtor continues to receive limited services from FAM related to certain litigation matters.  The

Debtor has requested the SS&C begin providing certain financial reporting services again.

8.      Finally, as noted above, I was appointed by the Debtor's board of directors

as the Debtor's CRO on July 14, 2012.  Although I will be the principal professional staffed by

CMS on the engagement, I will be assisted by staff of CMS on an as-need basis (the

"**Temporary Staff**").  While the Temporary Staff obviously will be of great help to me, I and the

Temporary Staff nonetheless must rely on Mr. Turner and Mr. MacGregor for a great deal of

necessary work product and information regarding the Debtor.

9.      Part A through C of this Declaration details the prepetition duties of Mr. Turner and Mr. MacGregor, along with the additional duties that they have assumed as a consequence of the chapter 11 filing and Part D details the work that these individuals will be asked to begin to accomplish in the next ninety days and beyond.

A.      **Mr. MacGregor's Prepetition Duties**

10.     Prior to the filing of the Debtor's chapter 11 case, Mr. MacGregor spent approximately 70% of his time each week working on matters for the Debtor and its subsidiary, Aesop.  In general, Mr. MacGregor acts as the Debtor's in house accountant responsible for all accounting-related matters.  His specific duties include, among other things:

a.      Preparing and maintaining all financial statements, including balance sheets, income statements and profit and loss statements;

b.      Preparing and maintaining the general ledger, including all data input;

c.      Managing all cash-related matters, including reconciliation, accrued expense allocation, preparation and review of cash activity and processing reports;

d.      Managing all periodic ledger account closings;

e.      Importing trade data and information into the accounting systems and general ledger, and reconciling such data;

f.      Analyzing trading activities and intercompany activities to determine proper allocation of investments and equity, and importing such information into general ledger accounts for reconciliation;

g.      Analyzing asset valuations, including analyzing market valuation information from outside valuation firms, converting such information into numeric values, reconciling and inputting such data into valuation reports and trading systems, and subsequently transferring such data to profit and loss statements and the general ledger; and

h.      Responding to frequent information requests from the liquidators for Fletcher Income Arbitrage Fund ("**Arbitrage**"), FIA Leveraged Fund ("**Leveraged**") and Fletcher Fixed Income Alpha Fund ("**Alpha**").

### B.    Mr. Turner's Pre-Petition Duties

11.    Prior to the chapter 11 filing, Mr. Turner, like Mr. MacGregor, spent approximately 70% of his time working for the Debtor as a consultant.[1]  In this capacity, Mr. Turner provided a wide range of financially-related services for the Debtor including, among other things:

a.    Managing and coordinating most investment-related activities, including seeking new investment opportunities in public and private companies, conducting due diligence regarding potential investments, and preparing reports and memoranda supporting or discrediting proposed transactions;

b.    Managing and reviewing the Debtor's investment portfolio, including managing overall hedging strategies and trading activities related thereto;

c.    Coordinating with outside valuation analysts to prepare and evaluate models for valuation of warrants and other nonstandard complex investments;

d.    Assisting Mr. MacGregor, SS&C and others in connection with collection and compilation of information necessary for the preparation of financial statements and the general ledger;

e.    Reviewing financial statements, cash reconciliations and investor statements;

f.    Developing investor presentation materials and communicating with investors and their consultants regarding their investments;

g.    Serving as the primary point of contact with all administrative service organizations, including SS&C and Appleby Services (Bermuda) Ltd., the Debtor's corporate secretary;

h.    Serving as the primary point of contact with respect to the Debtor's prime broker accounts and all bank accounts;

i.    Serving as the primary point of contact with respect to the Debtor's material legal actions; and

---

[1]    Although Mr. Turner resigned as an officer and director of the Debtor on July 15, 2012, he continues to provide services to the Debtor pursuant to a prepetition consulting agreement.

5

      j.      Responding to frequent information requests from the liquidators for Arbitrage, Leveraged and Alpha.

**C.**      **Additional Duties Assumed Since the Bankruptcy Filing**

12.      Between the time of the chapter 11 filing and the date that the CRO was appointed, Mr. MacGregor and Mr. Turner acted as the sole workforce of the Debtor, working tirelessly to stabilize the Debtor while assuming a host of new duties and responsibilities. Indeed, although the chapter 11 filing has reduced the need for certain work performed by Mr. Turner and Mr. MacGregor historically, these individuals now are being asked to spend more than 90% of their time working for the Debtor to meet the multitude of demands being imposed on them.

13.      In particular, since the chapter 11 filing, Mr. Turner and Mr. MacGregor have been asked to assume the following duties and responsibilities, among others:

      a.      Assisting counsel and Mr. Saunders, the Debtor's President, in gathering the information necessary for the Declaration of Floyd Saunders Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (Docket No. 2);

      b.      Assisting counsel and the CRO in identifying assets, bank accounts and custodial accounts;

      c.      Opening a new debtor-in-possession bank account and custodial accounts;

      d.      Negotiating with the Debtor's prepetition banks and prime broker account holder regarding the transfer of assets in the prepetition accounts to new debtor-in-possession accounts;

      e.      Assisting counsel in the investigation and analysis of certain of the Debtor's prepetition obligations and transactions;

      f.      Assisting counsel in identifying professionals to be retained, including the CRO and other professionals necessary to prosecute certain litigation actions that are valuable assets of Debtor's bankruptcy estate;

      g.      Preparing to respond to discovery requests in connection with the pending preliminary injunction litigation;

h.   Participating on frequent telephone calls with the Debtor's board of directors, CRO and counsel;

i.   Preparing for and participating in the initial Debtor interview conducted by the U.S. Trustee; and

j.   Responding to information requests by the U.S. Trustee, the CRO and counsel.

**D.   Additional Duties to be Assumed in the Next Ninety Days**

14.   In addition to their pre-petition duties and their new chapter 11 duties assumed since the filing—many of which will be ongoing—I will require the focused attention of Mr. Turner and Mr. MacGregor over the next ninety days (and beyond) to assist me and the CMS team to stabilize the Debtor and its business, to understand and analyze the Debtor and its assets and liabilities, to ensure that the Debtor is complying with the various requirements of the chapter 11 process, and to begin to formulate a reorganization strategy.

15.   More particularly, in the next ninety days, I will need Mr. Turner and Mr. MacGregor to assist me with the following tasks, among others:

a.   Conducting general due diligence regarding the Debtor's operations and investments;

b.   Analyzing various of the Debtor's historical transactions;

c.   Analyzing the Debtor's assets, including, without limitation, the value, marketability and other features of the Debtor's securities holdings and claims that are being or may be asserted through litigation;

d.   Analyzing the Debtor's liabilities, including claims, if any, that may be asserted by creditors and shareholders against the Debtor;

e.   Understanding any deadlines applicable to the Debtor's complex investments to avoid the unintended expiration of exercise rights;

f.   Developing a debtor-in-possession thirteen-week rolling budget;

g.   Understanding the operation of the cash management system to the extent that it exists, and implementing one to the extent that no such system exists;

  h.  Completing the Debtor's schedules of assets and liabilities and the statement of financial affairs;

  i.  Preparing monthly operating reports;

  j.  Developing a case strategy, and evaluating alternative plans and modes of implementation; and

  k.  Responding to various information requests, demands and administrative items.

  16.  In short, there is a tremendous amount or work to be done and few people to accomplish such work.  I believe that both Mr. Turner and Mr. MacGregor will be fully occupied with the above-described responsibilities and duties for the first ninety days of this case, and probably for a significantly more lengthy time.  As such, I believe that if the Debtor is forced to defend a winding up petition in Bermuda, which necessarily will require a significant time commitment from both Mr. Turner and Mr. MacGregor, the ability of Mr. Turner and Mr. MacGregor to focus their attention on restructuring-related tasks will be impaired—and consequently the Debtor's chapter 11 restructuring will be harmed, perhaps irreparably.

  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
   July 24, 2012


       By:   /s/ Donald S. Mackenzie
           Donald S. Mackenzie
           Chief Restructuring Officer

# <u>EXHIBIT I</u>

**June 22, 2012, Order of the Bermuda Court**

# IN THE SUPREME COURT OF BERMUDA

## (COMMERCIAL COURT)

### COMPANIES (WINDING UP)
### No.197 of 2012

### IN THE MATTER OF FLETCHER INTERNATIONAL LTD ("the Company")

### AND IN THE MATTER OF THE COMPANIES ACT 1981

BETWEEN

FIA LEVERAGED FUND LTD. (in liquidation)

Petitioner

and

FLETCHER INTERNATIONAL LTD.

Respondent

---

## ORDER

---

UPON THE HEARING of the Petition and the Respondent's Summons filed on 19 June 2012 to strike out specified parts of the Petition

AND UPON HEARING Counsel for the Petitioner, the Respondent and FLETCHER FIXED INCOME ALPHA FUND LIMITED (In Voluntary Liquidation) ("Alpha"), a supporting creditor

IT IS HEREBY ORDERED as follows:

1. That the Petition be adjourned to 31 August 2012 at 9:30 a.m. for mention;

2. That the Petitioner have 7 days to file and serve further affidavit evidence in support of the Petition;

3. That the Respondent have 14 days from the date of service of the Petitioner's evidence to file and serve affidavit evidence in response;

4.  That the Petitioner have 14 days from the date of service of the Respondent's evidence to file affidavit evidence in reply;

5.  That the parties seek to agree a date for the hearing of the Respondent's strike out summons to take place following the filing of the Petitioner's evidence in paragraph 4. above.

6.  That the Respondent have 14 days from the date of service of the Petitioner's evidence in reply to file and serve the evidence of an expert on New York law in respect of the Promissory Note underlying the Petitioner's insolvency claim;

7.  That the Petitioner be at liberty to file an affidavit of an expert in reply to the Respondent's expert evidence within 14 days;

8.  That Alpha have 21 days from the date of this Order to file an affidavit in support of the Petition, if so advised;

9.  There be liberty to apply;

10.  The costs of the petition be in the petition;

11.  The costs of the strike out application be in the application.

DATED the 22nd day of June 2012.

_____
Chief Justice

### IN THE SUPREME COURT OF BERMUDA
### (COMMERCIAL COURT)
### CIVIL JURISIDICTION
### No. 197 of 2012

**IN   THE   MATTER   OF   FLETCHER INTERNATIONAL LTD**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**ORDER**

---



**COX HALLETT WILKINSON**
*Attorneys for the Petitioner*
Cumberland Place
1 Victoria Street
Hamilton HM 11
Bermuda

SUPREME COURT BERMUDA
2012 JUN 25 AM 11:53